**PETER D. LEPISCOPO, ESQ.  C.S.B.  #139583**
LEPISCOPO & ASSOCIATES LAW FIRM
23 Corporate Plaza Drive, Suite 150
Newport Beach, California 92660
Telephone: (619) 251-2428; Facsimile: (619) 330-2991
Email: plepiscopo@att.net
Counsel of Record for Plaintiff, **SYLABS, INC.**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| **SYLABS, INC.**, a Delaware corporation, | Case No. _____ |
| Plaintiff, | **SYLABS, INC.'S COMPLAINT FOR:** |
| v. | (1) Violation of Defend Trade Secrets Act; |
| | (2) Violation of Computer Fraud and Abuse Act; |
| **GREGORY ROSE** a/k/a **GREGORY M. KURTZER**; **JULIA ROSE** a/k/a **JULIA KURTZER**; **ROBERT ADOLPH**; **MATTHEW HAYDEN**; **ERIN FONG**; **CTRL IQ, INC.** d/b/a **CIQ**; **OPEN DRIVES, INC.**; **DAVID BUSS**; **MARLIN PRAGER**; **JOEL  WHITLEY**; **IAG CAPITAL PARTNERS**; and **DOES 1** through **50**, inclusive, | (3) Violation of California Uniform Trade Secrets Act; |
| | (4) Violation of Civil RICO, 18 U.S.C. § 1962(c); |
| | (5) Violation Civil RICO, 18 U.S.C. § 1962(d); |
| | (6) Civil Conspiracy; |
| | (7) Violation of California Unfair Trade Practices Act, Cal. Bus & Prof. Code § 17200; |
| | (8) Breach of Fiduciary Duty; |
| | (9) Aiding & Abetting Breach of Fiduciary Duty; |
| Defendants. | (10) Unjust Enrichment; |
| | (11) Conversion. |
| | **DEMAND FOR TRIAL BY JURY** |

## I.
## JURISDICTION AND VENUE

1.     This Court has subject-matter jurisdiction of this case ("Action") under 28 U.S.C. §§ 1331 and 1338: it is a civil action arising under the laws of the United States –

specifically 18 U.S.C. § 1831 *et seq.*, 18 U.S.C. § 1836(b), 18 U.S.C. § 1030, 18 U.S.C. § 1839, 18 U.S.C. § 1962(c), and 18 U.S.C. § 1962(d).

2.     This Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.

3.     This Court further has jurisdiction over this Action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and an amount in controversy in excess of $75,000.

4.     Personal jurisdiction exists specifically over all the defendants because they have each committed acts of misappropriation in this District and the State of California, because they each directly and/or through their officers, directors, investors and their employees, subsidiaries, divisions, groups, or distributors, advertised, marketed, used, offered for sale, imported for sale, and/or sold and continued to sell the products at issue in this Action containing the stolen and misappropriated technology in this District and the State of California, and placed those products in the stream of commerce with the expectation and knowledge that they will be purchased in this District and the State of California. Further, the defendants' theft and misappropriations involved certain trade secrets that were invented in, stored in, or accessed from this District and the State of California. As such, defendants have conspired to and committed violations of various California and federal laws and tortious acts in this District and the State of California; have expressly aimed their actions at this District and the State of California with the knowledge that they would cause harm and substantial injury to Sylabs in the District and the State of California; and Sylabs' claims relate to defendants' products and services containing and/or utilizing trade secrets ("Trade Secrets") and intellectual property ("IP") stolen and misappropriated from Sylabs and advertised, marketed, used, offered for sale, imported, and/or sold in this District and in the State of California.

5.     Venue is proper in this district ("District") because Defendants committed the complained of acts in this District and are located, reside, are officers and/or directors of other defendants, or do business in this District. 12 U.S.C. § 5564(f).

## II.
## INTRODUCTION

6.     The theft of intellectual property has become a matter of national concern, which has been addressed through federal legislation. For example, in a rare show of solidarity, in 2016 the Defend Trade Secrets Act of 2016 ("DTSA") passed both houses of Congress with remarkable 87-0 approval in the Senate and 410-2 approval in the House. Studies cited placed the cost to the U.S. economy from theft and misappropriation of intellectual property at somewhere between $300 and $480 billion annually, a Senate Judiciary Committee Report noted that the DTSA would benefit trade secret owners by allowing them to bring misappropriation suits in federal court. Recognizing the danger that a trade secret may lose its value once stolen, disclosed, or misappropriated, the Committee also emphasized that the DTSA's *ex parte* seizure provision is an "important remedy" because it "enables a trade secret owner under limited, controlled conditions, to proactively contain a theft before it progresses and the trade secret is lost."[1]

7.     Sylabs, Inc. ("Sylabs") brings this action under the DTSA, 18 U.S.C. § 1831 *et seq*., the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, the civil provisions of the Racketeer Influenced and Corrupt Organizations Act, Patent Infringement, 18 U.S.C. § 1962, Civil Conspiracy, Violation of California Unfair Trade Practices Act, Cal. Bus & Prof. Code § 17200, Breach of Fiduciary Duty, Aiding & Abetting Breach of Fiduciary Duty, Unjust Enrichment, and Conversion against defendants Gregory Rose a/k/a Gregory M. Kurtzer, Julia Rose a/k/a Julia Kurtzer, Robert Adolph, Matthew Hayden, Erin Fong, CTRL IQ, Inc. d/b/a CIQ, Open Drives, Inc., David Buss, Marlin Prager, Joel Whitley, IAG Capital Partners, and Does 1-50 (collectively "Defendants").

---

[1]     Report of the U.S. Senate's Committee on the Judiciary, S. Rep. 114-220, at 3 (March 7, 2016).

LEPISCOPO & ASSOCIATES LAW FIRM

8.    As will be alleged in greater detail below, the general nature of Sylabs' claims relates to Defendants' cyber theft and misappropriation of Sylabs' Trade Secrets and IP, cyber theft of Sylabs' corporate secrets, cyber theft, misappropriation, and unlawful use of privileged/protected documents, unfair trade practices, and other tortious conduct.

9.    As will be alleged in greater detail below, Sylabs' IP relates to high-performance computing—an industry with over $39 billion in annual revenues worldwide, which is expected to grow to over $74 billion by 2030.[2]

### III.
### PLAINTIFF

10.    Sylabs, Inc., is a Delaware corporation with its headquarters located in Reno, Nevada.

### IV.
### DEFENDANTS

### DEFENDANTS CIQ, GREG KURTZER, JULIE KURTZER, ADOLPH, HAYDEN, AND FONG

11.    Defendant, Gregory Rose a/k/a Gregory M. Kurtzer ("Greg Kurtzer"), is an individual and resident of the State of California.

12.    Defendant, Julia Rose a/k/a Julia Kurtzer ("Julia Kurtzer"), is an individual and resident of the State of California and is defendant Greg Kurtzer's wife.

14.    Greg and Julia Kurtzer reside in this District and the acts complained of herein were committed by them and damages suffered by Sylabs occurred in this District.

15.    Defendant, Robert Adolph ("Adolph"), is an individual and resident of the State of California.

16.    Adolph resides in this District and the acts complained of herein were committed by him and damages suffered by Sylabs occurred in this District.

---

[2]    *See e.g.*:    https://www.bloomberg.com/press-releases/2022-07-21/high-performance-computing-market-size-to-surpass-74-101-million-by-2030-says-p-s-intelligence.

LEPISCOPO & ASSOCIATES LAW FIRM

17.     Defendant, Matthew Hayden ("Hayden"), is an individual and resident of the State of California.

18.     Hayden resides in this District and the acts complained of herein were committed by him and damages suffered by Sylabs occurred in this District.

19.     Defendant, Erin Fong ("Fong"), is an individual and resident of the State of California.

20.     Fong resides in this District and the acts complained of herein were committed by her and damages suffered by Sylabs occurred in this District.

21.     Defendant, CTRL IQ, Inc. dba CIQ ("CIQ"), is a Delaware corporation, which is registered and qualified to do business in California, with its principal address located in this District at 1191 Solano Avenue, Unit 6687, Albany, California 94706.

22.     Throughout this Complaint Greg Kurtzer, Julia Kurtzer, Adolph, Hayden, and Fong may be referred to collectively as "CIQ Defendants."

### DEFENDANTS OPEN DRIVES, BUSS, AND PRAGER

23.     Defendant, Open Drives, Inc. ("Open Drives"), is a Delaware corporation with its principal address located at 10602 Virginia Avenue, Culver City, California 90232.

24.     Defendant, David Buss ("Buss"), is an individual and resident of the State of California.

25.     Defendant, Marlin Prager ("Prager"), is an individual and resident of the State of California.

26.     Throughout this Complaint Open Drives, Buss, and Prager may be referred to collectively as "Open Drives Defendants."

### DEFENDANTS IAG AND WHITLEY

27.     IAG Capital Partners ("IAG") is a business entity, form unknown and place of formation unknown, and is engaged in business in this District and state of California.

28.     Defendant, Joel Whitley ("Whitley"), is an individual and resident of the State of California.

29.     Throughout this Complaint IAG and Whitley may be referred to collectively as "IAG Defendants."

## CO-CONSPIRATORS GREG KURTZER, JULIA KURTZER, ADOLPH, HAYDEN, FONG, BUSS, PRAGER, WHITLEY, CIQ, OPEN DRIVES, AND IAG

30.     During all relevant timeframes herein alleged, Co-Conspirator Greg Kurtzer is currently a founder and director of CIQ and CIQ's chief executive officer, chief financial officer, and secretary, and was Sylabs' former chief executive officer and member of the board of directors of Sylabs. During and after the time he held that position of trust with Sylabs and while he was employed by CIQ, he conspired with other defendants to engage in cyber theft and misappropriation of Sylabs' Trade Secrets and IP; cyber theft of Sylabs' corporate secrets; cyber theft and misappropriation; unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

31.     During all relevant timeframes herein alleged, Co-Conspirator Julia Kurtzer was a Sylabs' trusted advisor. During and after the time she held that position of trust with Sylabs, she conspired with other defendants to engage in cyber theft and misappropriation of Sylabs' Trade Secrets, cyber theft of Sylabs' corporate secrets; cyber theft and misappropriation; unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

32.     During all relevant timeframes herein alleged, Co-Conspirator Adolph is currently a founder of CIQ and CIQ's chief product officer and was a Sylabs' trusted advisor. During and after the time he held that position of trust with Sylabs and while he was employed by CIQ, he conspired with other defendants to engage in cyber theft and misappropriation of Sylabs' Trade Secrets; cyber theft of Sylabs' corporate secrets; cyber theft and misappropriation; unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

33.     During all relevant timeframes herein alleged, Co-Conspirator Hayden is currently CIQ's customer advocate and was Sylabs' project coordinator, which is a trusted

LEPISCOPO & ASSOCIATES LAW FIRM

position due to the fact that he had access to all of Sylabs' technologies that were under development and other corporate secrets. During and after the time he held that position of trust with Sylabs and while he was employed by CIQ, he conspired with other defendants to engage in cyber theft and misappropriation of Sylabs' Trade Secrets; cyber theft of Sylabs' corporate secrets; cyber theft, misappropriation, and unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

34.     During all relevant timeframes herein alleged, Co-Conspirator Fong is currently CIQ's operations manager and was Sylabs' controller and handled marketing, which is a trusted position due to the fact that she had access to all of Sylabs' technologies that were under development, marketing strategies and plans, and other corporate secrets. During and after the time she held that position of trust with Sylabs and while she was employed by CIQ, she conspired with other defendants to engage in cyber theft and misappropriation of Sylabs' Trade Secrets; cyber theft of Sylabs' corporate secrets; cyber theft, misappropriation, and unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

35.     During all relevant timeframes herein alleged, Co-Conspirator Buss is a director of defendant Open Drives and Open Drives' chief executive officer and secretary and while he was employed by Open Drives, he conspired with other defendants to engage in cyber theft and misappropriation of Sylabs' Trade Secrets; cyber theft of Sylabs' corporate secrets; cyber theft, misappropriation, and unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

36.     During all relevant timeframes herein alleged, Co-Conspirator Prager is a director of Open Drives and Open Drives' chief financial officer and while he was employed by Open Drives, he conspired with other defendants to engage in cyber theft and misappropriation of Sylabs' Trade Secrets; cyber theft of Sylabs' corporate secrets; cyber theft, misappropriation, and unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

37.    During all relevant timeframes herein alleged, Co-Conspirator Whitley is a principal of IAG and while he was employed by IAG, he conspired with other defendants to engage in cyber theft and misappropriation of Sylabs' Trade Secrets; cyber theft of Sylabs' corporate secrets; cyber theft, misappropriation, and unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

38.    During all relevant timeframes herein alleged, IAG and Open Drives invested in CIQ and, therefore, were aware of, ratified, and benefited from Defendants' conspiracy through their cyber theft and misappropriation of Sylabs' Trade Secrets; cyber theft of Sylabs' corporate secrets; cyber theft, misappropriation, and unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

39.    The main object of the foregoing conspiracy ("Conspiracy") was to steal Sylabs' Trade Secrets and IP, technologies, and customers for the express purpose of enriching defendants Open Drives, IAG, and Co-Conspirators and to eliminate Sylabs as a competitor in the high-performance computing industry marketplace.

## DOE DEFENDANTS

40.    Many facets of the conspiracy described herein likely remain unknown, and the complete list of Defendants and/or Co-Conspirators likely extends beyond the individuals and entities identified here. At present, Sylabs is ignorant of the true names and capacities of such individuals and entities and, therefore, sues them herein under the fictitious names Does 1-50. Sylabs will amend this Complaint to identify and state applicable claims, as appropriate, against additional individuals or entities as relevant information becomes available through discovery.

41.    Each of the Defendants and/or Co-Conspirators referenced in this Complaint was an agent, conspirator, aider, or abettor of the Defendants. The acts and omissions of each alleged Defendant and/or Co-Conspirator were performed within the course and scope of that agency, conspiracy, aiding or abetting. At all relevant times, Defendants and/or Co-Conspirators were each acting in concert with one or more of their Co-Conspirators pursuant to a common scheme, course of action, enterprise, or conspiracy.

LEPISCOPO & ASSOCIATES LAW FIRM

42.    As used in this Complaint, the term "Co-Conspirators" refers collectively to the Defendants, Co-Conspirator Greg Kurtzer, Co-Conspirator Julia Kurtzer, Co-Conspirator Buss, Co-Conspirator Prager, Co-Conspirator Adolph, Co-Conspirator Hayden, Co-Conspirator Fong, Co-Conspirator Whitley, and the DOE defendants.

## V.
## HISTORY AND BACKGROUND OF SYLABS AND ITS TRADE SECRETS

### General Description of Sylabs' Trade Secrets

43.    In 2018, Sylabs commenced development of technologies for the high-performance computing industry ("HPC"), which is a technology that harnesses the power of supercomputers or computer clusters to solve complex problems requiring massive computation.[3]

44.    Stated generally, HPC refers to the computer science architecture of aggregating computing power in a way that delivers much higher performance than could be obtained from a typical desktop computer or workstation in order to solve large problems in, for example, science, engineering, medicine, or business.

45.    Below, Figure 1 depicts the general architecture of a supercomputer.



**FIGURE 1**: General Architecture of Typical Supercomputer[4]

---

[3]    *See generally*: https://www.ibm.com/topics/hpc.

[4]    Yan, Beichuan, Ph.D., *See*:    https://www.researchgate.net/figure/Schematic-of-typical-architecture-of-a-modern-supercomputer_fig1_328946498.

46.    Drilling down, HPC is accomplished through structuring small to medium, but powerful, computers that are harmonized to operate as one supercomputer. Each separate computer is termed a "node." Groups of computers are termed "clusters."

47.    Supercomputers operate under the principle of parallel processing, which means that there is more than one computer working simultaneously on different operations. So, for example, if a single computer were used to do a complicated data analysis and that process took 1 hour through performing the calculations and analysis serially—*i.e.*, each calculation occurs one-by-one, with the previous calculation then being used by the next operation to perform the next calculation, then the next operation performs data analysis, for example, and so on. By employing 10 nodes (*see* Figure 1), each of which does separate operations simultaneously, each of which takes 1/10 of the time required to complete the entire serial process, the time needed to complete the entire process is drastically reduced. Thus, instead of performing the calculations and analysis serially over 60 minutes, by using parallel processing the same set of operations would take a mere 6 minutes. Although this is a simple example, the benefits of parallel processing are immediately perceivable.

48.    For example, when hurricane season arrives the National Hurricane Center at the National Oceanic and Atmospheric Administration ("NOAA") employs their supercomputers to simultaneously model the trajectories of several hurricanes. [5]

49.    Of course, in the absence of parallel processing through supercomputers, such modeling would be impossible.

50.    Moving from the foregoing general discussion to the specifics of this Action, the following is a general summary of how Sylabs' value-added technologies operate within supercomputer architecture. Keeping Figure 1 in mind, Sylabs' SingularityPRO (discussed below) is installed on each node of a supercomputer.

---

[5]    *See* National Hurricane Center at NOAA:
https://www.nhc.noaa.gov/gtwo.php?basin=atlc&fdays=2

LEPISCOPO & ASSOCIATES LAW FIRM

51.    Sylabs' SIF container technology (alleged below), which serves as a container for computer applications, would be placed in the shared disk space of the supercomputer. The applications contained within the SIF container would be both secure through encryption and portable due to Sylabs' SIF technology.

52.    Sylabs' Singularity Enterprise (alleged below) is an advanced, value-added technology that equips the users with the ability to build, share, and store SIF containers outside of the cluster, *i.e.*, on other supercomputers or the cloud, regardless of their locations.

53.    Fuzzball is Sylabs' value-added technology that works with Singularity to manage and schedule jobs to execute on one or more nodes and manage locality of data sets by selecting the correct node(s) and cluster(s).

54.    Making data security a high priority, Sylabs' SIF container technology is transformed into an advanced, high security format termed "Armored Containers."

55.    Sylabs' Trade Secrets are an instrumental part of the HPC industry, as will be alleged below. However,  before describing Sylabs' Trade Secrets, another strategy employed by the high-tech industry needs to be alleged before the value-added technology of Sylabs will be appreciated, to wit: open-source software ("open-source"):

> "Open source software (OSS) is software that is distributed with its source code, making it available for use, modification, and distribution with its original rights. Source code is the part of software that most computer users don't ever see; it's the code computer programmers manipulate to control how a program or application behaves. Programmers who have access to source code can change a program by adding to it, changing it, or fixing parts of it that aren't working properly. OSS typically includes a license that allows programmers to modify the software to best fit their needs and control how the software can be distributed." [6]

56.    This led to the open-source software known as "Singularity," which was created at Lawrence Berkley National Laboratory in 2016 to fill a gap in the performance of supercomputers in the HPC industry. Singularity was created to run complex

---

[6]    *See:* https://www.synopsys.com/glossary/what-is-open-source-software.html#.

LEPISCOPO & ASSOCIATES LAW FIRM

applications on HPC clusters in a simple, portable, and reproducible way. It quickly became popular at other HPC sites, academic sites, and beyond. Singularity is an open-source project, with a friendly community of developers and users.

57.    In addition, Singularity equips engineers and scientists with a tool to create and run rudimentary containers that package up pieces of software in a way that is portable and reproducible.

58.    Users can build a container using Singularity on a laptop, and then run it on many of the largest supercomputer clusters in the world, local university or company clusters, a single server, in the Cloud, or on a workstation down the hall. A container is a single computer file, which removes the worry about how to install all the software a user needs on each different operating system and system that a user might need to use—it makes the software created portable. However, the open-source Singularity had very limited capabilities, which is the point in time that Sylabs entered the HPC market.

59.    Sylabs was founded in order to invent and market value-added technology for Singularity in the HPC industry. Although Singularity is open-source, the value-added technology that Sylabs has created and added and continues to create and add to Singularity constitutes its Trade Secrets and IP. Thus, in 2018 the first value-added technology Sylabs developed was "SingularityPRO."

### Sylabs' SingularityPRO

60.    SingularityPRO is Sylabs' high-performance container technology specifically designed to enhance enterprise performance computing by building containers that support HPC, analytics, artificial intelligence, machine learning, and deep learning to provide "intelligence anywhere."

61.    SingularityPRO is differentiated from the Singularity open-source version by the inclusion of several plugins to augment capabilities, as well as a software bill of materials to address software supply chain security.

62.    Initially, it is important to note that the terms "Singularity Community" and "SingularityCE" refer to a basic, open-source Singularity platform released in 2016 that is

the basis for a multitude of higher-level applications specifically designed to operate in the HPC technology space. This includes the valued-added technologies developed and invented by Sylabs, all of which constitute its Trade Secrets and IP.

63.    It is important to understand that the transformation process of making an open-source piece of technology better through the addition of code, expansion of capabilities or functionality, support services, or other technologies constitutes trade secrets and intellectual property. Therefore, when Sylabs adds to Singularity to create, for example, SingularityPRO, such transformation constitutes Sylabs' Trade Secrets and IP.

64.    Sylabs has monetized SingularityPRO by licensing it to end-user with varying levels of support available, which is provided directly through Sylabs' team of experts. It is sold on a per-node basis or with pricing to suit unique scenarios.

65.    Whereas the open-source version of Singularity—called Community—is subject to rolling code changes from the open-source community at large, SingularityPRO is curated and supported by Sylabs. Specifically, SingularityPRO is designed to provide support, professional services, and value-added tooling for container runtime that has become predominant in high performance computing, which includes supercomputing, exascale computing (super high speed computing—1,000 times faster than most supercomputers), and in general batch-oriented   container workflows. Thus, SingularityPRO is for advanced users who require professional support of their HPC container workflow environments.

66.    Essentially, SingularityPRO provides five major value-added technology features: enterprise grade support; backporting of security and bug fixes; packaged binaries for easy deployment and upgrades; influence on feature development and timelines; and extra functionality via PRO plugins, also invented, developed, and designed by Sylabs.

67.    To further clarify the distinction between open-source components of SingularityCE with Sylabs' value-added technology in SingularityPRO, below in Figure 2 the features of SingularityCE are placed in juxtaposition with Sylabs' SingularityPRO in

LEPISCOPO & ASSOCIATES LAW FIRM

order to identify the value-added technologies that form the basis of Sylabs' Trade Secrets an IP.



**FIGURE 2: Value-Added Technology of SingularityPRO**

68.    Sylabs' technologies have raised the bar for container platforms throughout the HPC industry. SingularityPRO running on HPC platforms leverages the power of Artificial Intelligence ("AI"), machine learning, and deep learning to deliver unique

LEPISCOPO & ASSOCIATES LAW FIRM

enterprise-level services. SingularityPRO's advanced ecosystem of resources not only extends the overall value of the platform but also extends its ease of use and security.

## Sylabs' Singularity Image File Technology

69.     In 2018, Sylabs commenced research, design, and development to invent a more efficient and secure file format for use in the HPC industry.

70.     Sylabs' strategy was to invent container technologies for data-intensive workloads, or what is characterized as Enterprise Performance Computing ("EPC").

71.     Sylabs' invention strategy was and is to support and facilitate the private, public, academic, government, and military sectors to leverage more data to support and grow their enterprises and activities. This necessarily led to the need for these enterprises to properly containerize and support workflows related to artificial intelligence, machine/deep learning, and advanced analytics.

72.     In order to provide the efficiency, security, and functionality that the HPC market required, Sylabs invented Singularity Image Format ("SIF") to create a digital container that holds pieces of software in a structured format that allows the programs to be portable and reproducible, as well as being secured through encryption. This is especially important for the development, creation, and sharing of intellectual property in collaborative environments or ones subject to higher levels of security classifications (e.g., military, National Security Agency, etc.).

73.     For example, if a scientist wanted to design a complex weather analysis program to predict the direction of tropical storms in real time but wanted to keep it secure on a laptop before patenting and releasing it, Sylabs' SIF format would be utilized to hold all program information. Once created, the SIF container would be created and encrypted for ease of transport and use by, for example, NOAA's supercomputers.

74.     Generally, the architecture of Sylabs' SIF format is represented below in Figure 3.



**FIGURE 3: Sylabs' Singularity Image File Technology**

75.     On June 7, 2019, Sylabs filed its patent application with the U.S. Patent and Trademark Office ("USPTO") to patent Sylabs' SIF technology ("SIF Patent Application"), which was assigned Application No. 16/435,251.

76.     On January 5, 2023, the USPTO issued a Notice of Allowance of the SIF Patent. The owner of the SIF Patent is Sylabs, and the inventor is Yannick Cote, a former Sylabs employee.

77.     It is dispositive as to Defendants' theft of Sylabs' Trade Secrets that Sylabs' SIF technology serves as the *sine qua non* technology for all the Trade Secrets stolen by Defendants, including the patents they fraudulently procured from the USPTO.

**Sylabs' Singularity Enterprise**

78.     The next generation of Sylabs' value-added technology is known as "Singularity Enterprise."

79.     Simply put, Singularity Enterprise is a set of three services to support Sylabs' SIF container workflows. First, it is a remote builder utilized to build containers of varying architectures. Second, it has a container library to store, pull, and share SIF containers. Finally, it has a key management for SIF container authentication.

80.   As a natural progression in the development of its technology, Sylabs developed and designed "Sylabs' Container Library" and "Sylabs' Cloud Services."

81.   Fundamentally, the architecture of the Sylabs' Cloud Services and Container Library is set forth below in Figure 4.



**FIGURE 4**: **Architecture of Sylabs' Container Library and Cloud Services**

82.   Singularity Enterprise contains the full-featured Sylabs' Container Library, which can be hosted on-premises in a customer's data center or Sylabs' Cloud Services. Users can upload, download, search, and browse for containers in public and private areas, as well as share private containers with other users or via a generated link. Security and privacy in the Container Library are based on a user-owner model of library objects, and the concept of public or private collections.

83.   Users can utilize Singularity Enterprise to manage and store their applications in a format that is secure but also easily accessible and transportable, as will

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

be alleged below in greater detail. The following is a general summary of each of the main components of Sylabs' value-added technology provided by Singularity Enterprise.

84.    Singularity Enterprise's Remote Builder Services resides in Sylabs' Cloud Services. This value-added technology equips users to build containers in Sylabs' SIF format with architecture independence and integration, without requiring privileged access on the host system and unsupported kernel features. The resulting SIF files created can be cryptographically signed, and subsequently have their authenticity and integrity verified whenever and wherever they are used—this type of portability of applications is extremely beneficial to users.

85.    Singularity Enterprise's Container Library Services offers a repository to host Sylabs' SIF containers. Users can manage, store, and share containers in public and private directories, or share private containers with other users via a link generated through the Container Library Services. Available as a cloud service, or for on-premises deployment, the Container Library Services optimizes the management and storage of containers within any organization.

86.    Singularity Enterprise's Key Management Services ensures container signing and validation services to Singularity Enterprise and the Container Library. These key-signing and verification services eliminate the risk of unknowingly downloading and running compromised containers, greatly enhancing an organization's ability to restrict the types of containers that are allowed to run on a cluster.

87.    Sylabs' SIF technology and strategy in development of Singularity Enterprise, has successfully positioned the company as a global leader in secure, trusted, performance-focused container solutions. The capabilities that Sylabs has created are revolutionary and unique within the HPC industry, purposely and uniquely built to address some of the limits, shortcomings, and flaws within current container technologies.

88.    Further, Sylabs makes high performance computing more accessible to, for example, researchers, scientists, and engineers through Sylabs' SIF technology and

Singularity Enterprise, which is the most advanced container runtime technology for performance-intensive applications and environments.

89.     As the most active contributor to the Singularity ecosystem, through both the open-source community edition ("Sylabs' SingularityCE")[7] and Sylabs' value-added technology (Singularity Enterprise-supported and professional implementations) Sylabs' technological offerings enabled the progression and development of cutting-edge research and facilitated rapid scientific discovery. For example, Sylabs has developed additional value-added technologies known as "Fuzzball" and "Armored Containers."

90.     On or about June 5, 2019, Sylabs first discussed the concepts of Fuzzball and Armored Containers during a design review meeting with  Sylabs' staff, including its engineers. The high-level design of the architecture of Fuzzball commenced in late 2019 while that of Armored Containers commenced in July of 2019.

<strong>Sylabs' Fuzzball Technology</strong>

91.     Fuzzball is Sylabs' Trade Secrets and IP relating to value-added technology that creates a cluster of two differentiated software stacks. The first, Fuzzball **service**, is a cloud native service for workflow management and orchestration. The second, Fuzzball **agent**, is a small, purpose-built systems service that executes workflows on computer nodes.

92.     The power of Fuzzball clusters lies in their ability to be easily configured to accommodate various scales of compute resources. Fuzzball can be deployed in environments from as small as a single node running both the service and agent to deploying the service to orchestrate workloads across agents on various clusters of supercomputers located on-premises or on the cloud.

---

[7]     Maintained by Sylabs, SingularityCE is an open-source container platform created through needs of high performance computing and supercomputing use cases. It provides a means to create and run a package of contained software, with all its dependencies, for quick and reliable computing across environments. For functional differences between SingularityCE and SingularityPRO see Figure 3, above.

LEPISCOPO & ASSOCIATES LAW FIRM

93.    The Fuzzball service has a pluggable scheduler that will manage where and when jobs within a workflow are executed based on criteria such as submission order, data locality, hardware availability, etc. Having a pluggable scheduler allows for the cluster scheduling behavior to be changed depending on what is optimal for the particular cluster deployment.

94.    Essentially, Fuzzball can be comprehended as an intelligent task manager that controls data flow and computing at the node and cluster level regardless of the geographic locations of nodes and clusters—*i.e.*, it harmonizes supercomputers that might be located on premises or on the other side of the globe. Thus, Fuzzball's intelligent management technology makes location irrelevant. The intelligent management aspects of Fuzzball are designed by the user. So, for example, the user will create a set of parameters for flow of data and priority of computer operations.

95.    For example, back to weather monitoring examples, NOAA has supercomputer systems for weather and climate analysis in Virginia (pictured below in Figure 5) and Arizona and research and development supercomputers located in West Virginia, Tennessee, Mississippi, and Colorado. Imagine each of these locations as the main node for each location, thus making 6 main nodes. Each of the six main nodes is comprised of clusters of computers creating individual supercomputers in each location. For  example, Figure 5 shows the cluster comprising the Dogwood Supercomputer.



**FIGURE 5:** **NOAA's Dogwood Supercomputer in Manassas, Virginia**[8]

_____

[8]    *See:* https://www.noaa.gov/news-release/us-supercomputers-for-weather-and-climate-forecasts-get-major-

*LEPISCOPO & ASSOCIATES LAW FIRM*

96.     Based on NOAA scientists' specific instructions, Fuzzball's intelligent manager would be instructed on how each cluster in the six main node locations operates, and how the clusters comprising each of the six supercomputers operate and interface with each other. For example, the Virginia supercomputer node could be tasked by scientists through Fuzzball with collecting, storing, and analyzing certain data relating to wind velocity, patterns, and predictions for use by one of the other main nodes, say, for example, Mississippi, where storm and hurricane trajectories could be modeled.

97.     While the foregoing examples are rudimentary, the actual power of Fuzzball is much more complex, making it extremely effective and valuable to the growth of the HPC industry. Just to make the point, in the Dogwood Supercomputer (Figure 5) alone there are approximately 2,560 nodes to be intelligently managed.

98.     As will be alleged in greater detail in Section VI, below, in June of 2019 Sylabs invented and commenced development and design of Fuzzball, which Defendants misappropriated from Sylabs through their cyber theft of Sylabs' Trade Secrets and IP. Once their cyber theft was complete, Defendants subsequently **patented** Fuzzball as their own invention through prosecution of fraudulent patent applications and perpetrating a fraud on the USPTO.

### Sylabs' Armored Containers Technology

99.     Containerization concepts began in the late 1970s as a form of partitioning and isolating computing resources. Its fundamentals continued to take shape through the 2000s where it began to emerge as a fully developed technology and an alternative to virtualization. In this generation of the technology, applications could run in isolated user spaces using the same shared operating system. In the current generation of use-cases, scientists use container technologies to reproduce batch-oriented machine learning ("ML") and AI experiments, and enterprise organizations use it to deploy microservice

bump#:~:text=The%20twin%20Hewlett%20Packard%20Enterprise,Virginia%2C%20and%20Orlando%2C%20Florida.

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

infrastructure components. Container technologies have continued to evolve, and, as is natural with any development of technologies, new challenges have emerged.

100.    In June 2019, Sylabs invented and commenced development and design of "Armored Containers," which is the next generation of Sylabs' unique technology, Singularity Image Format, or SIF. For purposes of context, it was on June 7, 2019, that Sylabs filed its SIF Patent Application (No. 16/435,251) with the USPTO.

101.    Generally, Sylabs' Armored Containers technology expands its SIF technology in a way that allows increased security in deployments to cloud environments as well as on-field deployed devices.

102.    Unlike standard OCI containers, which are distributed as a combination of multiple layers and manifests, Sylabs' Armored Containers are built with simple, single SIF containers that can be easily moved into air-gapped systems without requiring additional infrastructure. As generally referred to herein, the term "air-gapped" refers to highly secured areas that includes security measures that isolate a computer or cluster of computers from establishing any outside connection in order to ensure no cyber theft or infiltration can occur. Specifically, a computer or cluster of computers is isolated by removing all wireless or physical connection to other computers or networks outside the relevant air-gapped area (*see* Figure 6). The Department of Defense ("DoD") refers to this as a Sensitive Compartmentation Information Facility, or "SCIF" (pronounced "Skiff"). Therefore, in the DoD vernacular, Sylabs' Armored Containers would be referred to as "SCIF SIFs."



**FIGURE 6: Air-Gap—Computer Isolated from the Internet and Unsecured Devices[9]**

---

[9]    *See, e.g.:* https://blog.tokensoft.io/mind-the-air-gap-best-practices-for-air-gapping-your-machine-a1b9fdc9d60a.

LEPISCOPO & ASSOCIATES LAW FIRM

103.    An Armored Container can be thought of as an "up-armored" form of Sylabs' SIF container, which is improved with not only air-gapping technology but also embedded cryptographic signatures and encryption support to provide further security and protections. Prominently displaying its security features, Figure 7 provides a physical analogue of Sylabs' digitally created Armored Containers (*see* Figure 3):

Sylabs' Armored SCIF SIF Container

 = 

**FIGURE 7**: Example SCIF Room[10]

104.    Sylabs' Armored Containers technology has raised the bar for container platforms throughout the HPC industry. For example, in the DoD's Artificial Intelligence Sector, in or about May or June of 2020, Sylabs commenced discussions with American Systems regarding a joint venture centered on Sylabs' Armored Containers technology. In or about September 14, 2020, American Systems announced the joint venture with Sylabs ("AS-Sylabs Venture"):

> "AMERICAN SYSTEMS has teamed with Sylabs.io—a leader in secure, trusted, performance focused container solutions—to form 'Team AMERICAN SYSTEMS'."

---

[10]    *See, e.g.*: https://scifglobal.com/scif-definition-what-is-a-scif/.

105. The AS-Sylabs Venture was under the jurisdiction of the DoD's Joint Artificial Intelligence Center ("JAIC") and governed by the DoD's 2018 Artificial Intelligence Strategy[11] and Presidential Executive Order No. 13869 (2/11/19).[12]

106. In its September 14, 2020, announcement of the AS-Sylabs Venture, American Systems listed the common mission areas in which Sylabs' Armored Containers technology would be utilized:

- Naval Warfare Systems
- Air Warfare Systems
- Land Warfare Systems
- Command, Control, Communications, Computers, and Intelligence Systems.
- Space Systems
- Cybersecurity

107. Sylabs' SIF and Armored Containers technologies have raised the bar for container platforms throughout the HPC industry. Thus, Sylabs' technologies leverage the power of AI, machine learning, and deep learning to deliver unique enterprise-level services and an advanced ecosystem of resources that not only extends the overall value of the technologies but also couples ease of use and portability with unmatched security.

**Market Examples for SingularityPRO, Singularity Enterprise, Fuzzball, and Armored Containers**

108. Finally, Sylabs' SIF Container technology, SingularityPRO, Singularity Enterprise, Fuzzball technology, and Armored Containers technology all have a broad customer base including academic and governmental research entities (DoE) and military agencies (DoD), as well as companies in the biomedical, telecommunications, electronics, and manufacturing sectors. Figure 8, below, provides some additional examples of Sylabs' Market Sectors.

---

[11]   *See, e.g.: https://media.defense.gov/2019/Feb/12/2002088963/-1/-1/1/SUMMARY-OF-DOD-AI-STRATEGY.PDF.*         .
[12]   *See, e.g.: https://www.govinfo.gov/content/pkg/FR-2019-02-14/pdf/2019-02544.pdf.*

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

| SYLABS TRADE SECRETS | PRIVATE SECTOR MARKETS | PUBLIC & GOVERNMENT MARKETS | MILITARY & LAW ENFORCEMENT MARKETS |
|---|---|---|---|
| SIF Containers<br><br>SingularityPRO<br><br>Singularity Enterprise | Any HPC environment, *e.g.*:<br><br>• Genomics<br>• Pharmaceutical<br>• Oil/Gas<br>• Manufacturing<br>• Chip design & manufacturing<br>• financial sector<br>• software design | Academia, National Laboratories, all federal and state institutions that use HPC / HPC-like environments. | DoD: All HPC / HPC-like environments. |
| Fuzzball | Any HPC environment, *e.g.*:<br><br>• Genomics<br>• Pharmaceutical<br>• Oil/Gas<br>• Manufacturing<br>• Chip design & manufacturing<br>• financial sector | Academia, National Laboratories, all federal and state institutions that use HPC / HPC-like environments. | DoD: All HPC / HPC-like environments. |
| Armored Containers | Cloud and on-premises environments leveraging containerization of sensitive intellectual property and/or data:<br><br>• Genomics<br>• Pharmaceutica<br>• Oil/Gas<br>• Manufacturing<br>• Chip design & manufacturing<br>• financial sector<br>• software design | Academia, National Laboratories, all federal and state institutions that use HPC / HPC-like environments, as the product evolves so will the opportunities in new markets. | DoD: All HPC / HPC-like environments. Cloud environments and on premises All airborne and waterborne platforms manned and unmanned, all data centers. |

**FIGURE 8: Partial Summary of Markets**

LEPISCOPO & ASSOCIATES LAW FIRM

# VI.
## DEFENDANTS' THEFT OF SYLABS' TRADE SECRETS

109.    The main gravamen of this Action is Defendants' theft, misappropriation, and unlawful and fraudulent patenting of Sylabs' Trade Secrets.

### Preliminary Statement of How Defendants Perpetrated
### Cyber Theft and Intrusion in this Action

110.    As will be alleged in greater detail in Section VII, below, during the time period between March 1 through June 1 of 2020, Defendants surreptitiously and unlawfully intruded into and accessed Sylabs' server to delete files and steal all of Sylabs' Trade Secrets that were under development and close to being submitted to the USPTO for protection and prosecution, including downloading Sylabs' entire server ("Sylabs' Server").[13] What follows is a detailed discussion of Defendants' acts of cyber theft, misappropriation, and unlawful use of Sylabs' Trade Secrets and other legally protected information.

### Preliminary Offer of Proof:
### Defendants' Theft of Trade Secrets & IP from and Intrusion into Sylabs' Server
### Will be Proven with Forensic Evidence: Audit Logs

111.    The details of Defendants' conspiracy and criminal scheme to steal Sylabs' Trade Secrets, IP, and Corporate Secrets will be set forth below. The evidence utilized is a forensic tool know as the audit trail, which is comprised of audit logs that provide detailed information about an individual's access and operations within a computer server.[14]

112.    The Information Technology Laboratory at the National Institute of Standards and Technology, U.S Department of Commerce ("NIST") provides the following guidance regarding audit trails (emphasis added):

"AUDIT TRAILS

---

[13]    At all relevant times, Sylabs' Server was hosted in Google Drive.
[14]    *See, generally:* https://csrc.nist.gov/glossary/term/audit_trail.

**Audit trails maintain a record of system activity** both by system and application processes and **by user activity** of systems and applications.
In conjunction with appropriate tools and procedures, audit trails can assist in detecting security violations, performance problems, and flaws in applications.

BENEFITS AND OBJECTIVES

Audit trails can provide a means to help accomplish several security-related objectives, including individual accountability, **reconstruction of events** (actions that happen on a computer system), intrusion detection, and problem analysis." [15]

113.    As alleged in this Action, Defendants' cyber theft and intrusion is evinced through audit logs from Sylabs' Server ("Audit Logs"). For example, in an effort to find a way to scrub her and other defendants' activities off Sylabs' Server, defendant Julia Kurtzer sent an email to a website known as: "joindeleteme.com." Figure 9 is an excerpt of her activity on March 30, 2020, taken from the Audit Logs of her email for that date:



**FIGURE 9**: Excerpt of Audit Logs: Defendant Julia Kurtzer on 3/30/20

114.    Throughout the country, the FBI utilizes computer forensics through its Regional Computer Forensics Laboratories for investigations into various areas of criminal activity, including trade secret theft and theft or destruction of intellectual property.[16]

115.    In fact, the FBI's use of computer forensics for investigation of cyber theft like those committed by Defendants in this Action is ubiquitous and indispensable:

" 'Without digital forensics, it would be hard to get a conclusion in a lot of cases,' said Walsh, who noted the very nature of modern communications makes the work of the FBI more challenging. 'Suspects aren't talking on the phone anymore and our technical techniques are not working as well because

---

[15]    *See:* https://csrc.nist.gov/csrc/media/publications/shared/documents/itl-bulletin/itlbul1997-03.txt.

[16]    *See:* https://www.rcfl.gov/.

LEPISCOPO & ASSOCIATES LAW FIRM

so much more is encrypted. I pull in the [Forensics Laboratory] very early in my investigative strategy.' "[17]

116.    Due to the fact that they are voluminous, the Audit Logs  referred to herein are maintained by Sylabs but will not be attached to this Complaint. The following convention will be used for citation purposes: "Audit Logs, Name, Date." So, for example, defendant Julia's Kurtzer's activity referred to above in Figure 9 would be cited as follows: "Audit Logs, Julia Kurtzer, 3-30-2022."

### Cyber Theft, Misappropriation, and Unlawful Use of
### Sylabs' Trade Secrets, IP, and Corporate Secrets

117.    In addition to cyber theft and misappropriation of Sylabs' Trade Secrets and IP, Defendants also accessed and copied Sylabs' Server in order to steal and misappropriate Sylabs' corporate secrets, including Sylabs' corporate documents and minutes of shareholder and board of directors' meetings ("Sylabs' Corporate Records"), financial records ("Sylabs Financial Records"), partner and joint venture records ("Collaboration Records"), customer list ("Sylabs' Customer List"), sales and potential sales lists ("Sylabs' Sales Lists"), statements of work ("Sylabs' SOWs"), purchase orders ("Sylabs' POs"), invoices ("Sylabs' Invoices"), marketing strategies, plans, and pricing ("Sylabs' Marketing"), and prospective investors list ("Sylabs' Investors"), all of which may be referred to collectively as "Sylabs' Corporate Secrets."

### Cyber Theft, Misappropriation, and Unlawful Use of Sylabs' Human Resources
### Department Records, Employees' Private Information, and Staff Agreements

118.    In addition to their cyber theft of Sylabs' Corporate Secrets, Defendants also stole Sylabs' Human Resources Department records ("Sylabs' HR Records") and  violated the privacy rights of Sylabs' employees by stealing their employment files ("Employees' Files") in violation of California and federal laws.

---

[17]    *See:* https://www.fbi.gov/news/stories/rcfls-follow-the-modern-evidence-trail-081219.

119.    Included within Defendants' cyber theft of Sylabs' HR and Employees' Files were employees' salary and benefits packages, payroll information, addresses, dates of birth, driver's licenses, tax identification numbers, etc. (collectively "Employees' Private Information").

120.    Further, included within Defendants' cyber theft of Sylabs' HR and Employees' Files were Sylabs' offers of employment, executive employment agreements, employment agreements, independent contract agreements, consultant agreements, technical advisor agreements, and reseller agreements,   (collectively "Sylabs' Staff Agreements").

**Cyber Theft, Misappropriation, and Unlawful Use of Federal Programs and Opportunities and Fraudulent Patenting: Sylabs' Armored Containers Technology**

121.    In order to expand research and development as well as promoting innovative small businesses, Congress enacted 15 U.S.C. § 638, stating the Nation's policy in subsection (a):

> "(a) Declaration of policy.   Research and development are major factors in the growth and progress of industry and the national economy. The expense of carrying on research and development programs is beyond the means of many small-business concerns, and such concerns are handicapped in obtaining the benefits of research and development programs conducted at Government expense. These small-business concerns are thereby placed at a competitive disadvantage. This weakens the competitive free enterprise system and prevents the orderly development of the national economy. It is the policy of the Congress that assistance be given to small-business concerns to enable them to undertake and to obtain the benefits of research and development in order to maintain and strengthen the competitive free enterprise system and the national economy."

122.    Section 638 gave birth to the Small Business Innovation Research program ("SBIR"), which is administered through the U.S. Small Business Administration's ("SBA") Office of Innovation and Technology ("OIT").[18]

---

[18]    *See*: https://www.sbir.gov/about.

LEPISCOPO & ASSOCIATES LAW FIRM

123.     On or about 2019,  the U.S. Air Force issued SBIR Request No. 20.1, Contract No. FA8649-20-P-0729, Tracking No. J201-CSO1-7047, and Topic J201CSO1 for Containers Technologies for LevelUp.[19]

124.     In or about the end of 2019, Sylabs commenced discussions and preparation of its SBIR proposal No. F2-13944 ("SBIR Proposal") regarding its hardened SIF container technology, which Sylabs titled, "Sylabs' Armored Containers."

125.     On or about August 24, 2020, Sylabs  submitted a second SBIR Proposal through the SBA's SBIR Innovation Portal.

126.     In addition to Defendants' theft of Sylabs' Armored Containers in its SBIR Proposal through Defendants'  unlawful  and unauthorized access to Sylabs' Server, defendants Julia Kurtzer and Hayden also had credentials to access the Trade Secrets set forth in Sylabs' SBIR Proposal through the Defense SBIR Innovation Portal.

127.     Through their theft and intrusion into Sylabs' Server, Defendants stole Sylabs' Armored Containers technology and submitted and received the following patents through perpetration of an intentional fraud upon the USPTO (hereinafter these patents will be referred to collectively as  "Stolen Sylabs' Armored Containers Trade Secrets"):

a.     Systems and Methods for Encrypted Container Image Management, Deployment, and Execution, Patent No. US 11,055,428 ("Stolen Sylabs' Trade Secret, Armored Containers #1");

b.     Systems and Methods for Encrypted Container Image Management, Deployment, and Execution, Patent No. US 11,163,902 ("Stolen Sylabs' Trade Secret, Armored Containers #2"); and

c.     Systems and Methods for Trusted and Secure Application Deployment Via Collective Signature Verification of the Application Artifacts, Patent No. US 11,321,064 ("Stolen Sylabs' Trade Secret, Armored Containers #3").

**Cyber Theft and Fraudulent Patenting: Sylabs' Fuzzball Technology**

LEPISCOPO & ASSOCIATES LAW FIRM

---

[19]     *See*: https://www.sbir.gov/node/1967051.

128.  Through their theft and intrusion into Sylabs' Server, Defendants stole Sylabs' Fuzzball Trade Secrets and submitted and received the following patents through perpetration of an intentional fraud upon the USPTO (hereinafter these patents will be referred to collectively as "Stolen Sylabs' Fuzzball Trade Secrets"):

a.  Systems and Methods for Orchestrating Seamless, Distributed, and Stateful High Performance Computing, Patent No. US 10,970,113 ("Stolen Sylabs' Trade Secret, Fuzzball #1");

b.  Systems and Methods for Orchestrating Seamless, Distributed, and Stateful High Performance Computing, Patent No. US 11,099,893 ("Stolen Sylabs' Trade Secret, Fuzzball #2"); and

c.  Systems and Methods for Optimizing a Software Allocation to Shared Resources Based on a Dynamic Mapping of Resource Relationships, Patent No. US 11,310,342 ("Stolen Sylabs' Trade Secret, Fuzzball #3").

**Defendants' Inequitable Conduct and Intentional Fraud**
**Perpetrated on the USPTO**

129.  After Defendants stole and misappropriated Sylabs' Armored Containers and Fuzzball Trade Secrets, they unlawfully patented Sylabs' technology through cyber theft and by perpetrating a fraud on the USPTO on the following grounds:

a.  Listing incorrect inventors and/or omitting inventors;

b.  Omitting prior art, *i.e.*, Sylabs' Trade Secrets and IP that Defendants obtained and misappropriated through cyber theft; and

c.  Inequitable conduct—fraud.

130.  Inequitable conduct requires that everyone participating in the procurement of a patent abide by 37 Code of Federal Regulations ("CFR") 1.56(a) (emphasis added):

"Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Patent Office, which includes a duty to disclose to the Patent Office **all information known to that individual to be material to patentability**."

131.    In addition to their inequitable conduct, Defendants also perpetrated an intentional fraud upon the USPTO, which is proscribed by 37 CFR 1.56(a) and which in its relevant part provides (emphasis added):

"However, no patent will be granted on an application in connection with which **fraud on the Office was practiced or attempted** or the duty of disclosure was violated through bad faith or intentional misconduct."

132.    Defendants violated 37 CFR 1.56 by breaching their duty of candor, disclosure, and good faith by perpetrating a fraud on the USPTO, to wit:

a.    fraudulently omitting prior art, *i.e.*, Sylabs' Trade Secrets that Defendants obtained and misappropriated through cyber theft;

b.    fraudulently representing that SIF containers, Fuzzball, and Armored Containers were their IP when they were actually invented and owned by Sylabs; and

c.    fraudulently representing they were the inventors of the IP, when the actual inventors were Sylabs and its relevant employees.

**Cyber Theft, Misappropriation, and Unlawful Use of Privileged Documents**

133.    In addition to the foregoing, Defendants also stole privileged documents ("Sylabs' Privileged Docs") including but not limited to attorney-client communications, attorney work-product documents, accountant-client communications, settlement negotiations and agreements, nondisclosure agreements, and tax returns.

**Cyber Theft, Misappropriation, and Unlawful Use of Sylabs' Emails**
**and Written Correspondence**

134.    In addition to the foregoing, Defendants also stole all emails and correspondence from the Sylabs' Server, including but not limited to ones relating to sensitive corporate secrets and affairs, and ones discussing attorney-client communications, attorney work-product documents, accountant-client communications, settlement negotiations and agreements, nondisclosure agreements, and tax returns information (collectively "Sylabs' Correspondence").

**VII.**
**DISCUSSION OF EVIDENCE PROVING:**
**DEFENDANTS' THEFT OF SYLABS' TRADE SECRETS, IP,**
**CORPORATE SECRETS,  AND OTHER SENSITIVE INFORMATION**

135.    The main aspect of this Action is Defendants' cyber theft, misappropriation, and unlawful and fraudulent patenting of Sylabs' Trade Secrets, as well as the following sensitive documents:

- corporate records;
- financial records;
- partner and joint venture records;
- customer lists;
- sales and potential sales lists;
- statements of work;
- purchase orders;
- invoices;
- marketing strategies, plans, and pricing;
- prospective investors list;
- HR records;
- employees' files;
- employees' private information;
- staff agreements;
- emails and correspondence; and
- privileged documents.

136.    It is clear that Defendants' cyber theft of the foregoing sensitive information demonstrates that their strategy was to surreptitiously commandeer Sylabs' entire business, resources, Trade Secrets, and IP so that they in effect had an ongoing business without having to invest in research and development or pay a single penny to Sylabs for use of Sylabs' Trade Secrets, IP, or Corporate Secrets.

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

137.   As initially discussed above, and as will be alleged in greater detail below, there is clear forensic evidence proving the date and time of each of the Defendants' acts of unlawful access to Sylabs' Server thereby proving the theft and/or destruction of Sylabs Trade Secrets through the Audit Logs, which capture their access and activities.

138.   The following discussion is not intended to be a comprehensive recitation of all the events surrounding the theft and subsequent use of Sylabs' Trade Secrets, IP, Corporate Secrets, privileged documents, and sensitive information. Rather, it is to establish a pattern of their criminal enterprise and conspiracy, which is currently ongoing and expanding. For example, through defendant CIQ, Defendants recently raised $26,000,000, making a total of $33,000,000 raised, and according to defendant Greg Kurtzer, CIQ now has a valuation of $150,000,000.[20]

139.   CIQ's raising of capital and its valuation are the product of their crimes as outlined above. Thus, separate and apart from the crimes Defendants have committed against Sylabs and the fraud perpetrated on the USPTO, Defendants have been and currently are engaged in an ongoing conspiracy to commit interstate securities fraud.

140.   The facts of this Action will now be presented below. In November of 2019, defendants Greg Kurtzer and Adolph commenced their plan of plundering Sylabs of its Trade Secrets, IP, Corporate Secrets, and other business and sensitive information. For example, in emails they started referring to "Newco." Ultimately, Newco would become defendant CIQ, which is the company that received the stolen Sylabs Trade Secrets and IP.

141.   An interesting situation occurring during the later part of 2019 became clear only after Defendants' crimes in this Action were discovered. Specifically, during meetings with prospective investors, Greg Kurtzer, Sylabs' CEO at the time, did everything he could to dissuade investors from investing in Sylabs, thereby sabotaging Sylabs' ability to receive investment capital. For example, he feigned being unprepared for meetings and uninterested in his presentations, could not explain Sylabs' IP or existing products,

---

[20]   *See*: https://siliconangle.com/2022/05/12/ciq-raises-26m-promote-free-alternative-red-hat-linux/.

provided incorrect and foolish answers to questions, and exhibited other behavior and demeanor that resulted in all investors being scared off and not moving forward with any further discussions or negotiations. For context, this is around the time that Sylabs was commencing preparation of its SBIR Proposal.

142.    As Defendants' plans were in place and in the process of being executed, on March 22, 2020, defendant Greg Kurtzer resigned as Sylabs' CEO, which would become effective March 31, 2020. However, defendant Greg Kurtzer and his co-conspirators continued to access Sylabs' Server even **after** defendant Greg Kurtzer was no longer employed by Sylabs, as memorialized in the Audit Logs, Defendants, 4/1/20 thru 6/1/20.

143.    It is important to note that during the time frame of March 1 through June 1, 2020, defendant Greg Kurtzer used three different email accounts to commit his cyber theft by granting full and complete credentials for all 3 email accounts to access Sylabs' Server, two of which were his personal email addresses, which he encouraged his Co-Conspirators to use to hide their cyber theft, as memorialized in the Audit Logs, Greg Kurtzer, 3/1/20 thru 6/1/20:

a.   Sylabs: g@sylabs.io; and

b.   Personal: gmkurtzer@gmail.com & gmk@hushmail.com ("Personal Emails").

**Defendants' Cyber Theft Prior to Defendant Greg Kurtzer's**
**Resignation Effective Date (3/1/20 thru 3/31/20)**

144.    The following acts of cyber theft were committed by Defendants from March 1 through 31, 2020, Greg Kurtzer's last day as a Sylabs' employee.

145.    Just as an initial matter, during the time frame from March 1 through 31, 2020, defendants Adolph and Greg Kurtzer were planning Defendants' theft of Sylabs' Trade Secrets and Corporate Secrets, as well as planning a collaboration between Open Drives and Newco that would use all of Sylabs' Trade Secrets, IP, and Corporate Secrets so that Newco could be immediately launched.

146.    On March 8 and 9, 2020, defendant Kurtzer provided defendants Prager and Open Drives with access to the Sylabs Server, in particular to all documents relating to

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

Fuzzball and terms relating to Corporate Secrets, as memorialized in the Audit Logs, Greg Kurtzer, 3/8/20 and 3/9/20.

147.    On March 11, 2020, defendant Greg Kurtzer sent defendant Joel Whitley, a principal of defendant IAG, an email ("Kurtzer/Whitley Email"),  wherein he explains part of the conspiracy to commit cyber theft of Sylabs' Trade Secrets and Sylabs' customers:

"Dear Joel, . . .

This will provide us with the ability to keep the team together and continue the development of Fuzzball/HPC-2.0. Additionally, we have some big name customers and opportunities we've been developing and this will allow us to continue bringing in the ARR (about $1M today) while also servicing a pipeline of $10M over the next 24 months.

It is important to note that the intellectual property that we would need to build Fuzzball is all open source and I personally lead those respective open source projects and communities. Sylabs does have some commercial IP, which would be quite advantageous to have (e.g. Singularity Enterprise, which is not open source), but it is not a requirement for Fuzzball or any of our plans or projections for **NEWCO**. . .

The second model demonstrates inclusion of an optimistic sales pipeline which includes multiple DOD awards, strategic development NREs, as well as building ARR. It also includes several new market injection points around Fuzzball, which are conservative."

The Kurtzer/Whitley Email is memorialized in the Audit Logs, Greg Kurzer, 3/11/20.

148.    In the Kurtzer/Whitley Email, defendant Greg Kurtzer incorrectly states that Fuzzball can be recreated through open-source programs. This ignores the legal barrier to such a tactic because Fuzzball was already and currently is Sylabs' Trade Secrets and IP. He also indicates how advantageous it would be for Newco to have Singularity Enterprise, which was already and currently is Sylabs' Trade Secrets and IP. Further, he references Sylabs' **"big name customers and opportunities" as though they belonged to him and Newco**. This, of course, informs the reasons for Defendants' cyber theft of Sylabs customers and other Corporate Secrets—to bring those assets to Newco without paying

Sylabs. This tactic is a type of secretly forced acquisition without payment of any purchase price to Sylabs.

149. Over an approximate two-week period at the end of March 2020, defendant Greg Kurtzer downloaded the entire Sylabs' Server, as memorialized in the Audit Logs, Greg Kurtzer, 3/26/20 thru 3/29/20.

150. On March 11, 2020 (same date as the Kutzer/Whitley Email), defendant Kurtzer provided defendants Whitley and IAG with access to the Sylabs Server, in particular to all documents relating to Fuzzball, as memorialized in the Audit Logs, Greg Kurtzer, 3/11/20.

151. On March 13, 2020, defendant Greg Kurtzer provided defendants Whitley and IAG with access to the Sylabs Server, in particular to all of Sylabs Corporate Records, as memorialized in the Audit Logs, Greg Kurtzer, 3/13/20.

152. During the March 7 through 13, 2020, timeframe, defendant Greg Kurtzer was engaged in detailed planning with defendants Adolph, Whitley, Open Drives, Prager, and IAG, during which time defendant Greg Kurtzer was providing them with Sylabs' Corporate Secrets and strategies in order to develop their plan for stealing Sylabs' Trade Secrets and Corporate Secrets, including the following Sylabs' corporate records: (a) series preferred stock purchase agreement, (b) investors' rights agreement, (c) credit line agreement, (d) stockholder consent, and (e) common stock purchase agreement. Essentially, these and other of Sylabs' Corporate Secrets were provided because defendant Greg Kurtzer was explaining that Sylabs was in dire straits and would most likely dissolve. This provided Defendants with the opportunity to raid and steal Sylabs' Trade Secrets, IP, customers, etc., as memorialized in the Audit Logs, Greg Kurtzer, 3/7/20 thru 3/13/20.

153. It was during the March 7 through 13, 2020, timeframe, and earlier, that Defendants were engaged in their conspiracy and planning the theft of Sylabs' SIF technology, Fuzzball technology, SingularityPRO, Singularity Enterprise, and signed and secure SIF containers (i.e., Armored Containers), as memorialized in the Audit Logs, Greg Kurtzer, 3/7/20 thru 3/13/20.

LEPISCOPO & ASSOCIATES LAW FIRM

154.     One part of Defendants' scheme was disclosed: defendant Greg Kurtzer would take Sylabs' Fuzzball and publish it to open-source so Defendants could use it (but would not have to pay for it) when they started Newco. This falls under the rubric of cyber theft known as **cyber destruction** of Sylabs' Trade Secrets, as memorialized in the Audit Logs, Greg Kurtzer, 3/7/20 thru 3/13/20.

155.     On March 18, 2020, defendant Greg Kurtzer commenced recruiting future employees and engineers, and solicited job applicants for Newco, as memorialized in the Audit Logs, Greg Kurtzer, 3/18/20.

156.     In furtherance of their conspiracy, Defendants commenced a coordinated 2-day resignation effort, resigning their positions with Sylabs, all effective on the same date, March 31, 2020, as set forth in the five following paragraphs.

157.     On March 22, 2020, defendant Greg Kurtzer resigned as CEO of Sylabs, which would make his last day as Sylabs' employee, March 31, 2020, as memorialized in the Audit Logs, Greg Kurtzer, 3/22/20.

158.     On March 23, 2020, defendant Adolph tendered his resignation to Sylabs, which would become effective on March 31, 2020, the same date as defendant Greg Kurtzer, as memorialized in the Audit Logs, Adolph, 3/23/20.

159.     On March 23, 2020, defendant Hayden tendered his resignation to Sylabs, which would become effective on March 31, 2020, the same date as defendants Greg Kurtzer and Adolph, as memorialized in the Audit Logs, Hayden, 3/23/20.

160.     On March 23, 2020, defendant Julia Kurtzer tendered her resignation to Sylabs, which would become effective on March 31, 2020, the same date as defendants Greg Kurtzer, Adolph, and Hayden, as memorialized in the Audit Logs, Julia Kurtzer, 3/23/20.

161.     On March 23, 2020, defendant Fong tendered her resignation to Sylabs, which would become effective on March 31, 2020, the same date as defendants Greg Kurtzer, Adolph, and Hayden, as memorialized in the Audit Logs, Fong, 3/23/20.

162.    On March 23, 2020, the very next day after he announced his resignation, defendant Greg Kurtzer destroyed Sylabs' Trade  Secrets and IP by releasing Sylabs' Fuzzball technology—which was **closed-source**—to open-source. In order to further Defendants' conspiracy to steal not only Sylabs' Fuzzball technology but also Sylabs' customers and sales, defendant Greg Kurtzer arranged for all sales inquiries and purchase requests to be held until April 1, 2020, when he would no longer be employed by Sylabs, and directed those sales inquiries and purchase requests to his **Personal** Email Accounts.

163.    On March 23, 2020, defendant Greg Kurtzer revealed that Newco would now be formed and started the formation of Control Command, Inc. ("Control Command"). In fact, on this date he purchased the URL name for Control Command: "CTRL-CMD.COM." Just a point of consistency, and as will be alleged below, defendant Greg Kurtzer later changed Control Command's official name to the name it currently holds and conducts business under, defendant CTRL IQ, INC. d/b/a CIQ**.**

164.    On March 24 through 31, 2020, defendant Adolph commenced deleting and downloading items from the Sylabs' Server by using defendant Greg Kurtzer's Command Control email account and defendant Adolph's personal email account. These deletions and downloads related primarily to Sylabs' Trade Secrets and IP as confidentially presented in Sylabs' SBIR Proposal and Sylabs' development of opportunities and sales in the federal space, as memorialized in the Audit Logs, Adolph, 3/24/20 through 3/31/20.

165.    Commencing on March 24 and continuing through April 6, 2020, defendant Hayden commenced his cyber theft of Sylabs' Corporate Secrets by accessing Sylabs' Server and downloading Sylabs' SBIR Proposal and work relating to Sylabs' SIF and Armored Containers technology utilized with the National Security Agency ("NSA") in 2018 through 2019, as memorialized in the Audit Logs, Hayden, 3/24/20 through 4/6/20. It may be that this particular cyber theft will involve Defendants' criminal violations relating to a federal agency operating in an extremely high national security environment, the NSA.

166. On March 26, 2020, defendant Greg Kurtzer granted his Personal Email accounts full access to Sylabs' Server, as memorialized in the Audit Logs, Greg Kurtzer (g@sylabs.io and gmkurtzer@gmail.com & gmk@hushmail.com), 3/26/20.

167. Once he granted his Personal Email accounts access to the Sylabs' Server on March 26, 2020, defendant Greg Kurtzer immediately commenced the cyber theft of Sylabs' Server by downloading the **entire** contents of Sylabs' Server to his Personal Email accounts, including, for example, all of Sylabs' Trade Secrets and IP, all current and potential sales and pipeline, all corporate documents, and privileged documents, as memorialized in the Audit Logs, Greg Kurtzer (g@sylabs.io and gmkurtzer@gmail.com & gmk@hushmail.com), 3/26/20.

168. One example of Defendants' diabolical treachery was that during the timeframe prior to the date his resignation was effective, defendant Greg Kurtzer downloaded, then **deleted** multiple documents relating to Sylabs' sales opportunities, committing more cyber destruction, as memorialized in the Audit Logs, Greg Kurtzer (g@sylabs.io and gmkurtzer@gmail.com & gmk@hushmail.com), 3/26/20 thru 3/31/20. This was done so that Defendants would be able to benefit from Sylabs' customers and sales opportunities. Keep in mind that development of these customers and sale opportunities were the consequence of marketing funds spent by Sylabs and payment of Sylabs' staff to develop.

169. On March 29, 2020, in order to further Defendants' conspiracy to steal Sylabs' Server, former Sylabs employee Rose Stein transferred her ownership and administrative credentials in Sylabs' Server to defendant Greg Kurtzer. He proceeded to download all of the documents from the Sylabs' Server. Thus, between March 26 through 29, 2020, defendant Greg Kurtzer committed a comprehensive cyber theft by downloading the entire Sylabs' Server to his Private Email, as memorialized in the Audit Logs, Greg Kurtzer (g@sylabs.io and gmkurtzer@gmail.com & gmk@hushmail.com), 3/26/20 thru 3/31/20.

**Defendants' Cyber Theft After Defendant Greg Kurtzer's**

**Resignation Effective Date (4/1/20 thru 6/1/20)**

170.    Starting on April 1 and continuing through June 1, 2020, Defendants took the following actions and unlawfully and surreptitiously accessed Sylabs' Server.

171.    On April 1, 2020, the day after his resignation was effective, defendant Greg Kurtzer formed Control Command, Inc., which, through a name change, is now defendant CTRL IQ, Inc. d/b/a CIQ, as a Delaware corporation by filing its certificate of incorporation.

172.    On April 2, 2020, Defendants furthered their cyber theft when defendant Greg Kurtzer remotely and surreptitiously (as he was no longer a Sylabs' employee) accessed Sylabs' Server. During this cyber intrusion, defendant Greg Kurtzer created numerous folders on Sylabs' Server and uploaded thousands of items into those folders. One folder was titled "Fresh Sales Export Files" and included all of Sylabs' potential and current customers, as memorialized in the Audit Logs, Greg Kurtzer (g@sylabs.io and gmkurtzer@gmail.com & gmk@hushmail.com), 4/2/20.

173.    On April 2, 2020, Defendants furthered their cyber theft when defendant Fong remotely and surreptitiously (as she was no longer a Sylabs' employee) accessed Sylabs' Server for an unknown purpose, as memorialized in the Audit Logs, Fong, 4/2/20.

174.    On April 6, 2020, defendant Greg Kurtzer remotely and surreptitiously accessed Sylabs' Server to further Defendants' cyber theft by downloading all of the folders and files (folder titled, "Fresh Sales Export Files") he created through his cyber intrusion on April 2, 2020, as memorialized in the Audit Logs, Greg Kurtzer (g@sylabs.io and gmkurtzer@gmail.com & gmk@hushmail.com), 4/6/20.

175.    On April 16, 2020, defendant Julia Kurtzer remotely and surreptitiously accessed Sylabs' Server to further Defendants' cyber theft of Sylabs' customers, sales, and opportunities by downloading and emailing Sylabs' Purchase Orders received from customers to defendants Greg Kurtzer, Fong, and Adolph, as memorialized in the Audit Logs, Julia Kurtzer, 4/16/20. For example, one purchase order was from SHI International

Corporation ("SHI PO") for an order for SingularityPRO for 200 nodes for 1 year and SingularityPRO for 100 nodes to six months, as memorialized in the Audit Logs, Julia Kurtzer, 4/16/20. Sylabs lost this customer to defendant CIQ through Defendants' cyber theft.

176.    On April 23, 2020, defendant Greg Kurtzer filed CIQ's Foreign Registration with the California Secretary of State permitting CIQ to conduct business in California.

177.    Although he was no longer Sylabs' employee, commencing on May 18th and continuing through May 26, 2020, defendant Adolph accessed Sylabs Server and renamed a document titled, "HPC Whitepaper: Sylabs and OpenDrives" to "HPC Whitepaper: ControlCommand and OpenDrives"  (hereinafter "Sylabs' HPC Whitepaper"), as memorialized in the Audit Logs, Adolph, 5/18/20 through 5/26/20.

178.    Finally, the HPC Whitepaper was drafted and worked on by Sylabs' employees Adam Hughes and Mike Frisch and was centered around Sylabs' opportunities with Fuzzball/HPC 2.0. However, defendant Adolph edited the Sylabs' HPC Whitepaper in a manner to read as though Sylabs' Trade Secrets and the opportunities expressed in that document had nothing to do with Sylabs, including listing Open Drives' defendant Adolph and Sean Lee as the authors, as memorialized in the Audit Logs, Adolph, 5/18/20 through 5/26/20.

## VIII.
## DISCUSSION OF DEFENDANTS' FRAUDULENT AND UNLAWFUL PATENTING OF TRADE SECRETS & IP INVENTED AND OWNED BY SYLABS

179.    The main gravamen of this Action is Defendants' theft, misappropriation, and unlawful and fraudulent patenting of Sylabs' Trade Secrets and IP.

180.    In particular, and as alleged in greater detail above, Defendants have unlawfully and fraudulently patented Sylabs' Fuzzball and Armored Containers technologies through their theft of Sylabs' Trade Secrets and IP, as set forth below in Figure 10.

LEPISCOPO & ASSOCIATES LAW FIRM

| SYLABS' TRADE SECRET | KURTZER, et al.'s THEFT: PATENT # (See Exhibit) | PROOF THAT PATENT IS SYLABS' TRADE SECRET |
|---|---|---|
| Fuzzball | US 10,970,113 | As set forth in greater detail in Sections V-VII, above, and the exhibits listed below, the evidence unequivocally demonstrates Sylabs was inventing, developing, and designing this technology as early as June of 2019, which is approximately 1 year prior to Defendants' theft and more than 2 years prior to patent issuance date.

In addition to the forgoing, on December 19, 2019, and January 9th and 13th 2020, design reviews of Fuzzball were held by Sylabs, which were video recorded. |
| Fuzzball | US 11,099,893 | "              " |
| Fuzzball | US 11,310,342 | "              " |
| | | |
| Armored Containers | US 11,055,428 (Exhibit 4) | The Armored Containers a based on Sylabs' prior trade secrets in the SIF technology.

As set forth in greater detail in Sections V-VII, above, and the exhibits listed below, the evidence unequivocally demonstrates Sylabs was inventing, developing, and designing this technology as early as July of 2019, which is approximately 1 year prior to Defendants' theft and more than 2 years prior to patent issuance date. |
| Armored Containers | US 11,163,902 (Exhibit 5) | "              " |
| Armored Containers | US 11,321,064 (Exhibit 6) | "              " |
| | | |

**FIGURE 10**: Defendants' Patents Through Theft of Sylabs' Trade Secrets

181.   Defendants' Stolen Patents of Sylabs' Armored Containers technology not only violates the armored technology itself but also Sylabs' underlying SIF technology, which is the necessary prior art upon which Armored Containers is built.

# IX.
## LEGAL BACKGROUND

### FEDERAL LAW: DEFEND TRADE SECRETS ACT

182.    In its relevant  part, Section 2 of the Defend Trade Secrets Act of 2016 ("DTSA"), Public Law No: 114-153 (05/11/2016), which amends the Economic Espionage Act of 1996 ("Espionage Act"), Public Law No.: 104–294 (10/11/2996), provides (emphasis added):

> "(Sec. 2) This bill amends the federal criminal code to create a **private civil cause of action** for trade secret misappropriation.
>
> A trade secret owner may file a civil action in a U.S. district court seeking relief for trade secret misappropriation related to a product or service in interstate or foreign commerce. The bill establishes remedies including injunctive relief, compensatory damages, and attorney's fees. It sets a three-year statute of limitation from the date of discovery of the misappropriation.
>
> A trade secret owner may apply for and a court may grant, in extraordinary circumstances, an ex parte seizure order to prevent dissemination of a trade secret if the court makes specific findings, including that: (1) a temporary restraining order or another form of equitable relief is inadequate, (2) an immediate and irreparable injury will occur if seizure is not ordered, and (3) the person against whom seizure would be ordered has actual possession of the trade secret and any property to be seized.
>
> A court must take custody of and secure seized materials and hold a seizure hearing within seven days. An interested party may file a motion to encrypt seized material."

183.    Section 5 of the DTSA provides Congress' clear and unequivocal rationale for its enactment:

> "(Sec. 5) The bill expresses the sense of Congress that: (1) trade secret theft occurs in the United States and around the world, (2) trade secret theft harms owner companies and their employees, (3) the Economic Espionage Act of 1996 applies broadly to protect trade secrets from theft; and (4) it is important, when seizing information, to balance the

LEPISCOPO & ASSOCIATES LAW FIRM

need to address misappropriation with the needs of third parties and the accused party."

184.   The DTSA is codified in 18 U.S.C. § 1831 *et seq.*

185.   As its trade secrets relate to products and services sold in interstate and international commerce, Sylabs is authorized to maintain this civil action because § 1836 the DTSA provides for a **private** **right** of action:

"(b) Private civil actions.

(1)  In general. An owner of a trade secret that is misappropriated may bring a civil action under [the DTSA] if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

186.   Section 1836(b)(3) of the DTSA provides civil remedies as follows:

"(3)   Remedies. In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may—

(A)  grant an injunction—

(i)  to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable, provided the order does not—

(I)   prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows; or

(II)  otherwise conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business;

(ii)  if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret; and

(iii)   in exceptional circumstances that render an injunction inequitable, that conditions future use of the trade secret upon

payment of a reasonable royalty for no longer than the period of time for which such use could have been prohibited;

(B) award—

(i)

(I) damages for actual loss caused by the misappropriation of the trade secret; and

(II) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or

(ii) in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret;

(C) if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B); and

(D) if a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, a motion to terminate an injunction is made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated, award reasonable attorney's fees to the prevailing party."

187. In its relevant part, Section 3 of the DTSA adds violations of the act to the list of predicates to establish a private civil action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1831 *et seq.* (emphasis added):

"(Sec. 3) . . . It adds economic espionage and **trade secret theft** to the list of predicate offenses that constitute racketeering activity."

188. Section 3 of the DTSA provides (emphasis added):

"(b) RICO PREDICATE OFFENSES.—Section 1961(1) of title 18,United States Code, is amended by inserting ''sections 1831 and 1832 (relating to economic espionage and **theft of trade secrets**),'' before 'section 1951'."

189.    Sections 1835(a) and 1836(b)(2), respectively, of the DTSA provide confidentiality and seizure provisions to protect the aggrieve party's trade secrets:

"§ 1835. Orders to preserve confidentiality (a) In general.    In any prosecution or other proceeding under this chapter [18 USCS §§ 1831 et seq.], the court shall enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets, consistent with the requirements of the Federal Rules of Criminal and Civil Procedure, the Federal Rules of Evidence, and all other applicable laws. An interlocutory appeal by the United States shall lie from a decision or order of a district court authorizing or directing the disclosure of any trade secret."

"§ 1836. Civil proceedings. . .

(b)(2)  Civil seizure.

(A)  In general.

(i)    Application. Based on an affidavit or verified complaint satisfying the requirements of this paragraph, the court may, upon ex parte application but only in extraordinary circumstances, issue an order providing for the seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action.

(ii)    Requirements for issuing order. The court may not grant an application under clause (i) unless the court finds that it clearly appears from specific facts that—

(I)  an order issued pursuant to [FRCP 65]  or another form of equitable relief would be inadequate to achieve the purpose of this paragraph because the party to which the order would be issued would evade, avoid, or otherwise not comply with such an order;

(II)   an immediate and irreparable injury will occur if such seizure is not ordered;

(III)   the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application and substantially outweighs the harm to any third parties who may be harmed by such seizure;

(IV)  the applicant is likely to succeed in showing that—

LEPISCOPO & ASSOCIATES LAW FIRM

(aa)  the information is a trade secret; and

(bb)  the person against whom seizure would be ordered—

(AA)  misappropriated the trade secret of the applicant by improper means; or

(BB)  conspired to use improper means to misappropriate the trade secret of the applicant;

(V)  the person against whom seizure would be ordered has actual possession of—

(aa)  the trade secret; and

(bb)  any property to be seized;

(VI)  the application describes with reasonable particularity the matter to be seized and, to the extent reasonable under the circumstances, identifies the location where the matter is to be seized;

(VII)  the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person; and

(VIII)  the applicant has not publicized the requested seizure.

(B)  Elements of order. If an order is issued under subparagraph (A), it shall—

(i)  set forth findings of fact and conclusions of law required for the order;

(ii)  provide for the narrowest seizure of property necessary to achieve the purpose of this paragraph and direct that the seizure be conducted in a manner that minimizes any interruption of the business operations of third parties and, to the extent possible, does not interrupt the legitimate business operations of the person accused of misappropriating the trade secret;

(iii)

(I)  be accompanied by an order protecting the seized property from disclosure by prohibiting access by the applicant or the person against whom the order is directed, and prohibiting any copies, in whole or in part, of the seized property, to prevent undue damage to the party against whom the order has issued

or others, until such parties have an opportunity to be heard in court; and

(II)  provide that if access is granted by the court to the applicant or the person against whom the order is directed, the access shall be consistent with subparagraph (D);

(iv)  provide guidance to the law enforcement officials executing the seizure that clearly delineates the scope of the authority of the officials, including—

(I)  the hours during which the seizure may be executed; and

(II)  whether force may be used to access locked areas;

(v)  set a date for a hearing described in subparagraph (F) at the earliest possible time, and not later than 7 days after the order has issued, unless the party against whom the order is directed and others harmed by the order consent to another date for the hearing, except that a party against whom the order has issued or any person harmed by the order may move the court at any time to dissolve or modify the order after giving notice to the applicant who obtained the order; and

(vi)  require the person obtaining the order to provide the security determined adequate by the court for the payment of the damages that any person may be entitled to recover as a result of a wrongful or excessive seizure or wrongful or excessive attempted seizure under this paragraph.

(C)  Protection from publicity. The court shall take appropriate action to protect the person against whom an order under this paragraph is directed from publicity, by or at the behest of the person obtaining the order, about such order and any seizure under such order.

(D)  Materials In custody of court.

(i)  In general. Any materials seized under this paragraph shall be taken into the custody of the court. The court shall secure the seized material from physical and electronic access during the seizure and while in the custody of the court.

(ii)  Storage medium. If the seized material includes a storage medium, or if the seized material is stored on a storage medium, the court shall prohibit the medium from being connected to a network or the Internet without the consent of both parties, until the hearing required under subparagraph (B)(v) and described in subparagraph (F).

(iii) Protection of confidentiality. The court shall take appropriate measures to protect the confidentiality of seized materials that are unrelated to the trade secret information ordered seized pursuant to this paragraph unless the person against whom the order is entered consents to disclosure of the material.

(iv) Appointment of special master. The court may appoint a special master to locate and isolate all misappropriated trade secret information and to facilitate the return of unrelated property and data to the person from whom the property was seized. The special master appointed by the court shall agree to be bound by a non-disclosure agreement approved by the court.

(E) Service of order. The court shall order that service of a copy of the order under this paragraph, and the submissions of the applicant to obtain the order, shall be made by a Federal law enforcement officer who, upon making service, shall carry out the seizure under the order. The court may allow State or local law enforcement officials to participate, but may not permit the applicant or any agent of the applicant to participate in the seizure. At the request of law enforcement officials, the court may allow a technical expert who is unaffiliated with the applicant and who is bound by a court-approved non-disclosure agreement to participate in the seizure if the court determines that the participation of the expert will aid the efficient execution of and minimize the burden of the seizure.

(F) Seizure hearing.

(i) Date. A court that issues a seizure order shall hold a hearing on the date set by the court under subparagraph (B)(v).

(ii) Burden of proof. At a hearing held under this subparagraph, the party who obtained the order under subparagraph (A) shall have the burden to prove the facts supporting the findings of fact and conclusions of law necessary to support the order. If the party fails to meet that burden, the seizure order shall be dissolved or modified appropriately.

(iii) Dissolution or modification of order. A party against whom the order has been issued or any person harmed by the order may move the court at any time to dissolve or modify the order after giving notice to the party who obtained the order.

(iv) Discovery time limits. The court may make such orders modifying the time limits for discovery under the Federal Rules of

LEPISCOPO & ASSOCIATES LAW FIRM

Civil Procedure as may be necessary to prevent the frustration of the purposes of a hearing under this subparagraph.

(G)  Action for damage caused by wrongful seizure. A person who suffers damage by reason of a wrongful or excessive seizure under this paragraph has a cause of action against the applicant for the order under which such seizure was made, and shall be entitled to the same relief as is provided under section 34(d)(11) of the Trademark Act of 1946 (*15 U.S.C. 1116(d)(11)*). The security posted with the court under subparagraph (B)(vi) shall not limit the recovery of third parties for damages.

(H)  Motion for encryption. A party or a person who claims to have an interest in the subject matter seized may make a motion at any time, which may be heard ex parte, to encrypt any material seized or to be seized under this paragraph that is stored on a storage medium. The motion shall include, when possible, the desired encryption method."

### FEDERAL LAW: COMPUTER FRAUD AND ABUSE ACT

190.    In its relevant part, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, provides (emphasis added):

"(a)  Whoever—
. . .
(2)  intentionally accesses a computer **without authorization** or **exceeds authorized access**, and thereby obtains—
. . .
(C)  information from any protected computer;
. . .
(4)  knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

(5)
(A)  knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

LEPISCOPO & ASSOCIATES LAW FIRM

(B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

(C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

(e) As used in this section—

(1) the term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable handheld calculator, or other similar device;

(2) the term "protected computer" means a computer—

. . .

(B) which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States;"

191.    This Action is authorized because Section 1030(g) of the CFAA provides for a **<u>private</u> right** of action:

"(g) Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."

## CALIFORNIA LAW: UNIFORM TRADE SECRETS ACT

192.    California provides protection for individuals and entities through the California Uniform Trade Secrets Act ("UTSA"), California Civil Code §§ 3426 *et seq*.

193.    Section 3426.1(a) of the UTSA prohibits **cyber theft** of trade secrets through improper means (emphasis added):

"'Improper means'" includes **theft**, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through **electronic** or other means. Reverse engineering or independent derivation alone shall not be considered improper means."

194. Section 3426.2 of the UTSA provides a remedy for injunctive relief:

(a) Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

(b) If the court determines that it would be unreasonable to prohibit future use, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.

(c) In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order."

195. Section 3426.3 of the UTSA provides for the recovery of damages, including unjust enrichment and punitive damages:

(a) A complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

(b) If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.

(c) If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subdivision (a) or (b).

196. Section 3426.4 of the UTSA provides for the recovery of attorneys' fees and costs:

LEPISCOPO & ASSOCIATES LAW FIRM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorney's fees and costs to the prevailing party. Recoverable costs hereunder shall include a reasonable sum to cover the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the prevailing party."

197.    Section 3426.5 of the UTSA provides for procedures for preserving secrecy of trade secrets:

"In an action under this title, a court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include granting protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval."

## FEDERAL LAW: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

198.    Section 1962 of the Racketeer Influenced and Corrupt Organization Act ("RICO") provides:

(a)  It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code [18 USCS § 2], to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the

outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b)   It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d)  It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

199.    Section 3 of the DTSA added **theft of trade secrets** to RICO as constituting racketeering activity. In its relevant part, 18 U.S.C § 1961 provides (emphasis added):

"(1)  'racketeering activity' means. . .(B) any act which is indictable under any of the following provisions of title 18, United States Code: . . . sections 1831 and 1832 (relating to economic espionage **and theft of trade secrets**) [18 USCS §§ 1831, 1832]. . .

(4)   'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5)  'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;"

### CALIFORNIA LAW: CIVIL CONSPIRACY

200.   The Judicial Council of California Civil Jury Instructions (2022 edition) ("CACI"), CACI No. 3600 provides (modified):

"Sylabs claims that it was harmed by the Co-Conspirators by their cyber theft of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other protected information and that Co-Conspirators are responsible for the harm because they were part of a conspiracy to commit the cyber theft of Sylabs' Trade Secrets, IP, Corporate Secrets, and other protected information. A conspiracy is an agreement by two or more persons to commit a wrongful act. Such an agreement may be made orally or in writing or may be implied by the conduct of the parties.

If you find that Co-Conspirators committed cyber theft of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other protected information that harmed Sylabs, then you must determine whether Co-Conspirators are also responsible for the harm. Co-Conspirators are responsible if Sylabs proves both of the following:

     1. That Co-Conspirators were aware that their respective co-conspirators planned to commit cyber theft of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other protected information; and

     2. That Co-Conspirators agreed with their respective co-conspirators and intended that the cyber theft of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other protected information be committed.

Mere knowledge of a wrongful act without cooperation or an agreement to cooperate is insufficient to make Co-Conspirators responsible for the harm.

A conspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and the interests of the alleged coconspirators. Sylabs is not required to prove that Co-Conspirators personally committed a wrongful act or that they knew all the details of the agreement or the identities of all the other participants."

201.    CACI No. 3601 provides (modified):

"If you decide that a co-conspirator joined the conspiracy to commit cyber theft of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other protected information, then he/she is responsible for all acts done as part of the conspiracy, whether the acts occurred before or after he/she joined the conspiracy."

## CALIFORNIA LAW: CALIFORNIA UNFAIR COMPETITION LAW

202.    Section 17200 of the California Unfair Trade Practices Act ("UCL") provides:

> "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

203.    Section 17203 of UCL provides:

> "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state."

## CALIFORNIA LAW: BREACH OF FIDUCIARY DUTY

204.    Directors and officers of corporations owe fiduciary duties of care, loyalty, and good faith to the corporation and its shareholders they serve.

205.    CACI No. 4400 provides (modified):

> "A corporate officer or director owes what is known as a fiduciary duty to his/her corporation and shareholders. A fiduciary duty imposes on an officer or director a duty to act with the utmost care, loyalty, and good faith in the best interests of his/her corporation

LEPISCOPO & ASSOCIATES LAW FIRM

and duties of undivided loyalty to the corporation and confidentiality."

## CALIFORNIA LAW: UNJUST ENRICHMENT

206.    CACI No. 4410 provides (modified):

"Defendants were unjustly enriched if their theft and misappropriation of Sylabs' trade secrets caused Defendants to receive benefits that they otherwise would not have achieved."

## CALIFORNIA LAW: CONVERSION

207.    CACI No. 2100 provides (modified):

"Sylabs claims that Defendants wrongfully stole and exercised control over its trade secrets. To establish this claim, Sylabs must prove all of the following:

1.    That Sylabs invented, owned, possessed, and had a right to possess and receive the benefits from its Trade Secrets and/or IP;

2.    That Defendants stole and substantially interfered with Sylabs' trade secrets by knowingly or intentionally committing cyber theft of Sylabs' Trade Secrets and/or IP by destroying certain trade secrets and/or IP by publishing them to open-source;

3.    That Sylabs did not consent;

4.    That Sylabs was harmed; and

5.    That Defendants' conduct was a substantial factor in causing Sylabs' harm."

## X.
## CLAIMS FOR RELIEF

208.    Sylabs alleges the following claims for relief against Defendants, jointly and severally.

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

**COUNT I**

**VIOLATIONS OF DEFEND TRADE SECRETS ACT**

**(Against All Defendants)**

209.    The allegations in Paragraphs 1 to 207 are incorporated herein by reference.

210.    As alleged in greater detail in Sections V-IX, above, Sylabs' Trade Secrets and IP include scientific, technical, economic, and engineering information, as well as Sylabs' Corporate Secrets, IP, and/or other privileged and protected information as herein alleged.

211.    Sylabs' Trade Secrets and IP constitute information, including systems and methods, code, compilations, programs, devices, methods, techniques, or processes that derive independent economic value from not being generally known to the public or other persons who can obtain significant economic value from the Trade Secrets and IP's disclosure.

212.    At all times mentioned herein, Sylabs has taken reasonable measures to protect the secrecy of the Sylabs' Trade Secrets and IP. However, as alleged in greater detail in Sections V-IX, above, Co-Conspirators' actions constitute actual and threatened cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information by Co-Conspirators under 18 U.S.C. §§ 1836 and 1839.

213.    At all times relevant to this Complaint, Sylabs owned Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information as Sylabs is the entity in which rightful legal or equitable title to Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information is reposed.

214.    As alleged in greater detail in Sections V-IX, above, the Co-Conspirators intended to and knowingly stole through cyber theft from Sylabs' Server and, without authorization, disclosed, acquired, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information. They performed such

acts in furtherance of the conspiracy and to perpetrate the theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in the Northern District of California.

215.    As alleged in greater detail in Sections V-IX, above, the Co-Conspirators intended to and knowingly stole and misappropriated Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information through cyber theft and then perpetrated a fraud on the USPTO by submitting fraudulent patent applications to the USPTO and receiving fraudulently obtained patents, to wit: US 10,970,113; US 11,099,893; US 11,310,342; US 11,055,428; US 11,163,902; and US 11,321,064 (collectively "Stolen Patents").

216.    As alleged in greater detail in Sections V-IX, above, the Co-Conspirators acquired, used, or disclosed Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, knowing that they were stolen and misappropriated, obtained, or converted through Co-Conspirators' cyber theft of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information without Sylabs' consent or authorization. Further, the Co-Conspirators intentionally engaged in these acts to benefit themselves, with the knowledge and/or intent that these acts would injure Sylabs.

217.    The use of the Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information by Co-Conspirators was without Sylabs' authorization, and Sylabs did not consent to their acquisition, disclosure, or use of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information.

218.    At all times mentioned in this Complaint, the Co-Conspirators intended to convert, misappropriate, and steal Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information to their own use and benefit and for their own enrichment.

219.    As alleged in greater detail in Sections V-IX, above, the Co-Conspirators clearly knew and intended that Sylabs, as the owner of the Sylabs' Trade Secrets, IP,

LEPISCOPO & ASSOCIATES LAW FIRM

Corporate Secrets, and/or other privileged and protected information, would be injured by their actions.

220.    As a result of the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, Sylabs has suffered actual damages in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

221.    As a result of the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information, Co-Conspirators have been unjustly enriched.

222.    As a result of the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, Sylabs requests that the Court issue an order that all right, title, and interest in and to the Stolen Patents be divested from defendant CIQ and fully vested in Sylabs, and that the currently listed inventors in the Stolen Patents be removed and replaced with the names of Sylabs' relevant employees as the sole inventors.

223.    Sylabs further pleads entitlement to a reasonable royalty from each of the Stolen Patents to compensate Sylabs for Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

224.    Sylabs further pleads entitlement to a disgorgement of profits received from each of the Stolen Patents to compensate Sylabs for Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

225.    Sylabs further pleads entitlement to all funds Co-Conspirators have raised due to their cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate

Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that exceeds $25,000,000.

226.   As alleged in greater detail in Sections V-IX, above, the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information was willful and malicious based on the facts alleged herein. Co-Conspirators acted with a purpose and willingness to commit the acts alleged, and Co-Conspirators' conduct was not reasonable under the circumstances. Sylabs is therefore entitled to exemplary damages and attorney fees and costs. Sylabs further seeks exemplary damages against Defendants in an amount up to two times the amount of Sylabs' actual damages according to proof under 18 U.S.C. § 1836.

227.   As alleged in greater detail in Sections V-IX, above, the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information has caused and will continue to cause Sylabs irreparable and substantial injury and therefore cannot be fully redressed through damages alone.

228.   As already demonstrated in Sections V-IX, above, if Co-Conspirators were permitted to continue to use and disseminate Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, then Sylabs would be irreparably harmed and the economic damages to Sylabs would be difficult to quantify. An injunction prohibiting Co-Conspirators from further acquisition, disclosure, use, and possession of the Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information is necessary to provide Sylabs with complete relief.

229.   Sylabs requests injunctive relief, as Co-Conspirators' wrongful conduct alleged herein by their cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information will continue unless enjoined and restrained by this Court  and will cause great and irreparable injury to Sylabs' business, and it could cause Co-Conspirators to have improper advantages, positions, and rights in the marketplace to Sylabs' detriment. Absent injunctive relief, Co-Conspirators'

LEPISCOPO & ASSOCIATES LAW FIRM

further disclosure and use of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information could irreparably harm Sylabs.

## COUNT II

### VIOLATIONS OF COMPUTER FRAUD AND ABUSE ACT

### (Against All Defendants)

230.    The allegations in Paragraphs 1 to 207 are incorporated herein by reference.

231.    As alleged in greater detail in Sections V-IX, above, Sylabs' Trade Secrets and IP include scientific, technical, economic, and engineering information, as well as Sylabs' Corporate Secrets and other privileged and protected information as herein alleged.

232.    Sylabs' Trade Secrets and IP constitute information, including systems and methods, code, compilations, programs, devices, methods, techniques, or processes that derive independent economic value from not being generally known to the public or other persons who can obtain significant economic value from the Trade Secrets and IP's disclosure.

233.    At all times mentioned herein, Sylabs has taken reasonable measures to protect the secrecy of the Sylabs' Trade Secrets and IP. However, as alleged in greater detail in Sections V-IX, above, Co-Conspirators' actions constitute actual and threatened theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information by Co-Conspirators.

234.    As alleged in greater detail in Sections V-IX, above, the Co-Conspirators intended to and knowingly stole through cyber theft from Sylabs' Server and, without authorization, disclosed, acquired, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information. They performed such acts in furtherance of the conspiracy and to perpetrate the theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information in the Northern District of California.

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

235.    As alleged in greater detail in Sections V-IX, above, the Co-Conspirators intended to and knowingly stole Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information through cyber theft and then fraud perpetrated on the USPTO by submitting fraudulent patent applications to the USPTO and receiving approval and issuance of the Stolen Patents.

236.    The use of the Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information by Co-Conspirators was without Sylabs' authorization, and Sylabs did not consent to their acquisition, disclosure, or use of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information.

237.    At all times mentioned in this Complaint, the Co-Conspirators intended to convert Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information to their own use and benefit.

238.    As alleged in greater detail in Sections V-IX, above, the Co-Conspirators clearly knew and intended that Sylabs, as the owner of the Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information, would be injured by their actions.

239.    As alleged in greater detail in Sections V-IX, above, the Co-Conspirators clearly knew that obtaining and using Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information for their own interests and benefit but not for Sylabs' benefit exceeded their authority to use Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information in contravention of CFAA, 18 U.S.C. § 1030.

240.    As a result of the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information, Sylabs has suffered actual damages in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

241.   As a result of the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information, Co-Conspirators have been unjustly enriched.

242.   As a result of the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information, Sylabs requests that the Court issue an order that all right, title, and interest in and to the Stolen Patents be divested from defendant CIQ and fully vested in Sylabs, and that the currently listed inventors in the Stolen Patents be removed and replaced with the names of Sylabs' relevant employees as the sole inventors.

243.   Sylabs further pleads entitlement to a reasonable royalty from each of the Stolen Patents to compensate Sylabs for Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

244.   Sylabs further pleads entitlement to a disgorgement of profits received from each of the Stolen Patents to compensate Sylabs for Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

245.   Sylabs further pleads entitlement to all funds Co-Conspirators have raised due to their cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that exceeds $25,000,000.

246.   As alleged in greater detail in Sections V-IX, above, the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information has caused and will continue to cause Sylabs irreparable and substantial injury and therefore cannot be fully redressed through damages alone.

247. As already demonstrated in Sections V-IX, above, if Co-Conspirators were permitted to continue to use and disseminate Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, then Sylabs would be irreparably harmed and the economic damages to Sylabs would be difficult to quantify. An injunction prohibiting Co-Conspirators from further acquisition, disclosure, use, and possession of the Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information is necessary to provide Sylabs with complete relief.

248. Sylabs requests injunctive relief, as Co-Conspirators' wrongful conduct alleged herein by their cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information will continue unless enjoined and restrained by this Court  and will cause great and irreparable injury to Sylabs' business, and it could cause Co-Conspirators to have improper advantages, positions, and rights in the marketplace to Sylabs' detriment. Absent injunctive relief, Co-Conspirators' further disclosure and use of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information could irreparably harm Sylabs.

## COUNT III

### VIOLATIONS OF CALIFORNIA UNIFORM TRADE SECRETS ACT
### (Against All Defendants)

249. The allegations in Paragraphs 1 to 207 are incorporated herein by reference.

250. As alleged in greater detail in Sections V-IX, above, Sylabs' Trade Secrets and IP include scientific, technical, economic, and engineering information, as well as Sylabs' Corporate Secrets and other privileged and protected information as herein alleged.

251. Sylabs' Trade Secrets and  IP constitute information, including systems and methods, code, compilations, programs, devices, methods, techniques, or processes that derive independent economic value from not being generally known to the public or other persons who can obtain significant economic value from the Trade Secrets and IP's disclosure.

LEPISCOPO & ASSOCIATES LAW FIRM

252.   At all times mentioned herein, Sylabs has taken reasonable measures to protect the secrecy of the Sylabs' Trade Secrets and IP. However, as alleged in greater detail in Sections V-IX, above, Co-Conspirators' actions constitute actual and threatened theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information by Co-Conspirators.

253.   As alleged in greater detail in Sections V-IX, above, the Co-Conspirators intended to and knowingly stole through cyber theft from Sylabs' Server and, without authorization, disclosed, acquired, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information. They performed such acts in furtherance of the conspiracy and to perpetrate the theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in the Northern District of California.

254.   As alleged in greater detail in Sections V-IX, above, the Co-Conspirators intended to and knowingly stole Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information through cyber theft and then fraud perpetrated on the USPTO by submitting fraudulent patent applications to the USPTO and receiving approval and issuance of the Stolen Patents.

255.   The use of the Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information by Co-Conspirators was without Sylabs' authorization, and Sylabs did not consent to their acquisition, disclosure, or use of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information.

256.   At all times mentioned in this Complaint, the Co-Conspirators intended to convert Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information to their own use and benefit.

257.   As alleged in greater detail in Sections V-IX, above, the Co-Conspirators clearly knew and intended that Sylabs, as the owner of the Sylabs' Trade Secrets, IP,

Corporate Secrets, and other privileged and protected information, would be injured by their actions.

258.    As alleged in greater detail in Sections V-IX, above, the Co-Conspirators clearly knew that obtaining and using Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information for their own interests and benefit but not for Sylabs' benefit exceeded their authority to use Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information in contravention of UTSA, California Civil Code §§ 3426 et seq.

259.    As a result of the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, Sylabs has suffered actual damages in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

260.    As a result of the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, Co-Conspirators have been unjustly enriched.

261.    As a result of the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, Sylabs requests that the Court issue an order that all right, title, and interest in and to the Stolen Patents be divested from defendant CIQ and fully vested in Sylabs, and that the currently listed inventors in the Stolen Patents be removed and replaced with the names of Sylabs' relevant employees as the sole inventors.

262.    Pursuant to UTSA, California Civil Code § 3426.1, Sylabs further pleads entitlement to a reasonable royalty from each of the Stolen Patents to compensate Sylabs for Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

263.    Pursuant to UTSA, California Civil Code § 3426.1, Sylabs further pleads entitlement to a disgorgement of profits received from each of the Stolen Patents to

compensate Sylabs for Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

264.    Pursuant to UTSA, California Civil Code § 3426.1, Sylabs further pleads entitlement to all funds Co-Conspirators have raised due to their cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that exceeds $25,000,000.

265.    As alleged in greater detail in Sections V-IX, above, the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information has caused and will continue to cause Sylabs irreparable and substantial injury and therefore cannot be fully redressed through damages alone.

266.    As already demonstrated in Sections V-IX, above, if Co-Conspirators were permitted to continue to use and disseminate Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, then Sylabs would be irreparably harmed and the economic damages to Sylabs would be difficult to quantify. An injunction prohibiting Co-Conspirators from further acquisition, disclosure, use, and possession of the Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information is necessary to provide Sylabs with complete relief.

267.    Pursuant to UTSA, California Civil Code § 3426.1, Sylabs requests injunctive relief , as Co-Conspirators' wrongful conduct alleged herein by their cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information will continue unless enjoined and restrained by this Court  and will cause great and irreparable injury to Sylabs' business, and it could cause Co-Conspirators to have improper advantages, positions, and rights in the marketplace to Sylabs' detriment. Absent injunctive relief, Co-Conspirators' further disclosure and use of

LEPISCOPO & ASSOCIATES LAW FIRM

Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information could irreparably harm Sylabs.

268.    As alleged in greater detail in Sections V-IX, above, the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information  was willful and malicious based on the facts alleged herein. Co-Conspirators acted with a purpose and willingness to commit the acts alleged, and Co-Conspirators' conduct was not reasonable under the circumstances. Sylabs is therefore entitled to exemplary damages and attorney fees and costs. Sylabs further seeks exemplary damages against Defendants in an amount up to two times the amount of Sylabs' actual damages according to proof under UTSA, California Civil Code § 3426.1.

**COUNT IV**

**VIOLATIONS OF CIVIL RICO, 18 U.S.C. § 1962(c)**

**(Against All Defendants)**

269.    The allegations in Paragraphs 1 to 207 are incorporated herein by reference.

270.    As alleged in greater detail in Sections V-IX, above, Sylabs' Trade Secrets and IP include scientific, technical, economic, and engineering information, as well as Sylabs' Corporate Secrets and other privileged and protected information as herein alleged, all of which is intended to be placed in interstate and foreign commerce.

271.    Sylabs' Trade Secrets and IP constitute information, including systems and methods, code, compilations, programs, devices, methods, techniques, or processes that derive independent economic value from not being generally known to the public or other persons who can obtain significant economic value from the Trade Secrets and IP's disclosure, and all of which is intended to be placed in interstate and foreign commerce.

272.    At all times mentioned herein, Sylabs has taken reasonable measures to protect the secrecy of the Sylabs' Trade Secrets and IP. However, as alleged in greater detail in Sections V-IX, above, Co-Conspirators' actions constitute actual and threatened interstate theft and misappropriation and sale of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information by Co-Conspirators.

273. As alleged in greater detail in Sections V-IX, above, the Co-Conspirators intended to and knowingly stole through cyber theft from Sylabs' Server and, without authorization, disclosed, acquired, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information. They performed such acts in furtherance of the conspiracy and to perpetrate the interstate theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in the Northern District of California.

274. As alleged in greater detail in Sections V-IX, above, the Co-Conspirators intended to and knowingly stole Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information through the interstate cyber theft and then fraud perpetrated on the USPTO by submitting fraudulent patent applications to the USPTO and receiving approval and issuance of the Stolen Patents.

275. The use of the Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information by Co-Conspirators was without Sylabs' authorization, and Sylabs did not consent to their acquisition, disclosure, or use of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information.

276. At all times mentioned in this Complaint, the Co-Conspirators intended to convert Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information to their own use and benefit.

277. As alleged in greater detail in Sections V-IX, above, the Co-Conspirators clearly knew and intended that Sylabs, as the owner of the Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, would be injured by their actions.

278. As alleged in greater detail in Sections V-IX, above, the Co-Conspirators clearly knew that obtaining and using Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information for their own interests and benefit but not for

Sylabs' benefit exceeded their authority to use Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information.

279.    As alleged in greater detail in Sections V-IX and pursuant to 18 U.S.C § 1961(4), the Co-Conspirators formed an association-in-fact enterprise (the "Enterprise") to engage in activities to affect interstate and foreign commerce by conspiring and collaborating to plan and effectuate the interstate theft and sale of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information. The Enterprise operated in and through the instrumentalities of interstate and foreign commerce and within in this District.

280.    As alleged in greater detail in Sections V-IX and pursuant to 18 U.S.C § 1961(1), the Enterprise's interstate theft and sale of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information constitutes racketeering activity under RICO, all of which was operated in and through the instrumentalities of interstate and foreign commerce and within this District.

281.    As alleged in greater detail in Sections V-IX and pursuant to 18 U.S.C § 1961(5), the Enterprise's interstate theft and sale of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information constitutes a pattern of racketeering activity under RICO, all of which was operated in and through the instrumentalities of interstate and foreign commerce and within in this District.

282.    As alleged in greater detail in Sections V-IX, as a direct and proximate result of racketeering activities and violations of 18 U.S.C. § 1962(c) by the Enterprise, which operated in and through the instrumentalities of interstate and foreign commerce and within this District, Sylabs has suffered economic damages both domestically and abroad, including, but not limited to, injuries in the Northern District of California, in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

283.    As alleged in greater detail in Sections V-IX, the aforementioned acts of the Enterprise, which operated in and through the instrumentalities of interstate and foreign

commerce and within this District, were done willfully, with malice toward Sylabs, entitling Sylabs to treble damages, attorneys' fees, and costs.

284.    As alleged in greater detail in Sections V-IX, the Enterprise's racketeering activities and violations of 18 U.S.C. § 1962(c), which operated in and through the instrumentalities of interstate and foreign commerce and within this District, has caused and will continue to cause Sylabs irreparable and substantial injury and therefore cannot be fully redressed through damages alone. An injunction prohibiting the Enterprise from further acquisition, disclosure, use, and possession of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information is necessary to provide Sylabs with complete relief.

285.    If the Enterprise is permitted to continue to engage in their racketeering activities and violations of 18 U.S.C. § 1962(c), which operates in and through the instrumentalities of interstate and foreign commerce, Sylabs would be irreparably harmed and the economic damages to Sylabs will be difficult to quantify.

**COUNT V**

**VIOLATIONS OF CIVIL RICO, 18 U.S.C. § 1962(d)**

**(Against All Defendants)**

286.    The allegations in Paragraphs 1 to 207 are incorporated herein by reference.

287.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, the Co-Conspirators have intentionally conspired and agreed to directly and indirectly participate in the affairs of the Enterprise through a pattern of racketeering activities in violation of 18 U.S.C § 1832, which operated in and through the instrumentalities of interstate and foreign commerce and within this District.

288.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, the Co-Conspirators knew that their actions constituted a pattern of racketeering activities and agreed to those actions in furtherance of, and for the benefit of the Enterprise, which operated in and through the instrumentalities of interstate and foreign commerce and within this District.

289.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, the actions of the Co-Conspirators constitute a conspiracy to violate 18 U.S.C § 1962(c), in violation of 18 U.S.C § 1962(d).

290.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, as a direct and proximate result of racketeering activities and violations of 18 U.S.C. § 1962(d) by the Enterprise, which operated in and through the instrumentalities of interstate and foreign commerce and within this District, Sylabs has suffered economic damages both domestically and abroad, including, but not limited to, injuries in the Northern District of California, in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

291.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, the aforementioned acts of the Co-Conspirators were done willfully, with malice toward Sylabs, entitling Sylabs to treble damages, attorneys' fees, and costs.

## COUNT VI

### CIVIL CONSPIRACY

### (Against All Defendants)

292.    The allegations in Paragraphs 1 to 207 are incorporated herein by reference.

293.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, the Co-Conspirators entered into an agreement to commit cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information.

294.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, Co-Conspirators carried out their agreement and performed such acts in furtherance of the conspiracy to perpetrate the theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in the Northern District of California.

LEPISCOPO & ASSOCIATES LAW FIRM

295.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, the Co-Conspirators carried out their agreement and conspiracy when they knowingly and intentionally stole Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information through cyber theft and then perpetrated a fraud on the USPTO by submitting fraudulent patent applications to the USPTO and receiving approval and issuance of the Stolen Patents.

296.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, the Co-Conspirators' agreement and conspiracy are ongoing and in furtherance of their conspiracy.

297.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, through their agreement and conspiracy, Co-Conspirators have caused and will continue to cause Sylabs irreparable and substantial injury and therefore cannot be fully redressed through damages alone. An injunction prohibiting Co-Conspirators from further acquisition, disclosure, use, and possession of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information is necessary to provide Sylabs with complete relief.

298.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, as a result of the Co-Conspirators' agreement and conspiracy to commit cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, Sylabs has suffered actual damages in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

299.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, as a result of the Co-Conspirators' agreement and conspiracy to commit cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, Co-Conspirators have been unjustly enriched.

LEPISCOPO & ASSOCIATES LAW FIRM

## COUNT VII

### VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW ("UCL"), CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, *et seq.*

### (Against All Defendants)

300.    The allegations in Paragraphs 1 to 207 are incorporated herein by reference.

301.    The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

302.    The UCL imposes strict liability. Sylabs need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred. However, as alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, Defendants engaged in knowing and intentional conduct that constitutes unfair, fraudulent, and unlawful business practices.

### "*Unfair*" Prong

303.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to individuals, entities, and/or consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

304.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, Defendants' behavior clearly offends Acts of Congress and California policy regarding trade secrets and intellectual property. Further, to say Defendants' actions were unscrupulous would clearly be an understatement, as their actions violated the **criminal** provisions of DTSA, CFAA, and RICO.

305.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, the harm to Sylabs, as well as the public, outweighs the utility of Defendants' practices. There were reasonably available alternatives to further

Defendants' legitimate business interests other than the unlawful, fraudulent, misleading, and deceptive conduct alleged herein; for example, Defendants could have sought a license from Sylabs to use Sylabs' Trade Secrets and IP. Instead, Defendants chose to commit interstate cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information and to perpetrate a fraud on the USPTO.

### "*Fraudulent*" Prong

306.    A business act or practice is "fraudulent" under the UCL if it is likely to be deceptive and injurious to individuals, entities, the public, or public policy.

307.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, Defendants' conduct was clearly fraudulent and designed to commit cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information and to perpetrate a fraud on the USPTO.

308.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint,  Defendants' actions were in clear contravention of the established public policy aims of  DTSA, CFAA, and RICO.

### "*Unlawful*" Prong

309.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

310.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, Defendants' acts and practices alleged above constitute unlawful business acts or practices as they have violated state and federal law in connection with their cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information and fraud perpetrated on the USPTO.

311.    The violation of any law constitutes an "unlawful" business practice under the UCL.

312.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, Defendants' conspiracy and their acts and practices engaged in furtherance of their conspiracy were intended to and did result in violations of DTSA, CFAA, and RICO.

313.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, Defendants' conspiracy and their conduct have defrauded and misled Sylabs and the public in the past and will continue to mislead in the future; for example, they are not the owners or inventors of the Stolen Patents but have raised over $25,000,000 based on that fraud, their cyber theft, and their unlawful competition practices. Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

314.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, Defendants' violation of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat to Sylabs and the public.

315.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, pursuant to the UCL, Sylabs is entitled to preliminary and permanent injunctive relief and order Defendants to cease their fraudulent and unfair competition, as well as disgorgement of and restitution to Sylabs of all Defendants' revenues associated with their unfair competition, or such portion of those revenues as the Court may find equitable.

## COUNT VIII

### BREACH OF FIDUCIARY DUTY—CYBER THEFT & FRAUD BY OFFICER & DIRECTOR
### (Against Defendant Greg Kurtzer and DOES 1 through 10)

316.    The allegations in Paragraphs 1 to 207 are incorporated here by reference.

317.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, defendant Greg Kurtzer was an officer and director of Sylabs and breached his fiduciary duties to Sylabs.

318.   As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, defendant Greg Kurtzer has willfully and intentionally breached the fiduciary duties he owed to Sylabs as an officer and director of Sylabs by committing cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information and perpetrating a fraud on the USPTO.

319.   As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, defendant Greg Kurtzer has failed to act with the utmost care, loyalty, and good faith in the best interests of Sylabs and failed to honor and satisfy his duties of undivided loyalty to the corporation and confidentiality as an ordinary and prudent officer or director of a corporation would under similar circumstances.

320.   As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, as a result of defendant Greg Kurtzer's breach of the fiduciary duties he owed to Sylabs by participating in the conspiracy to commit cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information and perpetration of a fraud on the USPTO, Sylabs has suffered actual damages in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

321.   As alleged in greater detail in Sections V-IX, above, defendant Greg Kurtzer breached his fiduciary duties to Sylabs by committing cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information and perpetrated a fraud on the USPTO which was willful and malicious based on the facts alleged herein. Further, defendant Greg Kurtzer acted with a purpose and willingness to commit the acts alleged, and his conduct was not reasonable under the circumstances. Sylabs is therefore entitled to exemplary damages in an amount to be proven at time of trial.

322.   Sylabs is also entitled to its attorneys' fees and costs.

## Count IX

### Aiding and Abetting Breach of Fiduciary Duty—Cyber Theft & Fraud by Officer & Director

### (Against Defendants Julia Kurtzer, Robert Adolph, Matthew Hayden, Erin Fong, CIQ, Open Drives, Inc., David Buss, Marlin Prager, Joel Whitley, IAG Capital Partners, and DOES 20 through 50)

323.     The allegations in Paragraphs 1 to 207 are incorporated herein by reference.

324.     As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I, IV, and VIII of this Complaint, defendant Greg Kurtzer was an officer and director of Sylabs and breached his fiduciary duties to Sylabs.

325.     As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, defendants Julia Kurtzer, Robert Adolph, Matthew Hayden, Erin Fong, CIQ, Open Drives, Inc., David Buss, Marlin Prager, Joel Whitley, IAG Capital Partners, and Does 20 through 50 have willfully and intentionally conspired and agreed to directly and indirectly aid and abet and in fact aided and abetted defendant Greg Kurtzer's breach of the fiduciary duties he owed to Sylabs as an officer and director of Sylabs.

326.     As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, defendants Julia Kurtzer, Robert Adolph, Matthew Hayden, Erin Fong, CIQ, Open Drives, Inc., David Buss, Marlin Prager, Joel Whitley, IAG Capital Partners, and Does 20 through 50 aided and abetted defendant Greg Kurtzer to breach his fiduciary duties to Sylabs by participating in the conspiracy to commit cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information and perpetrate a fraud on the USPTO.

327.     As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, as a result of Julia Kurtzer, Robert Adolph, Matthew Hayden, Erin Fong, CIQ, Open Drives, Inc., David Buss, Marlin Prager, Joel Whitley, IAG Capital Partners, and Does 20 through 50's aiding and abetting defendant Greg

Lepiscopo & Associates Law Firm

LEPISCOPO & ASSOCIATES LAW FIRM

Kurtzer to breach his fiduciary duties to Sylabs by participating in the conspiracy to commit cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, Sylabs has suffered actual damages in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

328.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, Julia Kurtzer, Robert Adolph, Matthew Hayden, Erin Fong, CIQ, Open Drives, Inc., David Buss, Marlin Prager, Joel  Whitley, IAG Capital Partners, and Does 20 through 50's aiding and abetting defendant Greg Kurtzer to breach his fiduciary duties to Sylabs by participating in the conspiracy to commit cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information and perpetrate a fraud on the USPTO was willful and malicious based on the facts alleged herein. Said defendants acted with a purpose and willingness to commit the acts alleged, and their conduct was not reasonable under the circumstances. Sylabs is therefore entitled to exemplary damages in an amount to be proven at time of trial.

329.    Sylabs is also entitled to its attorneys' fees and costs.

## COUNT X

### UNJUST ENRICHMENT

### (Against All Defendants)

330.    The allegations in Paragraphs 1 to 207 are incorporated herein by reference.

331.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, Sylabs' Trade Secrets and IP include scientific, technical, economic, and engineering information, as well as Sylabs' Corporate Secrets and other privileged and protected information as herein alleged.

332.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, Sylabs' Trade Secrets and IP constitute information, including systems and methods, code, compilations, programs, devices, methods, techniques, or processes that derive independent economic value from not being

generally known to the public or other persons who can obtain significant economic value from the Trade Secrets or IP's disclosure.

333.   As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, Sylabs has taken reasonable measures to protect the secrecy of the Sylabs' Trade Secrets and IP. However, Co-Conspirators' actions constitute actual and threatened theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information by Co-Conspirators.

334.   As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, the Co-Conspirators intended to and knowingly stole through cyber theft from Sylabs' Server and, without authorization, disclosed, acquired, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information. They performed such acts in furtherance of the conspiracy and to perpetrate the theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in the Northern District of California.

335.   As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, the Co-Conspirators intended to and knowingly stole Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information through cyber theft and then perpetrated a fraud on the USPTO by submitting fraudulent patent applications to the USPTO and receiving approval and issuance of the Stolen Patents.

336.   As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, the use of the Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information by Co-Conspirators was without Sylabs' authorization, and Sylabs did not consent to their acquisition, disclosure, or use of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information.

337.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, the Co-Conspirators intended to convert Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information to their own use and benefit.

338.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, the Co-Conspirators clearly knew and intended that Sylabs, as the owner of the Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information, would be injured by their actions.

339.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, the Co-Conspirators clearly knew that stealing and using Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information for their own interests and benefit but not for Sylabs' benefit exceeded their authority to use Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information thereby constituting conversion.

340.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, as a result of the Co-Conspirators' conversion through cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, Co-Conspirators have been unjustly enriched.

341.    As a result of the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information, Sylabs requests that the Court issue an order that all right, title, and interest in and to the Stolen Patents be divested from defendant CIQ and fully vested in Sylabs, and that the currently listed inventors in the Stolen Patents be removed and replaced with the names of Sylabs' relevant employees as the sole inventors.

342.    Sylabs further pleads entitlement to a reasonable royalty from each of the Stolen Patents to compensate Sylabs for Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected

LEPISCOPO & ASSOCIATES LAW FIRM

information in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

343.    Sylabs further pleads entitlement to a disgorgement of profits received from each of the Stolen Patents to compensate Sylabs for Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

344.    Sylabs further pleads entitlement to all funds Co-Conspirators have raised due to their cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that exceeds $25,000,000.

**COUNT XI**

**CONVERSION**

**(Against All Defendants)**

345.    The allegations in Paragraphs 1 to 207 are incorporated herein by reference.

346.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, Sylabs' Trade Secrets and IP include scientific, technical, economic, and engineering information, as well as Sylabs' Corporate Secrets and other protected information as herein alleged.

347.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, Sylabs' Trade Secrets and IP constitute information, including systems and methods, code, compilations, programs, devices, methods, techniques, or processes that derive independent economic value from not being generally known to the public or other persons who can obtain significant economic value from the Trade Secrets and IP's disclosure.

348.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, Sylabs has taken reasonable measures to protect the secrecy of the Sylabs' Trade Secrets and IP. However, Co-Conspirators' actions

constitute actual and threatened theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information by Co-Conspirators.

349.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, the Co-Conspirators intended to and knowingly stole and converted through cyber theft from Sylabs' Server and, without authorization, disclosed, acquired, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information. They performed such acts in furtherance of the conspiracy and to perpetrate the theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information in the Northern District of California.

350.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, the Co-Conspirators intended to and knowingly stole and converted Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information through cyber theft and then perpetrated a fraud on the USPTO by submitting fraudulent patent applications to the USPTO and receiving approval and issuance of the Stolen Patents.

351.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, the use of the Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information by Co-Conspirators was without Sylabs' authorization, and Sylabs did not consent to their conversion, acquisition, disclosure, or use of Sylabs' Trade Secrets, IP, Corporate Secrets, or other privileged and protected information.

352.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, the Co-Conspirators intended to convert and steal Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information to their own use and benefit.

353.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, the Co-Conspirators clearly knew and intended that Sylabs, as the owner of the Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information, would be injured by their actions.

354.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, the Co-Conspirators clearly knew that stealing, converting, and using Sylabs' Trade Secrets, IP, Corporate Secrets, and other privileged and protected information for their own interests and benefit but not for Sylabs' benefit exceeded their authority to use Sylabs' Trade Secrets, IP, Corporate Secrets, or other privileged and protected information thereby constituting  conversion.

355.    As alleged in greater detail in Sections V-IX and as alleged in greater detail in Counts I and IV of this Complaint, above, as a result of the Co-Conspirators' conversion through cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, Co-Conspirators have been unjustly enriched.

356.    As a result of the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, Sylabs requests that the Court issue an order that all right, title, and interest in and to the Stolen Patents be divested from defendant CIQ and fully vested in Sylabs, and that the currently listed inventors in the Stolen Patents be removed and replaced with the names of Sylabs' relevant employees as the sole inventors.

357.    Sylabs further pleads entitlement to a reasonable royalty from each of the Stolen Patents to compensate Sylabs for Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

358.    Sylabs further pleads entitlement to a disgorgement of profits received from each of the Stolen Patents to compensate Sylabs for Co-Conspirators' cyber theft and

misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

359.    Sylabs further pleads entitlement to all funds Co-Conspirators have raised due to their conversion through cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that exceeds $25,000,000.

## XI.
## DEMAND FOR TRIAL BY JURY

360.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Sylabs hereby respectfully demands a jury trial on all issues triable by jury.

## XII.
## DEMAND FOR RELIEF

Sylabs requests the following relief:

1.    Pursuant to the confidentiality and seizure provisions of DTSA, 18 U.S.C. §§ 1835 and 1836, an order appointing a special master ("Special Master") to receive and review the documents in Defendants' possession due to their cyber theft of Sylabs' Server, Trade Secrets, IP, Corporate Secrets, Privileged Documents, and/or other privileged or Sensitive Documents.

2.    Pursuant to the confidentiality and seizure provisions of DTSA, 18 U.S.C. §§ 1835 and 1836, an order seizing and directing Defendants, and each of them, to forthwith deliver all servers, laptops, smartphones, tablets, and all other electronic devices to the Special Master.

3.    As a result of the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, Sylabs requests that the Court issue an order that all right, title, and interest in and to the Stolen Patents be divested from defendant CIQ and fully vested in Sylabs, and

that the currently listed inventors in the Stolen Patents be removed and replaced with the names of Sylabs' relevant employees as the sole inventors.

4.    As a result of Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information, Sylabs requests damages against Defendants, jointly and severally, in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

5.    Sylabs further requests an award against the Defendants, jointly and severally, of the reasonable royalty from each of the Stolen Patents to compensate Sylabs for Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

6.    Sylabs further requests disgorgement of profits received by Defendants, jointly and severally, from each of the Stolen Patents to compensate Sylabs for Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

7.    Sylabs further requests an award against Defendants, jointly and severally, for disgorgement and receipt of all funds and capital Co-Conspirators have raised due to their cyber theft and misappropriation of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that exceeds $25,000,000.

8.    Sylabs further seeks exemplary damages against Defendants, jointly and severally, in an amount according to proof.

9.    Sylabs further seeks exemplary damages against Defendants, jointly and severally, in an amount up to two times the amount of Sylabs' actual damages according to proof.

10.    Sylabs further requests entry of an injunction prohibiting Defendants, and each of them, from further acquisition, disclosure, use, and possession of the Sylabs' Trade

Secrets, IP, Corporate Secrets, and/or other privileged and protected information, which is necessary to provide Sylabs with complete relief.

11.    Attorneys' fees and costs.

12.    Pre-judgment and/or post-judgment interest on all damages awarded.

13.    Such other and further relief as the Court deems just and proper.

Dated:  February 24, 2023.                LEPISCOPO & ASSOCIATES LAW FIRM


                                  By:  /s/ Peter D. Lepiscopo          _
                                       **PETER D. LEPISCOPO**
                                       *Counsel of Record*
                                       Attorneys for Plaintiff, **SYLABS, INC.**