

## LEPISCOPO & ASSOCIATES

*SERVING SAN DIEGO & ORANGE COUNTIES*

 http://www.linkedin.com/in/petelepiscopo/
www.LepiscopoLawFirm.com

**NEWPORT BEACH OFFICE**

# EXHIBIT 74

**PETER D. LEPISCOPO, ESQ.   C.S.B.  #139583**
LEPISCOPO & ASSOCIATES LAW FIRM
23 Corporate Plaza Drive, Suite 150
Newport Beach, California 92660
Telephone: (619) 251-2428; Facsimile: (619) 330-2991
Email: plepiscopo@att.net
Counsel of Record for Plaintiff, **SYLABS, INC.**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| **SYLABS, INC.**, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>**GREGORY ROSE** a/k/a **GREGORY M. KURTZER**; **JULIA ROSE** a/k/a **JULIA KURTZER**; **ROBERT ADOLPH**; **MATTHEW HAYDEN**; **ERIN FONG**; **CTRL IQ, INC.** d/b/a **CIQ**; **OPEN DRIVES, INC.**; **DAVID BUSS**; **MARLIN PRAGER**; **JOEL  WHITLEY**; **IAG FUND II, LP a/k/a IAG CAPITAL PARTNERS; IAG CAPITAL HOLDINGS II, LLC a/k/a IAG CAPITAL PARTNERS**; and **DOES 1** through **50**, inclusive,<br><br>Defendants. | Case No.  5:23-cv-00849-SVK<br><br>**SYLABS, INC.'S FIRST AMENDED COMPLAINT FOR:**<br><br>(1) Violation of Defend Trade Secrets Act;<br>(2) Violation of Computer Fraud & Abuse Act;<br>(3) Violation of California Uniform Trade Secrets Act;<br>(4) Violation of Civil RICO, 18 U.S.C. § 1962(c);<br>(5) Violation Civil RICO, 18 U.S.C. § 1962(d);<br>(6) Civil Conspiracy;<br>(7) Violation of California Unfair Trade Practices Act, Cal. Bus & Prof. Code § 17200;<br>(8) Breach of Fiduciary Duty;<br>(9) Aiding & Abetting Breach of Fiduciary Duty;<br>(10) Unjust Enrichment;<br>(11) Conversion;<br>(12) Breach of Written Contract;<br>(13) Intentional Misrepresentation.<br><br>**DEMAND FOR TRIAL BY JURY** |

Pursuant to this Court's December 19, 2023, Order Granting Defendants' Motion to Dismiss, Dkt. 59 ("MTD Order"), which granted leave to amend (*see* p. 16, ll. 1-5), plaintiff, Sylabs, Inc., hereby submits this First Amended Complaint ("Complaint") to cure all the deficiencies identified by this Court in the MTD Order. *See* Fed. R. Civ. P. 15(a)(2).

LEPISCOPO & ASSOCIATES LAW FIRM

For the Court's assistance and convenience, Sylabs has attached a highlighted version of this Complaint so the Court can see the changes Sylabs made to the original complaint for purposes of curing the deficiencies identified in the MTD Order (*see* Exhibit 74).[1]

## I.
## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction of this case ("Action") under 28 U.S.C. §§ 1331 and 1338: it is a civil action arising under the laws of the United States – specifically 18 U.S.C. § 1831 *et seq*., 18 U.S.C. § 1836(b), 18 U.S.C. § 1030, 18 U.S.C. § 1839, 18 U.S.C. § 1962(c), and 18 U.S.C. § 1962(d).

2. This Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.

3. This Court further has jurisdiction over this Action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and an amount in controversy in excess of $75,000.

4. Personal jurisdiction exists specifically over all the defendants because they have each committed acts of misappropriation in this District and the State of California, because they each directly and/or through their officers, directors, investors and their employees, subsidiaries, divisions, groups, or distributors, advertised, marketed, used, offered for sale, imported for sale, and/or sold and continued to sell the products at issue in this Action containing the stolen and misappropriated technology in this District and the State of California, and placed those products in the stream of commerce with the expectation and knowledge that they will be purchased in this District and the State of California. Further, the defendants' theft and misappropriations involved certain trade

---

[1] Hereinafter all citations to "Exhibit" or "Exh." shall refer to the exhibits attached to this Complaint, all of which are true and correct copies of their originals and are incorporated herein by this reference as though fully set forth herein. For example, Exhibit 1 will be cited as "Exh. 1."

LEPISCOPO & ASSOCIATES LAW FIRM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

secrets that were invented in, stored in, or accessed from this District and the State of California. As such, defendants have conspired to and committed violations of various California and federal laws and tortious acts in this District and the State of California; have expressly aimed their actions at this District and the State of California with the knowledge that they would cause harm and substantial injury to Sylabs in the District and the State of California; and Sylabs' claims relate to defendants' products and services containing and/or utilizing trade secrets ("Trade Secrets") stolen and misappropriated from Sylabs and advertised, marketed, used, offered for sale, imported, and/or sold in this District and in the State of California.

5.     Venue is proper in this district ("District") because Defendants committed the complained of acts in this District and are located, reside, are officers and/or directors of other defendants, or do business in this District. 12 U.S.C. § 5564(f).

## II.
## INTRODUCTION & ALLEGATIONS CURING DEFICIENCIES IDENTIFIED IN THE MTD ORDER

6.     This section will provide a general outline of some of the amended allegations designed to cure the pleading deficiencies identified by the Court in its MTD Order, keeping in mind that more detailed allegations curing these deficiencies are set forth in the remaining sections of this Complaint along with submission of supporting Exhibits 1 through 74.

7.     The theft of intellectual property has become a matter of national concern, which has been addressed through federal legislation. For example, in a rare show of solidarity, in 2016 the Defend Trade Secrets Act of 2016 ("DTSA") passed both houses of Congress with remarkable 87-0 approval in the Senate and 410-2 approval in the House. Studies cited placed the cost to the U.S. economy from theft and misappropriation of intellectual property at somewhere between $300 and $480 billion annually, a Senate Judiciary Committee Report noted that the DTSA would benefit trade secret owners by allowing them to bring misappropriation suits in federal court. Recognizing the danger that a trade secret may lose its value once stolen, disclosed, or misappropriated, the Committee

also emphasized that the DTSA's *ex parte* seizure provision is an "important remedy" because it "enables a trade secret owner under limited, controlled conditions, to proactively contain a theft before it progresses and the trade secret is lost."[2]

8.     Sylabs, Inc. ("Sylabs") brings this action under federal and California statutory schemes, separately alleged in Counts I through XXI, inclusive, under the DTSA, 18 U.S.C. § 1831 *et seq*., the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, the civil provisions of the Racketeer Influenced and Corrupt Organizations Act, Patent Infringement, 18 U.S.C. § 1962, Civil Conspiracy, Violation of California Unfair Trade Practices Act, Cal. Bus & Prof. Code § 17200, Breach of Fiduciary Duty, Aiding & Abetting Breach of Fiduciary Duty, Unjust Enrichment, Conversion, Breach of Written Contract, and Intentional Misrepresentation against defendants Gregory Rose a/k/a Gregory M. Kurtzer, Julia Rose a/k/a Julia Kurtzer, Robert Adolph, Matthew Hayden, Erin Fong, CTRL IQ, Inc. d/b/a CIQ, Open Drives, Inc., David Buss, Marlin Prager, Joel Whitley, IAG Fund II, LP a/k/a IAG Capital Partners, IAG Capital Holdings II, LLC a/k/a IAG Capital Partners, and Does 1-50 (collectively "Defendants").

**Sylabs' Cyber Forensics Expert: Former FBI Agent, Christopher Tarbell**

9.     As will be alleged in greater detail below, and pursuant to the Court's MTD Order (Dkt. 59 p. 5, n. 3), Sylabs will include allegations and evidence regarding its claims through the declaration of its expert witness, Christopher Tarbell (Exh. 38) ("Decl. of Tarbell") and supporting Exhibits 1-36, 44, 45, 57, and 68-73.

10.    In preparing his declaration (Exh. 38), Mr. Tarbell has reviewed and considered this Court's MTD Order (Dkt. 59) in order to provide as much information possible to assist the Court in reaching its ultimate decision on this Complaint in the event Defendants file a second set of motions to dismiss. *See* Decl. of Tarbell ¶¶ 1 & 2.

11.    By way of introduction, Mr. Tarbell was a special agent of the Federal Bureau of Investigation ("FBI"). He was employed as a computer forensic examiner and

---

[2]     Report of the U.S. Senate's Committee on the Judiciary, S. Rep. 114-220, at 3 (March 7, 2016).

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

Special Agent. As a member of the FBI's Computer Analysis Response Team ("CART"), his professional responsibilities focused on forensically recovering data and conducting forensic examinations of electronic evidence. He is also certified as a Forensic Computer Examiner with the International Association of Computer Investigative Specialists ("IACIS"). *See* Exh. 38: Decl. of Tarbell ¶¶ 17 and 19-21; Exh. 1, p. 1.

12.    As a Special Agent with the FBI, Mr. Tabell's primary professional responsibility was to conduct criminal investigations into computer and network intrusions, which also involved the retrieval and forensic examination of computer-related evidence. During the course of his career at the FBI, Mr. Tarbell worked on nearly 100 criminal and national security investigations that involved the recovery and forensic analysis of a wide range of electronic evidence as well as the investigations of computer artifacts from cyber intrusions. *See* Exh. 38: Decl. of Tarbell ¶ 17; Exh. 1,  p. 1.

13.    As a computer forensic examiner with the FBI, Mr. Tarbell engaged in rapid-response investigations all over the world on matters related to terrorism, botnets, and other cybercrimes. In 2009, Mr. Tarbell joined the FBI's renowned Cybercrime Squad as a Special Agent in the New York field office. He was the lead investigator on several of the FBI's most complex and cutting-edge cases, including the takedown of the billion-dollar, cryptocurrency based drug marketplace "Silk Road" including the arrest of its founder, and the investigation and arrest of the leadership of the Anonymous/LulzSec hacking crews. *See* Exh. 38: Decl. of Tarbell ¶ 22; Exh. 1, p. 1.

14.    As will be alleged in greater detail below, Sylabs' Drive and Email Audit Logs (Exhs. 44 and 45), along with Exhibits 2-36, 57, and 68-73, evince and memorialize each and every act of cyber corruption, cyber destruction, and cyber theft perpetrated by Defendants. These exhibits contain the following information for each and every unlawful access to Sylabs' computer server system ("Sylabs' Server")[3]:  (a) the identity of the person accessing; (b) the date and time of access; (c) what was accessed; (d) what folders were

---

[3]    At all relevant times, Sylabs' Server was hosted in Google Workspace also referred to as Google Drive. *See* Exh. 38: Decl. of Tarbell ¶¶ 3-5.

LEPISCOPO & ASSOCIATES LAW FIRM

trashed; (e) what folders were deleted; (f) what files were trashed; (g) what files were deleted; (h) what folders were renamed; (i) what files were renamed; (j) what files were download; (k) what directories were created for deletion and copying purposes; (l) what permissions for access were granted and to whom; (m) the specific email addresses utilized to access Sylabs' server; and so on. *See* Exh. 38: Decl. of Tarbell ¶¶ 27-139; Exhs. 44 & 45.

15.     As set forth in his declaration, Mr. Tarbell performed a comprehensive review and analysis of the Audit Logs. *See* Exh. 38: Decl. of Tarbell ¶¶ 42-111; Exhs. 44 & 45.

16.     In his Declaration, Mr. Tarbell explains what an "insider threat" is and how such threats—like the ones posed by Defendants—can use **trust placed in them** to harm a company:

> "The Cybersecurity and Infrastructure Security Agency ("CISA") of the United States defines an insider threat as 'the potential for an insider to use their **authorized** access or understanding of an organization **to harm that organization**.'"

*See* Exh. 38: Decl. of Tarbell ¶ 29 (emphasis added).

17.     As will be alleged in greater detail below, for example, Mr. Tarbell has concluded from his review and analysis of the evidence that defendants Greg Kurtzer, Julia Kurtzer, Robert Adolph, Matthew Hayden, Erin Fong, Marlin Prager, and David Buss were **"insider threats"** to Sylabs at the time they committed cyber corruption, cyber destruction, and cyber theft of Sylabs' Trade Secrets and Intellectual Property:

> "Sylabs suffered multiple insider threat attacks by their former CEO and his cohorts. Sylabs' former CEO, Gregory Kurtzer ("KURTZER"), used his authorized access to and knowledge of Sylabs' intellectual property, trade secrets, confidential information, resources, including personnel, facilities, information, equipment, networks, and system to delete, share with outsiders, and download Sylabs' sensitive corporate data."

*See* Exh. 38: Decl. of Tarbell ¶ 30.

18.    As set forth in his declaration and supporting exhibits, Mr. Tarbell provides numerous factual examples of Defendants' **insider threats** and external cyber intrusions into Sylabs' Server. *See* Exh. 38: Decl. of Tarbell ¶¶ 31-127; Exhs. 2-36, 57, 44, 45, & 68-73.

19.    On page 12 of the MTD Order, this Court determined that under the original complaint (Dkt. 1) Sylabs' "CFAA Claim Fails Because Sylabs Does Not Allege That It Suffered Any Harm Remediable By The Statute" (Dkt. 59, p. 12, ll. 1-27). As set forth in below in Count II, as well as in greater detail in this Section and Sections V-VIII, Sylabs has alleged sufficient facts and provided sufficient evidence to prove Defendants' cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories. As a consequence, Sylabs has suffered actual, remediable damage[4] due to Defendants' cyber corruption and cyber destruction in the form of monetary damage in an amount that exceeds $75,000:

(a)  costs, wages, and fees incurred to discover Defendants' cyber intrusions to Sylabs' Server;

(b)  costs, wages, and fees incurred to discover the harm caused to Sylabs' server, data, folders, files, and directories by Defendants' cyber intrusions, cyber corruption, and cyber destruction;

(c)  costs, wages, and fees incurred to find, gather, and organize evidence of Defendants' cyber intrusions to Sylabs' Server;

(d)  costs, wages, and fees incurred to find, gather, and organize evidence of the harm caused to Sylabs' server, data, folders, files, and directories by Defendants' cyber intrusions, cyber corruption, and cyber destruction;

(e)  costs, wages, and fees incurred to assess the evidence of Defendants' cyber intrusions to Sylabs' Server;

---

[4]    For purposes of CFAA, the terms "**damage**" "**damages**," and "**harm**" shall have the same meaning and will be used interchangeably throughout the Complaint.

SYLABS, INC.'S **FIRST AMENDED** COMPLAINT

7

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

(f)   costs, wages, and fees incurred to assess the evidence of the harm caused to Sylabs' server, data, folders, files, and directories by Defendants' cyber intrusions, cyber corruption, and cyber destruction;

(g)   costs, wages, and fees incurred to conduct forensic analysis of the evidence of Defendants' cyber intrusions to Sylabs' Server;

(h)   costs, wages, and fees incurred to conduct forensic analysis of the evidence of the harm caused to Sylabs' server, data, folders, files, and directories by Defendants' cyber intrusions, cyber corruption, and cyber destruction;

(i)   costs, wages, and fees incurred to prepare forensic reports of the evidence of Defendants' cyber intrusions to Sylabs' Server;

(j)   costs, wages, and fees incurred to prepare forensic reports of the evidence of the harm caused to Sylabs' server, data, folders, files, and directories by Defendants' cyber intrusions, cyber corruption, and cyber destruction;

(k)   costs, wages, and fees incurred to remedy harm caused by Defendants' cyber intrusions to Sylabs' Server;

(l)   costs, wages, and fees incurred to remedy harm caused to Sylabs' server, data, folders, files, and directories by Defendants' cyber intrusions, cyber corruption, and cyber destruction;

(m)  all other costs, wages, and fees incurred as a consequence of Defendants' cyber intrusions to Sylabs' Server; and

(n)  all other costs, wages, and fees incurred as a consequence of Defendants' cyber corruption and cyber destruction to Sylabs' server, data, folders, files, and directories.

20.   Mr. Tarbell has provided an analysis and discussion of evidence to address the insufficiency of the original allegations. *See* Exh. 38: Decl. of Tarbell ¶¶ 3-13. First, Mr. Tarbell explains the security features of Sylabs' Server and Google Workspace:

"One part of Google's security features is the audit logs that record users' actions on Sylabs access controlled computer systems. These audit logs provide Sylabs administrators a detailed list of security-relevant actions

LEPISCOPO & ASSOCIATES LAW FIRM

taken on their sensitive corporate files. These actions include, but are not limited to, trashing files, trashing folders, deleting files, and deleting folders."

*See* Exh. 38: Decl. of Tarbell ¶ 4.

21. Mr. Tarbell goes on to explain why Defendants' trashing or deleting files and folders constitutes the type of harm that is remediable under the Computer Fraud and Abuse Act ("CFAA"). In particular, Mr. Tarbell explains:

"Google states that a user 'can remove Google Drive files and folders from… (Google Workspace) My Drive and shared drives…(with) trash or delete.' Files and folders in Google Workspace Drive can be **permanently deleted without moving the data to trash**. Any file or folder that is moved into trash is automatically deleted after 30 days. **After a file is deleted, any other user that has been shared that file will lose access to the file**."

*See* Exh. 38: Decl. of Tarbell ¶ 5 (emphasis added).

22. Next, Mr. Tarbell connects the preceding explanation with Section 1030(e)(8) of the CFAA: "Damage, as defined in 18 USC § 1030(e)(8), is 'any impairment to the integrity or availability of data, a program, a system, or information.'" *See* Exh. 38: Decl. of Tarbell ¶ 6.

23. Mr. Tarbell then goes  on to explain that Sylabs has suffered cognizable damage that is remediable under CFAA:

"Deleting and trashing, which are automatically deleted after 30 days, files and folders in Sylabs' Google Workspace is a damage. These files' availability to legitimate Sylabs' Google Workspace users was impaired."

*See* Exh. 38: Decl. of Tarbell ¶ 7.

24. Further, Mr. Tarbell explains that under Section 1030(e)(6) Defendants' access to Sylabs' Server for the purpose of deleting and trashing Sylabs' data, files, and directories **exceeded any authorized access** they might have enjoyed under, for example, the IP Assignment/NDA Agreements (*see* Exhs. 48-52):

"Exceeds authorized access, as defined in 18 USC § 1030(e)(6), is to access a computer with authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or

alter. **Deleting and trashing files, damaging the data, on a Sylabs' computer system after resigning from Sylabs is exceeding authorized access**."

*See* Exh. 38: Decl. of Tarbell ¶ 13 (emphasis added).

25.     Finally, Mr. Tarbell provides examples of Defendants' unlawful acts that caused Sylabs damage under Section 1030(e)(8):

"As KURTZER was walking out the door of Sylabs, after tendering his resignation, KURTZER deleted 142 folders (Exhibit 3) and 881 files (Exhibit 4).

Defendant Robert Adolph ("ADOLPH") trashed 24 files from Sylabs' Google Workspace between tendering his resignation and the effective date of his resignation. These trashed files would also be automatically deleted within 30 days.

As Shara Hayden was leaving Sylabs, she deleted 95 folder (Exhibit 34) and deleted 255 files (Exhibit 35).

Defendant Matthew Hayden ("HAYDEN") deleted a file from Sylabs' Google Workspace nine days after his resignation from Sylabs."

*See* Exh. 38: Decl. of Tarbell ¶¶ 8-12; Exhs. 3, 4, 19, 20, 34, 35, 44, and 45.

26.     On page 1 of the MTD Order, this Court immediately focused Sylabs on the main deficiency with its original complaint: "With the exception of Defendant GK, Sylabs offers little detail concerning Defendants' conduct. What detail Sylabs does offer proves insufficient to state any of Sylabs' claims." *See* MTD Order, Dkt. 59, p. 1, ll. 14-16. Further, this Court also identifies the insufficiency of Sylabs' allegations as they relate to specifics regarding Defendants' conspiracy: "but [Sylabs] offers no particularized facts to illustrate Defendants' roles in such a conspiracy." *See* MTD Order, Dkt. 59, p. 8, ll. 11-12.

### Summary of Examples of Defendants' Conspiracy and Individual Defendants' Actionable Conduct

27.     The following sets forth the most egregious examples of Defendants' intentional cyber corruption and destruction of Sylabs' Server, data, folders, and files. Specifically, for example, Sylabs' Trade Secrets in the form of Fuzzball were contained in

LEPISCOPO & ASSOCIATES LAW FIRM

multimedia files (*i.e.*, video and audio files in mp4 format). *See* Exh. 38: Decl. of Tarbell ¶¶ 102 and 103. These files related to what Sylabs' calls, "**All Hands**" meetings, which means: a meeting with the entire company to get everyone together to get updates on each component of the business, to put out guidance, make changes to policy or products and any other items that may be discussed. In this particular context, the "All Hands" meetings concerned the design, development, and design reviews of Sylabs' Trade Secrets relating to Fuzzball. As set forth in the chart below, Defendants **trashed** and **deleted** the listed video and audio files constituting Sylabs' Trade Secrets relating to Fuzzball—this is clear damage to Sylabs (CIQ's competitor) under Sections 1030(e)(8) and 1030(e)(6) of the CFAA, and, of course, this occurred **after** Defendants downloaded all of these to their personal, external emails and servers so they could be used by Defendants to launch defendant CIQ and procure the Fuzzball patents (Exhs. 37, 39, and 40).

28. An example of Defendants' theft of these Fuzzball All Hands Meetings occurred on March 26, 2020, when, <u>prior</u> to trashing and deleting "GMT20191231-211549_ALL-HANDS-.m4a" file, Defendants downloaded this file to defendant Greg Kurtzer's **personal** G-mail account, gmkurtzer@gmail.com. *See* Exh. 38: Decl. of Tarbell ¶¶ 119-121; Exhs. 44, and 45.

29. Here are some additional examples of All Hands Meetings recordings concerning Sylabs' Trade Secrets relating to Fuzzball that were trashed and deleted by Defendants in furtherance of their cyber corruption and cyber destruction of these files, and cyber theft of Sylabs' Trade Secrets:

| DATE TRASHED AND DELETED | DATE & NAME OF FILE | DESCRIPTION | EVIDENCE |
|---|---|---|---|
| 3/26/20 | 12/14/18: "All HANDS Pt. 1 12.14.18.mp4" | Fuzzball: All Hands Meeting Recordings | Exh. 38: Decl. of Tarbell ¶¶ 104-106; Exh. 44 |
| 3/26/20 | 12/14/18: "All HANDS Pt. 2 12.14.18.mp4" | Fuzzball: All Hands Meeting Recordings | Exh. 38: Decl. of Tarbell ¶¶ 107-109; Exh. 44 |

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

| 3/26/20 | 1/11/19: "GMT20190111-210155_ALL-HANDS-.m4a" | Fuzzball: All Hands Meeting Recordings | Exh. 38: Decl. of Tarbell ¶ 111; Exh. 44 |
|---|---|---|---|
| 3/26/20 | 1/11/19: "GMT20190111-210155_ALL-HANDS-1886x1104.mp4" | Fuzzball: All Hands Meeting Recordings | Exh. 38: Decl. of Tarbell ¶ 112; Exh. 44 |
| 3/26/20 | 3/18/19: "GMT20190308-211337_ALL-HANDS-.m4a" | Fuzzball: All Hands Meeting Recordings | Exh. 38: Decl. of Tarbell ¶ 110; Exh. 44 |
| 3/26/20 | 4/12/19: "GMT20190412-195413_ALL-HANDS-.m4a" | Fuzzball: All Hands Meeting Recordings | Exh. 38: Decl. of Tarbell ¶ 115; Exh. 44 |
| 3/26/20 | 4/12/19: "GMT20190412-195413_ALL-HANDS-1920x900.mp4" | Fuzzball: All Hands Meeting Recordings | Exh. 38: Decl. of Tarbell ¶ 116; Exh. 44 |
| 3/26/20 | 5/10/2019: "GMT20190510-200104_ALL-HANDS-.m4a" | Fuzzball: All Hands Meeting Recordings | Exh. 38: Decl. of Tarbell ¶ 113; Exh. 44 |
| 3/26/20 | 5/10/2019: "GMT20190510-200104_ALL-HANDS-1920x972.mp4" | Fuzzball: All Hands Meeting Recordings | Exh. 38: Decl. of Tarbell ¶ 114; Exh. 44 |
| 3/26/20 | 6/21/19: "GMT20190621-195421_ALL-HANDS-.m4a" | Fuzzball: All Hands Meeting Recordings | Exh. 38: Decl. of Tarbell ¶ 117; Exh. 44 |
| 3/26/20 | 6/21/19: "GMT20190621-195421_ALL-HANDS-1920x956.mp4" | Fuzzball: All Hands Meeting Recordings | Exh. 38: Decl. of Tarbell ¶ 118; Exh. 44 |
| 3/26/20 | 12/31/19: "GMT20191231-211549_ALL-HANDS-.m4a" | Fuzzball: All Hands Meeting Recordings | Exh. 38: Decl. of Tarbell ¶¶ 119-120; Exh. 44 |

30.     Another example, in furtherance of their conspiracy and in an effort to conceal their cyber corruption and cyber destruction of Sylabs' data, folders, and files, and cyber theft of Sylabs' Trade Secrets, on April 15, 2020 (after Defendants had already departed from Sylabs), Defendants surreptitiously and without authorization accessed Sylabs' Server to return one of the 12/31/19 Fuzzball All Hands meeting recording,

"GMT20191231-211549_ALL-HANDS-.m4a," to Sylabs' Server, which had been trashed and deleted on March 26, 2020:

> "120. Then on that same day at 1:29:53 PM PT, Gregory Kurtzer changed this file's sharing permissions for gmkurtzer@gmail.com from Can Edit to None. Followed by Gregory Kurtzer **downloading** the file at 1:32:02 PM PT on that same day. Then, on that same day, at 4:14:50 PM PT, Gregory Kurtzer **trashed** the file and then **deleted** the file approximately 24 minutes later. This same file, "GMT20191231-211549_ALL-HANDS-.m4a" with unique Item Id 1VXi0QPCPtozr4PdQsQnLU8KiICPXJ53 was put back on Sylabs' Google Drive on April 15, 2020, at 4:58:19 AM PT by Gregory Kurtzer."

*See* Exh. 38: Decl. of Tarbell ¶ 120; Exhs. 44, and 45 (emphasis added).

31.    In order to provide context for this section, the following general outline of Fuzzball's development is provided. On December 19, 2019, a Zoom meeting was held during which time Sylabs commenced its planning of design and development of Fuzzball, including preparation of an initial planning document ("Fuzzball Planning Document"). Pursuant to this Court's concerns regarding defendant Buss (Dkt. 59, p. 4, ll. 21-22), it is important to note that defendant Buss was in attendance at this 12/19/19 Fuzzball Planning Meeting, as well as other meetings. *See* Exh. 63.

32.    On February 19, 22, and 27, 2020, Sylabs conducted internal demonstrations of how Fuzzball worked. On March 4, 2020, Sylabs created an internal document titled, "Rough Draft" of Fuzzball talking points ("Fuzzball Talking Points"), which provided a general description and discussion of Sylabs' Fuzzball trade secrets. *See* Exh. 64.

33.    The following summary of Sylabs' assets and property that was stolen and misappropriated by Defendants, which are not defined as, nor are they a part of Sylabs' Trade Secrets (hereinafter referred to collectively as "Sylabs' Corporate Assets"):

(a)    corporate documents and minutes of shareholder and board of directors' meetings ("Sylabs' Corporate Records");

(b)    financial records ("Sylabs' Financial Records");

(c)    partner and joint venture records ("Sylabs' Collaboration Records");

(d)    existing and prospective customer list ("Sylabs' Customer List");

LEPISCOPO & ASSOCIATES LAW FIRM

(e)  sales and potential sales lists ("Sylabs' Sales Lists");

(f)  statements of work ("Sylabs' SOWs");

(g)  purchase orders ("Sylabs' POs");

(h)  invoices ("Sylabs' Invoices");

(i)  marketing strategies, plans, and pricing ("Sylabs' Marketing");

(j)  prospective investors list ("Sylabs' Investors");

(k)  human resources ("HR") records ("Sylabs' HR Records");

(l)  employees' files, including information relating to Sylabs employees' salary and benefits packages, payroll information, addresses, dates of birth, driver's licenses, tax identification numbers, etc. (collectively "Sylabs Employees' Files");

(m) offers of employment, executive employment agreements, employment agreements, independent contract agreements, consultant agreements, technical advisor agreements, and reseller agreements  (collectively "Sylabs' Staff Agreements");'

(n)  attorney-client communications, attorney work-product documents, accountant-client communications, settlement negotiations and agreements, nondisclosure agreements, and tax returns (collectively "Sylabs' Privileged Docs"); and

(o)  emails and correspondence from the Sylabs' Server, including but not limited to ones relating to sensitive corporate secrets and affairs, and ones discussing attorney-client communications, attorney work-product documents, accountant-client communications, settlement negotiations and agreements, nondisclosure agreements, and tax returns information (collectively "Sylabs' Sensitive Correspondence").

34.    Sylabs is informed and believes, and based upon such information and belief alleges that in or about February of 2020 defendants Greg Kurtzer, Julia Kurtzer, Adolph, Hayden, Fong, Buss, Prager, and Whitley, and, through their respective officers, CIQ, Open Drives, and IAG,  agreed to carry out their scheme against Sylabs, as set forth in greater detail below in this Section II and Sections V through VIII, inclusive, to create a new company that would be named, CTRL IQ, INC. dba CIQ ("CIQ"), for the express purpose of commandeering all of Sylabs' Trade Secrets, Sylabs' Corporate Assets, and corporate

secrets to cause the following damage to Sylabs (CIQ's competitor) and Sylabs' server, data, folders, files, and directories: (a) corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer data; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer files; (j) cyber intrusion to Sylabs' computer directories; (k) cyber theft of Sylabs' Trade Secrets; (l) cyber misappropriation of Sylabs' Trade Secrets; (m) cyber theft of Sylabs' Corporate Assets; (n) cyber misappropriation of Sylabs' Corporate Assets; (o) cyber theft of Sylabs' corporate secrets; and (p) cyber misappropriation of Sylabs' corporate secrets.

35.     For example, on March 17, 2020, defendants Adolph and Greg Kurtzer were in contact with Vijay Rao, Director of Technology & Strategy at Facebook, for the purpose of promoting Fuzzball for implementation when CIQ was finally launched on April 1, 2020—this constitutes Defendants' direct admission of their intentions to steal Sylabs' Trade Secrets and converting them CIQ's assets:

> "I believe if we could work out an agreement for a yearly support/development model with you/your team, we could easily sidetrack this situation and **possibly even open a __new__ entity focused on this solution (codename __Fuzzball__)**."

*See* Exh. 65 (emphasis added).

36.     Of course, opening a "new entity" in which to place Fuzzball was shorthand for the secret identity of defendant CIQ. This is especially evident since defendant Adolph was promoting "a **__yearly__** support development model. . .", which he clearly meant to be implemented __after__ he left Sylabs in that same month and moved to defendant CIQ. Furthermore, Adolph was  enticing Facebook to get involved in "the **startup phase**" of CIQ and Fuzzball. *See* Exh. 65 (emphasis added).

37.     Sylabs is informed and believes, and based upon such information and belief alleges that in furtherance of their conspiracy, on March 8, 2020, defendants Greg Kurtzer,

LEPISCOPO & ASSOCIATES LAW FIRM

Julia Kurtzer, Adolph, Hayden, Fong, Buss, Prager, and Whitley, and, through their respective officers, CIQ, Open Drives, and IAG,  prepared a budget ("CIQ Budget") for CIQ (identified in the Budget as "Newco"). *See* Exh. 56.

38.    In addition to preparing the budgetary elements, defendants Greg Kurtzer, Julia Kurtzer, Adolph, Hayden, Fong, Buss, Prager, and Whitley, and, through their respective officers, CIQ, Open Drives, and IAG prepared a budget for CIQ, which listed the following Sylabs' customers and prospective customers as CIQ's: (a) LLNL - Spack Collaboration; (b) Genentech; (c) RStor – ABCI; (d) Qualcomm; (e) Lawrence Livermore National Laboratory; (f) Federal Reserve Bank; (g) RStor - RIKEN (Singularity Enterprise); (h) University of Florida; (i) San Diego Supercomputing Center; (j) Pfizer; (k) Sandia National Laboratory; (l) Lawrence Berkeley National Laboratory; (m) MythicAI; and (n) Oak Ridge National Laboratory. S*ee* Exh. 56, p. 1.

39.    As will be discussed in detail below, Sylabs is informed and believes, and based upon such information and belief alleges that as a retired U.S. Navy Admiral, defendant David Buss used his knowledge and expertise with the Department of Defense ("DoD") to recognize the value of Sylabs' DoD projects and how to promote them at the DoD. Sylabs is further informed and believes, and based upon such information and belief alleges that defendant Buss was involved in assessing Sylabs' DoD projects that were under way for the purpose of including them in **CIQ's business plan** and **CIQ Budget** because he knew Sylabs' Trade Secrets would be used as the basis to procure the six CIQ Patents. *See* Exhs. 37 and 39-43.

40.    Further, Sylabs is informed and believes, and based upon such information and belief alleges that in March of 2020, defendant Buss and the other Defendants included a government project that Sylabs was already involved with regarding the U.S. Air Force. Specifically, as set forth in greater detail below in Sections VI and VII, in or about the end of 2019, Sylabs commenced discussions and preparation of its SBIR proposal No. F2-13944 ("SBIR Proposal") regarding its hardened SIF container technology, which Sylabs has titled, "Sylabs' Armored Containers."

LEPISCOPO & ASSOCIATES LAW FIRM

41.    On March 6, 2020, the U.S. Air Force awarded the SBIR Phase 1 contract to Sylabs. *See* Exh. 61.

42.    On March 10, 2020, defendant Greg Kurtzer sent an email to defendants Buss, Adolph, and Prager:  "Hi guys, Here is the formal SBIR Phase 1 Award. Greg" (Exh. 61). At this point defendant Buss and his co-defendants knew that the SBIR Phase 1, as well as follow-up awards for Phase 2 and Phase 3, were Sylabs' property and future business, as it was based and awarded on Sylabs' technology. However, defendants Buss, Greg Kurtzer, Adolph, and Prager's plan in furtherance of their conspiracy was already underway so that CIQ would benefit from SBIR Phase 1, Phase 2, and Phase 3, including planning on its revenues in CIQ's budget (Exh. 58). Decl. of Tarbell ¶ 41; Exhs. 44, 45, and 57.

43.    Specifically, in a March 16, 2020, email to his co-defendants Buss, Greg Kurtzer, and Prager, defendant Adolph discussed Sylabs' SBIR that was stolen by Defendants for use by **"NewCo,"** which is actually defendant **CIQ**:

"Hi Marlin and Dave,
        This is the **NewCo** next **SBIR**...This is them asking for the Sylabs Edge Solution.
        The current SBIR is just secure containers. . ."

*See* Decl. of Tarbell ¶ 41; Exh. 58: 3/16/20 Email from Robert Adolph to  David Buss, Greg Kurtzer, and Marlin Prager (emphasis added); *see also* Exh. 56 and below in Section VI of this Complaint, ¶ 288 ("The 'Newco' which they began to refer to in emails eventually would become defendant CIQ, which is the company that eventually received the stolen Sylabs Trade Secrets.").

44.    Further, in a March 29, 2020, email to his codefendants, Greg Kurtzer, Marlin Prager, and Robert Adolph, defendant Buss' involvement with SBIR through the U.S. Navy's program is evident:

"Interesting. I just received a LinkedIn connection request from Matt Williams, who runs the Navy's SBIR program. Of course I said yes and connected. Will reach out to him.
Dave

David H. Buss
CEO, OpenDrives, LLC"

*See* Decl. of Tarbell ¶ 41; Exh. 59: 3/29/20 Email from David Buss to Greg Kurtzer, Marlin Prager, and Robert Adolph.

45.    In March of 2020, after the U.S. Air Force awarded the Phase 1 SBIR to Sylabs, defendant Buss and the other Defendants included within CIQ's Budget the following revenue line items regarding Sylabs' SBIR Award & Proposal: (a) USAF SBIR Phase 1, $50,000;  (b) USAF SBIR Phase **2**, $2,000,000; and (c) USAF SBIR Phase **3**, $5,000,000. Keep in mind, at this very time Defendants were not only corrupting, destroying, and stealing Sylabs' data, files, and directories, they were actively planning how they—through CIQ—would benefit from Sylabs' customers and active projects with the Department of Defense. *See* Exh. 56, p. 1; Exh. 38: Decl. of Tarbell ¶ 41; Exhs. 44 and 45: Drive and Mail Audit Logs.

46.    Further, in that same CIQ Budget (Exh. 56), Defendants further revealed their unlawful intentions when they treated Fuzzball as their own. Specifically, Defendants identify six different Fuzzball products based on Sylabs' Fuzzball Trade Secrets, which will be promoted by CIQ: (a) Fuzzball licensing and support; (b) FuzzStack; (c) FuzzStack on hardware; (d) FuzzCloud (SaaS); (e) FuzzSecure; and (f) FuzzEdge. *See* Exh. 56, p. 1.

47.    Returning to the Court's request for additional allegations regarding defendant Buss' involvement, a series of emails for the timeframe March 10, 2020, through March 29, 2020, are provided showing defendant Buss' involvement in all aspects of the conspiracy  and planning of the transition of Sylabs' business to CIQ. *See* Exh. 62: 3/10/20 email (pp. 1-2), 3/13/20 email (p. 3), 3/16/20 email (p. 4), 3/19/20 email (pp. 5-8), 3/19/20 email (p. 9), 3/27/20 email (pp.  10-11), and 3/29/20 email (p. 12).

48.    Further, defendant Buss' email activity with his co-defendant Adolph  was ongoing from March 8, 2020, through March 30, 2020, regarding Sylabs' SBIR and other issues relating to Sylabs' ongoing business and defendant CIQ's **pre-start** up business. *See*

LEPISCOPO & ASSOCIATES LAW FIRM

Exh. 57: David Buss' email audit logs; Exh. 38: Decl. of Tarbell ¶¶ 41 and 98-101; Exhs. 44 and 45: Drive and Mail Audit Logs.

49.  On March 11, 2020, defendant Greg Kurtzer gave defendant Prager access to view a file titled "Email cover to Joel", which Prager accessed. On the same day, defendant Greg Kurtzer sent defendant Joel Whitley, a principal of defendant IAG, an email ("Kurtzer/Whitley Email"),  wherein he explains part of the conspiracy to commit cyber theft of Sylabs' Trade Secrets and Sylabs' customers, including confirming the information set forth in the CIQ Budget:

"Dear Joel, . . .

This will provide us with the ability to keep the team together and continue the development of Fuzzball/HPC-2.0. Additionally, we have some big name customers and opportunities we've been developing and this will allow us to continue bringing in the ARR (about $1M today) while also servicing a pipeline of $10M over the next 24 months.

It is important to note that the intellectual property that we would need to build Fuzzball is all open source and I personally lead those respective open source projects and communities. Sylabs does have some commercial IP, which would be quite advantageous to have (e.g. Singularity Enterprise, which is not open source), but it is not a requirement for Fuzzball or any of our plans or projections for **NEWCO**. . .

The second model demonstrates inclusion of an optimistic sales pipeline which includes multiple DOD awards, strategic development NREs, as well as building ARR. It also includes several new market injection points around Fuzzball, which are conservative."

*See* Exh. 46: 3/11/20 Kurtzer/Whitley Email, pp. 1, 5-6; Decl. of Tarbell ¶¶ 22 & 24.b; Exh. 45: Mail Audit Logs, Greg Kurzer, 3/11/20.

50.  Sylabs is informed and believes, and based upon such information and belief alleges that in furtherance of their conspiracy, on or about March 8, 2020, defendants Greg Kurtzer, Julia Kurtzer, Adolph, Hayden, Fong, Buss, Prager, and Whitley, and, through their respective officers, CIQ, Open Drives, and IAG, agreed to engage in unauthorized access—through insider and external threats—for the purpose of having defendant Greg

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

Kurtzer provide defendants Julia Kurtzer, Adolph, Hayden, Fong, Buss, Prager, and Whitley with unauthorized access and credentials and permissions to access Sylabs' Server in order to carryout their conspiracy to cause damage to Sylabs (CIQ's competitor) and Sylabs' server, data, files, and directories: (a) cyber corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer files; (j) cyber intrusion to Sylabs' computer directories; (k) cyber theft of Sylabs' Trade Secrets; (l) cyber misappropriation of Sylabs' Trade Secrets; (m) cyber theft of Sylabs' Corporate Assets; (n) cyber misappropriation of Sylabs' Corporate Assets; (o) cyber theft of Sylabs' corporate secrets; and (p) cyber misappropriation of Sylabs' corporate secrets. *See* Exh. 38: Decl. of Tarbell ¶¶ 31-127; Exhs. 2-36 and 57; Exhs. 44 and 45: Drive and Mail Audit Logs.

51.     During the month of March 2020, prior to defendant Greg Kurtzer tendering his resignation, his account g@sylabs.io changed sharing, accessing, viewing, and downloading permissions 54 times across 44 files and one folder, including, for example:

(a)     granted permissions to defendants Adolph, Prager, Open Drives, Whitley, and IAG, which were used by them to access and edit the CIQ Budget (*see* Exh. 38: Decl. of Tarbell ¶¶ 32 and 50-54; Exhs. 2, p. 1; Exhs. 25, 28, and 29; Exhs. 44 and 45: Drive and Mail Audit Logs);

(b)     granted permission to defendants Whitley and IAG, which were used by them to access and view all of Sylabs' Corporate Secrets, including, for example, all of Sylabs' corporate records,  board consents, stock purchase agreements, indemnification agreements, Series Seed Cert. SS-1 (R-Stor), investors' rights agreements, 409A valuations, patent cooperation treaty, and other documents (*see* Exh. 38: Decl. of Tarbell ¶ 50; Exh. 36; Exhs. 44 and 45: Drive and Mail Audit Logs);  and

(c)      granted permissions to defendants Adolph and Open Drives, which were used by them to view and comment on Sylabs' privileged document, Settlement Agreement between Sylabs and R-Stor, Inc. (*see* Exh. 38: Decl. of Tarbell ¶ 50.h; Exh. 26; Exhs. 44 and 45: Drive and Mail Audit Logs).

52.      Sylabs is informed and believes, and based upon such information and belief alleges that in furtherance of their conspiracy, in or about March 8, 2020, defendants Greg Kurtzer, Julia Kurtzer, Adolph, Hayden, Fong, Buss, Prager, and Whitley, and, through their respective officers, CIQ, Open Drives, and IAG, agreed to engaging in unauthorized access—through insider and external threats—for the purpose of having defendant Greg Kurtzer to engage in cyber corruption and cyber destruction of Sylabs' data, folders, files, and directories. Keep in mind, and as will be alleged in greater detail below in Sections V through VIII, Defendants copied Sylabs' Server in its entirety. So, through their cyber theft Defendants copied all Sylabs' data, folders, files, and directories, and then through their cyber corruption and cyber destruction deleted Sylabs' date, folders, files, and directories. For example, between tendering his resignation and the effective date of his resignation, March 31, 2020, defendant Greg Kurtzer deleted 142 folders on March 26, 2020, including, for example: (a) meetings and meeting notes; (b) proposals; (c) Fuzzball Demo; (d) presentations; (e) recruiting; (f) customer documents; (g) full drive; (h) SBIR documents (i) semi-automatic container creation; (j) professional services; (k) SingularityPRO; (l) Singularity Enterprise; (m) Qualcomm; (n) PR/Analyst Relations; (o) trade events; (p) product management; (q) pricing; (r) Fuzzball; (s) All corporate docs; (t) signed corporate and individual NDAs; (u) reseller agreements; (v) marketing materials; (w) brainstorming; (x) resumes; and (y) customer and partner meetings. *See* Exh. 38: Decl. of Tarbell ¶¶ 9 and 51.c; Exh. 3, p. 1; Exhs. 44 and 45: Drive and Mail Audit Logs.

53.      Another interesting part of Defendants' conspiracy was to gather up all of Sylabs' email addresses for contacts, customers, etc. Specifically, Sylabs is informed and believes, and based upon such information and belief alleges that in furtherance of their conspiracy, between March 22 through 31, 2020, defendants Greg Kurtzer, Julia Kurtzer,

Adolph, Hayden, Fong, Buss, Prager, and Whitley, and, through their respective officers, CIQ, Open Drives, and IAG, agreed to engage in unauthorized access—through insider and external threats—for the purpose of having defendant Greg Kurtzer change the accessiblility and ownership of email contact information and converted to **.csv** (comma-separated values)[5] formatted files used for spreadsheets, including, for example: (a) Emails.csv; (b) Contact_Emails.csv; (c) Lead_Emails.csv; (d) Deal_Contacts.csv; and (e) Appointment_Attendees.csv. *See* Exh. 38: Decl. of Tarbell ¶ 51.h; Exh. 7, pp. 1-2; Exhs. 44 and 45: Drive and Mail Audit Logs.

54.    There are significant additional allegations set forth below in Sections V through VIII regarding Defendants' unlawful conduct in furtherance of their conspiracy and intrusion into Sylabs' Server. However, one last point needs to be made in this Section II. Specifically, Sylabs is informed and believes, and based upon such information and belief alleges that in furtherance of their conspiracy, defendants Greg Kurtzer, Julia Kurtzer, Adolph, Hayden, Fong, Buss, Prager, and Whitley, and, through their respective officers, CIQ, Open Drives, and IAG, agreed to continue engaging in unauthorized access even **after** defendants Greg Kurtzer, Adolph, Hayden, Julia Kurtzer, and Fong left their employment with Sylabs on March 31, 2020. For example, between April 2, 2020 and April 15, 2020, Defendants made significant and ongoing unlawful cyber intrusions into Sylabs' Server for the purposes of: (a) cyber corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer files; (j) cyber intrusion to Sylabs' computer directories; (k) cyber theft of Sylabs' Trade Secrets; (l) cyber misappropriation of Sylabs' Trade Secrets; (m) cyber theft of Sylabs' Corporate Assets;

---

[5]    As utilized and defined by the Library of Congress, see definition of **.csv** files: https://www.loc.gov/preservation/digital/formats/fdd/fdd000323.shtml

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

(n) cyber misappropriation of Sylabs' Corporate Secrets; (o) cyber theft of Sylabs' corporate secrets; and (p) cyber misappropriation of Sylabs' corporate secrets. *See* Exh. 38: Decl. of Tarbell ¶ 52; Exhs. 16 through 23; Exhs. 44 and 45: Drive and Mail Audit Logs.

55.     In its MTD Order, this Court analyzed Sylabs' Defense of Trade Secrets Act ("DTSA") (Count I) and California's Uniform Trade Secrets Act ("CUTSA") (Count III) "together because the elements are substantially similar." *See* Dkt. 59, p. 8, ll. 22-24 (citation omitted). Thus, Sylabs will address the Court's concerns to Counts I and III together. Further, the Court expressed concerns that Sylabs did not plead facts with sufficient particularity to establish Sylabs' Trade Secrets under DTSA and CUTSA: (a) Sylabs did not allege facts sufficient to show those aspects of its SIF technology **not** discussed in Sylabs' U.S. Patent Application No. US 2019/0377708 A1 ("Sylabs SIF Application") (*see* Exh. 54); and (b) Sylabs did not allege facts sufficient to show the policies, methods, and procedures it maintained to protect the secrecy of its Trade Secrets from being publicly disclosed (Dkt. 59, p. 8, l. 21 through p. 11, l. 27).

### Sylabs' SIF Technology Trade Secrets

56.     As to showing those aspects of its SIF technology **not** discussed in Sylabs' SIF Application, Sylabs has provided sufficient allegations below in this Section II and Section VIII of this Complaint (*see* ¶¶ 167, 210, and 372, Figure 10).

57.     As to Sylabs' Fuzzball technology, as set forth in greater detail below in Section IV, CIQ's Six Patents are based on Sylabs' Trade Secrets regarding Fuzzball. Specifically, as set forth below in greater detail in Section VI, ¶¶ 207-209, CIQ's Patent Nos. US 10,970,113 (Exh. 37), US 11,099,893 (Exh. 39), and  US 11,310,342 (Exh. 40), are described and based upon the high level architecture of the "Fuzzball/HPC 2.0" project, which was born out of Sylabs' research and development starting in June of 2019.

58.     As to the SIF Technology, as set forth below in greater detail in Section VI, ¶¶ 210-211, CIQ's Patents Based on  Sylabs' Armored Containers Trade Secrets, CIQ's Patent Nos. US 11,055,428 (Exh. 41), US 11,163,902 (Exh. 42), and US 11,321,064 (Exh.

43) are described and based upon the Armored Container Technology, which was born out of Sylabs' research and development starting in June of 2019. It is important to note that the armored technology that serves as the basis of CIQ's patents is **not** based on the technology disclosed in Sylabs' SIF Application for its SIF technology.

**Sylabs' Efforts to Protect Its Trade Secrets**

59.      As mentioned, the MTD Order indicates that Sylabs needs to identify and allege the specific policies, methods, and procedures utilized by Sylabs to protect its Trade Secrets (*see* Dkt. 59, p. 11, ll. 13-17).

60.      As to the policies, methods, and procedures Sylabs maintained to protect the secrecy of its Trade Secrets from being publicly disclosed,  Sylabs  provides the following allegations to cure this deficiency.

61.      Generally, Sylabs' Server and Google Workspace provide security for the protection of Sylabs' Trade Secrets. *See* Exh. 38: Decl. of Tarbell ¶¶ 3-5. Of course, this type of security was nullified by Defendants through their unlawful and unauthorized intrusions into Sylabs' Server when they were insider threats and external threats with unimpeded access to Sylabs' Server from March 2020 through June 2020. Specifically, Mr. Tarbell provides numerous factual examples of Defendants' insider threats and external cyber intrusions into Sylabs' Server. *See* Exh. 38: Decl. of Tarbell ¶¶ 29-127; Exhs. 2-36, 57, 44, & 45.

62.      Sylabs provides the following policies, methods, and procedures Sylabs utilized to maintain secrecy of and protect from public disclosure of its Trade Secrets (collectively "Trade Secret Protections"). *See* Exh. 47.

63.      Sylabs utilized a protective server environment for its data, folders, files, and directories. Specifically, Sylabs utilized Google Workspace, which is a cloud computing-based service that many companies utilize for employees to collaborate, store, and share files. Workspace has a robust logging feature that allows the auditing of employee activities within this environment. *See* Exh. 38: Decl. of  Tarbell ¶ 4.

64.     Sylabs utilized Workspace features such as Google Drive to securely store, edit, and work together on sensitive corporate files. Sylabs employed these Google Workspace tools in part to ensure the security of their company secrets and sensitive data. *See* Exh. 38: Decl. of Tarbell ¶ 5.

65.     In addition to the Trade Secret Protections, Sylabs maintained conflict of interest policies ("Conflict of Interest Policies") to not only ensure the secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets and those having knowledge of those Trade Secrets from being utilized as a means of **competing against Sylabs**—in the way that Defendants' conspiracy empowered CIQ to compete against Sylabs after stealing Sylabs' Trade Secrets and Sylabs' Corporate Assets. *See* Exh. 47.

66.     In addition to the Trade Secret Protections and Conflict of Interest Policies, Sylabs maintained and utilized various technology-based protections ("Technical Protections") to not only maintain secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets from being utilized and those having knowledge of those Trade Secrets from utilizing them as a means of competing against Sylabs.

67.     So, for example, during all times relevant to this Action, Sylabs took steps to ensure that all source code and other materials related to its Fuzzball and Armored Containers Trade Secrets were kept secret, as is the general practice for other closed source Sylabs projects/products such as SingularityPRO and Singularity Enterprise. Thus, source code, technical documentation, and planning material are stored in private server projects, and access to the projects was strictly limited on a need-to-know basis even within Sylabs. As is common practice at technology firms, Sylabs' employees, including Defendants, execute IP Assignment/NDA Agreements. *See* Exhs. 48-52.

68.     By way of an actual example, during the relevant timeframe of this Action, Sylabs was engaged in pursuing business with the United States Government, in particular the DoD. So, for example, when Sylabs responded to the U.S. Government's request for proposal, which is titled "Open Call for Innovative Defense-Related Dual-Purpose Technologies/Solutions with a Clear Air Force Stakeholder" ("RFP"), such

LEPISCOPO & ASSOCIATES LAW FIRM

communications were subject to DoD nondisclosures. For example, it included in this RFP, as well as other proposals, the following Notice (*see* Exh. 53):

"This proposal includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed-in whole or in part-for any purpose other than to evaluate this proposal. If, however, a contract is awarded to this offeror as a result of-or in connection with-the submission of this data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. . ."

69.     In addition to the Trade Secret Protections, Conflict of Interest Policies, and Technical Protections, Sylabs also utilized intellectual property assignment agreements and nondisclosure agreements ("IP Assignment/NDA Agreements") to not only maintain the secrecy of Sylabs' Trade Secrets and Sylabs' Corporate Assets but also prevent those Trade Secrets and Corporate Assets from being utilized and those having knowledge of these from utilizing them as a means of competing against Sylabs. *See* Exhs. 47-52.

70.     However, as alleged in greater detail below in Sections VI-VIII of this Complaint, notwithstanding the Trade Secret Protections, Conflict of Interest Policies, Technical Protections, and IP Assignment/NDA Agreements specifically created and utilized by Sylabs, Defendants simply ignored and failed to comply with them and affirmatively conspired to circumvent them for purposes of causing cyber corruption, cyber destruction, and cyber theft of Sylabs' Trade Secrets and Sylabs' Corporate Assets. As a consequence, Defendants created a turnkey start-up, defendant CIQ, which was an immediate competitor of Sylabs.

71.     Sylabs provides the following summary of the specific policies, methods, and procedures comprising Sylabs' Trade Secret Protections, Conflict of Interest Policies, Technical Protections, and IP Assignment/NDA Agreements, all of which are designed to protect Sylabs' Trade Secrets, Corporate Secrets, and Privileged and Protected Information. *See* Exhs. 47-52.

72.     **Trade Secret Protections:** These include specific policies and procedures set forth in Sylabs' Employee Handbook ("Handbook") (*see* Exh. 47) that was in effect during all relevant timeframes alleged herein. In particular, the Handbook provides

LEPISCOPO & ASSOCIATES LAW FIRM

extensive protections for all of Sylabs' computers, computer servers, computer storage, databases, email, voice mail, use of internet, laptops, tablets, and cell phones (collectively "Sylabs' Computer Systems") (*see* Exh. 47, p. 15; emphasis added):

"**Computers, Databases, E-Mail, Voice Mail and the Internet**

The following policy governs the use of all Company controlled computer equipment and software, collectively referred to hereinafter as 'Our Company Computer Systems.' Our Company Computer Systems includes all computing/processing assets either owned, leased, internally developed, or otherwise within the company's control, including servers, computers, laptops, tablets, handheld devices, storage devices, electronic devices, cell phones, smart phones, scanners, copiers, fax machines, databases, applications, cloud services, and network infrastructure used for Company business (including e-mail, voice mail, Internet access, data processing, data storage, and application development, installation, and maintenance). This policy also governs all Personal devices used for Company business including tablets, handheld devices, laptops, cell phones, smart phones, or home computers that are connected with or to Our Company Computer System on a regular or intermittent basis, but which otherwise are not part of Our Company Computer Systems.

Every component of Our Company Computer Systems is Our Company's property to be used to facilitate the business of Our Company. All information that is temporarily or permanently stored, transmitted or received via Our Company Computer Systems remains the sole and exclusive property of Our Company. As such, employees should have no expectation of privacy in connection with their access and use of such equipment and systems.

Employees should not use or access Our Company Computer Systems in any manner that is unlawful, inappropriate, or wasteful of Company resources, or contrary to Our Company's best interests. These electronic tools are provided to assist employees with the execution of their job duties and should not be abused."

73.    The Handbook also makes clear that Sylabs owns all Trade Secrets, and software installed on and data, folders, files, and directories stored in Sylabs' Server and other devices, and specifically prohibits such software, files, and data from being removed

LEPISCOPO & ASSOCIATES LAW FIRM

or taken upon termination of employment with Sylabs (*see* Exh. 47, pp. 15-16; emphasis added):

"**Company Property**

All software that has been installed on Our Company Computer Systems is Company property and may not be used for any non-business, unlawful or improper purpose. In addition, all data temporarily or permanently received, collected, downloaded, uploaded, copied and/or created on Our Company Computer Systems and all data temporarily or permanently received, collected, downloaded, uploaded, copied and/or created on non-Company computers used for Company business that relates in any manner to our Company's business is subject to monitoring by our Company, is the exclusive property of our Company and may not be copied or transmitted to any outside party or used for any purpose that violates this policy.

Upon termination of employment, an employee shall not remove any software or data from Our Company Computer Systems and shall completely remove all data collected, downloaded and/or created on non-Company computers used for Company business that relate in any manner to our Company's business. Upon request of our Company, a terminating employee shall provide proof that such data has been removed from all personal computers used for Company business."

74.    As alleged in greater detail below, Defendants violated this policy on numerous occasions during and after their tenure with Sylabs, including through unauthorized access.

75.    The Handbook also sets forth the proper and prohibited uses of Sylabs' Computer Systems (*see* Exh. 47, pp. 16-18; emphasis added):

"**Proper Use**

Employees are strictly prohibited from using Our Company Computer Systems, or personal computers used for Company business, for any purpose that violates this policy. Any employee who uses Our Company Computer Systems in violation of this policy will be subject to discipline, up to and including immediate termination.

**Prohibited Use Under Any Circumstances**

It is not possible to identify every type of inappropriate or impermissible use of Our Company Computer Systems. The following conduct, however, is strictly prohibited under any circumstances and at any time: . . .

- Employees may not use Our Company Computer Systems in any manner that violates our Company's Policy on Confidential and Trade-Secret Information.
- Employees may not use or allow another individual to use Our Company Computer Systems for any purpose that is competitive with our Company. All such access and use is unauthorized.
- Employees must honor and comply with all laws applicable to trademarks, copyrights, patents and licenses to software and other electronically available information. Employees may not send, receive, download, upload or copy software or other copyrighted or otherwise legally protected information through our Company Computer System without prior authorization.

**Prohibited Use During Working Time**

The following conduct is prohibited during an employee's working time, which excludes time spent on an employee's meal or rest break, or before or after an employee's shift:

- Employees may not solicit personal business opportunities or conduct personal advertising through Our Company Computer System.
- Employees may not access Our Company Computer System for any purpose that does not advance the employer's legitimate business interests.
- Employees may not download, transmit, stream or retrieve messages, data, or information from multi-network gateways, real-time data and conversation programs including, but not limited to, instant messaging services (e.g. G-Chat and Yahoo Messenger), chat rooms and message boards, unless such activity is necessary for business purposes.

**Unsolicited E-mail**

Electronic mail has become an extremely important and efficient means of communication, particularly in the business world. However, the abuse of electronic mail systems, as well as the receipt and transmission of unsolicited commercial electronic mail places an incredible drain on Our Company Computer Systems, and imposes significant monetary costs to filter and remove unsolicited e-mails from our system. To eliminate the receipt and

transmission of unsolicited commercial electronic mail, our Company complies with the federal "CAN-SPAM" law. All employees are responsible for complying with the federal Anti-Spam regulations and therefore may not use Our Company Computer Systems to transmit unsolicited commercial email:

- Promoting our Company's business, goods, products and services without prior authorization.
- Promoting your own personal business, goods, products and services.
- To our Company's customers who have elected to "opt-out" of receiving our Company's electronic advertisements.
- That contains or is accompanied by maliciously false or misleading information.
In addition, to help our Company eliminate the receipt of unsolicited commercial e-mail from outside parties advertising various websites, products or services and to further prevent the receipt of offensive or undesired outside e-mail, employees should delete unfamiliar or suspicious e-mail from outside our Company without opening it."

76.    Further, the Handbook sets forth policies and procedures to protect the integrity of Sylabs' Computer Systems, files, directories, and data (*see* Exh. 47, pp. 18-19; emphasis added):

**"System Integrity**

Because outside storage devices may compromise Our Company Computer Systems, employees are not permitted to use personal storage devices or copies of software or data in any form on any Company computer without first: (1) obtaining specific authorization from Our Internal HR Contact, and (2) scanning the data for viruses. Any employee who intentionally introduces a virus into Our Company Computer Systems via use of personal software or data may be held responsible for the consequences, including cost of repair and lost productivity.

Similarly, information is not to be downloaded directly from the Internet onto Our Company Computer Systems. All information downloaded from the Internet is to be placed on a disk and scanned for viruses before being introduced into Our Company Computer System."

LEPISCOPO & ASSOCIATES LAW FIRM

77.   **Conflict of Interest Policy:** In addition to the Trade Secret Protections, the Handbook sets forth Sylabs' Conflict of Interest Policy (*see* Exh. 47, p. 19; emphasis added):

"**Conflict of Interest**

Our policy forbids employees from engaging in any other business that competes with our Company. Company policy also forbids a financial interest in an outside concern, which does business with or is a competitor of our Company (except where such ownership consists of securities of a publicly owned corporation regularly traded on the public stock market).

Rendering of directive, managerial, or consulting services to any outside concern which does business with or is a competitor of our Company, except with the knowledge and written consent of Our Internal HR Contact, is also prohibited. If you think that there is a possibility that any business venture of yours may conflict with this policy, it is your responsibility to notify Our Internal HR Contact and obtain his/her approval in writing."

78.   In addition to the foregoing protections, the Handbook also sets forth Sylabs' specific policy on the protection of trade secrets and other protected information ("Trade Secrets Policy") (*see* Exh. 47, pp. 19-20; emphasis added):

"**Protection of our Company's Trade Secrets and Confidential Information**

As part of their employment with our Company, employees may be exposed to and/or provided with trade secrets ('Trade Secrets') and other confidential and proprietary information ("Confidential Information") of our Company relating to the operation of our Company's business and its customers (collectively referred to as 'Trade Secrets/Confidential Information').

'Trade Secrets' mean information, including a formula, pattern, compilation, program, device, method, technique or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons or entities who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain it secrecy. Our Company's Trade Secrets are: (1) not generally known to the public or to our Company's competitors; (2) were developed or compiled at significant expense by our

LEPISCOPO & ASSOCIATES LAW FIRM

Company over an extended period of time; and (3) are the subject of our Company's reasonable efforts to maintain their secrecy.

'Confidential Information' means information belonging to our Company, whether reduced to writing or in a form from which such information can be obtained, translated or derived into reasonably usable form, that has been provided to employees during their employment with our Company and/or employees have gained access to while employed by our Company and/or were developed by employees in the course of their employment with our Company, that is proprietary and confidential in nature.

As part of the consideration employees provide to our Company in exchange for their employment and continued employment with our Company is their agreement and acknowledgement that all Trade Secrets/Confidential Information developed, created or maintained by them shall remain at all times the sole property of our Company, and that if our Company's Trade Secrets/Confidential Information were disclosed to a competing business or otherwise used in an unauthorized manner, such disclosure or use would cause immediate and irreparable harm to our Company and would give a competing business an unfair business advantage against our Company."

79.     Further, Sylabs' Trade Secrets Policy prohibited Defendants from disclosing Sylabs' Trade Secrets during or **after** they left their employment with Sylabs (*see* Exh. 47, p. 20; emphasis added):

"Employees will not, except as required in the conduct of our Company's business or as authorized in writing by our Company, **disclose or use during their term of employment or subsequent thereto any Trade Secrets/Confidential Information.** Furthermore, all records, files, plans, documents and the like relating to the business of our Company which employees prepare, use or come in contact with shall be and shall remain the sole property of our Company and shall not be copied without written permission of our Company and shall be returned to our Company on termination or cessation of employment, or at our Company's request at any time."

80.     **IP Assignment/NDA Agreements:** In addition to being bound by the protections of Sylabs' Trade Secret Protections and Conflict of Interest Policy, Defendants Greg Kurtzer, Matthew Hayden, Erin Fong, Robert Adolph, David Buss, Marlin Prager,

LEPISCOPO & ASSOCIATES LAW FIRM

and Open Drives are bound by intellectual property assignments and nondisclosure agreements (referred to individually as "Kurtzer Assignment/NDA," "Hayden Assignment/NDA," "Fong Assignment/NDA," "Adolph Assignment/NDA," "Buss/Prager/Open Drives NDA," or collectively as "Defendants' Assignments/NDAs") (*see* Exhs. 48-52, respectively).[6]

81.     Sylabs is informed and believes, and based upon such information and belief alleges that Whitley and IAG have not executed a nondisclosure or confidentiality agreement with Sylabs for the relevant times alleged herein, as no nondisclosure or confidentiality agreement has been located in any of Sylabs' records. In furtherance of Defendants' conspiracy, Sylabs is further informed and believes, and based upon such information and belief alleges that defendant Greg Kurtzer and defendants Whitley and IAG agreed that they would not enter into a nondisclosure or confidentiality agreement so as to conceal the identities of Whitley and IAG from Sylabs. This is supported by the fact that during this same time frame, in meetings with prospective investors (except IAG), defendant Greg Kurtzer did everything he could to dissuade **other prospective** investors from investing in Sylabs, thereby sabotaging Sylabs' ability to receive investment capital. For example, he feigned being unprepared for meetings and uninterested in his presentations, could not explain Sylabs' existing products, provided incorrect and foolish answers to questions, and exhibited other behavior and demeanor that resulted in **all** investors being scared off and not moving forward with any further discussions or negotiations with Sylabs. Thus, Defendants' conspiracy scared-off investors for Sylabs, **while securing IAG as the investment capital for CIQ** when it was launched on April 1,

---

[6]     David Buss, Marlin Prager, and Open Drives are bound by the same Nondisclosure and Confidentiality Agreement, Exhibit 52. Specifically, defendant Buss is and at all times alleged herein was a director of defendant Open Drives and Open Drives' chief executive officer and secretary; and defendant Prager is and at all times alleged herein was a director of Open Drives and Open Drives' chief financial officer.as alleged below in Section IV.

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

2020. For added context, this was occurring during the time frame that Sylabs was commencing preparation of its SBIR Proposal for presentation to the DoD.

82.     As alleged in greater detail below and setting aside the federal and California statutory schemes set forth herein prohibiting the cyber corruption, cyber destruction, and cyber theft, Sylabs' Trade Secret Protections and Conflict of Interest Policy prohibited Defendants from engaging in the unlawful conduct alleged herein.

83.     **Technical Protections:** Additionally, Sylabs takes very technical steps to secure and keep its Trade Secrets protected, secret, and secure from public disclosure ("Technical Protections"). In particular, Sylabs has ensured that all source code and other materials related to its Trade Secrets are kept secret, as is the general practice for other closed source Sylabs projects and products, such as SingularityPRO and Singularity Enterprise. Source code, technical documentation, and planning material are securely stored, and access to Sylabs' Trade Secrets is strictly limited on a need-to-know basis even within Sylabs. As is common practice at technology firms, during all times relevant herein, Sylabs utilized nondisclosure and intellectual property assignment agreements to protect their Trade Secrets and valuable technology generated by the company. *See* Exhs. 47-52.

84.     As will be alleged in greater detail below in Sections V-VIII of this Complaint, in spite of Sylabs' Trade Secret Protections, Conflict of Interest Policy, Technical Protections, and Defendants' Assignments/NDAs, Defendants conspired together and intentionally damaged Sylabs as follows: (a) cyber corruption, cyber destruction, cyber theft, and cyber misappropriation of Sylabs' Trade Secrets; (b) cyber corruption, cyber destruction, cyber theft, and cyber misappropriation of Sylabs' Corporate Assets; and (c) cyber theft, misappropriation, and unlawful Sylabs' corporate secrets.

85.     It is important to note from the outset, as alleged below, including through Sylabs' forensic expert, Christoper Tarbell's declaration (*see* Exh. 38), that Defendants' unlawful actions and conspiracy were designed by Defendants to cause and did cause the following categories of damage to Sylabs (CIQ's competitor), each of which separately exceeds $75,000, including, for example:

a.  corruption, damage, and destruction to Sylabs' computer server;

b.  corruption, damage, and destruction to Sylabs' computer data;

c.  corruption, damage, and destruction to Sylabs' computer folders;

d.  corruption, damage, and destruction to Sylabs' computer files;

e.  corruption and damage to Sylabs' computer directories;

f.  cyber intrusion to Sylabs' computer server;

g.  cyber intrusion to Sylabs' computer data;

h.  cyber intrusion to Sylabs' computer folders;

i.  cyber intrusion to Sylabs' computer files;

j.  cyber intrusion to Sylabs' computer directories;

k.  cyber theft of Sylabs' Trade Secrets;

l.  cyber misappropriation of Sylabs' Trade Secrets;

m. cyber theft of Sylabs' Corporate Assets;

n.  cyber misappropriation of Sylabs' Corporate Assets;

o.  cyber theft of Sylabs' Corporate Secrets; and

p.  cyber misappropriation of Sylabs' Corporate Secrets.

**Sylabs Alleges Additional Counts for Breach of Written Contract and Fraud**

86.  As will be alleged in greater detail below, the general nature of Sylabs' claims relates to Defendants' (a) cyber corruption, cyber destruction, cyber theft, and cyber misappropriation of Sylabs' Trade Secrets; (b) cyber corruption, cyber destruction, cyber theft, and cyber misappropriation of Sylabs' Corporate Assets; and (c) cyber theft, misappropriation, and unlawful use of Sylabs' corporate secrets. Consequently, Defendants breached their IP Assignment/NDA Agreements with Sylabs. Further, Sylabs is informed and believes, and based on such information and belief alleges that these Defendants engaged in fraud in the procurement of the IP Assignment/NDA Agreements without having any intention of performing the promises made in their respective agreements. Accordingly, Sylabs has alleged separate breach of written contract and intentional misrepresentation counts against defendants Gregory Kurtzer, Matthew Hayden, Erin

LEPISCOPO & ASSOCIATES LAW FIRM

Fong, Robert Adolph, David Buss, Marlin Prager, and Open Drives, Inc., including requests for punitive damages. *See* Counts XII-XXI, below.

87.     Finally, in its MTD Order, this Court found that Sylabs' Counts IV and V for RICO fail because they relied upon Sylabs' Count I (*i.e.*, violation of the DTSA) as their Predicate Acts to establish RICO, which this Court held Sylabs failed to establish in the original complaint:

> "Sylabs selects Defendants' alleged violations of the DTSA as the necessary predicate acts. See Complaint ¶¶ 187-88; see also CIQ Opposition at 22-23; IAG Opposition at 22-23; 18 U.S.C. § 1961(1). Its Section 1962(c) claim therefore fails, because Sylabs does not sufficiently allege any DTSA violations."

*See* MTD Order, Dkt. 59, p.13, ll. 6-10 (emphasis added).

88.     It follows, therefore, that if Sylabs' cures deficiencies with violations of DTSA (Count I), then Sylabs' RICO claims in Counts IV and V are sufficiently pleaded. *Id.*

89.     As alleged in Count I, as well as in greater detail above in this Section II and below in Sections V-VIII, CIQ's patent Nos. US 10,970,113 (Exh. 37), US 11,099,893 (Exh. 39), US 11,310,342 (Exh. 40), US 11,055,428 (Exh. 41), US 11,163,902 (Exh. 42), and US 11,321,064 (Exh. 43) are based on Sylabs' Trade Secrets that Defendants unlawfully acquired through cyber corruption, destruction, theft, misappropriation, and unlawful and fraudulent patenting of Sylabs' Trade Secrets. These are clear violations of the DSTA.

90.     It is important to note for purposes of alleging the Predicate Acts under the RICO Act claims alleged in Counts IV and V, that the allegations set forth herein constitute not only civil claims but also Defendants' violation of federal **criminal** statutes, including, for example: 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1030(a)(4) (Computer Fraud), 18 U.S.C. § 1030(a)(2) (Theft of Information from a Computer), 18 U.S.C. § 1030(b) (Conspiring to Violate the CFAA), and 18 U.S.C. § 1030(a)(5)(B) (Recklessly Damaging a Computer).

LEPISCOPO & ASSOCIATES LAW FIRM

### III.
### <u>PLAINTIFF</u>

91.     Sylabs, Inc. is a Delaware corporation with its headquarters located in Reno, Nevada.

### IV.
### <u>DEFENDANTS</u>

**DEFENDANTS CIQ, GREG KURTZER, JULIE KURTZER, ADOLPH, HAYDEN, AND FONG**

92.     Defendant, Gregory Rose a/k/a Gregory M. Kurtzer ("Greg Kurtzer"), is an individual and resident of the State of California.

93.     Defendant, Julia Rose a/k/a Julia Kurtzer ("Julia Kurtzer"), is an individual and resident of the State of California and is defendant Greg Kurtzer's wife.

94.     Greg and Julia Kurtzer reside in this District and the acts complained of herein were committed by them and damages suffered by Sylabs occurred in this District.

95.     Defendant, Robert Adolph ("Adolph"), is an individual and resident of the State of California.

96.     Adolph resides in this District and the acts complained of herein were committed by him and damages suffered by Sylabs occurred in this District.

97.     Defendant, Matthew Hayden ("Hayden"), is an individual and resident of the State of California.

98.     Hayden resides in this District and the acts complained of herein were committed by him and damages suffered by Sylabs occurred in this District.

99.     Defendant, Erin Fong ("Fong"), is an individual and resident of the State of California.

100.     Fong resides in this District and the acts complained of herein were committed by her and damages suffered by Sylabs occurred in this District.

101.     Defendant, CTRL IQ, Inc. dba CIQ ("CIQ"), is a Delaware corporation, which was formed in Delaware on April 1, 2020, and is registered and qualified to do

business in California, with its principal address located in this District at 1191 Solano Avenue, Unit 6687, Albany, California 94706. *See* Exhs. 66 and 67.

102.    Throughout this Complaint Greg Kurtzer, Julia Kurtzer, Adolph, Hayden, and Fong may be referred to collectively as "CIQ Defendants."

### DEFENDANTS OPEN DRIVES, BUSS, AND PRAGER

103.    Defendant, Open Drives, Inc. ("Open Drives"), is a Delaware corporation with its principal address located at 10602 Virginia Avenue, Culver City, California 90232.

104.    Defendant, David Buss ("Buss"), is an individual and resident of the State of California.

105.    Defendant, Marlin Prager ("Prager"), is an individual and resident of the State of California.

106.    Throughout this Complaint Open Drives, Buss, and Prager may be referred to collectively as "Open Drives Defendants."

### DEFENDANTS IAG AND WHITLEY

107.    Upon information and belief, Defendants, IAG Fund II, LP a/k/a IAG Capital Partners and IAG Capital Holdings II, LLC a/k/a IAG Capital Partners (collectively "IAG"), and, as represented by their legal counsel in the motion to dismiss (Dkt. 39, p. 1 n. 1), were incorrectly sued as IAG Capital Partners in the original complaint (Dkt.  1). IAG are business entities forms unknown and places of formation unknown and are engaged in business in this District and state of California.

108.    As IAG Capital Holdings II, LLC a/k/a IAG Capital Partners and IAG Capital Holdings II, LLC a/k/a IAG Capital Partners have already generally appeared in this Action by virtue of filing of their motion to dismiss (Dkt. 39), and, therefore, this Court has *in personam* jurisdiction over these defendants.

109.    Defendant, Joel Whitley ("Whitley"), is an individual and resident of the State of California.

110.    Throughout this Complaint IAG and Whitley may be referred to collectively as "IAG Defendants."

LEPISCOPO & ASSOCIATES LAW FIRM

### CO-CONSPIRATORS GREG KURTZER, JULIA KURTZER, ADOLPH, HAYDEN, FONG, BUSS, PRAGER, WHITLEY, CIQ, OPEN DRIVES, AND IAG

111. During all relevant timeframes herein alleged, Co-Conspirator Greg Kurtzer is currently a founder and director of CIQ and CIQ's chief executive officer, chief financial officer, and secretary, and was Sylabs' former chief executive officer and member of the board of directors of Sylabs. During and after the time he held that position of trust with Sylabs and while he was employed by CIQ, he conspired with other defendants to engage in cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft and misappropriation of Sylabs' Trade Secrets and Sylabs' Corporate Assets; cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft of Sylabs' corporate secrets; cyber theft and misappropriation; unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

112. During all relevant timeframes herein alleged, Co-Conspirator Julia Kurtzer was Sylabs' trusted advisor. During and after the time she held that position of trust with Sylabs, she conspired with other defendants to engage in cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft and misappropriation of Sylabs' Trade Secrets, Sylabs' Corporate Assets, cyber theft of Sylabs' corporate secrets; cyber theft and misappropriation; unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

113. During all relevant timeframes herein alleged, Co-Conspirator Adolph is currently a founder of CIQ and CIQ's chief product officer and was a Sylabs' trusted advisor. During and after the time he held that position of trust with Sylabs and while he was employed by CIQ, he conspired with other defendants to engage in cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft and misappropriation of Sylabs' Trade Secrets; cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft and misappropriation of Sylabs' Corporate Assets; cyber theft of Sylabs' corporate secrets; cyber theft and

LEPISCOPO & ASSOCIATES LAW FIRM

misappropriation; unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

114.    During all relevant timeframes herein alleged, Co-Conspirator Hayden is currently CIQ's customer advocate and was Sylabs' project coordinator, which is a trusted position due to the fact that he had access to all of Sylabs' technologies that were under development and other corporate secrets. During and after the time he held that position of trust with Sylabs and while he was employed by CIQ, he conspired with other defendants to engage in cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft and misappropriation of Sylabs' Trade Secrets; cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft and misappropriation of Sylabs' Corporate Assets; cyber theft of Sylabs' corporate secrets; cyber theft, misappropriation, and unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

115.    During all relevant timeframes herein alleged, Co-Conspirator Fong is currently CIQ's operations manager and was Sylabs' controller and handled marketing, which is a trusted position due to the fact that she had access to all of Sylabs' technologies that were under development, marketing strategies and plans, and other corporate secrets. During and after the time she held that position of trust with Sylabs and while she was employed by CIQ, she conspired with other defendants to engage in cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft and misappropriation of Sylabs' Trade Secrets; cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft and misappropriation of Sylabs' Corporate Assets; cyber theft of Sylabs' corporate secrets; cyber theft, misappropriation, and unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

116.    During all relevant timeframes herein alleged, Co-Conspirator Buss is a director of defendant Open Drives and Open Drives' chief executive officer and secretary and while he was employed by Open Drives, he conspired with other defendants to engage

LEPISCOPO & ASSOCIATES LAW FIRM

in cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft and misappropriation of Sylabs' Trade Secrets; cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft and misappropriation of Sylabs' Corporate Assets; cyber theft of Sylabs' corporate secrets; cyber theft, misappropriation, and unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

117.    During all relevant timeframes herein alleged, Co-Conspirator Prager is a director of Open Drives and Open Drives' chief financial officer and while he was employed by Open Drives, he conspired with other defendants to engage in cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft and misappropriation of Sylabs' Trade Secrets; cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft and misappropriation of Sylabs' Corporate Assets; cyber theft of Sylabs' corporate secrets; cyber theft, misappropriation, and unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

118.    During all relevant timeframes herein alleged, Co-Conspirator Whitley is a principal of IAG and while he was employed by IAG, he conspired with other defendants to engage in cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft and misappropriation of Sylabs' Trade Secrets; cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft and misappropriation of Sylabs' Corporate Assets; cyber theft of Sylabs' corporate secrets; cyber theft, misappropriation, and unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

119.    During all relevant timeframes herein alleged, IAG and Open Drives invested in CIQ and, therefore, were aware of, ratified, and benefited from Defendants' conspiracy through their cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber theft and misappropriation of Sylabs' Trade Secrets; cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and

LEPISCOPO & ASSOCIATES LAW FIRM

cyber theft and misappropriation of Sylabs' Corporate Assets; cyber theft of Sylabs' corporate secrets; cyber theft, misappropriation, and unlawful use of privileged documents; unfair trade practices; and other tortious conduct.

120.    The main object of the foregoing conspiracy ("Conspiracy") was to take steps in furtherance of committing cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories, and cyber steal Sylabs' Trade Secrets, Sylabs' Corporate Assets, technologies, and customers for the express purpose of enriching Defendants and to eliminate Sylabs as a competitor in the high-performance computing industry marketplace.

### DOE DEFENDANTS

121.    Many facets of the conspiracy described herein likely remain unknown, and the complete list of Defendants and/or Co-Conspirators likely extends beyond the individuals and entities identified here. At present, Sylabs is ignorant of the true names and capacities of such individuals and entities and, therefore, sues them herein under the fictitious names Does 1-50. Sylabs will amend this Complaint to identify and state applicable claims, as appropriate, against additional individuals or entities as relevant information becomes available through discovery.

122.    Each of the Defendants and/or Co-Conspirators referenced in this Complaint was an agent, conspirator, aider, or abettor of the Defendants. The acts and omissions of each alleged Defendant and/or Co-Conspirator were performed within the course and scope of that agency, conspiracy, aiding or abetting. At all relevant times, Defendants and/or Co-Conspirators were each acting in concert with one or more of their Co-Conspirators pursuant to a common scheme, course of action, enterprise, or conspiracy.

123.    As used in this Complaint, the term "Co-Conspirators" refers collectively to the Defendants, Co-Conspirator Greg Kurtzer, Co-Conspirator Julia Kurtzer, Co-Conspirator Buss, Co-Conspirator Prager, Co-Conspirator Adolph, Co-Conspirator Hayden, Co-Conspirator Fong, Co-Conspirator Whitley, and the DOE defendants.

/////

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

# V.
## HISTORY AND BACKGROUND OF SYLABS AND ITS TRADE SECRETS

**Preliminary Statement: Sylabs' Intellectual Property Constituted Trade Secrets Prior To Defendants' Cyber Corruption, Cyber Destruction, Cyber Theft, Open Sourcing, and Fraudulent Patenting of Sylabs' Trade Secrets**

124.    As set forth in greater detail below and as set forth in this Court's MTD Order, between 2018 and 2020, Sylabs created five value-added technologies: (1) SingularityPRO, (2) Singularity Image Format ("SIF") technology, (3) Singularity Enterprise, (4) Fuzzball and (5) Armored Containers (hereinafter referred to as "Sylabs' Trade Secrets" or "Trade Secrets"). *See* MTD Order, Dkt. p. 2, ll. 7-11.

125.    As set forth herein, Sylabs identifies five Trade Secrets that serve as the basis of its legal claims alleged in this Complaint: (a) SingularityPRO, (b) SIF technology, (c) Singularity Enterprise, (d) Fuzzball and (e) Armored Containers.

126.    In its MTD Order, this Court indicated that: "[T]he definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *Id*. (citations omitted). In identifying a trade secret at the pleading stage, a plaintiff "need not 'spell out the details of the trade secret,' but must minimally provide 'reasonable notice of the issues which must be at the time of trial and . . . provide reasonable guidance in ascertaining the scope of appropriate discovery.'" *See* MTD Order, Dkt. 59, p. 9, ll. 1-6.

127.    Under these elements, this Court made a finding that Sylabs sufficiently described SingularityPRO, Singularity Enterprise, Fuzzball, and Armored Containers as trade secrets for purposes of this Action: "Thus, Sylabs sufficiently describes four of its five purported trade secrets which are not publicly available." *See* MTD Order, Dkt. 59, p. 9, l. 17 through p. 11, l. 14.

128.    As to Sylabs' SIF Technology, this Court found that Sylabs did <u>not</u> sufficiently describe it because it failed to distinguish between what was publicly disclosed in its SIF Application (Exh. 54) and that which constitutes its trade secrets:

"While Sylabs may retain trade-secret protection over those aspects of SIF technology not published in its patent application, it fails to 'delineate the boundaries between its trade secrets and its information that has been made public through patents and patent applications. . . ' Rather, **Sylabs must simply allege with particularity those aspects of its SIF technology not discussed in its patent application**, and it does not do so in the Complaint."

*See* MTD Order, Dkt. 59, p. 10, ll. 7-10 (emphasis added).

129.    In order to cure this deficiency, this Court indicated that "Sylabs must simply allege with particularity those aspects of its SIF technology **not** discussed" in Sylabs' SIF Application (Exh. 54). *See* MTD Order, Dkt. 59, p. 10, ll. 14-16 (emphasis added).

130.    Sylabs alleges as follows to cure the aforementioned deficiencies. Specifically, Sylabs alleges that the following SIF technology components were not disclosed in Sylabs' SIF Application (Exh. 54) or Sylabs' SIF Patent (Exh. 55) but were stolen and used by Defendants to procure the Armored Containers patents. For example, CIQ patent 11,055,428 (Exh. 41) specifically mentions this type of approach for another format of container images, namely Open Container Initiative ("OCI") container images. Sylabs has never publicly disclosed the Trade Secrets underlying the specific method of encrypting container images as it pertains to OCI images but has been developing this as part of its secret "armored containers" project, well before Defendants left Sylabs. Thus, these are Sylabs' Trade Secrets, which were stolen by Defendants to develop and unlawfully and fraudulently procure their Patent Nos. US 11,055,428 (Exh. 41), US 11,163,902 (Exh. 42), and US 11,321,064 (Exh. 43).

131.    In its MTD Order, this Court found that Sylabs did not allege its efforts to maintain the secrecy of its Trade Secrets: "However, the Court agrees with Defendants' third argument that Sylabs does not sufficiently allege any efforts to maintain the secrecy of its technologies. Indeed, Sylabs offers no allegations of any specific measures it took. Accordingly, Sylabs' DTSA and CUTSA claims fail." *See* MTD Order, Dkt. 59, p. 11, ll. 14-17.

132.    In response to the MTD Order's finding that the allegations of the Complaint fail to allege Sylabs' Trade Secrets with the required sufficiency, Sylabs provides the

LEPISCOPO & ASSOCIATES LAW FIRM

following additional allegations, along with those set forth below in Sections VI through VIII, inclusive, to cure such deficiencies. *See* MTD Order, Dkt. 59 p. 9, ll. 11-14 and n. 7.

133.    Specifically, as described in greater detail in Section II, *supra*, and below, Sylabs alleges the Trade Secrets in sufficient detail in order to address the Court's concerns in the MTD Order. *See* MTD Order, Dkt. 59 p. 9, ll. 12-13.

134.    Further, the following allegations relating to Sylabs' Trade Secrets were not a matter of public knowledge and were kept secret—thereby constituting its Trade Secrets—until Defendants committed their cyber corruption, cyber destruction, and cyber theft of Sylabs' Trade Secrets, thereafter, publishing all of it to Open Source and patenting such Trade Secrets. *See* Exhs. 37 and 39-43.

135.    As alleged in greater detail below and above in Section II of this Complaint, Sylabs' Trade Secrets were valuable, secret, and not publicly available but for Defendants' cyber theft. Thus, Sylabs' Trade Secrets would have remained secret until such time as Sylabs would decide whether or not to patent such Trade Secrets. Defendants should not be permitted to benefit from their cyber corruption and theft by allowing them to claim Sylabs' Trade Secrets were publicly available, and, therefore, do not constitute trade secrets and do not enjoy trade secret protection. Such logic would eviscerate the federal and California statutory schemes that serve as the basis for Counts I through XI of this Complaint. These allegations are alleged above in Section II of this Complaint and  below with sufficient particularity to address the Court's concerns in the MTD Order (Dkt. 59 p. 9, l. 13).

136.    Finally, pursuant to Sylabs' Trade Secret Protections, Conflict of Interest Policy, Technical Protections, and Defendants' Assignments/NDAs, Sylabs took steps to keep secret and protect its Trade Secrets, all of which are alleged above in Section II of this Complaint with sufficient particularity to address the Court's concerns in the MTD Order and cure the pleading deficiencies (Dkt. 59 p. 9, ll. 13-14). *See* Exhs. 47-52.

/////

/////

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

**General Description of Sylabs' Trade Secrets**

137.    In 2018, Sylabs commenced development of technologies for the high-performance computing industry ("HPC"), which is a technology that harnesses the power of supercomputers or computer clusters to solve complex problems requiring massive computation. [7]

138.    Stated generally, HPC refers to the computer science architecture of aggregating computing power in a way that delivers much higher performance than could be obtained from a typical desktop computer or workstation in order to solve large problems in, for example, science, engineering, medicine, or business.

139.    As will be alleged in greater detail below, Sylabs' Trade Secrets relate to high-performance computing—an industry with over $39 billion in annual revenues worldwide, which is expected to grow to over $74 billion by 2030.[8]

140.    Below, Figure 1 depicts the general architecture of a supercomputer.



**FIGURE 1: General Architecture of Typical Supercomputer**[9]

141.    Drilling down, HPC is accomplished through structuring small to medium, but powerful, computers that are harmonized to operate as one supercomputer. Each separate computer is termed a "node." Groups of computers are termed "clusters."

---

[7]    *See generally*: https://www.ibm.com/topics/hpc.

[8]    *See e.g.*:    https://www.bloomberg.com/press-releases/2022-07-21/high-performance-computing-market-size-to-surpass-74-101-million-by-2030-says-p-s-intelligence.

[9]    Yan, Beichuan, Ph.D., *See*:    https://www.researchgate.net/figure/Schematic-of-typical-architecture-of-a-modern-supercomputer_fig1_328946498.

142.   Supercomputers operate under the principle of parallel processing, which means that there is more than one computer working simultaneously on different operations. So, for example, if a single computer were used to do a complicated data analysis and that process took 1 hour through performing the calculations and analysis serially—*i.e.*, each calculation occurs one-by-one, with the previous calculation then being used by the next operation to perform the next calculation, then the next operation performs data analysis, for example, and so on. By employing 10 nodes (*see* Figure 1), each of which does separate operations simultaneously, each of which takes 1/10 of the time required to complete the entire serial process, the time needed to complete the entire process is drastically reduced. Thus, instead of performing the calculations and analysis serially over 60 minutes, by using parallel processing the same set of operations would take a mere 6 minutes. Although this is a simple example, the benefits of parallel processing are immediately perceivable.

143.   For example, when hurricane season arrives the National Hurricane Center at the National Oceanic and Atmospheric Administration ("NOAA") employs their supercomputers to simultaneously model the trajectories of several hurricanes.[10]

144.   Of course, in the absence of parallel processing through supercomputers, such modeling would be impossible.

**Sylabs' Intellectual Property Constituted Trade Secrets <u>Prior</u> to Defendants' Cyber Corruption, Cyber Destruction, Cyver Theft, Open Sourcing, and Fraudulent Patenting of Sylabs' Trade Secrets**

145.   In response to the MTD Order's finding that the allegations of the Complaint fail to allege Sylabs' Trade Secrets with the required sufficiency (Dkt. 59 p. 9, ll. 11-14 and n. 7), Sylabs provides the following additional allegations to cure such deficiencies. Specifically, Sylabs describes in greater detail below the Trade Secrets in sufficient detail in order to address the Court's concerns in the MTD Order (Dkt. 59 p. 9, ll. 12-13).

---

[10]   *See* National Hurricane Center at NOAA:
https://www.nhc.noaa.gov/gtwo.php?basin=atlc&fdays=2.

LEPISCOPO & ASSOCIATES LAW FIRM

146.   Further, the following allegations relating to Sylabs' Trade Secrets were not a matter of public knowledge and were kept secret—thereby constituting its Trade Secrets—until Defendants committed their cyber theft of Sylabs' Trade Secrets, thereafter, publishing all of it to open source and patenting such Trade Secrets. *See* Exhs. 37 and 39-43.  Thus, as outlined above in Section II, Sylabs took all reasonably necessary steps to keep, and in fact kept its Trade Secrets from being disclosed to public knowledge. It was the Defendants who first stole then publicly disclosed Sylabs' Trade Secrets.

147.   As alleged in greater detail  below, Sylabs' Trade Secrets were valuable, secret, and not publicly available but for Defendants' cyber theft. In particular, using Sylabs' Trade Secrets, Defendants raised $26,000,000, making a total of $33,000,000 raised, and according to defendant Greg Kurtzer, CIQ now has an enterprise value of $150,000,000.[11] Thus, Sylabs' Trade Secrets would have remained secret until Sylabs decided to patent such Trade Secrets. Defendants should not be permitted to benefit from their cyber corruption, cyber destruction, and cyber theft by allowing them to claim Sylabs' Trade Secrets were publicly available, and, therefore, do not constitute trade secrets and do not enjoy trade secret protection. However, such logic would eviscerate the federal and California statutory schemes that were enacted to secure and protect trade secrets. These allegations are alleged below with sufficient particularity to address the Court's concerns in the MTD Order (Dkt. 59 p. 9, l. 13).

148.   As alleged in greater above in Section II and as alleged in greater detail below in Sections V-VIII, Sylabs took steps to keep secret and protect its Trade Secrets thereby alleging with sufficient particularity to address the Court's concerns in the MTD Order (Dkt. 59 p. 9, ll. 13-14). Specifically, in addition to being bound by the protections of Sylabs' Trade Secret Protections and Conflict of Interest Policy, Defendants Greg Kurtzer, Matthew Hayden, Erin Fong, Robert Adolph, David Buss, Marlin Prager, and Open Drives are bound by Defendants' Assignments/NDAs. *See* Exhs. 48-52, respectively. As

---

[11]   *See*:  https://siliconangle.com/2022/05/12/ciq-raises-26m-promote-free-alternative-red-hat-linux/.

LEPISCOPO & ASSOCIATES LAW FIRM

mentioned above, Sylabs has alleged separate breach of written contract and fraud counts against each of these Defendants. *See* Counts XII-XXI, below.

149.    Moving from the foregoing general discussion to the specifics of this Action, the following is a general summary of how Sylabs' value-added technologies operate within supercomputer architecture. Keeping Figure 1 in mind, Sylabs' SingularityPRO (discussed below) is installed on each node of a supercomputer.

150.    Sylabs' SIF container technology (alleged below), which serves as a container for computer applications, would be placed in the shared disk space of the supercomputer. The applications contained within the SIF container would be both secure through encryption and portable due to Sylabs' SIF technology.

151.    Sylabs' Singularity Enterprise (alleged below) is an advanced, value-added technology that equips the users with the ability to build, share, and store SIF containers outside of the cluster, *i.e.*, on other supercomputers or the cloud, regardless of their locations.

152.    Fuzzball is Sylabs' value-added technology that works with Singularity to manage and schedule jobs to execute on one or more nodes and manage locality of data sets by selecting the correct node(s) and cluster(s).

153.    Making data security a high priority, Sylabs' SIF container technology is transformed into an advanced, high security format termed "Armored Containers."

154.    Sylabs' Trade Secrets are an instrumental part of the HPC industry, as will be alleged below. However,  before describing Sylabs' Trade Secrets, another strategy employed by the high-tech industry needs to be alleged before the value-added technology of Sylabs will be appreciated, to wit: open-source software ("open-source"):

"Open source software (OSS) is software that is distributed with its source code, making it available for use, modification, and distribution with its original rights. Source code is the part of software that most computer users don't ever see; it's the code computer programmers manipulate to control how a program or application behaves. Programmers who have access to source code can change a program by adding to it, changing it, or fixing parts of it that aren't working properly. OSS typically includes a license that allows

programmers to modify the software to best fit their needs and control how the software can be distributed." [12]

155.    This led to the open-source software known as "Singularity," which was created at Lawrence Berkley National Laboratory in 2016 to fill a gap in the performance of supercomputers in the HPC industry. Singularity was created to run complex applications on HPC clusters in a simple, portable, and reproducible way. It quickly became popular at other HPC sites, academic sites, and beyond. Singularity is an open-source project, with a friendly community of developers and users.

156.    In addition, Singularity equips engineers and scientists with a tool to create and run rudimentary containers that package up pieces of software in a way that is portable and reproducible.

157.    Users can build a container using Singularity on a laptop, and then run it on many of the largest supercomputer clusters in the world, local university or company clusters, a single server, in the Cloud, or on a workstation down the hall. A container is a single computer file, which removes the worry about how to install all the software a user needs on each different operating system and system that a user might need to use—it makes the software created portable. However, the open-source Singularity had very limited capabilities, which is the point in time that Sylabs entered the HPC market.

158.    Sylabs was founded in order to invent and market value-added technology for Singularity in the HPC industry. Although Singularity is open-source, the value-added technology that Sylabs has created and added and continues to create and add to Singularity constitutes its Trade Secrets. Thus, in 2018 the first value-added technology Sylabs developed was "SingularityPRO."

### Sylabs' SingularityPRO

159.    SingularityPRO is Sylabs' high-performance container technology specifically designed to enhance enterprise performance computing by building containers

LEPISCOPO & ASSOCIATES LAW FIRM

---

[12]    *See:* https://www.synopsys.com/glossary/what-is-open-source-software.html#.

that support HPC, analytics, artificial intelligence, machine learning, and deep learning to provide "intelligence anywhere."

160.    SingularityPRO is differentiated from the Singularity open-source version by the inclusion of several plugins to augment capabilities, as well as a software bill of materials to address software supply chain security.

161.    Initially, it is important to note that the terms "Singularity Community" and "SingularityCE" refer to a basic, open-source Singularity platform released in 2016 that is the basis for a multitude of higher-level applications specifically designed to operate in the HPC technology space. This includes the valued-added technologies developed and invented by Sylabs, all of which constitute its Trade Secrets.

162.    It is important to understand that the transformation process of making an open-source piece of technology better through the addition of code, expansion of capabilities or functionality, support services, or other technologies constitutes trade secrets and intellectual property. Therefore, when Sylabs adds to Singularity to create, for example, SingularityPRO, such transformation constitutes Sylabs' Trade Secrets.

163.    Sylabs has monetized SingularityPRO by licensing it to end-user with varying levels of support available, which is provided directly through Sylabs' team of experts. It is sold on a per-node basis or with pricing to suit unique scenarios.

164.    Whereas the open-source version of Singularity—called Community—is subject to rolling code changes from the open-source community at large, SingularityPRO is curated and supported by Sylabs. Specifically, SingularityPRO is designed to provide support, professional services, and value-added tooling for container runtime that has become predominant in high performance computing, which includes supercomputing, exascale computing (super high speed computing—1,000 times faster than most supercomputers), and in general batch-oriented  container workflows. Thus, SingularityPRO is for advanced users who require professional support of their HPC container workflow environments.

LEPISCOPO & ASSOCIATES LAW FIRM

165.    Essentially, SingularityPRO provides five major value-added technology features: enterprise grade support; backporting of security and bug fixes; packaged binaries for easy deployment and upgrades; influence on feature development and timelines; and extra functionality via PRO plugins, also invented, developed, and designed by Sylabs.

166.    To further clarify the distinction between open-source components of SingularityCE with Sylabs' value-added technology in SingularityPRO, below in Figure 2 the features of SingularityCE are placed in juxtaposition with Sylabs' SingularityPRO in order to identify the value-added technologies that form the basis of Sylabs' Trade Secrets.



**FIGURE 2: Value-Added Technology of SingularityPRO**

167.    Sylabs' technologies have raised the bar for container platforms throughout the HPC industry. SingularityPRO running on HPC platforms leverages the power of

LEPISCOPO & ASSOCIATES LAW FIRM

Artificial Intelligence ("AI"), machine learning, and deep learning to deliver unique enterprise-level services. SingularityPRO's advanced ecosystem of resources not only extends the overall value of the platform but also extends its ease of use and security.

### Sylabs' Singularity Image File Technology

168.    In 2018, Sylabs commenced research, design, and development to invent a more efficient and secure file format for use in the HPC industry.

169.    Sylabs' strategy was to invent container technologies for data-intensive workloads, or what is characterized as Enterprise Performance Computing ("EPC").

170.    Sylabs' invention strategy was and is to support and facilitate the private, public, academic, government, and military sectors to leverage more data to support and grow their enterprises and activities. This necessarily led to the need for these enterprises to properly containerize and support workflows related to artificial intelligence, machine/deep learning, and advanced analytics.

171.    In order to provide the efficiency, security, and functionality that the HPC market required, Sylabs invented Singularity Image Format ("SIF") to create a digital container that holds pieces of software in a structured format that allows the programs to be portable and reproducible, as well as being secured through encryption. This is especially important for the development, creation, and sharing of intellectual property in collaborative environments or ones subject to higher levels of security classifications (e.g., military, National Security Agency, etc.).

172.    For example, if a scientist wanted to design a complex weather analysis program to predict the direction of tropical storms in real time but wanted to keep it secure on a laptop before patenting and releasing it, Sylabs' SIF format would be utilized to hold all program information. Once created, the SIF container would be created and encrypted for ease of transport and use by, for example, NOAA's supercomputers.

173.    Generally, the architecture of Sylabs' SIF format is represented below in Figure 3.

LEPISCOPO & ASSOCIATES LAW FIRM



**FIGURE 3: Sylabs' Singularity Image File Technology**

174. On June 7, 2019, Sylabs filed its SIF Application with the U.S. Patent and Trademark Office ("USPTO") to patent Sylabs' SIF technology, which was assigned U.S. Patent Application No. US 2019/0377708 A1. *See* Exh. 54.

175. On January 5, 2023, the USPTO issued a Notice of Allowance of the SIF Patent. The owner of the SIF Patent is Sylabs, and the inventor is Yannick Cote, a former Sylabs' employee.

176. On May 2, 2023, the USPTO granted Sylabs' SIF Application and issued the SIF Technology patent to Sylabs, assigning U.S. Patent No. US 11,640, 372 B2 ("SIF Patent"), with Sylabs listed as owner and Yannick Cote as inventor. *See* Exh. 55.

**Sylabs' Singularity Enterprise**

177. The next generation of Sylabs' value-added technology is known as "Singularity Enterprise."

178. Simply put, Singularity Enterprise is a set of three services to support Sylabs' SIF container workflows. First, it is a remote builder utilized to build containers of varying architectures. Second, it has a container library to store, pull, and share SIF containers. Finally, it has a key management for SIF container authentication.

179. As a natural progression in the development of its technology, Sylabs developed and designed "Sylabs' Container Library" and "Sylabs' Cloud Services."

180. Fundamentally, the architecture of the Sylabs' Cloud Services and Container Library is set forth below in Figure 4.

LEPISCOPO & ASSOCIATES LAW FIRM



**FIGURE 4: Architecture of Sylabs' Container Library and Cloud Services**

181.   Singularity Enterprise contains the full-featured Sylabs' Container Library, which can be hosted on-premises in a customer's data center or Sylabs' Cloud Services. Users can upload, download, search, and browse for containers in public and private areas, as well as share private containers with other users or via a generated link. Security and privacy in the Container Library are based on a user-owner model of library objects, and the concept of public or private collections.

182.   Users can utilize Singularity Enterprise to manage and store their applications in a format that is secure but also easily accessible and transportable, as will be alleged below in greater detail. The following is a general summary of each of the main components of Sylabs' value-added technology provided by Singularity Enterprise.

183.   Singularity Enterprise's Remote Builder Services resides in Sylabs' Cloud Services. This value-added technology equips users to build containers in Sylabs' SIF format with architecture independence and integration, without requiring privileged access on the host system and unsupported kernel features. The resulting SIF files created can be cryptographically signed, and subsequently have their authenticity and integrity verified whenever and wherever they are used—this type of portability of applications is extremely beneficial to users.

184.   Singularity Enterprise's Container Library Services offers a repository to host Sylabs' SIF containers. Users can manage, store, and share containers in public and private directories, or share private containers with other users via a link generated through

LEPISCOPO & ASSOCIATES LAW FIRM

the Container Library Services. Available as a cloud service, or for on-premises deployment, the Container Library Services optimizes the management and storage of containers within any organization.

185.   Singularity Enterprise's Key Management Services ensures container signing and validation services to Singularity Enterprise and the Container Library. These key-signing and verification services eliminate the risk of unknowingly downloading and running compromised containers, greatly enhancing an organization's ability to restrict the types of containers that are allowed to run on a cluster.

186.   Sylabs' SIF technology and strategy in development of Singularity Enterprise has successfully positioned the company as a global leader in secure, trusted, performance-focused container solutions. The capabilities that Sylabs has created are revolutionary and unique within the HPC industry, purposely and uniquely built to address some of the limits, shortcomings, and flaws within current container technologies.

187.   Further, Sylabs makes high performance computing more accessible to, for example, researchers, scientists, and engineers through Sylabs' SIF technology and Singularity Enterprise, which is the most advanced container runtime technology for performance-intensive applications and environments.

188.   As the most active contributor to the Singularity ecosystem, through both the open-source community edition ("Sylabs' SingularityCE")[13] and Sylabs' value-added technology (Singularity Enterprise-supported and professional implementations) Sylabs' technological offerings enabled the progression and development of cutting-edge research and facilitated rapid scientific discovery. For example, Sylabs has developed additional value-added technologies known as "Fuzzball" and "Armored Containers."

---

[13]   Maintained by Sylabs, SingularityCE is an open-source container platform created through needs of high performance computing and supercomputing use cases. It provides a means to create and run a package of contained software, with all its dependencies, for quick and reliable computing across environments. For functional differences between SingularityCE and SingularityPRO see Figure 3, above.

LEPISCOPO & ASSOCIATES LAW FIRM

189.    On or about June 5, 2019, Sylabs first discussed the concepts of Fuzzball and Armored Containers during a design review meeting with  Sylabs' staff, including its engineers. The high-level design of the architecture of Fuzzball commenced in late 2019 while that of Armored Containers commenced in July of 2019.

## Sylabs' Fuzzball Technology

190.    Fuzzball is Sylabs' Trade Secrets relating to value-added technology that creates a cluster of three differentiated software stacks. The first, Fuzzball **service**, is a cloud native service for workflow management and orchestration. The second, Fuzzball **agent**, is a small, purpose-built systems service that executes workflows on computer nodes. The third, "Fuzzctl" is a command line utility ("CLI") that users use to interact with and manage other Fuzzball components.

191.    The power of Fuzzball clusters lies in their ability to be easily configured to accommodate various scales of computer resources. Fuzzball can be deployed in environments from as small as a single node running both the service and agent to deploying the service to orchestrate workloads across agents on various clusters of supercomputers located on-premises or on the cloud.

192.    The Fuzzball service has a pluggable scheduler that will manage where and when jobs within a workflow are executed based on criteria such as submission order, data locality, hardware availability, etc. Having a pluggable scheduler allows for the cluster scheduling behavior to be changed depending on what is optimal for the particular cluster deployment.

193.    Essentially, Fuzzball can be comprehended as an intelligent task manager that controls data flow and computing at the node and cluster level regardless of the geographic locations of nodes and clusters—*i.e.*, it harmonizes supercomputers that might be located on premises or on the other side of the globe. Thus, Fuzzball's intelligent management technology makes location irrelevant. The intelligent management aspects of Fuzzball are designed by the user. So, for example, the user will create a set of parameters for flow of data and priority of computer operations.

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

194.    For example, back to weather monitoring examples, NOAA has supercomputer systems for weather and climate analysis in Virginia (pictured below in Figure 5) and Arizona and research and development supercomputers located in West Virginia, Tennessee, Mississippi, and Colorado. Imagine each of these locations as the main node for each location, thus making 6 main nodes. Each of the six main nodes is comprised of clusters of computers creating individual supercomputers in each location. For example, Figure 5 shows the cluster comprising the Dogwood Supercomputer.



**FIGURE 5:** **NOAA's Dogwood Supercomputer in Manassas, Virginia[14]**

195.    Based on NOAA scientists' specific instructions, Fuzzball's intelligent manager would be instructed on how each cluster in the six main node locations operates, and how the clusters comprising each of the six supercomputers operate and interface with each other. For example, the Virginia supercomputer node could be tasked by scientists through Fuzzball with collecting, storing, and analyzing certain data relating to wind velocity, patterns, and predictions for use by one of the other main nodes, say, for example, Mississippi, where storm and hurricane trajectories could be modeled.

196.    While the foregoing examples are rudimentary, the actual power of Fuzzball is much more complex, making it extremely effective and valuable to the growth of the

---

[14]    *See:* https://www.noaa.gov/news-release/us-supercomputers-for-weather-and-climate-forecasts-get-major-bump#:~:text=The%20twin%20Hewlett%20Packard%20Enterprise,Virginia%2C%20and%20Orlando%2C%20Florida.

HPC industry. Just to make the point, in the Dogwood Supercomputer (Figure 5) alone there are approximately 2,560 nodes to be intelligently managed.

197.     As will be alleged in greater detail in Section VI, below, in June of 2019 Sylabs invented and commenced development and design of Fuzzball, which Defendants misappropriated from Sylabs through their cyber theft of Sylabs' Trade Secrets. Once their cyber theft was complete, Defendants subsequently **patented** Fuzzball as their own invention through prosecution of fraudulent patent applications and perpetrating a fraud on the USPTO.

### Sylabs' Armored Containers Technology

198.     Containerization concepts began in the late 1970s as a form of partitioning and isolating computing resources. Its fundamentals continued to take shape through the 2000s where it began to emerge as a fully developed technology and an alternative to virtualization. In this generation of technology, applications could run in isolated user spaces using the same shared operating system. In the current generation of use-cases, scientists use container technologies to reproduce batch-oriented machine learning ("ML") and AI experiments, and enterprise organizations use it to deploy microservice infrastructure components. Container technologies have continued to evolve, and, as is natural with any development of technologies, new challenges have emerged.

199.     In June 2019, Sylabs invented and commenced development and design of "Armored Containers," which is an extension to Sylabs' unique technology, Singularity Image Format, or SIF. For purposes of context, it was on June 7, 2019, that Sylabs filed its SIF Application with the USPTO.

200.     Generally, Sylabs' Armored Containers technology expands its SIF technology in a way that allows increased security in deployments to cloud environments as well as on-field deployed devices.

201.     Unlike standard OCI containers, which are distributed as a combination of multiple layers and manifests, Sylabs' Armored Containers are built with simple, single SIF containers that can be easily moved into air-gapped systems without requiring

additional infrastructure. As generally referred to herein, the term "air-gapped" refers to highly secured areas that includes security measures that isolate a computer or cluster of computers from establishing any outside connection in order to ensure no cyber theft or infiltration can occur. Specifically, a computer or cluster of computers is isolated by removing all wireless or physical connection to other computers or networks outside the relevant air-gapped area (*see* Figure 6). The Department of Defense ("DoD") refers to this as a Sensitive Compartmented Information Facility, or "SCIF" (pronounced "Skiff"). Therefore, in the DoD vernacular, Sylabs' Armored Containers would be referred to as "SCIF SIFs."



**FIGURE 6: Air-Gap—Computer Isolated from the Internet and Unsecured Devices[15]**

202.    An Armored Container can be thought of as an "up-armored" form of Sylabs' SIF container, which is improved with not only air-gapping technology but also embedded cryptographic signatures and encryption support to provide further security and protections. Prominently displaying its security features, Figure 7 provides a physical analogue of Sylabs' digitally created Armored Containers (*see* Figure 3):

/////

/////

/////

/////

/////

/////

/////

---

[15]    *See, e.g.*: https://blog.tokensoft.io/mind-the-air-gap-best-practices-for-air-gapping-your-machine-a1b9fdc9d60a.

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

Sylabs' Armored SCIF SIF Container

 = 

**FIGURE 7: Example SCIF Room**[16]

203.    Sylabs' Armored Containers technology has raised the bar for container platforms throughout the HPC industry. For example, in the DoD's Artificial Intelligence Sector, in or about May or June of 2020, Sylabs commenced discussions with American Systems regarding a joint venture centered on Sylabs' Armored Containers technology. In or about September 14, 2020, American Systems announced the joint venture with Sylabs ("AS-Sylabs Venture"):

> "AMERICAN SYSTEMS has teamed with Sylabs.io—a leader in secure, trusted, performance focused container solutions—to form 'Team AMERICAN SYSTEMS'."

204.    The AS-Sylabs Venture was under the jurisdiction of the DoD's Joint Artificial Intelligence Center ("JAIC") and governed by the DoD's 2018 Artificial Intelligence Strategy[17] and Presidential Executive Order No. 13869 (2/11/19).[18]

205.    In its September 14, 2020, announcement of the AS-Sylabs Venture, American Systems listed the common mission areas in which Sylabs' Armored Containers technology would be utilized:

---

[16]    *See, e.g.:* https://scifglobal.com/scif-definition-what-is-a-scif/.
[17]    *See, e.g.: https://media.defense.gov/2019/Feb/12/2002088963/-1/-1/1/SUMMARY-OF-DOD-AI-STRATEGY.PDF*            .
[18]    *See, e.g.:* https://www.govinfo.gov/content/pkg/FR-2019-02-14/pdf/2019-02544.pdf.

- Naval Warfare Systems
- Air Warfare Systems
- Land Warfare Systems
- Command, Control, Communications, Computers, and Intelligence Systems
- Space Systems
- Cybersecurity

206.    Sylabs' SIF and Armored Containers technologies have raised the bar for container platforms throughout the HPC industry. Thus, Sylabs' technologies leverage the power of AI, machine learning, and deep learning to deliver unique enterprise-level services and an advanced ecosystem of resources that not only extends the overall value of the technologies but also couples ease of use and portability with unmatched security.

**Market Examples for SingularityPRO, Singularity Enterprise, Fuzzball, and Armored Containers**

207.    Finally, Sylabs' SIF Container technology, SingularityPRO, Singularity Enterprise, Fuzzball technology, and Armored Containers technology all have a broad customer base including academic and governmental research entities (DoE) and military agencies (DoD),  as well as companies in the biomedical, telecommunications, electronics, and manufacturing sectors.  Figure 8, below, provides some additional examples of Sylabs' Market Sectors.

/////
/////
/////
/////
////
/////
/////
/////
/////

| SYLABS TRADE SECRETS | PRIVATE SECTOR MARKETS | PUBLIC & GOVERNMENT MARKETS | MILITARY & LAW ENFORCEMENT MARKETS |
|---|---|---|---|
| SIF Containers SingularityPRO Singularity Enterprise | Any HPC environment, *e.g.*: <br>• Genomics <br>• Pharmaceutical <br>• Oil/Gas <br>• Manufacturing <br>• Chip design & manufacturing <br>• financial sector <br>• software design | Academia, National Laboratories, all federal and state institutions that use HPC / HPC-like environments. | DoD: All HPC / HPC-like environments. |
| Fuzzball | Any HPC environment, *e.g.*: <br>• Genomics <br>• Pharmaceutical <br>• Oil/Gas <br>• Manufacturing <br>• Chip design & manufacturing <br>• financial sector | Academia, National Laboratories, all federal and state institutions that use HPC / HPC-like environments. | DoD: All HPC / HPC-like environments. |
| Armored Containers | Cloud and on-premises environments leveraging containerization of sensitive intellectual property and/or data: <br>• Genomics <br>• Pharmaceutica <br>• Oil/Gas <br>• Manufacturing <br>• Chip design & manufacturing <br>• financial sector <br>• software design | Academia, National Laboratories, all federal and state institutions that use HPC / HPC-like environments, as the product evolves so will the opportunities in new markets. | DoD: All HPC / HPC-like environments. Cloud environments and on premises  All airborne and waterborne platforms manned and unmanned, all data centers. |

**FIGURE 8: Partial Summary of Markets**

LEPISCOPO & ASSOCIATES LAW FIRM

**VI.**

**DEFENDANTS' CYBER CORRUPTION, CYBER DESTRUCTION, AND CYBER THEFT OF SYLABS' TRADE SECRETS**

**Sylabs' Discovery of Defendants' Cyber Corruption, Cyber Destruction, and Cyber Theft of Sylabs' Trade Secrets**

208.    Through the publication of defendant CIQ's U.S. Patent No. US 10,970,113 B1 (Exh. 37), which occurred on or after April 6, 2021, Sylabs first started discovering evidence of Defendants' cyber corruption, destruction, theft, misappropriation, and unlawful and fraudulent patenting of Sylabs' Trade Secrets. This patent was actually Sylabs' Trade Secrets, not anything developed or invented by Defendants. In fact, defendants Greg Kurtzer and Adolph listed themselves as co-inventors, when in fact they, along with the other Defendants, were co-conspirators to the cyber theft of Sylabs' Trade Secrets they fraudulently claim as their own. *See* Exh. 37, p. 1, ¶ (72), "Inventors."

209.    Thereafter, Sylabs commenced review of Sylabs' Server Audit Logs, which are comprised of  separate **drive** audit logs and **email** audit logs, Exhs. 44 & 45, respectively, which started to reveal Defendants' cyber corruption, cyber destruction, and cyber theft of Sylabs' Trade Secrets. *See* Exh. 38: Decl. of  Tarbell ¶¶ 4-5 and 27-127; Exhs. 2-6, 44, 45, and 57.

**CIQ's Six Patents are Based on Sylabs' Trade Secrets**

210.    CIQ's Patents Based on Fuzzball Trade Secrets: CIQ's Patent Nos. US 10,970,113 (Exh. 37), US 11,099,893 (Exh. 39), and  US 11,310,342 (Exh. 40) are described and based upon the high level architecture of the "Fuzzball/HPC 2.0" project, which was born out of Sylabs' research and development starting in 2019. These patents were stolen by Defendants and are based on Sylabs' Trade Secrets, and, therefore, are Sylabs' property. Prior to March of 2020, Sylabs took steps to ensure that Fuzzball/HPC 2.0 source code and related material were kept secret. *See* Sylabs' Trade Secret Protections, Conflict of Interest Policies, Technical Protections, and IP Assignment/NDA Agreements. *See* Exhs. 47-52. However, through their cyber corruption, cyber destruction, and cyber

LEPISCOPO & ASSOCIATES LAW FIRM

theft, as alleged in greater detail below, Defendants stole and used Sylabs' Trade Secrets to procure these patents.

211.    CIQ's Patents Based on Armored Containers Trade Secrets: CIQ's Patent Nos. US 11,055,428 (Exh. 41), US 11,163,902 (Exh. 42), and  US 11,321,064 (Exh. 43) are described and based upon the Armored Containers technology, which was born out of Sylabs' research and development starting in 2019. Again, in its MTD Order, this Court expressed concerns that Sylabs did not allege facts sufficient to show those aspects of its SIF technology were not discussed in Sylabs' SIF Application. *See* Dkt. 59, p. 10, ll. 4-16 ("But the Court does not demand an exacting distinction at this stage that would depend upon discovery. Rather, Sylabs must simply allege with particularity those aspects of its SIF technology not discussed in the patent application, and it does not do so in the Complaint."). It is important to note that the Armored Containers technology that serves as the basis of CIQ's patents is not based on the technology disclosed in Sylabs' SIF Application regarding its SIF technology. These patents were stolen by Defendants and are based on Sylabs' Trade Secrets and, therefore, are Sylabs' property. As alleged in greater detail above in Section II, prior to March of 2020, Sylabs took steps to ensure that Armored Containers technology source code and related material were protected and kept secret. *See* Sylabs' Trade Secret Protections, Conflict of Interest Policies, Technical Protections, and IP Assignment/NDA Agreements (*see* Exhs. 47-52). However, through their cyber destruction, cyber destruction, and cyber theft, as alleged herein, Defendants used Sylabs' Trade Secrets to procure these patents.

212.    As alleged in greater detail above in Section II and below in this Section VI, CIQ's patent nos. US 10,970,113 (Exh. 37), US 11,099,893 (Exh. 39),  US 11,310,342 (Exh. 40), US 11,055,428 (Exh. 41), US 11,163,902 (Exh. 42), and  US 11,321,064 (Exh. 43) are based on Sylabs' Trade Secrets that Defendants unlawfully acquired through cyber corruption, cyber destruction, cyber theft, misappropriation, and unlawful and fraudulent patenting of Sylabs' Trade Secrets.

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

**Preliminary Statement of How Defendants Perpetrated Cyber Corruption, Cyber Destruction, Cyber Theft, and Cyber Intrusion in this Action**

213.    As will be alleged in greater detail in Section VII, below, during the time period between March 1 through June 1 of 2020, Defendants surreptitiously and unlawfully intruded into and accessed Sylabs' server to delete files and steal all of Sylabs' Trade Secrets that were under development and close to being submitted to the USPTO for protection and prosecution, including downloading Sylabs' entire server, among other unlawful activities alleged herein.

214.    In response to the MTD Order's finding that Sylabs does not sufficiently allege any efforts to maintain the secrecy of its technologies (Dkt. 59 p. 11, ll. 14-16), Sylabs provides, in addition to the specific details alleged above in Section II, the following additional allegations to cure such deficiencies.

215.    At all times mentioned herein, Sylabs took reasonable measures to protect the security and integrity of Sylabs' Server, where Sylabs kept and maintained its Trade Secrets, Corporate Secrets, and other confidential and proprietary information. *See* Sylabs' Trade Secret Protections, Conflict of Interest Policies, Technical Protections, and IP Assignment/NDA Agreements. *See* Exhs. 47-52.

216.    At all times mentioned herein, Sylabs' Server was hosted on Google Drive. Google Drive is a feature of Google Workspace, a cloud computer-based service that Sylabs uses to safely and securely collaborate, store, and share files. Google Drive allows Sylabs to securely store, edit, and work together on sensitive files, as well as creating audits that record users' activity. Sylabs employed Google Workspace and Google Drive to protect and secure its Trade Secrets, Corporate Secrets, and other confidential and proprietary information. Sylabs also restricted access to outsiders, limited access to employees, issued private email accounts, and had password protected accounts to restrict and limit access to information, among other reasonable measures Sylabs took to secure, protect, and safeguard its Trade Secrets, Corporate Secrets, and other confidential and proprietary information. *See* Sylabs' Trade Secret Protections, Conflict of Interest Policies,

LEPISCOPO & ASSOCIATES LAW FIRM

Technical Protections, and IP Assignment/NDA Agreements *See* Decl. of Tarbell ¶¶ 3 & 4; Exhs. 47-52.

217.   What follows is a detailed discussion of Defendants' acts of cyber corruption and cyber destruction of Sylabs' server, data, files, and directories, and cyber theft, misappropriation, and unlawful use of Sylabs' Trade Secrets and other legally protected information.

**PRELIMINARY OFFER OF PROOF:**

**Defendants' Cyber Corruption and Cyber Destruction of Sylabs' Server, Data, Folders, Files, and Directories, and Cyber Theft of Sylabs' Trade Secrets Will be Proven with:**

**(1) Forensic Evidence and (2) Expert Testimony**

218.   The details of Defendants' conspiracy and criminal scheme to steal Sylabs' Trade Secrets and Corporate Secrets will be set forth below. The evidence utilized is a forensic tool known as the audit trail, which is comprised of audit logs that provide detailed information about an individual's access and operations within a computer server.[19]

219.   The Information Technology Laboratory at the National Institute of Standards and Technology, U.S Department of Commerce ("NIST") provides the following guidance regarding audit trails (emphasis added):

"AUDIT TRAILS

**Audit trails maintain a record of system activity** both by system and application processes and **by user activity** of systems and applications. In conjunction with appropriate tools and procedures, audit trails can assist in detecting security violations, performance problems, and flaws in applications.

BENEFITS AND OBJECTIVES

Audit trails can provide a means to help accomplish several security-related objectives, including individual accountability, **reconstruction of events**

---

[19]   *See, generally:*  https://csrc.nist.gov/glossary/term/audit_trail.

SYLABS, INC.'S FIRST AMENDED COMPLAINT

67

(actions that happen on a computer system), intrusion detection, and problem analysis." [20]

220.   As alleged in greater detail above in Section II, and pursuant to the Court's MTD Order (Dkt. 59 p. 5, n. 3), Sylabs has included additional allegations and evidence regarding its claims through its expert witness, Christopher Tarbell's declaration (Exh. 38) and supporting Exhibits 1-36, 44, 45, 57, and 68-73.

221.   As alleged in this Action, Defendants' cyber theft and intrusion is evinced through audit logs from Sylabs' Server ("Audit Logs"). *See* Exhs. 44 and 45; Exh: 38: Decl. of Tarbell ¶¶ 3-5, 24, 42-48, and 128-139. For example, in an effort to find a way to scrub her and other defendants' activities off Sylabs' Server, defendant Julia Kurtzer sent an email to a website known as: "joindeleteme.com." Figure 9 is an excerpt of her activity on March 30, 2020, taken from the Audit Logs of her email for that date :



**FIGURE 9**: Excerpt of Audit Logs: Defendant Julia Kurtzer on 3/30/20

*See* Exh. 45, p. 21; Exh. 69; Exh 38: Decl. of Tarbell ¶¶ 24.a.vii and 24.b.ii, and 68-70.

222.   Throughout the country, the FBI utilizes computer forensics through its Regional Computer Forensics Laboratories for investigations into various areas of criminal activity, including trade secret theft and theft or destruction of intellectual property.[21]

223.   In fact, the FBI's use of computer forensics for investigation of cyber theft like those committed by Defendants in this Action is ubiquitous and indispensable:

" 'Without digital forensics, it would be hard to get a conclusion in a lot of cases,' said Walsh, who noted the very nature of modern communications makes the work of the FBI more challenging. 'Suspects aren't talking on the phone anymore and our technical techniques are not working as well because

---

[20]   *See:* https://csrc.nist.gov/csrc/media/publications/shared/documents/itl-bulletin/itlbul1997-03.txt.

[21]   *See:* https://www.rcfl.gov/.

LEPISCOPO & ASSOCIATES LAW FIRM

so much more is encrypted. I pull in the [Forensics Laboratory] very early in my investigative strategy.' "[22]

224. In addition to citing to the Drive Audit Logs (Exh. 44) and Mail Audit Logs (Exh. 45) and the Declaration of Christopher Tarbell (Exh. 38), the following convention will be used for citation purposes: "Audit Logs, Name, Date." So, for example, defendant Julia's Kurtzer's activity referred to above in Figure 9 would be cited as follows: "Audit Logs, Julia Kurtzer, 3-30-2022."

225. More specifically, Google Workspace, formally known as Google Apps and G Suite, is a collection of productivity and collaboration tools and products developed and marketed by Google. These tools and products are cloud computing based, meaning they have on-demand delivery to such services as computing resources, servers, applications, and data storage. *See* Exh 38: Decl. of Tarbell ¶ 42.

226. Google Workspace[23] provides a business with "a custom email…and include(s) collaboration tools like Gmail, Calendar, Meet, Chat, Drive, Docs, Sheets, Slides, Forms, Sites, and more." *See* Exh 38: Decl. of Tarbell ¶ 43.

227. Gmail, the email service provided in Google Workspace, allows a business to choose a domain name for the business's email; for example, the fictitious company Fast Food could have Gmail email addresses with the domain name@fastfood.com. While the domain name reflects the company name in this example,the email service is provided by Gmail. *See* Exh 38: Decl. of Tarbell ¶ 44.

228. Google Workspace's Drive[24] is a file storage and synchronization service that allows a business to "store, share, and collaborate on files and folders from…mobile device(s), tablet(s), or computer(s)." *See* Exh 38: Decl. of Tarbell ¶ 45.

229. Google Workspace archives users' actions and offers administrative accounts access to audit logs. These audit logs are a sequential record of security-relevant

---

[22]   *See:* https://www.fbi.gov/news/stories/rcfls-follow-the-modern-evidence-trail-081219.
[23]   *See:* https://workspace.google.com.
[24]   "Google Drive," *see:* https://www.google.com/drive.

events and the organization's user activity within Google Workspace. Both Google Drive and Gmail generate these audit logs. *See* Exh 38: Decl. of Tarbell ¶ 46.

230.    Gmail audit logs are a record of actions and events for the organization's user and administrative activity with the organization's email. These logs archive data about sending and receiving the organization's email such as, but not limited to, the email message ID, timestamps, sender, message size, subject, the direction of the email, number of attachments, recipient email address, event target, event status, event target IP address, and if the email has encryption. *See* Exh 38: Decl. of Tarbell ¶ 47.

231.    Finally, Google "Drive log events include content your users create in Google Docs, Sheets, Slides, and other Google Workspace apps, and content that your users upload to Drive, such as PDFs and Microsoft Word files." These events can include, but are not limited to, add to folder, create, delete, download, edit, editor setting change, link sharing access type change, link sharing visibility change, move, print, remove from folder, rename, restore, shared drive membership change, trash, upload, user sharing permissions change, and view. *See* Exh 38: Decl. of Tarbell ¶ 48.

### Defendants' Cyber Corruption, Cyber Destruction, and Cyber Theft, Misappropriation, and Unlawful Use of Sylabs' Trade Secrets and Sylabs' Corporate Assets

232.    Sylabs' Google Workspace account g@sylabs.io is assigned to defendant Greg Kurtzer. Within Sylabs' Server, account g@sylabs.io is labeled as "Gregory Kurtzer." *See* Exh 38: Decl. of Tarbell ¶ 49.

233.    In furtherance of Defendants' conspiracy and pursuant to their instructions, during the month of March 2020, prior to defendant Greg Kurtzer tendering his resignation, his account g@sylabs.io changed sharing permissions 54 times across 44 files and one folder for the purpose of providing his co-conspirators with unauthorized access to Sylabs' Server. *See* Exh 38: Decl. of Tarbell ¶ 50.a-n; Exhs. 2, 44, and 45.

234.    In furtherance of Defendants' conspiracy and pursuant to their instructions, defendant Greg Kurtzer's account g@sylabs.io deleted 142 folders and deleted 881 files

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

on March 26, 2020, and downloaded 3,901 files between March 22 through 31, 2020, for the purpose of concealing his and his co-conspirators' unlawful activities and unauthorized access to Sylabs' Server. *See* Exh 38: Decl. of Tarbell ¶ 51.a-t; Exhs. 3, 4, 5, 44, and 45.

235.   In furtherance of Defendants' conspiracy and pursuant to their instructions, between April 2, 2020, and April 15, 2020, well **after** defendant Greg Kurtzer left employment with Sylabs, he made numerous unlawful and unauthorized intrusions into Sylabs' Server using his Sylabs' account g@sylabs.io  through which he conducted numerous activities on Sylabs' Google Drive for the purposes of perpetrating Defendants' cyber corruption and cyber destruction of Sylabs' data, folders, files, and directories, cyber theft of Sylabs' Trade Secrets and Sylabs' Corporate Assets, and concealing his and his co-conspirators' unlawful activities and unauthorized access to Sylabs' Server: created 206 folders (Exh. 15); created 945 files (Exh. 16); downloaded 1,662 files (Exh. 17); edited 2 files and moved 65 files (Exh. 18); trashed 42 folders (Exh. 19); trashed 330 files (Exh. 20); uploaded 426 files (Exh. 21); changed user sharing permissions 65 times to 64 folders (Exh. 22); changed user sharing permissions 489 times to 489 files (Exh. 23); and viewed 15 files. *See* Exh 38: Decl. of Tarbell ¶ 52.a-k; Exhs. 15-23, 44, and 45.

236.   In furtherance of Defendants' conspiracy and pursuant to their instructions, between April 2, 2020, and April 15, 2020, defendant Greg Kurtzer's account g@sylabs.io conducted 4,696 actions on Sylabs' Google Drive. Of these 4,696 actions, 3,609 actions (approximately 76.9%)[25]  were from IP address 135.180.12.122. While defendant Greg Kurtzer was still employed at Sylabs, his account g@sylabs.io conducted 13,210 actions between February 10, 2020, and March 30, 2020, from this exact same IP address, 135.180.12.122. Furthermore, defendant Julia Kurtzer's account julia@sylabs.io conducted 11 actions between February 17, 2020, and February 25, 2020, from this exact same IP address, 135.180.12.122. All of these actions were taken by Defendants for the

---

[25]   The remaining 1,087 actions (approximately 23.1%) did not have a recorded IP address. All the 4,696 actions of account g@sylabs.io between April 2, 2020, and April 15, 2020, were either from IP address 135.180.12.122 or did not have a recorded IP address.

LEPISCOPO & ASSOCIATES LAW FIRM

purposes of perpetrating Defendants' cyber corruption and cyber destruction of Sylabs' data, folders, files, and directories, cyber theft of Sylabs' Trade Secrets and Sylabs' Corporate Assets, and concealing Greg and Julia Kurtzer's and their co-conspirators' unlawful activities and unauthorized access to Sylabs' Server. *See* Exh 38: Decl. of Tarbell ¶ 53; Exhs. 44, 45, and 69.

237.    In furtherance of Defendants' conspiracy and pursuant to their instructions, five days prior to leaving his employment with Sylabs, on March 26, 2020, defendant Greg Kurtzer used his Sylabs' account, g@sylabs.io, to give himself access to 1,186 files and folders on Sylabs' Server to his **external personal** G-mail account, gmkurtzer@gmail.com, so he could access Sylabs' Server **after** he left his employment with Sylabs. In addition, defendant Greg Kurtzer gave himself access to Sylabs' Server for **after** he left employment with Sylabs for the purpose of continuing Defendants' cyber corruption and cyber destruction of Sylabs' data, folders, files, and directories, cyber theft of Sylabs' Trade Secrets and Sylabs' Corporate Assets, and concealing Greg and Julia Kurtzer's and their co-conspirators' unlawful activities and unauthorized access to Sylabs' Server. *See* Exh 38: Decl. of Tarbell ¶ 54; Exhs. 24, 44, and 45.

238.    In furtherance of Defendants' conspiracy and pursuant to their instructions, defendant Greg Kurtzer commenced downloading 1,086 files from Sylabs' Server with his personal G-mail account, gmkurtzer@gmail.com, for the purpose of continuing Defendants' cyber corruption and cyber destruction of Sylabs' data, folders files, and directories, cyber theft of Sylabs' Trade Secrets and Sylabs' Corporate Assets, and concealing Greg and Julia Kurtzer's and their co-conspirators' unlawful activities and unauthorized access to Sylabs' Server. *See* Exh 38: Decl. of Tarbell ¶ 54; Exhs. 25, 44, and 45.

239.    In furtherance of Defendants' conspiracy and pursuant to their instructions, during the month of March 2020, prior to tendering his resignation, defendant Adolph used his Sylabs' account, robert@sylabs.io, to view 41 files. *See* Exh 38: Decl. of Tarbell ¶ 56; Exhs. 26, 44, and 45. With this access, defendant Adolph made numerous unlawful and

LEPISCOPO & ASSOCIATES LAW FIRM

unauthorized intrusions to Sylabs' Server for the purposes of perpetrating Defendants' cyber corruption and cyber destruction of Sylabs' data, folders, files, and directories, cyber theft of Sylabs' Trade Secrets and Sylabs' Corporate Assets, and concealing his and his co-conspirators' unlawful activities and unauthorized access to Sylabs' Server: trashed 24 files; created 10 files; downloaded 11 files; edited 14 files; changed link sharing access and visibility on 5 files; renamed 4 files; uploaded 1 file; changed user sharing permissions on 3 files; and viewed 49 files. *See* Exh 38: Decl. of Tarbell ¶¶ 56 and 57; Exhs. 26, 44, and 45.

240.    In furtherance of Defendants' conspiracy and pursuant to their instructions, during the month of March 2020, prior to tendering his resignation, defendant Hayden used his Sylabs' account, matt@sylabs.io, for the purposes of perpetrating Defendants' cyber corruption and cyber destruction of Sylabs' data, folders, files, and directories, cyber theft of Sylabs' Trade Secrets and Sylabs' Corporate Assets, and concealing his and his co-conspirators' unlawful activities and unauthorized access to Sylabs' Server: trashed 1 file; deleted 3 files; changed permissions for his account so he could edit; created 1 file; downloaded 6 files; edited 2 files; viewed 31 files. *See* Exh 38: Decl. of Tarbell ¶¶ 58, 59, and 60; Exhs. 44, 45, and 68.

241.    In furtherance of Defendants' conspiracy and pursuant to their instructions, between April 5, 2020, and April 9, 2020, well **after** he left his employment with Sylabs, defendant Hayden unlawfully used his Sylabs' account, matt@sylabs.io, to conduct unauthorized intrusions into Sylabs' Server for the purposes of perpetrating Defendants' cyber corruption and cyber destruction of Sylabs' data, folders, files, and directories, cyber theft of Sylabs' Trade Secrets and Sylabs' Corporate Assets, and concealing his and his co-conspirators' unlawful activities and unauthorized access to Sylabs' Server. *See* Exh 38: Decl. of Tarbell ¶ 61; Exhs. 44, 45, 68. For example, on April 5, 2020, defendant Hayden used his Sylabs' account to create the file "Untitled document" on Sylabs' Server. This same account then edited the file "Untitled document" over the next approximately 90 minutes to and renamed the file to "Direct to Phase II." Defendant Hayden continued to

LEPISCOPO & ASSOCIATES LAW FIRM

edit the file "Direct to Phase II" for nearly two hours on Sylabs' Google Drive. Finally, the file was downloaded twice from Sylabs' Server by defendant Hayden. Along with downloading the file "Direct to Phase II," defendant Hayden downloaded 47 other files from Sylabs' Google Drive on April 5, 2020. Along with viewing the file "Direct to Phase II," on April 5, 2020, defendant Hayden viewed the three files "Copy of 2019 - Business Plan – Sylabs," "BABELFISH Future Work," and "status report for Bryan Embry." *See* Exh 38: Decl. of Tarbell ¶¶ 62-65; Exhs. 44, 45, and 68.

242.    In furtherance of Defendants' conspiracy and pursuant to their instructions, on April 9, 2020, <u>after</u> his departure from Sylabs, defendant Hayden unlawfully accessed Sylabs' Server and deleted a file (".DS_Store") owned by the Department of Defense. *See* Exh 38: Decl. of Tarbell ¶¶ 66-67; Exhs. 44, 45, and 68.

243.    In furtherance of Defendants' conspiracy and pursuant to their instructions, during the month of January 2020, defendant Julia Kurtzer (Greg Kurtzer's wife) used her Sylabs' account, julie@sylabs.io, to: edit 2 files and view six files; and during the month of February 2020, she edited 2 files and viewed 4 files. *See* Exh 38: Decl. of Tarbell ¶¶ 68-70; Exhs. 44, 45, 69.

244.    In furtherance of Defendants' conspiracy and pursuant to their instructions, prior to her resignation from Sylabs, defendant Fong, used her Sylabs' account, erin@sylabs.io, to: edit 11 files (editing one file 18 times on March 24, 2020); change permissions for "Untitled spreadsheet" so anyone could view and edit the file; rename a filed titled "Sylabs Reseller Agreement_Mannai" to "Sylabs Reseller Agreement_Mannai Corporation;" uploaded 1 file; download 18 files; view 28 files; create 5 files. *See* Exh 38: Decl. of Tarbell ¶¶ 71-73; Exhs. 44, 45, and 70.

245.    In furtherance of Defendants' conspiracy and pursuant to their instructions, on April 2, 2020, after her departure from Sylabs, defendant Fong unlawfully accessed Sylabs' Server created the folder "members_export_705bf21892" on Sylabs' Google Drive. Immediately following creation of this folder, she uploaded three files named "cleaned_members_export_705bf21892.cvs," "subscribed_members_export_705bf21892.cvs,"

and "unsubscribed_members_export_705bf21892.cvs." *See* Exh 38: Decl. of Tarbell ¶ 74; Exhs. 44, 45, and 70.

246.   In furtherance of Defendants' conspiracy and pursuant to their instructions, on March 25, 2020, Rose Anne Stein used her Sylabs' account, rose@sylabs.io, to add 137 files to her account folder. *See* Exh 38: Decl. of Tarbell ¶¶ 75-76; Exhs. 44, and 45.

247.   In furtherance of Defendants' conspiracy and pursuant to their instructions, on March 29, 2020, Rose Anne Stein used her Sylabs' account, rose@sylabs.io, to: add 137 files to her account folder (Exh. 27); change the sharing permissions for 478 folders for account g@sylabs.io to "Owner" or "Can edit" (Exh. 28); change the sharing permissions for 17,236 files for account g@sylabs.io to "Owner" or "Can edit" (Exh. 29); change the sharing permissions for 476 folders for account rose@sylabs.io from "Owner" to "Can edit" (Exh. 30); and Changed the sharing permissions for 17,235 files for account rose@sylabs.io from "Owner" to "Can edit" (Exh. 31). *See* Exh 38: Decl. of Tarbell ¶ 77; Exhs. 27-31, 44, and 45.

248.   In furtherance of Defendants' conspiracy and pursuant to their instructions, on March 16, 2020, Rose Anne Stein used her **second** Sylabs' account, anne@sylabs.io, to: create a file named "Untitled document." This file was then renamed to "Email Templates." Rose Anne Stein then changed the link sharing visibility of this file from "Private" to "Anyone with the link within the domain for sylabs.io." She then changed this document's link sharing access type from "None" to "Can view for sylabs.io" to "Can edit for sylabs.io." Also on March 16, 2020, Rose Anne Stein downloaded, viewed, and edited this file multiple times. On March 16, 2020, and March 17, 2020, this same file was subsequently viewed and edited by defendant Fong. *See* Exh 38: Decl. of Tarbell ¶¶ 78-80; Exhs. 44, 45, 70, and 73.

249.   In furtherance of Defendants' conspiracy and pursuant to their instructions, on March 4, 2020, Cedric Clerget used his Sylabs' account, cedric@sylabs.io, to upload the file "inception.sif" to Sylabs' Server. Cedric Clerget then changed the link sharing visibility from "Private" to "Anyone with the link within the domain for sylabs.io" and the

LEPISCOPO & ASSOCIATES LAW FIRM

link sharing access type from "None" to "Can view for sylabs.io" for this file. *See* Exh 38: Decl. of Tarbell ¶¶ 81-82; Exhs. 44, 45, and 71.

250.    In furtherance of Defendants' conspiracy and pursuant to their instructions, between March 4, 2020, and March 27, 2020, Cedric Clerget viewed eight files on Sylabs' Google Drive: "inception.sif," "Resource/Availability," "Open-Topic-20.1-Focus-Areas," "2020-02_Dev_Timeline," "2020-02_Roadmap_Pub," and "2020-03-27 DT Handover." On March 9, 2020, Cedric Clerget edited "Resource/Availability" twice. *See* Exh 38: Decl. of Tarbell ¶ 83; Exhs. 44, 45, and 71.

251.    In furtherance of Defendants' conspiracy and pursuant to their instructions, on April 1, 2020, Cedric Clerget viewed two files on Sylabs' Server: "2020-03-27 DT Handover" and "SingularityPRO Customer Licenses." *See* Exh 38: Decl. of Tarbell ¶ 84; Exhs. 44, 45, and 71.

252.    In furtherance of Defendants' conspiracy and pursuant to their instructions, from March 1, 2020, through March 22, 2020, Shara Hayden, who was defendant's Hayden's wife, used her Sylabs' account, shara@sylabs.io, to: trash 12 files; create 3 files; delete 28 files; download 4 files; edit 9 files; download 4 files; rename the file "Samsung_Sylabs_NDA.pdf" to "Samsung Semiconductor, Inc._Sylabs_NDA.pdf"; and view 16 files. *See* Exh 38: Decl. of Tarbell ¶¶ 85-86; Exhs. 44, and 45.

253.    In furtherance of Defendants' conspiracy and pursuant to their instructions, on March 26, 2020, Shara Hayden took the following actions on Sylabs' Server: trashed 94 folders (Exh. 32); trashed 256 files (Exh. 33); deleted 95 folders (Exh. 34); and deleted 255 files (Exh. 35). *See* Exh 38: Decl. of Tarbell ¶ 87; Exhs. 32-35, 44, and 45.

254.    In furtherance of Defendants' conspiracy and pursuant to their instructions, on March 13, 2020, external threats, defendants Whitley and IAG, viewed 14 files on Sylabs' Server, including files relating to Fuzzball and Sylabs' corporate records. *See* Exh 38: Decl. of Tarbell ¶ 88; Exhs. 36, 44, and 45.

255.    In furtherance of Defendants' conspiracy and pursuant to their instructions, on March 12 and 13, 2020, defendant Greg Kurtzer changed the permissions on 39 files in

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

Sylabs' Server so external threats, defendants Whitley and IAG, could access through Whitley's personal G-mail, joel.whitley@gmail.com. *See* Exh 38: Decl. of Tarbell ¶ 89; Exhs. 36, 44, and 45.

256.    In furtherance of Defendants' conspiracy and pursuant to their instructions, with the permissions defendant Greg Kurtzer provided to defendants Whitley and IAG, on March 13, 2020, defendants Whitley and IAG downloaded the document titled "Fuzz Budget" from Sylabs' Server. *See* Exh 38: Decl. of Tarbell ¶¶ 90-91; Exhs. 36, 44, and 45.

257.    In furtherance of Defendants' conspiracy and pursuant to their instructions, an email account that is **external** to Sylabs, m.prager@opendrives.com, which was assigned to and used for the benefit of defendants Prager and Open Drives while defendant Prager was employed by defendant Open Drives, Inc., had access to Sylabs' Server. Between March 8, 2020, and March 21, 2020, defendants Prager and Open Drives viewed four files on Sylabs' Server: "Fuzz Budget," "Sylabs Spin-in Terms," "Email cover to Joel," and "Disrupt the Status Quo-HPC Taken to the Next Level." *See* Exh 38: Decl. of Tarbell ¶ 92; Exhs. 44, 45, and 72.

258.    In furtherance of Defendants' conspiracy and pursuant to their instructions, on March 8, 2020, and March 9, 2020, March 11, 2020, March 18, 2020, and March 19, 2020, respectively, defendant Greg Kurtzer changed the permissions on the files "Fuzz Budget" and "Sylabs Spin-in Terms" and "Email cover to Joel [Whitley]" and HPC is at the heart of Sylabs" and "Disrupt the Status Quo-HPC Taken to Next Level" in Sylabs' Server for external access for defendants Prager and Open Drives so that they could access them through defendant Prager's email, m.prager@opendrives.com. *See* Exh 38: Decl. of Tarbell ¶¶ 93-97; Exhs. 44, 45, and 72.

259.    In furtherance of Defendants' conspiracy and pursuant to their instructions, on March 19, 2020, defendants Buss and IAG sent an email to both defendants Greg Kurzer and Adolph. The subject of this email is "Fwd: FW: Latest News for GigaIO" and the email has three attachments.  Approximately 55 minutes later, defendants Buss and IAG sent, with the subject "Fwd: FW: Latest News for GigaIO," defendant Adolph an email with the

subject "Re: FW: Latest News from GigaIO." This email also has three attachments and was sent to defendants Buss, Open Drives, Adolph, Prager, and Greg Kutzer. *See* Exh 38: Decl. of Tarbell ¶¶ 98-99; Exhs. 57, 62, 44, and 45.

260.    In furtherance of Defendants' conspiracy and pursuant to their instructions, on March 27, 2020, and March 30, 2020, defendants Buss and Open Drives sent emails to Greg Kurtzer regarding Sylabs' SBIR. *See* Exh 38: Decl. of Tarbell ¶¶ 100-101; Exhs. 57-59, 62, 44, and 45.

261.    In addition to and separate and apart from their cyber theft and misappropriation of Sylabs' Trade Secrets, Defendants also accessed and copied Sylabs' Server in order to steal and misappropriate Sylabs' corporate secrets, including Sylabs' corporate documents and minutes of shareholder and board of directors' meetings ("Sylabs' Corporate Records"), financial records ("Sylabs' Financial Records"), partner and joint venture records ("Collaboration Records"), customer list ("Sylabs' Customer List"), sales and potential sales lists ("Sylabs' Sales Lists"), statements of work ("Sylabs' SOWs"), purchase orders ("Sylabs' POs"), invoices ("Sylabs' Invoices"), marketing strategies, plans, and pricing ("Sylabs' Marketing"), and prospective investors list ("Sylabs' Investors"), all of which may be referred to collectively as "Sylabs' Corporate Secrets."

262.    Sylabs suffered multiple insider threat attacks by their former CEO, defendant Greg Kurtzer, and his cohorts. Defendant Greg Kurtzer used his authorized access to Sylabs' Trade Secrets and Sylabs' Corporate Assets, Corporate Secrets, confidential information, resources, including personnel, facilities, information, equipment, networks, and system to delete, share with outsiders, and download Sylabs' sensitive corporate data. *See* Exh 38: Decl. of Tarbell ¶ 30; *see also, e.g.*, Exhs. 2-25, 28, 29, 44, and 45.

263.    Defendant Greg Kurtzer shared the folder "All Corporate Docs" with an external user and shared access to over 40 of Sylabs' documents with others outside of Sylabs, for example, including external threats, defendants Buss and Open Drives, and

LEPISCOPO & ASSOCIATES LAW FIRM

defendants Whitley and IAG. *See* Exh 38: Decl. of Tarbell ¶ 31; *see also* Exhs. 36, 57, 44, and 45.

264.    After tendering his resignation, defendant Greg Kurtzer, in one day on Sylabs' Server, deleted 142 folders, deleted 880 files, downloaded 3,901 of Sylabs' files, changed the sharing permissions on 137 folders and 1,094 files, and gave his personal email access to nearly 1,200 Sylabs' files and folders – which defendant Greg Kurtzer then used to download 1,086 files belonging to Sylabs. *See* Exh 38: Decl. of Tarbell ¶ 32; *see also, e.g.*, Exhs. 2-25, 28, 29, 44, and 45.

265.    Even after his resignation, when defendant Greg Kurtzer was no longer an employee of Sylabs, defendant Greg Kurtzer moved from being an inside threat to an external threat as he had numerous unauthorized accesses to Sylabs' Server that included downloading 1,662 files, editing files, and trashing 42 folders and 330 files.

**Cyber Corruption, Cyber Destruction, and Cyber Theft, Misappropriation, and Unlawful Use of Sylabs' Human Resources Department Records, Employees' Private Information, and Staff Agreements**

266.    In addition to their cyber theft of Sylabs' Corporate Secrets, Defendants also stole Sylabs' Human Resources Department records ("Sylabs' HR Records") and violated the privacy rights of Sylabs' employees by stealing their employment files ("Employees' Files") in violation of California and federal laws.

267.    Included within Defendants' cyber theft of Sylabs' HR and Employees' Files were employees' salary and benefits packages, payroll information, addresses, dates of birth, driver's licenses, tax identification numbers, etc. (collectively "Employees' Private Information").

268.    Further, included within Defendants' cyber theft of Sylabs' HR and Employees' Files were Sylabs' offers of employment, executive employment agreements, employment agreements, independent contract agreements, consultant agreements, technical advisor agreements, and reseller agreements,  (collectively "Sylabs' Staff Agreements").

LEPISCOPO & ASSOCIATES LAW FIRM

**Cyber Corruption, Cyber Destruction, and Cyber Theft, Misappropriation, and Unlawful Use of Federal Programs and Opportunities and Fraudulent Patenting: Sylabs' Armored Containers Technology**

269.     In order to expand research and development as well as promoting innovative small businesses, Congress enacted 15 U.S.C. § 638, stating the Nation's policy in subsection (a):

> "(a) Declaration of policy.   Research and development are major factors in the growth and progress of industry and the national economy. The expense of carrying on research and development programs is beyond the means of many small-business concerns, and such concerns are handicapped in obtaining the benefits of research and development programs conducted at Government expense. These small-business concerns are thereby placed at a competitive disadvantage. This weakens the competitive free enterprise system and prevents the orderly development of the national economy. It is the policy of the Congress that assistance be given to small-business concerns to enable them to undertake and to obtain the benefits of research and development in order to maintain and strengthen the competitive free enterprise system and the national economy."

270.     Section 638 gave birth to the Small Business Innovation Research program ("SBIR"), which is administered through the U.S. Small Business Administration's ("SBA") Office of Innovation and Technology ("OIT").[26]

271.     On or about 2019,   the U.S. Air Force issued SBIR Request No. 20.1, Contract No. FA8649-20-P-0729, Tracking No. J201-CSO1-7047, and Topic J201CSO1 for Containers Technologies for LevelUp.[27]

272.     In or about the end of 2019, Sylabs commenced discussions and preparation of its SBIR proposal No. F2-13944 ("SBIR Proposal") regarding its hardened SIF container technology, which Sylabs titled, "Sylabs' Armored Containers."

273.     On or about August 24, 2020, Sylabs  submitted a second SBIR Proposal through the SBA's SBIR Innovation Portal.

---

[26]     *See*: https://www.sbir.gov/about.
[27]     *See*: https://www.sbir.gov/node/1967051.

LEPISCOPO & ASSOCIATES LAW FIRM

274.    In addition to Defendants' theft of Sylabs' Armored Containers in its SBIR Proposal through Defendants' unlawful  and unauthorized access to Sylabs' Server, defendants Julia Kurtzer and Hayden also had credentials to access the Trade Secrets set forth in Sylabs' SBIR Proposal through the Defense SBIR Innovation Portal.

275.    Through their theft and intrusion into Sylabs' Server, Defendants stole Sylabs' Armored Containers technology and submitted and received the following patents through perpetration of an intentional fraud upon the USPTO (hereinafter these patents will be referred to collectively as  "Stolen Sylabs' Armored Containers Trade Secrets"):

a.    Systems and Methods for Encrypted Container Image Management, Deployment, and Execution, Patent No. US 11,055,428 ("Stolen Sylabs' Trade Secret, Armored Containers #1");

b.    Systems and Methods for Encrypted Container Image Management, Deployment, and Execution, Patent No. US 11,163,902 ("Stolen Sylabs' Trade Secret, Armored Containers #2"); and

c.    Systems and Methods for Trusted and Secure Application Deployment Via Collective Signature Verification of the Application Artifacts, Patent No. US 11,321,064 ("Stolen Sylabs' Trade Secret, Armored Containers #3").

**Cyber Theft and Fraudulent Patenting: Sylabs' Fuzzball Technology**

276.    Through their theft and intrusion into Sylabs' Server, Defendants stole Sylabs' Fuzzball Trade Secrets and submitted and received the following patents through perpetration of an intentional fraud upon the USPTO (hereinafter these patents will be referred to collectively as  "Stolen Sylabs' Fuzzball Trade Secrets"):

a.    Systems and Methods for Orchestrating Seamless, Distributed, and Stateful High Performance Computing, Patent No. US 10,970,113 ("Stolen Sylabs' Trade Secret, Fuzzball #1");

b.    Systems and Methods for Orchestrating Seamless, Distributed, and Stateful High Performance Computing, Patent No. US 11,099,893 ("Stolen Sylabs' Trade Secret, Fuzzball #2"); and

LEPISCOPO & ASSOCIATES LAW FIRM

c.   Systems and Methods for Optimizing a Software Allocation to Shared Resources Based on a Dynamic Mapping of Resource Relationships, Patent No. US 11,310,342 ("Stolen Sylabs' Trade Secret, Fuzzball #3").

### Defendants' Inequitable Conduct and Intentional Fraud
### Perpetrated on the USPTO

277.   After Defendants stole and misappropriated Sylabs' Armored Containers and Fuzzball Trade Secrets, they unlawfully patented Sylabs' technology through cyber theft and by perpetrating a fraud on the USPTO on the following grounds:

a.   Listing incorrect inventors and/or omitting inventors;

b.   Omitting prior art, *i.e.*, Sylabs' Trade Secrets that Defendants obtained and misappropriated through cyber theft; and

c.   Inequitable conduct—fraud.

278.   Inequitable conduct requires that everyone participating in the procurement of a patent abide by 37 Code of Federal Regulations ("CFR") 1.56(a) (emphasis added):

"Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Patent Office, which includes a duty to disclose to the Patent Office **all information known to that individual to be material to patentability**."

279.   In addition to their inequitable conduct, Defendants also perpetrated an intentional fraud upon the USPTO, which is proscribed by 37 CFR 1.56(a) and which in its relevant part provides (emphasis added):

"However, no patent will be granted on an application in connection with which **fraud on the Office was practiced or attempted** or the duty of disclosure was violated through bad faith or intentional misconduct."

280.   Defendants violated 37 CFR 1.56 by breaching their duty of candor, disclosure, and good faith by perpetrating a fraud on the USPTO, to wit:

a.   fraudulently omitting prior art, *i.e.*, Sylabs' Trade Secrets that Defendants obtained and misappropriated through cyber theft;

b.   fraudulently representing that SIF containers, Fuzzball, and Armored Containers were their Trade Secrets when they were actually invented and owned by Sylabs; and

c.   fraudulently representing they were the inventors of the Trade Secrets, when the actual inventors were Sylabs and its relevant employees.

**Cyber Theft, Misappropriation, and Unlawful Use of Privileged Documents**

281.   In addition to the foregoing, Defendants also stole privileged documents ("Sylabs' Privileged Docs") including but not limited to attorney-client communications, attorney work-product documents, accountant-client communications, settlement negotiations and agreements, nondisclosure agreements, and tax returns.

**Cyber Corruption, Cyber Destruction, and Cyber Theft, Misappropriation, and Unlawful Use of Sylabs' Emails and Written Correspondence**

282.   In addition to the foregoing, Defendants also stole all emails and correspondence from the Sylabs' Server, including but not limited to ones relating to sensitive corporate secrets and affairs, and ones discussing attorney-client communications, attorney work-product documents, accountant-client communications, settlement negotiations and agreements, nondisclosure agreements, and tax returns information (collectively "Sylabs' Correspondence").

**VII.**
**DISCUSSION OF EVIDENCE PROVING:**
**DEFENDANTS' CYBER CORRUPTION, CYBER DESTRUCTION, AND CYBER THEFT OF SYLABS' TRADE SECRETS, INTELLECTUAL PROPERTY, CORPORATE SECRETS,  AND OTHER SENSITIVE INFORMATION**

283.   As outlined by the Supreme Court's decision in *Van Buren v. United States* ("*Van Buren*") and the Ninth Circuit's decision in *Andrews v. Sirius XM Radio* (9th Circuit) ("*Sirius XM*"), one aspect of this Action is the cyber destruction, corruption, damage, and loss caused through **technological** harms—such as the corruption and destruction of Sylabs' computer server, data, folders, files, and directories—caused by Defendants, all of which is more commonly known as cyber corruption and cyber destruction. Further, as

LEPISCOPO & ASSOCIATES LAW FIRM

demonstrated below, Defendants stole Sylabs' Trade Secrets, Corporate Secrets, customer information, etc., and gave it to Sylabs' competitor, defendant CIQ. Under *Van Buren* and *Sirius* all of the foregoing constitutes remediable harm under the CFAA, which Sylabs suffered as a direct consequence of Defendants' unlawful acts as alleged herein in Sections II and V-VIII.

284.    As alleged in greater detail below, this cyber corruption and destruction was perpetrated by Defendants when they were acting as insider threats to Sylabs, as well as from outside Sylabs through Defendants' external intrusion into Sylabs' Server.

285.    Although the main aspect of this Action is Defendants' cyber destruction , corruption, and cyber theft, misappropriation, and unlawful and fraudulent patenting of Sylabs' Trade Secrets, there was additional harm and damage caused by Defendants that was separate and apart from Defendants' cyber theft that constitute separate causes of action under California law (*see* Counts VI through XXI, *infra*), to wit: through the cyber theft and use of following sensitive documents:

- corporate records;
- financial records;
- partner and joint venture records;
- customer lists;
- sales and potential sales lists;
- statements of work;
- purchase orders;
- invoices;
- marketing strategies, plans, and pricing;
- prospective investors list;
- HR records;
- employees' files;
- employees' private information;
- staff agreements;

Lepiscopo & Associates Law Firm

- emails and correspondence; and
- privileged documents.

286. It is clear that Defendants' cyber destruction and corruption of Sylabs' directories and files and Defendants' cyber theft of the foregoing sensitive information demonstrates that their coordinated and comprehensive strategy was to surreptitiously commandeer Sylabs' entire business, resources, Trade Secrets, and Sylabs' Corporate Assets, so that they in effect had an ongoing business without having to invest any funds in research, development, or marketing, or pay a single penny to Sylabs for taking right, title, and interest in and to Sylabs' Trade Secrets and then patenting all of it as their own.

287. As initially discussed above, and as will be alleged in greater detail below, there is clear forensic evidence proving the date and time of each of the Defendants' acts of unlawful access to Sylabs' Server thereby proving the theft and/or destruction of Sylabs' Trade Secrets through the Audit Logs, which capture their access and activities.

288. The facts of this Action will now be presented below. As an overview, in November of 2019, defendants Robert Adolph and Greg Kurtzer were planning Defendants' theft of Sylabs' Trade Secrets and Corporate Secrets, as well as planning a collaboration between Open Drives and "Newco" that would use all of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets so that "Newco" could be immediately launched. The "Newco" which they began to refer to in emails eventually would become defendant CIQ, which is the company that eventually received the stolen Sylabs' Trade Secrets and Sylabs' Corporate Assets. *See* Exhs. 56 and 58.

289. An interesting situation occurring during the later part of 2019 became clear only after Defendants' crimes in this Action were discovered. Specifically, during meetings with prospective investors, Greg Kurtzer, Sylabs' CEO at the time, did everything he could to dissuade investors from investing in Sylabs, thereby sabotaging Sylabs' ability to receive investment capital. For example, he feigned being unprepared for meetings and uninterested in his presentations, could not explain Sylabs' IP or existing products, provided incorrect and foolish answers to questions, and exhibited other behavior and

LEPISCOPO & ASSOCIATES LAW FIRM

demeanor that resulted in all investors being scared off and not moving forward with any further discussions or negotiations. For context, this is around the time that Sylabs was commencing preparation of its SBIR Proposal.

290. As Defendants' plans were in place and in the process of being executed, on March 22, 2020, defendant Greg Kurtzer resigned as Sylabs' CEO, which would become effective March 31, 2020. One day later, on March 23, 2020, defendants Julia Kurtzer, Erin Fong, Matthew Hayden, and Robert Adolph all followed suit and tendered their resignations in concert to Sylabs on the same day. Decl. of Tarbell ¶¶ 8, 9, 22, 50-54, 56, 77, and 87; Exhs. 2-36, 57, 68-73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

291. During the time frame from March 1 through 31, 2020, defendants Greg Kurtzer and Adolph commenced their plan of plundering Sylabs of its Trade Secrets, Corporate Assets, Corporate Secrets, and other business and sensitive information for this very purpose. Decl. of Tarbell ¶¶ 8, 9, 22, 50-54, 56, 77, and 87; Exhs. 2-36, 57, 68-73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

292. Greg Kurtzer and the other former employees of Sylabs downloaded, deleted, and trashed files on Sylabs' systems as they were walking out the door to other employment; in some cases, these acts were committed when they were no longer an employee of Sylabs, they accessed Sylabs' systems without authorization, and were inconsistent with the IP Assignment/NDA Agreements (Exhs. 48-52). *See* Exh. 38: Decl. of Tarbell ¶¶ 8, 9, 22, 50-54, 56, 77, and 87; Exhs. 2-36, 48-52, 57, 68-73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

293. After Greg Kurtzer's resignation, other former Sylabs employees followed Greg Kurtzer to be employed by defendant CIQ and also became insider threat actors, including Defendants Robert Adolph, Matthew Hayden, and Erin Fong. *See* Exh. 38: Decl. of Tarbell ¶¶29, 30, and 34 ; Exh. 44: Drive Audit Logs; Exh. 45: Email Audit Logs.

294. After defendant Greg Kurtzer was no longer employed by Sylabs, and in furtherance of Defendants' malicious plans, Greg Kurtzer and his co-conspirators knowingly made numerous unauthorized intrusions into Sylabs' Server and downloaded

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

thousands of directories and files. *See* Exh. 38: Decl. of Tarbell ¶¶ 8, 9, 22, 50-54, 56, 77, and 87; Exhs. 2-36, 57, 68-73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

295. Defendant Greg Kurtzer did not act alone. More specifically, Greg Kurtzer, Matthew Hayden, and Erin Fong all accessed Sylabs' Google Workspace after their employment with Sylabs had ended; these were unauthorized accesses to computer systems. For example, after their departure from Sylabs, defendants Matthew Hayden and Erin Fong knowingly accessed Sylabs' Server without Sylabs' authorization to corrupt, delete, create, download, and view Sylabs' files and folders. *See* Exh. 38: Decl. of Tarbell ¶¶ 8, 9, 22, 50-54, 56, 77, and 87; Exhs. 2-36, 57, 68-73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

296. Greg Kurtzer's unauthorized intrusions to Sylabs' computer systems resulted in over 1,600 Sylabs' files being downloaded and over 300 Sylabs' files being trashed. *See* Exh. 38: Decl. of Tarbell ¶ 130; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

297. Greg Kurtzer also gave access to three external accounts (m.prager@opendrives.com, joel.whitley@gmail.com, and gmkurtzer@gmail.com) on Sylabs' computer system. These actions led directly to the downloading of over 1,000 of Sylabs' files and unauthorized external access to Sylabs' folder "All Corporate Docs." *See* Exh. 38: Decl. of Tarbell ¶ 131; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

298. It is important to note that during the time frame of March 1 through June 1, 2020, defendant Greg Kurtzer used three different email accounts to commit his cyber theft by granting full and complete credentials for all 3 email accounts to access Sylabs' Server, two of which were his personal email addresses, which he encouraged his Co-Conspirators to use to hide their cyber theft (*see* Exh. 38: Decl. of Tarbell ¶¶ 8, 9, 22, 50-54, 56, 77, and 87; Exhs. 2-36, 57, 68-73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log):

     a. Sylabs: g@sylabs.io; and

     b. Personal: gmkurtzer@gmail.com & gmk@hushmail.com ("Personal Emails").

LEPISCOPO & ASSOCIATES LAW FIRM

299.   Within Sylabs' Google Drive logs, there is forensic evidence that both Greg Kurtzer's Sylabs' account, g@sylabs.io, and his personal account, gmkurtzer@gmail.com, trashed, deleted, viewed, edited, moved, downloaded, changed user sharing permissions, and changed file editor settings for numerous files containing "Fuzzball" as part of their naming convention. *See* Exh. 38: Decl. of Tarbell ¶¶ 8, 9, 22, 50-54, 56, 77, and 87; Exhs. 2-36, 57, 68-73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

300.   The following discussion is not intended to be a comprehensive recitation of all the events surrounding the theft and subsequent use of Sylabs' Trade Secrets, Corporate Assets, Corporate Secrets, privileged documents, and sensitive information. Rather, it is to establish a pattern of their criminal enterprise and conspiracy, which is currently ongoing and expanding. For example, through defendant CIQ, Defendants recently raised $26,000,000, making a total of $33,000,000 raised, and according to defendant Greg Kurtzer, CIQ now has a valuation of $150,000,000.[28]

301.   CIQ's raising of capital and its valuation are the product of their crimes as outlined above. Thus, separate and apart from the crimes Defendants have committed against Sylabs and the fraud perpetrated on the USPTO, Defendants have been and currently are engaged in an ongoing conspiracy to commit interstate securities fraud by continuing to seek capital from investors.

**Defendants' Cyber Corruption, Cyber Destruction, and Cyber Theft Prior to Defendants' Resignations Effective Date (3/1/20 thru 3/31/20)**

302.   Defendant Gregory Kurtzer tendered his resignation to Sylabs on March 22, 2020. One day later, on March 23, 2020, defendants Julia Kurtzer, Erin Fong, Matthew Hayden, and Robert Adolph all tendered their resignations to Sylabs on the same day. All of the aforementioned Defendants cited March 31, 2020, as their last day of employment at Sylabs. The following acts of cyber theft were committed by Defendants from March 1

---

[28]   *See*:  https://siliconangle.com/2022/05/12/ciq-raises-26m-promote-free-alternative-red-hat-linux/.

through 31, 2020, during the month leading up to the resignation effective date of the aforementioned employees.

303.   The following acts of cyber intrusion and cyber theft committed during the month of March 2020 are categorized according to each Defendant who committed the crime.

**Gregory Kurtzer's Cyber Intrusion, Cyber Corruption, and Cyber Destruction Prior to his Resignation Effective Date (3/1/20 thru 3/31/20)**

304.   Greg Kurtzer spent the month of March 2020 methodically eviscerating Sylabs of its Trade Secrets and Corporate Secrets for the purpose of creating defendant CIQ.

305.   For example, after tendering his resignation, Greg Kurtzer, in one day on Sylabs' systems, deleted 142 folders, deleted 880 files, downloaded 3,901 of Sylabs' files, changed the sharing permissions on 137 folders and 1,094 files, and gave his personal email access to nearly 1,200 Sylabs' files and folders – which Greg Kurtzer then used to download 1,086 files belonging to Sylabs. *See* Exh. 38: Decl. of Tarbell ¶¶ 8 and 9; Exhs. 3 and 4; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

306.   Sylabs' Google Workspace account g@sylabs.io is assigned to Greg Kurtzer. Between the time Greg Kurtzer tendered his resignation with Sylabs and the effective date of his resignation, Greg Kurtzer downloaded approximately 3,901 files from Sylabs' Google Drive with the account g@sylabs.io. *See* Exh. 38: Decl. of Tarbell ¶ 32; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

307.   During the month of March 2020, prior to tendering his resignation, Greg Kurtzer's account g@sylabs.io:

   a.   Added the file "Disrupt the Status Quo - HPC Taken to the Next Level" to the folder "Root" on March 19, 2020.

   b.   Created the folder "All Corporate Docs" on March 13, 2020.

   c.   Created 10 files: "Untitled spreadsheet," "Fuzz Budget," "Untitled document," "Untitled document," "Untitled document," "Untitled

spreadsheet," "Untitled document," "Untitled document," "Untitled document," and "Copy of Disrupt the Status Quo - HPC Taken to the Next Level."

d. Deleted four folders: "Product Information (Descriptions)," "Customer-Specific Product Information (Descriptions) DRAFTS," "Sales," and "WIP Quotes."

e. Deleted four files: "Sylabs MPA.pdf," "DOD - DSRC," "Pacific Tech," and "Pacific Tech - Feb 25 2018."

f. Downloaded six files: "Total Sales," "Sylabs_NPA_92019pdf_Exhi.pdf," "Cover Letter," "Sylabs / RStor Settlement," "Disrupt the Status Quo - HPC Taken to the Next Level," and "Disrupting the Status Quo - HPC Taken to the Next Level."

g. Edited 18 files: "Disrupt the Status Quo - HPC Taken to the Next Level," "Employee Restructured Burn," "Sylabs / RStor Settlement," "Bookings, Revenue, and Expenses," "Total Sales," "Greg's HPC History," "ARR Pipeline Draft," "Cover Letter," "Disrupting the Status Quo - HPC Taken to the Next Level," "Facebook proposal," "Fuzzball Timeline," "Sales Pipeline," "Fuzzball Slides Content," "Sylabs Spin-in Terms," "Fuzz Budget," "Product Pricing Model (CONFIDENTIAL)," "RStor notes," and "Employees open to moving to RStor."

h. Printed the file "A001 - Certificate of Incorporation - 10-11-17.pdf" on March 16, 2020.

i. Renamed nine files: "Untitled spreadsheet" to "Total Sales," "Untitled document" to "Terms" to "Sylabs Spin-in Terms," "Untitled document to Email cover to Joel to Cover Letter," "Untitled document to Sylabs / RStor Settlement," "Untitled spreadsheet to Employees open to moving to RStor," "Untitled document to Facebook proposal,"

"Untitled document to Jon Notes to RStor notes," "Untitled document" to "Greg's HPC History," and "Copy of Disrupt the Status Quo – HPC Taken to the Next Level" to "Disrupting the Status Quo - HPC Taken to the Next Level."

j. Trashed the file "Employees open to moving to RStor" on March 16, 2020.

k. Uploaded 38 files on March 13, 2020: "Patent Cooperation Treaty - 2019.07.11.pdf," "409A Valuation as of 12-31-17 - Carta Valuations LLC - 6-20-18.pdf," "008 - Joint Board and Shareholder Consent of Conversion - 7.10.18.pdf," "A003 - Certificate of Incorporation [Sylabs Inc. 2018] - 8-17-18.pdf," "Founder Stock Purchase Agreement - Sylabs Holdings LLC - 8.31.18.pdf," "009 - Action of Incorporator [Sylabs Inc. 2018] - 8.17.18.pdf," "011 - Stockholder Consent (Indemnification Agreements and Assumption of 2017 Plan) [Sylabs Inc. 2018] - 8.31.18.pdf," "010 - Board Consent (Organizational Resolutions) [Sylabs Inc. 2018] - 9.4.18.pdf," "(1) – Amended and Restated Certificate of Incorporation (Series Seed) FILED 12-1-17.pdf," "Certificate of Conversion (Corp to LLC) - 7.20.18.pdf," "008A - Joint Board and Shareholder Consent of Conversion [DUPLICATE - WITH DRAFT STAMP] - 7.10.18.pdf," "B002 - Bylaws [Sylabs Inc. 2018] - 8.31.18.pdf," "Plan of Conversion - 7.10.18.pdf," "A002 - Amended and Restated Certificate of Incorporation (Series Seed) FILED 12-1-17.pdf," "Investors' Rights Agreement (Series Seed) - 12-1-17.pdf," "CA SOS Foreign Qualification FILED 12-4-17.pdf," "(6) - Series Seed cert. SS-1 (R-Stor Inc.) - 12-1-17.pdf," "Indemnification Agreement (Giovanni Coglitore) - 12-1-17.pdf," "(7) - Investors' Rights Agreement (Series Seed) - 12-1-17.pdf," "007 – Stockholder Consent (appointment of

Series Seed Director) - 12-1-17.pdf," "(8) - Indemnification Agreement (Giovanni Coglitore) - 12-1-17.pdf," "(5) – Series Seed Preferred Stock Purchase Agreement - 12-1-17.pdf," "(4) – Stockholder Consent (appointment of Series Seed Director) - 12-1-17.pdf," "Series Seed cert. SS-1 (R-Stor Inc.) - 12-1-17.pdf," "003 - Stockholder Consent (Indemnification Agreements and 2017 Stock Plan) - 11-22-17.pdf," "006 - Stockholder Consent (Series Seed) - 11-30-17.pdf," "004 - Board Consent re adoption of 2017 Stock Plan - 11-22-17.pdf," "(3) - Stockholder Consent (Series Seed) - 11-30-17.pdf," "005 - Board Consent (Series Seed) - 11-30-17.pdf," "(2) - Board Consent (Series Seed) - 11-30-17.pdf," "002 - Board Consent (Organizational Resolutions) - 11-10-17.pdf," "Assignment of Technology Agreement (Greg Kurtzer) - 11-10-17.pdf," "Series Seed Preferred Stock Purchase Agreement - 12-1-17.pdf," "B001 - Bylaws - 11-10-17.pdf," "A001 - Certificate of Incorporation - 10-11-17.pdf," "001 - Action of Incorporator - 10-11-17.pdf," "Indemnification Agreement (Greg Kurtzer) - 11-10-17.pdf," and "Common Stock Purchase Agreement (Gregory Kurtzer) - 11-10-17.pdf."

l. Changed the sharing permission to the folder "All Corporate Docs" for the external account joel.whitley@gmail.com from "None" to "Can view."

m. Changed sharing permissions 54 times across 44 files and one folder. This includes giving 42 sharing permission changes ("Can view" and "Can comment") to external accounts m.prager@opendrives.com and joel.whitley@gmail.com for 41 files in Sylabs' Google Drive.

n. Viewed 37 files: "Untitled document," "Product Pricing Model (CONFIDENTIAL)," "EDF Statement of Work for Active Directory (LDAP) Integration," "ARR Pipeline Draft," "Sylabs Pro Ent," "Sales

LEPISCOPO & ASSOCIATES LAW FIRM

Pipeline," "Employee Restructured Burn," "Monthly Burn," "Total Sales," "Sylabs Master Purchase Agreement - Final," "PO_B640518 Signed.pdf," "EDF," "Fuzzball Slides Content," "Sylabs_NPA_92019pdf_Exhi.pdf," "Bookings, Revenue, and Expenses," "Fuzz Budget," "Sylabs Spin-in Terms," "Price Sheet," "Untitled spreadsheet," "Fuzzball Timeline," "Fuzzball Planning," "Cover Letter," "2020-02_Dev_Timeline," "DRAFT-PRO_Support_Lifecycle," "Sylabs / RStor Settlement,"7 "A001 - Certificate of Incorporation - 10-11-17.pdf," "A003 - Certificate of Incorporation [Sylabs Inc. 2018] - 8-17-18.pdf," "systacks," "Untitled document," "SyIQ," "Facebook proposal," "RStor notes," "2020-02_Roadmap_Pub," "Greg's HPC History," "Disrupt the Status Quo - HPC Taken to the Next Level," "Disrupting the Status Quo - HPC Taken to the Next Level," and "VC Status."

o. On March 8, 2020, account g@sylabs.io changed the permissions on the file "Fuzz Budget" in Sylabs' Google Drive for external account m.prager@opendrives.com from "None" to "Can view, Can comment." This permission change by g@sylabs.io allowed this external account, m.prager@opendrives.com, to view the file "Fuzz Budget" in Sylabs' Google Drive on March 8, 2020, and March 9, 2020.

p. On March 9, 2020, account g@sylabs.io changed the permissions on the file "Terms" in Sylabs' Google Drive for external account m.prager@opendrives.com from "None" to "Can view, Can comment." Just 16 seconds after changing these permissions, g@sylabs.io changed the file's name from "Terms" to "Sylabs Spin-in Terms." This permission change by g@sylabs.io allowed this external

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

account, m.prager@opendrives.com, to view the file "Sylabs Spin-in Terms" in Sylabs' Google Drive on March 9, 2020.

q.   On March 11, 2020, account g@sylabs.io changed the permissions on the file "Email cover to Joel" in Sylabs' Google Drive for external account m.prager@opendrives.com from "None" to "Can view, Can comment." This permission change by g@sylabs.io allowed this external account, m.prager@opendrives.com, to view the file "Email cover to Joel" in Sylabs' Google Drive on March 11, 2020. The external account m.prager@opendrives.com viewed "Email cover to Joel" less than three minutes after g@sylabs.io changed the file's permissions.

r.   On March 12 and 13, 2020, account g@sylabs.io changed the permissions on 39 files in Sylabs' Google Drive for account joel.whitley@gmail.com from "None" to "Can view." These permissions changes by KURTZER allowed this external account, joel.whitley@gmail.com, to view 14 files from Sylabs' Google Drive.

s.   On March 13, 2020, the external account joel.whitley@gmail.com downloaded the file "Fuzz Budget" from Sylabs' Google Drive. This file, "Fuzz Budget," was created on March 8, 2020, by the account g@sylabs.io, KURTZER. This same account, g@sylabs.io, changed the permissions on "Fuzz Budget" for account joel.whitley@gmail.com from "None" to "Can view, Can Comment" on March 12, 2020. This permission change by KURTZER allowed this external account, joel.whitley@gmail.com, to download the file from Sylabs' Google Drive.

*See* Exh. 38: Decl. of Tarbell ¶ 50; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

308.   Between tendering his resignation and the effective date of his resignation, March 31, 2020, Greg Kurtzer's account g@sylabs.io:

a. Created the three folders "Sales," "OpenDrives," "Archive," and "DOD" on March 26, 2020. Created the four folders "Full Drive," rose@sylabs.io, "westley@sylabs.io," and "gwendolyn@sylabs.io" on March 29, 2020.

b. Created the file "Untitled spreadsheet" on March 25, 2020.

c. Deleted 142 folders on March 26, 2020.

d. Deleted 881 files on March 26, 2020.

e. Downloaded 3,901 files.

f. Edited four files: "RStor notes," "Fuzz Budget," "Employee Resignations (March 2020)," and "BABELFISH Future Work."

g. Changed the editor settings from "Owner" to "Owner, Writer" on 75 folders.

h. Changed the editor settings from "Owner" to "Owner, Writer" on 501 files.

i. Changed the link sharing access and visibility on the folder y@sylabs.io.

j. Changed the link sharing access and visibility on four files: "Getting started," "Untitled Site," "SIF Lab notes," and "Untitled Site (Home)."

k. Moved 59 folders.

l. Moved 82 files.

m. Removed 10 folders from folders: "From Kai SC18," "EasyBuildUserMeetingfeb-2018," "MAGIC-meeting-feb-2018," "Interview Help," "Hiring Templates," "Globalization Partners," "Contractor Agreements," "OnBoarding," "Hiring Plans," and "Inactive/Unaccepted."

n. Renamed the file "Untitled spreadsheet" to "Employee Resignations (March 2020)" on March 25, 2020.

o. Restored the folder "Full Drive" on March 26, 2020.

LEPISCOPO & ASSOCIATES LAW FIRM

p.   Trashed 126 folders on March 26, 2020.

q.   Trashed 722 files on March 26, 2020.

r.   Change user sharing permissions 390 times to 137 folders on March 26, 2020.

s.   Change user sharing permissions 3,251 times to 1,094 files. All but three of these 3,251 changes occurred on March 26, 2020.

t.   View 47 files.

u.   On March 26, 2020, account g@sylabs.io gave access to 1,186 files and folders on Sylabs' Google Drive to the external account gmkurtzer@gmail.com. The account g@sylabs.io started granting permissions to the gmkurtzer@gmail.com account at approximately 3:04:04 pm. Approximately one hour and nineteen minutes later, the account gmkurtzer@gmail.com had finished taking a copy of 1,086 files from Sylabs' Google Drive.

*See* Exh. 38: Decl. of Tarbell ¶ 51; Exhs. 3-14; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

309.   Between tendering his resignation and the effective date of his resignation, March 31, 2020, Greg Kurtzer used his personal, external email account gmkurtzer@gmail.com. to access Sylabs' Google Drive. This secondary account then downloaded 1,086 files from Sylabs' Google Drive on March 26, 2020. These downloaded files were not able to be tracked by Sylabs once they were downloaded from their controlled systems. *See* Exh. 38: Decl. of Tarbell. ¶ 54; Exh. 25; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

310.   On March 8 and 9, 2020, defendant Greg Kurtzer (insider threat) provided defendants Prager and Open Drives –external threats who were not employees or agents of or authorized by Sylabs–with access to Sylabs' Server, in particular to all documents relating to Fuzzball and terms relating to Corporate Secrets. For example, within minutes of access, defendant Prager began viewing Sylabs' Trade Secrets, Corporate Assets,

LEPISCOPO & ASSOCIATES LAW FIRM

Corporate Secrets, and other proprietary and confidential information. *See* Exh. 38: Decl. of Tarbell ¶¶ 8, 9, 22, 50-54, 56, 77, and 87; Exhs. 2-36, 57, 68-73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

311.    On March 11, 2020, the same day that defendant Greg Kurtzer gave defendant Prager access to view a file entitled "Email cover to Joel", which Prager accessed. On the same day, Defendant Greg Kurtzer sent defendant Joel Whitley, a principal of defendant IAG, an email ("Kurtzer/Whitley Email"),  wherein he explains part of the conspiracy to commit cyber theft of Sylabs' Trade Secrets and Sylabs' customers:

> "Dear Joel, . . .
>
> This will provide us with the ability to keep the team together and continue the development of Fuzzball/HPC-2.0. Additionally, we have some big name customers and opportunities we've been developing and this will allow us to continue bringing in the ARR (about $1M today) while also servicing a pipeline of $10M over the next 24 months.
>
> It is important to note that the intellectual property that we would need to build Fuzzball is all open source and I personally lead those respective open source projects and communities. Sylabs does have some commercial IP, which would be quite advantageous to have (e.g. Singularity Enterprise, which is not open source), but it is not a requirement for Fuzzball or any of our plans or projections for **NEWCO**. . .
>
> The second model demonstrates inclusion of an optimistic sales pipeline which includes multiple DOD awards, strategic development NREs, as well as building ARR. It also includes several new market injection points around Fuzzball, which are conservative."

*See* Kurtzer/Whitley Email (Exh. 46, pp. 1, 5-6) and memorialized in the Audit Logs, Greg Kurzer, 3/11/20 (Exh. 45).

312.    In the Kurtzer/Whitley Email, defendant Greg Kurtzer incorrectly states that Fuzzball can be recreated through open-source programs. This ignores the legal barrier to such a tactic because Fuzzball was already and currently is Sylabs' Trade Secrets. He also indicates how advantageous it would be for Newco to have Singularity Enterprise, which was already and currently is Sylabs' Trade Secrets. Further, he references Sylabs' "**big**

**name customers and opportunities" as though they belonged to him and Newco**. This, of course, informs the reasons for Defendants' cyber theft of Sylabs' customers and other Corporate Secrets—to bring those assets to Newco without paying Sylabs. This tactic is a type of secretly forced acquisition without payment of any purchase price to Sylabs.

313.    Between March 11 and 12, 2020, defendant Greg Kurtzer provided defendants Whitley and IAG with access to the Sylabs' Server, in particular to all of Sylabs' Corporate Records, as memorialized in the Audit Logs, Greg Kurtzer, 3/13/20. This allowed defendants Whitley and IAG, who were never employees or agents of Sylabs, then proceed without authorization from Sylabs to view and download Sylabs' Corporate Records, Trade Secrets, and/or other confidential and proprietary information.

**Julia Kurtzer's Cyber Intrusion, Cyber Corruption, and Cyber Destruction Prior to Her Resignation Effective Date (3/1/20 thru 3/31/20)**

314.    During the month of January 2020, Julia Kurtzer's account julie@sylabs.io:

a.   Edited the two files "Employees/Advisors," and "LCCR_Client Questionnaire."

b.   Viewed the six files "MPA-SaaS T&C-PS T&C (Draft for Review)," "MASTER PURCHASE AGREEMENT (Genentech/Roche)," "LCCR_Client Questionnaire," "Resource/Availability," "Sylabs, Inc. PEO Letter.pdf," and "singularitypro35_blog."

*See* Exh. 38: Decl. of Tarbell ¶ 69; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

315.    During the month of February 2020, Julia Kurtzer's account julie@sylabs.io:

a.   Viewed the four files "Credit Card Statement_02-03-2020," "Copy of 4a.    Proposal    Number_Company    Name_Cost    Volume," "Resource/Availability," and "Bookings, Revenue, and Expenses."

b. Edited the two files "Credit Card Statement_02-03-2020" and "Bookings, Revenue, and Expenses."

*See* Exh. 38: Decl. of Tarbell ¶ 69; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

LEPISCOPO & ASSOCIATES LAW FIRM

316.   The account julia@sylabs.io conducted 11 actions between February 17, 2020, and February 25, 2020, from this exact same IP address, 135.180.12.122, as the IP address from which Greg Kurtzer later conducted 3,609 actions on Sylabs' Server in April of 2020, after he was no longer employed at Sylabs. *See* Exh. 38: Decl. of Tarbell ¶ 53; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

**Robert Adolph's Cyber Intrusion, Cyber Corruption, and Cyber Destruction Prior to his Resignation Effective Date (3/1/20 thru 3/31/20)**

317.   On March 18, 2020, Robert Adolph's Sylabs email account robert@sylabs.io changed the permissions on the file "HPC is at the heart of Sylabs" in Sylabs' Google Drive for external account m.prager@opendrives.com from "None" to "Can edit." Just 76 seconds after changing this permission, robert@sylabs.io changed the file's name from "HPC is at the heart of Sylabs" to "Disrupt the Status Quo - HPC Taken to the Next Level." This permission change by robert@sylabs.io allowed this external account, m.prager@opendrives.com, to view the "Disrupt the Status Quo - HPC Taken to the Next Level" in Sylabs' Google Drive on March 19, 2020, and March 21, 2020. *See* Exh. 38: Decl. of Tarbell ¶ 96; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

318.   On March 19, 2020, external account m.prager@opendrives.com edited the file "Disrupt the Status Quo - HPC Taken to the Next Level." The permission change by robert@sylabs.io allowed this external account, m.prager@opendrives.com, to edit and alter a file that was on Sylabs' Google Drive. *See* Exh. 38: Decl. of Tarbell ¶ 96; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

319.   In addition, during the month of March 2020, prior to tendering his resignation, Adolph's account robert@sylabs.io:

    a.  Created nine files: "Vendor Registration Form - V3Final.pdf," "PO_B640518 Signed.pdf," "Untitled document," "Singularity-Release_Notes-V1.doc," "Untitled presentation," "ExxonMobilContainerStrategy.pdf," "Sylabs Pro Ent (3) (2)," "Untitled document," and "Untitled document."

LEPISCOPO & ASSOCIATES LAW FIRM

b.  Downloaded eight files: "RStor - USAF Proposal - 100secs.mp4," "2. J201-CSO1-7047_Sylabs_Slide Deck.pdf," "1. J201-CSO1-7047_Sylabs_Technical Volume.pdf," "Sylabs Support SLA Matrix," "systacks," "Untitled presentation," "ExxonMobilContainerStrategy.pdf," and "HPC is at the heart of Sylabs."

c.  Edited 13 files: "Disrupt the Status Quo - HPC Taken to the Next Level,"14 "Sylabs Support SLA Matrix," "Untitled document," "2020-02_Dev_Timeline, DRAFT-PRO_Support_Lifecycle," "Facebook proposal," "Sylabs Pro Ent (3) (2)," "zoom," "systacks,"15 "Sylabs Roadmap,"16 "Fuzz Budget," "Product Pricing Model (CONFIDENTIAL) ," and "ONUG Notes."

d.  Changed the link sharing access and visibility on five files: "Vendor Registration Form - V3Final.pdf," "PO_B640518 Signed.pdf," "systacks," "ExxonMobilContainerStrategy.pdf," and "HPC is at the heart of Sylabs."

e.  Renamed four files: "Untitled document" to "zoom," "Untitled presentation" to "systacks" then to "SyIQ," "Sylabs Pro Ent" to "Sylabs Roadmap," and "Untitled document" to "HPC is at the heart of Sylabs" then to "Disrupt the Status Quo - HPC Taken to the Next Level."

f.  Uploaded file "Sylabs Pro Ent (3) (2).pdf."

g.  Change user sharing permissions on three files: "systacks," "Sylabs Roadmap," and "HPC is at the heart of Sylabs."

h.  Viewed 41 files.

*See* Exh. 38: Decl. of Tarbell ¶ 56; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

320.  Between tendering his resignation and the effective date of his resignation, March 31, 2020, Adolph's account robert@sylabs.io:

LEPISCOPO & ASSOCIATES LAW FIRM

a.  Created the file "Untitled document" on March 25, 2020. This file was renamed by robert@sylabs.io to "Geographically Distributed HPC" on March 25, 2020. After multiple views and edits by robert@sylabs.io, the file was renamed again to "C" on March 27, 2020.

b.  Along with the edits to "C" (a.k.a. "Untitled document" and "Geographically Distributed HPC"), robert@syslabs.io edited the file "SyIQ" on March 23, 2020.

c.  Downloaded three files March 27, 2020: "SyIQ," "Sylabs Pro Ent (3) (2).pdf," and "Sylabs Roadmap."

d.  Trashed 24 files from Sylabs' Google Drive: ".~lock.Sylabs - PITCH-corp (1).pptx#," "C,"17 "Disrupt the Status Quo - HPC Taken to the Next Level," "ExxonMobilContainerStrategy.pdf," "Getting started," "image.png," "PO_B640518 Signed.pdf," "Singularity-Release_Notes-V1.doc," "SyIQ," "Sylabs - PITCH-corp.pptx," "Sylabs Business Strategy," "Sylabs Pro Ent (3) (2)," "Sylabs Pro Ent (3) (2).pdf," "Sylabs Roadmap," "Sylabs Solutions Brief (PRO_Enterprise) ," "Sylabs Solutions Brief (PRO_Enterprise).pdf," "Sylabs Support SLA Matrix (1) ," "Sylabs Support SLA Matrix (1).pdf," "Sylabs Support SLA Matrix (1).pdf," "Untitled document," "Untitled presentation," "Untitled presentation," "zoom," and "Vendor Registration Form - V3Final.pdf."

e.  Viewed eight files: "Facebook Pitch," "SyIQ," "Fuzz Budget," "Sylabs Pro Ent (3) (2).pdf," "Sylabs Roadmap," "Disrupt the Status Quo - HPC Taken to the Next Level," "C," and "ECMWF_Singularity.pptx."

*See* Exh. 38: Decl. of Tarbell ¶ 57; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

/////

/////

/////

**Erin Fong's Cyber Intrusion, Cyber Corruption, and Cyber Destruction Prior to her Resignation Effective Date (3/1/20 thru 3/31/20)**

321.    During the month of March 2020, prior to Erin Fong tendering her resignation, her Sylabs' email account erin@sylabs.io:

    a. Created five files: "Untitled spreadsheet," "Sylabs Reseller Agreement_Mannai," "Sylabs Master Purchase Agreement – KAUST," "Mannai NEW SUPPLIER ACCOUNT OPENING FORM-0910-VEV (2)," and "Untitled spreadsheet."

    b. Downloaded 14 files: "Linkedin Email Logo.png," "Twitter Email Logo.png," "Github Email Logo.png," "Youtube Email Logo.png," "Sylabs Master Purchase Agreement - Final," "Untitled spreadsheet," "Sylabs Reseller Agreement_Mannai Corporation," "Sylabs Master Purchase Agreement - KAUST," "Mannai NEW SUPPLIER ACCOUNT OPENING FORM-0910-VEV (2)," "HPE_Sylabs_NDA.pdf," "ABB_Sylabs_NDA.pdf," "HPC Now_Sylabs_NDA.pdf," "Facebook_Sylabs_NDA.pdf," and "Intel_Sylabs_NDA.pdf."

    c. Edited 10 files: "Untitled document," "Sales Pipeline," "Sylabs Master Purchase Agreement - Final," "Untitled spreadsheet," "Sylabs Reseller Agreement_Mannai," "Sylabs Master Purchase Agreement - KAUST," "Mannai NEW SUPPLIER ACCOUNT OPENING FORM-0910-VEV (2)," "Monthly Subscriptions," "Email Templates," and "Untitled spreadsheet."

    d. Changed the file permissions for "Untitled spreadsheet" so any account within Sylabs' domain can view and edit the file.

    e. Renamed file "Sylabs Reseller Agreement_Mannai" to "Sylabs Reseller Agreement_Mannai Corporation."

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

   f.   Viewed 16 files: "Untitled document," "Sales Pipeline," "Sylabs Business Strategy," "Bookings, Revenue, and Expenses," "PO_B640518 Signed.pdf," "Sylabs Master Purchase Agreement - Final," "Reseller Agreement - Mark III Systems," "QCRI-HBKU Reseller Discussion," "Sylabs Reseller Agreement FINAL," "Sylabs Reseller Agreement_Mannai Corporation,"18 "Sylabs Master Purchase Agreement - KAUST," "Mannai NEW SUPPLIER ACCOUNT OPENING FORM-0910-VEV (2)," "Monthly Subscriptions," "HPE_Sylabs_NDA.pdf," "Intel_Sylabs_NDA.pdf," and "Email Templates."

   g.   Viewed and edited file "Email Templates" created by anne@sylabs.io.

*See* Exh. 38: Decl. of Tarbell ¶ 72; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

   322.   Between tendering her resignation and the effective date of her resignation, March 31, 2020, Fong's account erin@sylabs.io:

   a.   Downloaded four files: "Untitled spreadsheet," "Greg Kurtzer (9/1/19) salary adjustment letter.docx," "Separation Agreement – MG (1).pdf," and "Payroll_Register_PDF_with_Employer_ Charges.pdf."

   b.   Edited one file (18 times on March 24, 2020 between 2:32pm and 6:04pm): "Untitled spreadsheet."

   c.   Uploaded one file: Payroll_Register_PDF_with_Employer_ Charges.pdf."

   d.   Viewed 12 files: "Untitled spreadsheet," "Email Templates," "Greg Kurtzer (9/1/19) salary adjustment letter.docx," "Sylab[s] Employee NDA and IP Assignment," "171212 DRAFT Collaborative Proposal to US Department of Defense.0.6.jfc.docx," "consultant - Template StdServicesAgreement.docx," "Erin Fong," "Separation Agreement - MG (1).pdf," "Employee NDA and IP Assignment," "Sushma Yellapragada - Intern Contract Agreement," "Adrian Wobito -

LEPISCOPO & ASSOCIATES LAW FIRM

Contractor - StdServicesAgreement.docx," and "Sylabs Reseller Agreement FINAL."

*See* Exh. 38: Decl. of Tarbell ¶ 73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

**Matthew Hayden's Cyber Intrusion, Cyber Corruption, and Cyber Destruction Prior to his Resignation Effective Date (3/1/20 thru 3/31/20)**

323.   During the month of March 2020, prior to Matthew Hayden tendering his resignation, his Sylabs email account matt@sylabs.io:

a.   Created the folder "SBIR."

b.   Deleted the three files "3. J201-CSO1-7047_SYLABS_COST VOLUME.xlsx," "Copy of Copy of 4a. Proposal Number_Company Name_Cost Volume," and "LCCR_Client Questionnaire."

c.   Downloaded the five files "Resource/Availability," "Copy of 5c. Proposal Number_Company Name_Coversheet Supplement," ".DS_Store," "1. J201-CSO1-7047_Sylabs_Technical Volume," and "BABELFISH Future Work."

d.   Edit the two files "Resource/Availability" and "Projects/Products."

e.   Trash the file ".DS_Store."

f.   Changed the sharing permissions for account robert@sylabs.io from "None" to "Can edit" on the file "Resource/Availability."

g.   Viewed 23 files: "HPC-2.0," "2. J201-CSO1-7047_Sylabs_Slide Deck," "Revised Babelfish_2," "main-demo-short.mp4," "Projects/Products," "EDF Statement of Work for Active Directory (LDAP) Integration," "My Copy of BABELFISH New Work," "BABELFISH Future Work," "2020-02_Dev_Timeline," "2. J201-CSO1-7047_Sylabs_Slide Deck.pdf," "DRAFT-PRO_Support_Lifecycle," "BALANCE SHEET," "2e. 20.1 Need IDs," "BABELFISH Future Work.xlsx," "HPC-2.0," "Copy of BABELFISH Future Work - September 5, 6:46 AM," "4. Additional

LEPISCOPO & ASSOCIATES LAW FIRM

Info_Sylabs.pdf," "1. J201-CSO1-7047_Sylabs_Technical Volume," "Fuzzball Slides Content," "Resource/Availability," "Client Questionnaire Master Working Copy," ".DS_Store," and "1. J201-CSO1-7047_Sylabs_Technical Volume.pdf." (Tarbell. p. 21. ll. 5-27.) *See* Exh. 38: Decl. of Tarbell ¶ 59; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

324.   Between tendering his resignation and the effective date of his resignation, March 31, 2020, Hayden's account matt@sylabs.io:

  a.   Downloaded the file "BABELFISH Future Work" four times.

  b.   Viewed the eight files "Facebook Pitch," "HPC-2.0," "Client Questionnaire Master Working Copy," "Resource/Availability," "EDF Statement of Work for Active Directory (LDAP) Integration," "2020-02_Dev_Timeline," "BALANCE SHEET," and "Projects/Products." (Tarbell. p. 22. ll. 1-7.)

*See* Exh. 38: Decl. of Tarbell ¶ 60; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

**Marlin Prager and Open Drives' Cyber Intrusion, Cyber Corruption, and Cyber Destruction During the month of March 2020 (3/1/20 thru 3/31/20)**

325.   An email account that is external to Sylabs, m.prager@opendrives.com, used by defendant Marlin Prager while employed by defendant Open Drives, Inc., had access to Sylabs' Google Drive. *See* Exh. 38: Decl. of Tarbell ¶¶ 8, 9, 22, 50-54, 56, 77, and 87; Exhs. 2-36, 57, 68-73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

326.   Specifically, on March 8, 2020, Greg Kurtzer's account g@sylabs.io changed the permission on the file "Fuzz Budget" in Sylabs' Google Drive for external account m.prager@opendrives.com from "None" to "Can view, Can comment." This permission change by g@sylabs.io allowed this external account, m.prager@opendrives.com, to view the file "Fuzz Budget" in Sylabs' Google Drive on March 8, 2020, and March 9, 2020. *See* Exh. 38: Decl. of Tarbell ¶ 93; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

LEPISCOPO & ASSOCIATES LAW FIRM

327. On March 9, 2020, account g@sylabs.io changed the permissions on the file "Terms" in Sylabs' Google Drive for external account m.prager@opendrives.com from "None" to "Can view, Can comment." Just 16 seconds after changing these permissions, g@sylabs.io changed the file's name from "Terms" to "Sylabs Spin-in Terms." This permission changed by g@sylabs.io allowed this external account, m.prager@opendrives.com, to view the file "Sylabs Spin-in Terms" in Sylabs' Google Drive on March 9, 2020. *See* Exh. 38: Decl. of Tarbell ¶ 93; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

328. On March 11, 2020, account g@sylabs.io changed the permissions on the file "Email cover to Joel" in Sylabs' Google Drive for external account m.prager@opendrives.com from "None" to "Can view, Can comment." This permission change by g@sylabs.io allowed this external account, m.prager@opendrives.com, to view the file "Email cover to Joel" in Sylabs' Google Drive on March 11, 2020. The external account m.prager@opendrives.com viewed "Email cover to Joel" less than three minutes after g@sylabs.io changed the file's permissions. *See* Exh. 38: Decl. of Tarbell ¶ 95; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

329. On March 18, 2020, account robert@sylabs.io changed the permissions on the file "HPC is at the heart of Sylabs" in Sylabs' Google Drive for external account m.prager@opendrives.com from "None" to "Can edit." Just 76 seconds after changing this permission, robert@sylabs.io changed the file's name from "HPC is at the heart of Sylabs" to "Disrupt the Status Quo - HPC Taken to the Next Level." This permission change by robert@sylabs.io allowed this external account, m.prager@opendrives.com, to view the "Disrupt the Status Quo - HPC Taken to the Next Level" in Sylabs' Google Drive on March 19, 2020, and March 21, 2020. *See* Exh. 38: Decl. of Tarbell ¶ 96; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

330. Altogether, between March 8, 2020, and March 21, 2020, Prager's external account viewed four files on Sylabs' Google Drive: "Fuzz Budge," "Sylabs Spin-in Terms," "Email cover to Joel," and "Disrupt the Status Quo – HPC Taken to the Next

LEPISCOPO & ASSOCIATES LAW FIRM

Level." *See* Exh. 38: Decl. of Tarbell ¶¶ 93-97; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

331.    Not only did Prager view four files on Sylabs' Google Drive, but also on March 19, 2020, external account m.prager@opendrives.com edited the file "Disrupt the Status Quo - HPC Taken to the Next Level." The permission change by robert@sylabs.io allowed this external account, m.prager@opendrives.com, to edit and alter a file that was on Sylabs' Google Drive. *See* Exh. 38: Decl. of Tarbell ¶ 97; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

**Joel Whitley and IAG's Cyber Intrusion, Cyber Corruption, and Cyber Destruction During the month of March 2020 (3/1/20 thru 3/31/20)**

332.    An email account belonging to Defendant Joel Whitley that is external to Sylabs had access to Sylabs' Google Drive, joel.whitley@gmail.com. At this time defendant Joel Whitley was a representative of defendant IAG. *See* Exh. 38: Decl. of Tarbell ¶ 131; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

333.    Specifically, on March 12 and 13, 2020, account g@sylabs.io changed the permissions on 39 files in Sylabs' Google Drive for account joel.whitley@gmail.com from "None" to "Can view." As a result of these permissions changes by Greg Kurtzer, on March 13, 2020, this external account, joel.whitley@gmail.com, viewed 14 files from Sylabs' Google Drive : "Fuzz Budget," "(6) - Series Seed cert. SS-1 (R-Stor Inc.) - 12-1-17.pdf," "001 - Action of Incorporator - 10-11-17.pdf," "008 - Joint Board and Shareholder Consent of Conversion - 7.10.18.pdf," "008A - Joint Board and Shareholder Consent of Conversion [DUPLICATE – WITH DRAFT STAMP] - 7.10.18.pdf," "A003 - Certificate of Incorporation [Sylabs Inc. 2018] - 8-17-18.pdf," "A002 - Amended and Restated Certificate of Incorporation (Series Seed) FILED 12-1-17.pdf," "Assignment of Technology Agreement (Greg Kurtzer) - 11-10-17.pdf," "B002 - Bylaws [Sylabs Inc. 2018] - 8.31.18.pdf," "Certificate of Conversion (Corp to LLC) - 7.20.18.pdf," "Founder Stock Purchase Agreement - Sylabs Holdings LLC- 8.31.18.pdf," "Investors' Rights Agreement (Series Seed) - 12-1-17.pdf," "Patent Cooperation Treaty - 2019.07.11.pdf,"

LEPISCOPO & ASSOCIATES LAW FIRM

and "Plan of Conversion - 7.10.18.pdf." *See* Exh. 38: Decl. of Tarbell ¶ 89; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

334.    Not only did Whitley view these files on Sylabs' Google Drive, but also on March 13, 2020, the external account joel.whitley@gmail.com downloaded the file "Fuzz Budget" from Sylabs' Google Drive. *See* Exh. 38: Decl. of Tarbell ¶ 89; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

**Defendants' Cyber Intrusion, Cyber Corruption, and Cyber Destruction <u>After</u> Defendants' Resignation Effective Date (*i.e.*, after 3/31/20)**

335.    Defendants accessed Sylabs' Server after their employment with Sylabs had ended, which were **unauthorized** accesses to Sylabs' Server, and are summarized below and categorized according to each Defendant. *See* Exh. 38: Decl. of Tarbell ¶¶ 8, 9, 22, 50-54, 56, 77, and 87; Exhs. 2-36, 57, 68-73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

**Gregory Kurtzer's Cyber Intrusion, Cyber Corruption, and Cyber Destruction <u>After</u> his Resignation Effective Date (*i.e.*, after 3/31/20)**

336.    Of note, on April 1, 2020, the day after his resignation was effective, defendant Greg Kurtzer formed Control  Command, Inc., which, through a name change, is now defendant CTRL IQ, Inc. d/b/a CIQ, as a Delaware corporation by filing its certificate of incorporation.

337.    Between April 2, 2020, and April 15, 2020, well after his resignation, Greg Kurtzer's g@sylabs.io account conducted numerous activities on Sylabs' Google Drive:

  a.  Created 206 folders. (See Exhibit 15.)

  b.  Created 945 files. (See Exhibit 16.)

  c.  Downloaded 1,662 files. (See Exhibit 17.)

  d.  Edited the two files "Employee Resignations (March 2020)" and "passport."

  e.  Moved 65 files. (See Exhibit 18.)

  f.  Trashed 42 folders. (See Exhibit 19.)

g.   Trashed 330 files. (See Exhibit 20.)

h.   Uploaded 426 files. (See Exhibit 21.)

i.   Change user sharing permissions 65 times to 64 folders. (See Exhibit 22.)

j.   Change user sharing permissions 489 times to 489 files. (See Exhibit 23.)

k.   View 15 files: "Sales Standard Operating Procedure_Feb 2020.docx," "Total Sales," "Sales Pipeline," "Sales Sync," "PacificTeck Quotes_," "BizDev Team Structure," "XBD201705-00094-001.png," "Employee Resignations (March 2020)," "passport," "RHT_Fee_Sylabs.pdf," "Jess Mahan - Sylabs Employee NDA and IP Assignment," "Various Sylabs HR Contacts," "Employee Data - phone and address," "Jon - Separation/ advisory update," and "Product Pricing Model (CONFIDENTIAL)."

*See* Exh. 38: Decl. of Tarbell ¶52; Exhs. 15-23; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

338.   As an example, one folder which Greg Kurtzer accessed was titled "Fresh Sales Export Files" and included all of Sylabs' potential and current customers, as memorialized in the Audit Logs, Greg Kurtzer (g@sylabs.io and gmkurtzer@gmail.com & gmk@hushmail.com), 4/2/20. *See* Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

339.   On April 2, 2020, between 5:07:57 PM PT and 5:08:30 PM PT, Kurter's account g@sylabs.io changed sharing permissions on 533 items on Sylabs' Google Drive for user adam@sylabs.io.   These changes were from "None" to "Can View." Thus, Greg Kurtzer continued with the ability to access Sylabs' sales content. *See* Exh. 38: Decl. of Tarbell ¶ 135; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

340.   Between April 2, 2020, and April 15, 2020, Greg Kurtzer's account g@sylabs.io conducted 4,696 actions on Sylabs' Google Drive. Of these 4,696 actions, 3,609 actions (approximately 76.9%) were from IP address 135.180.12.122. While Greg

LEPISCOPO & ASSOCIATES LAW FIRM

Kurtzer was still employed at Sylabs, his account g@sylabs.io conducted 13,210 actions between February 10, 2020, and February 25, 2020, from this exact same IP address. This is also the same IP address which Julia Kurtzer used to conduct actions on Sylabs' server in February of 2020. *See* Exh. 38: Decl. of Tarbell ¶ 53; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

341.   Also of note, on April 23, 2020, defendant Greg Kurtzer filed CIQ's Foreign Registration with the California Secretary of State permitting CIQ to conduct business in California. *See* Exh. 67.

**Julia Kurtzer's Cyber Intrusion, Cyber Corruption, and Cyber Destruction**
**After her Resignation Effective Date (*i.e.*, after 3/31/20)**

342.   On April 16, 2020,  defendant Julia Kurtzer remotely and surreptitiously accessed Sylabs' Server to further Defendants' cyber theft of Sylabs' customers, sales, and opportunities by downloading and emailing Sylabs' Purchase Orders received from customers to defendants Greg Kurtzer, Fong, and Adolph, as memorialized in the Audit Logs, Julia Kurtzer, 4/16/20. For example, one purchase order was from SHI International Corporation ("SHI PO") for an order for SingularityPRO for 200 nodes for 1 year and SingularityPRO for 100 nodes to six months, as memorialized in the Audit Logs, Julia Kurtzer, 4/16/20. **Sylabs lost this customer to defendant CIQ through Defendants' cyber theft of Sylabs' Corporate Assets**. *See* Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

**Matthew Hayden's Cyber Intrusion, Cyber Corruption, and Cyber Destruction**
**After his Resignation Effective Date (*i.e.*, after 3/31/20)**

343.   Between April 5, 2020, and April 9, 2020, well after his resignation, Hayden's matt@sylabs.io account conducted numerous activities on Sylabs' Google Drive. *See* Exh. 38: Decl. of Tarbell ¶ 61; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

344.   On April 5, 2020, HAYDEN's account created the file "Untitled document" on Sylabs' Google Drive. This same account then edited the file "Untitled document" over the next approximately 90 minutes to and renamed the file to "Direct to Phase II."

LEPISCOPO & ASSOCIATES LAW FIRM

HAYDEN's account continued to edit the file "Direct to Phase II" for nearly two hours on Sylabs' Google Drive. Finally, the file was downloaded twice from Sylabs' Google Drive by matt@sylabs.io. *See* Exh. 38: Decl. of Tarbell ¶¶ 61-63; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

345.    Along with downloading the file "Direct to Phase II," matt@sylabs.io downloaded 47 other files from Sylabs' Google Drive on April 5, 2020. *See* Exh. 38: Decl. of Tarbell ¶ 63; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

346.    Along with viewing the file "Direct to Phase II," matt@sylabs.io on April 5, 2020, viewed the three files "Copy of 2019 - Business Plan – Sylabs," "BABELFISH Future Work," and "status report for Bryan Embry." *See* Exh. 38: Decl. of Tarbell ¶ 63; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

347.    Defendant Hayden's account created and edited the file "Untitled form" on Sylabs' Google Drive on April 5, 2020, five days after his resignation date. *See* Exh. 38: Decl. of Tarbell ¶ 65; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

348.    On April 9, 2020, HAYDEN's account matt@sylabs.io deleted the file ".DS_Store" from Sylabs' Google Drive. The listed owner of this file in the audit logs was "DoD." *See* Exh. 38: Decl. of Tarbell ¶ 66; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

349.    The deletion of the file ".DS_Store" on April 9, 2020, by HAYDEN's account matt@sylabs.io logged into Sylabs' Google Drive from IP address 172.79.210.47. HAYDEN's account matt@sylabs.io had used this exact IP address to log into Sylabs' Google Drive between March 2, 2020, and March 16, 2020, to perform approximately 81 recorded activities. *See* Exh. 38: Decl. of Tarbell ¶ 67; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

### Erin Fong's Cyber Intrusion, Cyber Corruption, and Cyber Destruction After her Resignation Effective Date (*i.e.*, after 3/31/20)

350.    On April 2, 2020, after Erin Fong's effective resignation date form Sylabs, her Sylabs email account erin@sylabs.io created the folder

"members_export_705bf21892" on Sylabs' Google Drive. Immediately following this folder being created, the same account uploaded three files named "cleaned_members_export_705bf21892.cvs," "subscribed_members_export_705bf21892.cvs," and "unsubscribed_members_export_705bf21892.cvs." *See* Exh. 38: Decl. of Tarbell ¶ 74; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

### Summary of Defendants' Cyber Intrusion, Cyber Corruption, Cyber Destruction, and Cyber Theft

351.    In summary, as is clear from the facts outlined above, Defendants' cyber crimes including cyber intrusion, cyber theft, cyber destruction and corruption of Sylabs' sensitive and privileged Trade Secrets, Sylabs' Corporate Assets, and Corporate Secrets took root long before March of 2020 as Defendants methodically planned to eviscerate Sylabs of its entire business in order to create a new company founded on Sylabs' stolen Trade Secrets, Corporate Assets, including corporate secrets and partnerships.

352.    Then, more intensively leading up their resignation dates from Sylabs, and especially during the March 7 through 13, 2020, timeframe, defendant Greg Kurtzer was engaged in detailed planning with defendants Adolph, Whitley, Fong, Buss, Open Drives, Prager, and IAG, during which time defendant Greg Kurtzer was providing them with Sylabs' Corporate Assets and Corporate Secrets and strategies in order to develop their plan for stealing Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets, including the following Sylabs' corporate records: (a) series preferred stock purchase agreement, (b) investors' rights agreement, (c) credit line agreement, (d) stockholder consent, and (e) common stock purchase agreement. Essentially, these and other of Sylabs' Corporate Secrets were provided because defendant Greg Kurtzer was explaining that Sylabs was in dire straits and would most likely dissolve. This provided Defendants with the opportunity to raid and steal Sylabs' Trade Secrets, customers, etc., as memorialized in the Audit Logs, Greg Kurtzer, 3/7/20 through 3/13/20. *See* Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

LEPISCOPO & ASSOCIATES LAW FIRM

353.    It is evident from Defendants' activity as tracked on Sylabs' server and memorialized in the Audit Logs, Greg Kurtzer, 3/7/20 thru 3/13/20, that during the month of March 2020 Defendants were engaged in their conspiracy and planning the theft of Sylabs' SIF technology, Fuzzball technology, SingularityPRO, Singularity Enterprise, and signed and secure SIF containers (*i.e.*, Armored Containers), as memorialized in the Audit Logs, Greg Kurtzer, 3/7/20 thru 3/13/20. *See* Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

354.    One part of Defendants' scheme was disclosed: defendant Greg Kurtzer would take Sylabs' Fuzzball and publish it to open-source so Defendants could use it (but would not have to pay for it) when they started Newco. This falls under the rubric of cyber theft known as **cyber destruction** of Sylabs' Trade Secrets, as memorialized in the Audit Logs, Greg Kurtzer, 3/7/20 through 3/13/20. *See* Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

355.    On March 18, 2020, defendant Greg Kurtzer commenced recruiting future employees and engineers, and solicited job applicants for Newco, as memorialized in the Audit Logs, Greg Kurtzer, 3/18/20.  *See* Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log.

356.    In furtherance of their conspiracy, around this time defendant Adolph also began corrupting, downloading, and/or editing Sylabs' files and folders that contained Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets.

357.    In additional furtherance of their conspiracy, Defendants commenced a coordinated 2-day resignation effort, resigning their positions with Sylabs, all effective on the same date, March 31, 2020.

358.    On March 22, 2020, defendant Greg Kurtzer resigned as CEO of Sylabs, which would make his last day as Sylabs' employee, March 31, 2020, as memorialized in the Audit Logs, Greg Kurtzer, 3/22/20.

359.    On March 23, 2020, defendant Adolph tendered his resignation to Sylabs, which would become effective on March 31, 2020, the same date as defendant Greg Kurtzer, as memorialized in the Audit Logs, Adolph, 3/23/20.

360.    On March 23, 2020, defendant Hayden tendered his resignation to Sylabs, which would become effective on March 31, 2020, the same date as defendants Greg Kurtzer and Adolph, as memorialized in the Audit Logs, Hayden, 3/23/20.

361.    On March 23, 2020, defendant Julia Kurtzer tendered her resignation to Sylabs, which would become effective on March 31, 2020, the same date as defendants Greg Kurtzer, Adolph, and Hayden, as memorialized in the Audit Logs, Julia Kurtzer, 3/23/20.

362.    On March 23, 2020, defendant Fong tendered her resignation to Sylabs, which would become effective on March 31, 2020, the same date as defendants Greg Kurtzer, Adolph, and Hayden, as memorialized in the Audit Logs, Fong, 3/23/20.

363.    On March 23, 2020, the very next day after he announced his resignation, defendant Greg Kurtzer destroyed Sylabs' Trade  Secrets by releasing Sylabs' Fuzzball technology—which was **closed-source**—to open-source. In order to further Defendants' conspiracy to steal not only Sylabs' Fuzzball technology but also Sylabs' customers and sales, defendant Greg Kurtzer arranged for all sales inquiries and purchase requests to be held until April 1, 2020, when he would no longer be employed by Sylabs, and directed those sales inquiries and purchase requests to his **Personal** Email Accounts.

364.    On March 23, 2020, defendant Greg Kurtzer revealed that Newco would now be formed and started the formation of Control Command, Inc. ("Control Command"). In fact, on this date he purchased the URL name for Control Command: "CTRL-CMD.COM." Just a point of consistency, and as will be alleged below, defendant Greg Kurtzer later changed Control Command's official name to the name it currently holds and conducts business under, defendant CTRL IQ, INC. d/b/a CIQ**.**

365.    On March 24 through 31, 2020, defendant Adolph commenced deleting and downloading items from the Sylabs' Server by using defendant Greg Kurtzer's CIQ email

account and defendant Adolph's personal email account. These deletions and downloads related primarily to Sylabs' Trade Secrets as confidentially presented in Sylabs' SBIR Proposal and Sylabs' development of opportunities and sales in the federal space, as memorialized in the Audit Logs, Adolph, 3/24/20 through 3/31/20.

366.    Commencing on March 24 and continuing through April 6, 2020, defendant Hayden commenced his cyber theft of Sylabs' Corporate Secrets by accessing Sylabs' Server and downloading Sylabs' SBIR Proposal and work relating to Sylabs' SIF and Armored Containers technology utilized with the National Security Agency ("NSA") in 2018 through 2019, as memorialized in the Audit Logs, Hayden, 3/24/20 through 4/6/20. It may be that this particular cyber theft will involve Defendants' criminal violations relating to a federal agency operating in an extremely high national security environment, the NSA.

367.    Beginning as early as March 1, 2020, and continuing through March 22, 2020, Defendant Hayden also used his wife, Shara Hayden, to help him steal and misappropriate Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets. During this time frame, Mrs. Hayden corrupted, deleted, viewed, downloaded, and/or edited hundreds of folders and files in Sylabs' systems in anticipation of defendant Hayden's rapidly approaching departure from Sylabs.

368.    Moreover, on March 26, 2020, just days before defendant Hayden's resignation, Shara Hayden unlawfully accessed Sylabs' Server and corrupted and deleted over three hundred files and folders.

369.    Another example of Defendants' diabolical treachery was that during the final days leading up to his departure from Sylabs, defendant Greg Kurtzer downloaded, then **deleted** multiple documents relating to Sylabs' sales opportunities, committing more cyber destruction, as memorialized in the Audit Logs, Greg Kurtzer (g@sylabs.io and gmkurtzer@gmail.com & gmk@hushmail.com), 3/26/20 thru 3/31/20. This was done so that Defendants would be able to benefit from Sylabs' customers and sales opportunities.

LEPISCOPO & ASSOCIATES LAW FIRM

Keep in mind that development of these customers and sale opportunities were the consequence of marketing funds spent by Sylabs and payment of Sylabs' staff to develop.

370.    On March 29, 2020, in order to further Defendants' conspiracy to steal Sylabs' Server, former Sylabs employee Rose Stein transferred her ownership and administrative credentials in Sylabs' Server to defendant Greg Kurtzer.  He proceeded to access and download all of the documents from the Sylabs' Server, as well as manipulating them in a manner to conceal his unauthorized access. He also altered sharing permissions on hundreds of folders and tens of thousands of files. Thus, between March 26 through 29, 2020, defendant Greg Kurtzer committed comprehensive cyber destruction and cyber theft by downloading the entire Sylabs' Server to his Private Email, as memorialized in the Audit Logs, Greg Kurtzer (g@sylabs.io and gmkurtzer@gmail.com & gmk@hushmail.com), 3/26/20 thru 3/31/20.

371.    Finally, the HPC Whitepaper was drafted and worked on by Sylabs' employees Adam Hughes and Mike Frisch and was centered around Sylabs' opportunities with Fuzzball/HPC 2.0. However, defendant Adolph edited the Sylabs' HPC Whitepaper in a manner to read as though Sylabs' Trade Secrets and the opportunities expressed in that document had nothing to do with Sylabs, including listing Open Drives' defendant Adolph and Sean Lee as the authors, as memorialized in the Audit Logs, Adolph, 5/18/20 through 5/26/20.

**VIII.**
**DISCUSSION OF DEFENDANTS' FRAUDULENT AND UNLAWFUL PATENTING OF TRADE SECRETS & IP INVENTED AND OWNED BY SYLABS**

372.    The main gravamen of this Action is Defendants' theft, misappropriation, and unlawful and fraudulent patenting of Sylabs' Trade Secrets.

373.    In particular, and as alleged in greater detail above, Defendants have unlawfully and fraudulently patented Sylabs' Fuzzball and Armored Containers technologies through their theft of Sylabs' Trade Secrets, as set forth below in Figure 10.

| SYLABS' TRADE SECRET | KURTZER, et al.'s THEFT: PATENT # (See Exhibit) | PROOF THAT PATENT IS SYLABS' TRADE SECRET |
|---|---|---|
| Fuzzball | US 10,970,113 (*see* Exhibit 37) | CIQ patent 10,970,113 describes the high level architecture of the "Fuzzball/HPC 2.0" project that began development by Sylabs starting in 2019.<br><br>As set forth in greater detail in Sections V-VII, above, and the exhibits listed below, the evidence unequivocally demonstrates Sylabs was inventing, developing, and designing this technology as early as June of 2019, which is approximately 1 year prior to Defendants' theft and more than 2 years prior to patent issuance date.<br><br>In addition to the forgoing, on December 19, 2019, and January 9th and 13th 2020, design reviews of Fuzzball were held by Sylabs, which were video recorded. |
| Fuzzball | US 11,099,893 (*see* Exhibit 39) | CIQ patent 11,099,893 describes a continuation to CIQ patent 10,970,113, which describes the high level architecture of the "Fuzzball/HPC 2.0" project that began development by Sylabs starting in 2019.<br><br>As set forth in greater detail in Sections V-VII, above, and the exhibits listed below, the evidence unequivocally demonstrates Sylabs was inventing, developing, and designing this technology as early as June of 2019, which is approximately 1 year prior to Defendants' theft and more than 2 years prior to patent issuance date.<br><br>In addition to the forgoing, on December 19, 2019, and January 9th and 13th 2020, design reviews of Fuzzball were held by Sylabs, which were video recorded. |
| Fuzzball | US 11,310,342 (*see* Exhibit 40) | CIQ patent 11,310,342 describes a specific algorithm of the high level architecture of the "Fuzzball/HPC 2.0" project that began development by Sylabs starting in 2019.<br><br>As set forth in greater detail in Sections V-VII, above, and the exhibits listed below, the evidence unequivocally demonstrates Sylabs was inventing, developing, and designing this technology as early as June of 2019, which is approximately 1 year prior to Defendants' theft and more than 2 years prior to patent issuance date.<br><br>In addition to the forgoing, on December 19, 2019, and January 9th and 13th 2020, design reviews of Fuzzball were held by Sylabs, which were video recorded. |

LEPISCOPO & ASSOCIATES LAW FIRM

| | | |
|---|---|---|
| Armored Containers | US 11,055,428 *(see* Exhibit 41) | The Armored Containers a based on Sylabs' prior trade secrets in the SIF technology. It is important to note that the armored technology that serves as the basis of CIQ's patents is <u>not</u> based on the technology disclosed in Sylabs' SIF Application (Exh. 54) or SIF Patent (Exh. 55) for its SIF technology. This CIQ patent specifically mentions this type of approach for another format of container images, namely Open Container Initiative (OCI) container images. Sylabs has never publicly disclosed the Trade Secrets underlying the OCI method of encrypting container images as it pertains to OCI images but has been developing this as part of its secret "armored containers" project.<br><br>As set forth in greater detail in Sections V-VIII, above, and the exhibits listed below, the evidence unequivocally demonstrates Sylabs was  inventing, developing, and designing this technology as early as July of 2019, which is approximately 1 year prior to Defendants' theft and more than 2 years prior to patent issuance date. |
| Armored Containers | US 11,163,902 *(see* Exhibit 42) | "                    " |
| Armored Containers | US 11,321,064 *(see* Exhibit 43) | "                    " |

**FIGURE 10**: Defendants' Patents Through Theft of Sylabs' Trade Secrets

374.    Defendants' Stolen Patents of Sylabs' Armored Containers technology not only violates the armored technology itself but also Sylabs' underlying SIF technology, which is the necessary prior art upon which Armored Containers is built.

## IX.
## LEGAL BACKGROUND

### FEDERAL LAW: DEFEND TRADE SECRETS ACT

375.    In its relevant  part, Section 2 of the Defend Trade Secrets Act of 2016 ("DTSA"), Public Law No: 114-153 (05/11/2016), which amends the Economic Espionage Act of 1996 ("Espionage Act"), Public Law No.: 104–294 (10/11/2996), provides (emphasis added):

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

"(Sec. 2) This bill amends the federal criminal code to create a **private civil cause of action** for trade secret misappropriation.

A trade secret owner may file a civil action in a U.S. district court seeking relief for trade secret misappropriation related to a product or service in interstate or foreign commerce. The bill establishes remedies including injunctive relief, compensatory damages, and attorney's fees. It sets a three-year statute of limitation from the date of discovery of the misappropriation.

A trade secret owner may apply for and a court may grant, in extraordinary circumstances, an ex parte seizure order to prevent dissemination of a trade secret if the court makes specific findings, including that: (1) a temporary restraining order or another form of equitable relief is inadequate, (2) an immediate and irreparable injury will occur if seizure is not ordered, and (3) the person against whom seizure would be ordered has actual possession of the trade secret and any property to be seized.

A court must take custody of and secure seized materials and hold a seizure hearing within seven days. An interested party may file a motion to encrypt seized material."

376.   Section 5 of the DTSA provides Congress' clear and unequivocal rationale for its enactment:

"(Sec. 5) The bill expresses the sense of Congress that: (1) trade secret theft occurs in the United States and around the world, (2) trade secret theft harms owner companies and their employees, (3) the Economic Espionage Act of 1996 applies broadly to protect trade secrets from theft; and (4) it is important, when seizing information, to balance the need to address misappropriation with the needs of third parties and the accused party."

377.   The DTSA is codified in 18 U.S.C. § 1831 *et seq*.

378.   As its trade secrets relate to products and services sold in interstate and international commerce, Sylabs is authorized to maintain this civil action because § 1836 the DTSA provides for a **private** **right** of action:

"(b) Private civil actions.

(1) In general. An owner of a trade secret that is misappropriated may bring a civil action under [the DTSA] if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

379.   Section 1836(b)(3) of the DTSA provides civil remedies as follows:

"(3)   Remedies. In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may—

(A)  grant an injunction—

(i) to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable, provided the order does not—

(I)   prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows; or

(II) otherwise conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business;

(ii)  if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret; and

(iii)   in exceptional circumstances that render an injunction inequitable, that conditions future use of the trade secret upon payment of a reasonable royalty for no longer than the period of time for which such use could have been prohibited;

(B)  award—

(i)

(I)  damages for actual loss caused by the misappropriation of the trade secret; and

(II)   damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or

---

(ii)   in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret;

(C)  if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B); and

(D)  if a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, a motion to terminate an injunction is made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated, award reasonable attorney's fees to the prevailing party."

380.    In its relevant part, Section 3 of the DTSA adds violations of the act to the list of predicates to establish a private civil action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1831 *et seq.* (emphasis added):

"(Sec. 3) . . . It adds economic espionage and **trade secret theft** to the list of predicate offenses that constitute racketeering activity."

381.    Section 3 of the DTSA provides (emphasis added):

"(b)  RICO PREDICATE OFFENSES.—Section 1961(1) of title 18,United States Code, is amended by inserting ''sections 1831 and 1832 (relating to economic espionage and **theft of trade secrets**),'' before 'section 1951'."

382.    Sections 1835(a) and 1836(b)(2), respectively, of the DTSA provide confidentiality and seizure provisions to protect the aggrieve party's trade secrets:

"§ 1835. Orders to preserve confidentiality (a) In general.   In any prosecution or other proceeding under this chapter [18 USCS §§ 1831 et seq.], the court shall enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets, consistent with the requirements of the Federal Rules of Criminal and Civil Procedure, the Federal Rules of Evidence, and all other applicable laws. An interlocutory appeal by the United States shall lie from a decision or order of a district court authorizing or directing the disclosure of any trade secret."

LEPISCOPO & ASSOCIATES LAW FIRM

"§ 1836. Civil proceedings. . .

(b)(2)  Civil seizure.

(A)  In general.

(i)   Application. Based on an affidavit or verified complaint satisfying the requirements of this paragraph, the court may, upon ex parte application but only in extraordinary circumstances, issue an order providing for the seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action.

(ii)  Requirements for issuing order. The court may not grant an application under clause (i) unless the court finds that it clearly appears from specific facts that—

(I)  an order issued pursuant to [FRCP 65]  or another form of equitable relief would be inadequate to achieve the purpose of this paragraph because the party to which the order would be issued would evade, avoid, or otherwise not comply with such an order;

(II)  an immediate and irreparable injury will occur if such seizure is not ordered;

(III)  the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application and substantially outweighs the harm to any third parties who may be harmed by such seizure;

(IV)  the applicant is likely to succeed in showing that—

(aa)  the information is a trade secret; and

(bb)  the person against whom seizure would be ordered—

(AA)  misappropriated the trade secret of the applicant by improper means; or

(BB)   conspired  to  use  improper  means  to misappropriate the trade secret of the applicant;

(V)  the person against whom seizure would be ordered has actual possession of—

(aa)  the trade secret; and

(bb)  any property to be seized;

(VI)  the application describes with reasonable particularity the matter to be seized and, to the extent reasonable under the circumstances, identifies the location where the matter is to be seized;

(VII)  the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person; and

(VIII)  the applicant has not publicized the requested seizure.

(B)  Elements of order. If an order is issued under subparagraph (A), it shall—

(i)  set forth findings of fact and conclusions of law required for the order;

(ii)  provide for the narrowest seizure of property necessary to achieve the purpose of this paragraph and direct that the seizure be conducted in a manner that minimizes any interruption of the business operations of third parties and, to the extent possible, does not interrupt the legitimate business operations of the person accused of misappropriating the trade secret;

(iii)

(I)  be accompanied by an order protecting the seized property from disclosure by prohibiting access by the applicant or the person against whom the order is directed, and prohibiting any copies, in whole or in part, of the seized property, to prevent undue damage to the party against whom the order has issued or others, until such parties have an opportunity to be heard in court; and

(II)  provide that if access is granted by the court to the applicant or the person against whom the order is directed, the access shall be consistent with subparagraph (D);

(iv)  provide guidance to the law enforcement officials executing the seizure that clearly delineates the scope of the authority of the officials, including—

(I)  the hours during which the seizure may be executed; and

(II)  whether force may be used to access locked areas;

LEPISCOPO & ASSOCIATES LAW FIRM

(v)  set a date for a hearing described in subparagraph (F) at the earliest possible time, and not later than 7 days after the order has issued, unless the party against whom the order is directed and others harmed by the order consent to another date for the hearing, except that a party against whom the order has issued or any person harmed by the order may move the court at any time to dissolve or modify the order after giving notice to the applicant who obtained the order; and

(vi)  require the person obtaining the order to provide the security determined adequate by the court for the payment of the damages that any person may be entitled to recover as a result of a wrongful or excessive seizure or wrongful or excessive attempted seizure under this paragraph.

(C)  Protection from publicity. The court shall take appropriate action to protect the person against whom an order under this paragraph is directed from publicity, by or at the behest of the person obtaining the order, about such order and any seizure under such order.

(D)  Materials In custody of court.

(i)  In general. Any materials seized under this paragraph shall be taken into the custody of the court. The court shall secure the seized material from physical and electronic access during the seizure and while in the custody of the court.

(ii)  Storage medium. If the seized material includes a storage medium, or if the seized material is stored on a storage medium, the court shall prohibit the medium from being connected to a network or the Internet without the consent of both parties, until the hearing required under subparagraph (B)(v) and described in subparagraph (F).

(iii)  Protection of confidentiality. The court shall take appropriate measures to protect the confidentiality of seized materials that are unrelated to the trade secret information ordered seized pursuant to this paragraph unless the person against whom the order is entered consents to disclosure of the material.

(iv)  Appointment of special master. The court may appoint a special master to locate and isolate all misappropriated trade secret information and to facilitate the return of unrelated property and data to the person from whom the property was seized. The special master appointed by the court shall agree to be bound by a non-disclosure agreement approved by the court.

(E)  Service of order. The court shall order that service of a copy of the order under this paragraph, and the submissions of the applicant to obtain the order, shall be made by a Federal law enforcement officer who, upon making service, shall carry out the seizure under the order. The court may allow State or local law enforcement officials to participate, but may not permit the applicant or any agent of the applicant to participate in the seizure. At the request of law enforcement officials, the court may allow a technical expert who is unaffiliated with the applicant and who is bound by a court-approved non-disclosure agreement to participate in the seizure if the court determines that the participation of the expert will aid the efficient execution of and minimize the burden of the seizure.

(F)  Seizure hearing.

(i)  Date. A court that issues a seizure order shall hold a hearing on the date set by the court under subparagraph (B)(v).

(ii)  Burden of proof. At a hearing held under this subparagraph, the party who obtained the order under subparagraph (A) shall have the burden to prove the facts supporting the findings of fact and conclusions of law necessary to support the order. If the party fails to meet that burden, the seizure order shall be dissolved or modified appropriately.

(iii)  Dissolution or modification of order. A party against whom the order has been issued or any person harmed by the order may move the court at any time to dissolve or modify the order after giving notice to the party who obtained the order.

(iv)  Discovery time limits. The court may make such orders modifying the time limits for discovery under the Federal Rules of Civil Procedure as may be necessary to prevent the frustration of the purposes of a hearing under this subparagraph.

(G)  Action for damage caused by wrongful seizure. A person who suffers damage by reason of a wrongful or excessive seizure under this paragraph has a cause of action against the applicant for the order under which such seizure was made, and shall be entitled to the same relief as is provided under section 34(d)(11) of the Trademark Act of 1946 (*15 U.S.C. 1116(d)(11)*). The security posted with the court under subparagraph (B)(vi) shall not limit the recovery of third parties for damages.

(H)  Motion for encryption. A party or a person who claims to have an interest in the subject matter seized may make a motion at any time,

which may be heard ex parte, to encrypt any material seized or to be seized under this paragraph that is stored on a storage medium. The motion shall include, when possible, the desired encryption method."

**FEDERAL LAW: COMPUTER FRAUD AND ABUSE ACT**

383.    In its relevant part, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, provides (emphasis added):

"(a)  Whoever—
. . .
(2)  intentionally accesses a computer **without authorization** or **exceeds authorized access**, and thereby obtains—
. . .
(C)  information from any protected computer;
. . .
(4)  knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

(5)
(A)  knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;
(B)  intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

(C)  intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

(e)  As used in this section—

(1)  the term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility

LEPISCOPO & ASSOCIATES LAW FIRM

directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable handheld calculator, or other similar device;

(2)  the term "protected computer" means a computer—

. . .

(B)  which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States;"

384.   This Action is authorized because Section 1030(g) of the CFAA provides for a **private right** of action:

"(g)  Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."

## CALIFORNIA LAW: UNIFORM TRADE SECRETS ACT

385.   California provides protection for individuals and entities through the California Uniform Trade Secrets Act ("UTSA"), California Civil Code §§ 3426 *et seq.*

386.   Section 3426.1(a) of the UTSA prohibits **cyber theft** of trade secrets through improper means (emphasis added):

"'Improper means'" includes **theft**, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through **electronic** or other means. Reverse engineering or independent derivation alone shall not be considered improper means."

387.   Section 3426.2 of the UTSA provides a remedy for injunctive relief:

(a)  Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

LEPISCOPO & ASSOCIATES LAW FIRM

(b)  If the court determines that it would be unreasonable to prohibit future use, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.

(c)  In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order."

388.    Section 3426.3 of the UTSA provides for the recovery of damages, including unjust enrichment and punitive damages:

(a)  A complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

(b)   If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.

(c)  If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subdivision (a) or (b).

389.    Section 3426.4 of the UTSA provides for the recovery of attorneys' fees and costs:

"If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorney's fees and costs to the prevailing party. Recoverable costs hereunder shall include a reasonable sum to cover the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the prevailing party."

390.    Section 3426.5 of the UTSA provides for procedures for preserving secrecy of trade secrets:

LEPISCOPO & ASSOCIATES LAW FIRM

"In an action under this title, a court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include granting protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval."

**FEDERAL LAW: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**

391.    Section 1962 of the Racketeer Influenced and Corrupt Organization Act ("RICO") provides:

(a)  It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code [18 USCS § 2], to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b)    It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly,

in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d)  It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

392.    Section 3 of the DTSA added **theft of trade secrets** to RICO as constituting racketeering activity. In its relevant part, 18 U.S.C § 1961 provides (emphasis added):

"(1)  'racketeering activity' means. . .(B) any act which is indictable under any of the following provisions of title 18, United States Code: . . . sections 1831 and 1832 (relating to economic espionage **and theft of trade secrets**) [18 USCS §§ 1831, 1832]. . .

(4)  'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5)  'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;"

**CALIFORNIA LAW: CIVIL CONSPIRACY**

393.    The Judicial Council of California Civil Jury Instructions (2022 edition) ("CACI"), CACI No. 3600 provides (modified):

"Sylabs claims that it was harmed by the Co-Conspirators by their cyber theft of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other protected information and that Co-Conspirators are responsible for the harm because they were part of a conspiracy to commit the cyber theft of Sylabs' Trade Secrets, IP, Corporate Secrets, and other protected information. A conspiracy is an agreement by two or more persons to commit a wrongful act. Such an agreement may be made orally or in writing or may be implied by the conduct of the parties.

If you find that Co-Conspirators committed cyber theft of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other protected information that harmed Sylabs, then you must determine whether

LEPISCOPO & ASSOCIATES LAW FIRM

Co-Conspirators are also responsible for the harm. Co-Conspirators are responsible if Sylabs proves both of the following:

1. That Co-Conspirators were aware that their respective co-conspirators planned to commit cyber theft of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other protected information; and

2. That Co-Conspirators agreed with their respective co-conspirators and intended that the cyber theft of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other protected information be committed.

Mere knowledge of a wrongful act without cooperation or an agreement to cooperate is insufficient to make Co-Conspirators responsible for the harm.

A conspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and the interests of the alleged coconspirators. Sylabs is not required to prove that Co-Conspirators personally committed a wrongful act or that they knew all the details of the agreement or the identities of all the other participants."

394.   CACI No. 3601 provides (modified):

"If you decide that a co-conspirator joined the conspiracy to commit cyber theft of Sylabs' Trade Secrets, IP, Corporate Secrets, and/or other protected information, then he/she is responsible for all acts done as part of the conspiracy, whether the acts occurred before or after he/she joined the conspiracy."

**CALIFORNIA LAW: CALIFORNIA UNFAIR COMPETITION LAW**

395.   Section 17200 of the California Unfair Trade Practices Act ("UCL") provides:

"As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

LEPISCOPO & ASSOCIATES LAW FIRM

396.   Section 17203 of UCL provides:

"Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state."

## CALIFORNIA LAW: BREACH OF FIDUCIARY DUTY

397.   Directors and officers of corporations owe fiduciary duties of care, loyalty, and good faith to the corporation and its shareholders they serve.

398.   CACI No. 4400 provides (modified):

"A corporate officer or director owes what is known as a fiduciary duty to his/her corporation and shareholders. A fiduciary duty imposes on an officer or director a duty to act with the utmost care, loyalty, and good faith in the best interests of his/her corporation and duties of undivided loyalty to the corporation and confidentiality."

## CALIFORNIA LAW: UNJUST ENRICHMENT

399.   CACI No. 4410 provides (modified):

"Defendants were unjustly enriched if their theft and misappropriation of Sylabs' trade secrets caused Defendants to receive benefits that they otherwise would not have achieved."

**CALIFORNIA LAW: CONVERSION**

400. CACI No. 2100 provides (modified):

"Sylabs claims that Defendants wrongfully stole and exercised control over its trade secrets. To establish this claim, Sylabs must prove all of the following:

1. That Sylabs invented, owned, possessed, and had a right to possess and receive the benefits from its Trade Secrets;

2. That Defendants stole and substantially interfered with Sylabs' trade secrets by knowingly or intentionally committing cyber theft of Sylabs' Trade Secrets by destroying certain trade secrets by publishing them to open-source;

3. That Sylabs did not consent;

4. That Sylabs was harmed; and

5. That Defendants' conduct was a substantial factor in causing Sylabs' harm."

**CALIFORNIA LAW: BREACH OF WRITTEN CONTRACT**

401. CACI No. 303 provides (modified):

To recover damages from Defendant _____ for breach of contract, plaintiff, Sylabs, Inc., must prove all of the following:

1. That plaintiff, Sylabs, Inc., and Defendant _____ entered into a written contract;

2. That plaintiff, Sylabs, Inc., did all, or substantially all, of the significant things that the contract required it to do;

3. That Defendant _____ shall not substantially interfere with, corrupt, destroy, or steal Sylabs, Inc.'s trade secrets;

4. That Defendant _____ engaged in cyber corruption, cyber destruction, and cyber theft of plaintiff, Sylabs, Inc.'s trade secrets;

5. That plaintiff, Sylabs, Inc. was harmed; and

6. That Defendant _____'s breach of contract was a substantial factor in causing plaintiff, Sylabs, Inc.'s harm.

**CALIFORNIA LAW: FRAUD: PROMISE WITHOUT INTENTION TO PERFORM**

402.   CACI No. 1902 Fraud—Promise without intention to perform provides (modified):

Plaintiff, Sylabs, Inc., claims it was harmed because Defendant _____ made a false promise. To establish this claim, Plaintiff, Sylabs, Inc., must prove all of the following:

1. That Defendant _____ made a promise to Plaintiff, Sylabs, Inc.;

2. That Defendant _____ did not intend to perform this promise when [he/she/it] made it;

3. That Defendant _____ intended that Plaintiff, Sylabs, Inc., rely on this promise;

4. That Plaintiff, Sylabs, Inc., reasonably relied on Defendant _____'s promise;

5. That Defendant _____ did not perform the promised act;

6. That Plaintiff, Sylabs, Inc., was harmed; and

7. That Plaintiff, Sylabs, Inc.'s reliance on Defendant _____'s promise was a substantial factor in causing its harm.

**CALIFORNIA LAW: PUNITIVE DAMAGES**

403.   CACI No. 3940 Punitive Damages (modified):

If you decide that [*name of defendant*]'s conduct caused [*name of plaintiff*] harm, you must decide whether that conduct justifies an

award of punitive damages. The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the plaintiff and to discourage similar conduct in the future.

You may award punitive damages only if [*name of plaintiff*] proves by clear and convincing evidence that [*name of defendant*] engaged in that conduct with malice, oppression, or fraud.

"Malice" means that [*name of defendant*] acted with intent to cause injury or that [*name of defendant*]'s conduct was despicable and was done with a willful and knowing disregard of the rights or safety of another. A person acts with knowing disregard when the person is aware of the probable dangerous consequences of the person's conduct and deliberately fails to avoid those consequences.

"Oppression" means that [*name of defendant*]'s conduct was despicable and subjected [*name of plaintiff*] to cruel and unjust hardship in knowing disregard of [his/her/*nonbinary pronoun*] rights.

"Despicable conduct" is conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people. "Fraud" means that [*name of defendant*] intentionally misrepresented or concealed a material fact and did so intending to harm [*name of plaintiff*].

There is no fixed formula for determining the amount of punitive damages, and you are not required to award any punitive damages. If you decide to award punitive damages, you should consider all of the following factors in determining the amount:

(a) How reprehensible was [*name of defendant*]'s conduct? In deciding how reprehensible [*name of defendant*]'s conduct was, you may consider, among other factors:

1. Whether the conduct caused physical harm;

2. Whether [*name of defendant*] disregarded the health or safety of others;

3. Whether [*name of plaintiff*] was financially weak or vulnerable and [*name of defendant*] knew [*name of plaintiff*] was

LEPISCOPO & ASSOCIATES LAW FIRM

financially weak or vulnerable and took advantage of [him/her/*nonbinary pronoun*/it];

4. Whether [*name of defendant*]'s conduct involved a pattern or practice; and

5. Whether [*name of defendant*] acted with trickery or deceit.

(b) Is there a reasonable relationship between the amount of punitive damages and [*name of plaintiff*]'s harm [or between the amount of punitive damages and potential harm to [*name of plaintiff*] that [*name of defendant*] knew was likely to occur because of [his/her/ *nonbinary pronoun*/its] conduct]?

(c) In view of [*name of defendant*]'s financial condition, what amount is necessary to punish [him/her/*nonbinary pronoun*/it] and discourage future wrongful conduct? You may not increase the punitive award above an amount that is otherwise appropriate merely because [*name of defendant*] has substantial financial resources. [Any award you impose may not exceed [*name of defendant*]'s ability to pay.]

Punitive damages may not be used to punish [*name of defendant*] for the impact of [his/her/*nonbinary pronoun*/its] alleged misconduct on persons other than [*name of plaintiff*].

## X.
## CLAIMS FOR RELIEF

404.   Sylabs alleges the following claims for relief against Defendants, jointly and severally.

### COUNT I

### VIOLATIONS OF DEFEND TRADE SECRETS ACT

### (Against All Defendants)

405.   The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

406.   As alleged in greater detail in Sections II and V-VIII, above, Sylabs' Trade Secrets include scientific, technical, economic, and engineering information, as well as

LEPISCOPO & ASSOCIATES LAW FIRM

Sylabs' Trade Secrets, Corporate Secrets, and/or other privileged and protected information as herein alleged.

407.    As determined by and set forth in this Court's MTD Order, between 2018 and 2020, Sylabs created five such value-added technologies constituting Sylabs' Trade Secrets: (1) SingularityPRO, (2) Singularity Image Format, SIF technology, (3) Singularity Enterprise, (4) Fuzzball and (5) Armored Containers. *See* MTD Order, Dkt. p. 2, ll. 7-11.

408.    In its MTD Order, this Court indicated that: "[T]he definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." In identifying a trade secret at the pleading stage, a plaintiff  "need not 'spell out the details of the trade secret,' but must minimally provide 'reasonable notice of the issues which must be at the time of trial and . . . provide reasonable guidance in ascertaining the scope of appropriate discovery.'" *See* MTD Order, Dkt. 59, p. 9, ll. 1-6.

409.    Under these elements, this Court made a finding that Sylabs sufficiently described SingularityPRO, Singularity Enterprise, Fuzzball, and Armored Containers as trade secrets for purposes of this Action: "Thus, Sylabs sufficiently describes four of its five purported trade secrets which are not publicly available."  *See* MTD Order, Dkt. 59, p. 9, l. 17 through p. 11, l. 14.

410.    As to Sylabs' SIF Technology, this Court found that Sylabs did not sufficiently describe it because it failed to distinguish between what was publicly disclosed in its SIF Application (Exh. 54) and that which constitutes its trade secrets:

"While Sylabs may retain trade-secret protection over those aspects of SIF technology not published in its patent application, it fails to 'delineate the boundaries between its trade secrets and its information that has been made public through patents and patent applications. . . ' Rather, **Sylabs must simply allege with particularity those aspects of its SIF technology not discussed in its patent application**, and it does not do so in the Complaint."

*See* MTD Order, Dkt. 59, p. 10, ll. 7-10 (emphasis added).

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

411.   In order to cure this deficiency, this Court indicated that "Sylabs must simply allege with particularity those aspects of its SIF technology **not** discussed" in Sylabs' SIF Application (Exh. 54). *See* MTD Order, Dkt. 59, p. 10, ll. 14-16 (emphasis added).

412.   As to showing those aspects of its SIF technology **not** discussed in Sylabs' SIF Application, Sylabs has provided sufficient allegations in Section II and Sections V-VIII of this Complaint. *See* ¶ 57; ¶ 207-209, Figure 10).

413.   As to the  SIF Technology, as set forth below in greater detail in Section VI, ¶ 136, CIQ's Patents Based on Armored Containers Trade Secrets, CIQ's Patent Nos. US 11,055,428 (Exh. 41), US 11,163,902 (Exh. 42), and  US 11,321,064 (Exh. 43) are described and based upon the Armored Containers technology, which was born out of Sylabs' research and development starting in June of 2019. It is important to note that the Armored Containers technology that serves as the basis of CIQ's patents is **not** based on the technology disclosed in Sylabs' SIF Application for its SIF technology. *See* ¶ 58; ¶ 372, Figure 10).

414.   Sylabs alleges as follows to cure the aforementioned deficiencies. Specifically, Sylabs alleges that the following SIF technology components were not disclosed in Sylabs' SIF Application (Exh. 54) or Sylabs' SIF Patent (Exh. 55) but were stolen and used by Defendants to procure the Armored Container patents. For example, CIQ patent 11,055,428 (Exh. 41) specifically mentions this type of approach for another format of container images, namely OCI container images. Sylabs has never publicly disclosed the Trade Secrets underlying the specific methods of encrypting container images as it pertains to OCI images but began developing this as part of its secret "Armored Containers" project well before Defendants left Sylabs. Thus, these are Sylabs' Trade Secrets, which were stolen by Defendants to develop and unlawfully and fraudulently procure their Patent Nos. US 11,055,428 (Exh. 41), US 11,163,902 (Exh. 42), and US 11,321,064 (Exh. 43).

415.   Sylabs' Trade Secrets constitute information, including systems and methods, code, compilations, programs, devices, methods, techniques, or processes that

derive independent economic value from not being generally known to the public or other persons who can obtain significant economic value from the Trade Secrets' disclosure.

416. Sylabs' Trade Secrets were (and currently are) valuable and were secret and not publicly available but for Defendants' cyber corruption, cyber destruction, and cyber theft. In particular, after stealing, open-sourcing, patenting, employing, and marketing Sylabs' Trade Secrets, Defendants initially raised $26,000,000, reaching a total of $33,000,000 raised to date, and according to defendant Greg Kurtzer, CIQ now has an enterprise value of $150,000,000.[29]

417. As mentioned, the MTD Order indicates that Sylabs needs to identify and allege the specific policies, methods, and procedures utilized by Sylabs to protect its Trade Secrets (*see* Dkt. 59, p. 11, ll. 13-17).

418. At all times mentioned herein, Sylabs has taken more than adequate measures to protect the secrecy of Sylabs' Trade Secrets. In particular, and as set forth in greater detail above in Section II, ¶¶ 59-85, Sylabs has very specific policies, methods, and procedures for protecting the secrecy of its Trade Secrets: (a) Sylabs' Trade Secret Protections; (b) Conflict of Interest Policies; (c) Technical Protections; and (d) IP Assignment/NDA Agreements. Sylabs' policies, methods, and procedures are powerful and designed to protect the secrecy of Sylabs' Trade Secrets. *See* Exh. 38: Decl. of Tarbell ¶¶ 4 & 5; Exhs. 47-52.

419. Generally, Sylabs' Server and Google Workspace provide security for the protection of Sylabs' Trade Secrets. *See* Exh. 38: Decl. of Tarbell ¶¶ 3-5. Of course, this type of security was nullified by Defendants through their unlawful and unauthorized intrusions into Sylabs' Server when they were insider threats and external threats. Specifically, Mr. Tarbell provides numerous factual examples of Defendants' insider threats and external cyber intrusions into Sylabs' Server. *See* Exh. 38: Decl. of Tarbell ¶¶ 29-127; Exhs. 2-36, 57, 44, & 45.

---

[29] *See*: https://siliconangle.com/2022/05/12/ciq-raises-26m-promote-free-alternative-red-hat-linux/.

LEPISCOPO & ASSOCIATES LAW FIRM

420.   Sylabs utilized a protective server environment for its data, files, and directories. Specifically, Sylabs utilized Google Workspace, which is a cloud computing-based service that many companies utilize for employees to collaborate, store, and share files. Workspace has a robust logging feature that allows the auditing of employee activities within this environment. *See* Exh. 38: Decl. of Tarbell ¶ 4.

421.   Sylabs utilized Workspace features such as Google Drive to securely store, edit, and work together on sensitive corporate files. Sylabs employed these Google Workspace tools in part to ensure the security of their company secrets and sensitive data. *See* Exh. 38: Decl. of Tarbell ¶ 5.

422.   In addition to the Trade Secret Protections, Sylabs maintained Conflict of Interest Policies to not only ensure the secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets from being utilized and those having knowledge of those Trade Secrets from utilizing them as a means of **competing against Sylabs**—in the way that CIQ is competing against Sylabs after stealing Sylabs' Trade Secrets. *See* Exh. 47.

423.   In addition to the Trade Secret Protections and Conflict of Interest Policies, Sylabs maintained and utilized the Technical Protections to not only maintain the secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets from being utilized and those having knowledge of those Trade Secrets from utilizing them as a means of competing against Sylabs. So, for example, during all times relevant to this Action, Sylabs took steps to ensure that all source code and other materials related to its Fuzzball and Armored Containers Trade Secrets were kept secret, as is the general practice for other closed source Sylabs projects/products such as SingularityPRO and Singularity Enterprise. Thus, source code, technical documentation, and planning material was stored in private server projects, and access to the projects was strictly limited on a need-to-know basis even within Sylabs. As is common practice at technology firms, Sylabs' employees, including Defendants, execute IP Assignment/NDA Agreements. *See* Exhs. 48-52.

424.   By way of an actual example, during the relevant timeframe of this Action, Sylabs was engaged in pursuing business with the United States Government. So, for

example, when Sylabs responded to the U.S. Government's request for proposal, which is titled "Open Call for Innovative Defense-Related Dual-Purpose Technologies/Solutions with a Clear Air Force Stakeholder" ("RFP"), it included in this RFP, as well as other proposals, the following Notice (*see* Exh. 53):

> "This proposal includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed-in whole or in part-for any purpose other than to evaluate this proposal. If, however, a contract is awarded to this offeror as a result of-or in connection with-the submission of this data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. . ."

425. In addition to the Trade Secret Protections, Conflict of Interest Policies, and Technical Protections, Sylabs also utilized IP Assignment/NDA Agreements to not only maintain the secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets from being utilized and those having knowledge of those Trade Secrets from being utilizing them as a means of competing against Sylabs. *See* Exhs. 47-52.

426. Notwithstanding the Trade Secret Protections, Conflict of Interest Policies, Technical Protections, and IP Assignment/NDA Agreements specifically created and utilized by Sylabs, Defendants simply ignored and failed to comply with them and affirmatively conspired to circumvent them for purposes of causing cyber corruption, cyber destruction, and cyber theft of Sylabs' Trade Secrets. Consequently, Sylabs alleges that Defendants breached their IP Assignment/NDA Agreements with Sylabs. Further, Sylabs is informed and believes, and based on such information and belief alleges that these Defendants engaged in fraud in the procurement of the IP Assignment/NDA Agreements without having any intention of performing the promises made in their respective agreements. Accordingly, Sylabs has alleged separate breach of written contract and intentional misrepresentation counts against defendants Gregory Kurtzer, Matthew Hayden, Erin Fong, Robert Adolph, David Buss, Marlin Prager, and Open Drives, Inc., including requests for punitive damages. *See* Counts XII-XXI below.

427. As set forth in greater detail above, Defendants made significant and ongoing unlawful cyber intrusions into Sylabs' Server for the purposes of: (a) corruption and

LEPISCOPO & ASSOCIATES LAW FIRM

damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer files; (j) cyber intrusion to Sylabs' computer directories; (k) cyber theft of Sylabs' Trade Secrets; (l) cyber misappropriation of Sylabs' Trade Secrets; (m) cyber theft of Sylabs' Corporate Assets; (n) cyber misappropriation of Sylabs' Corporate Assets; (o) cyber theft of Sylabs' Corporate Secrets; and (p) cyber misappropriation of Sylabs' Corporate Secrets. *See* Section II, ¶¶ 27-54 of this Complaint; *see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

428.    Unlawful Conduct Engaged In By Defendants After Mass Resignation From Sylabs. Sylabs is informed and believes, and based upon such information and belief alleges that in furtherance of their conspiracy with their codefendants, defendants Greg Kurtzer, Julia Kurtzer, Adolph, Hayden, Fong, Buss, and Prager, and, through their respective officers, defendants CIQ and Open Drives, agreed to a mass resignation from Sylabs but to continue engaging in unauthorized access even **after** they departed Sylabs on March 31, 2020. For example, between April 2, 2020 and April 15, 2020, defendants Greg Kurtzer, Adolph, Hayden, Julia Kurtzer, and Fong made significant and ongoing unlawful cyber intrusions into Sylabs' Server for the purposes of: (a) corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer files; (j) cyber intrusion to Sylabs' computer directories; (k) cyber theft of Sylabs' Trade Secrets; (l) cyber misappropriation of Sylabs' Trade Secrets; (m) cyber theft of Sylabs' Corporate Assets; (n) cyber misappropriation of Sylabs' Corporate Assets; (o) cyber theft of Sylabs'

LEPISCOPO & ASSOCIATES LAW FIRM

Corporate Secrets; and (p) cyber misappropriation of Sylabs' Corporate Secrets. *See* Section II, ¶¶ 27-54 of this Complaint; *see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

429.    As alleged in greater detail in this Count and in Sections II and V-VIII, above, Defendants' actions constitute actual, and threatened and ongoing violations under 18 U.S.C. §§ 1836 and 1839: (a) cyber corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer files; (j) cyber intrusion to Sylabs' computer directories; (k) cyber theft of Sylabs' Trade Secrets; (l) cyber misappropriation of Sylabs' Trade Secrets; (m) cyber theft of Sylabs' Corporate Assets; (n) cyber misappropriation of Sylabs' Corporate Assets; (o) cyber theft of Sylabs' Corporate Secrets; and (p) cyber misappropriation of Sylabs' Corporate Secrets. *See* Section II, ¶¶ 27-54 of this Complaint; *see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

430.    At all times relevant to this Complaint, Sylabs owned Sylabs' Trade Secrets, Corporate Secrets, and/or other privileged and protected information as Sylabs is the entity in which rightful legal or equitable title to Sylabs' Trade Secrets, Corporate Secrets, and other privileged and protected information is reposed.

431.    As alleged in greater detail in this Count and in Sections II and V-VIII, above, Defendants intended to and knowingly caused damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories, and accessed Sylabs' Server without authorization and disclosed, acquired, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Sylabs' Trade Secrets, Corporate Secrets, and/or other privileged and protected information. They performed such acts in furtherance of the conspiracy and to perpetrate the theft and

misappropriation of Sylabs' Trade Secrets, Corporate Secrets, and/or other privileged and protected information in the Northern District of California.

432.    As alleged in greater detail in this Count and in Sections II and V-VIII, above, the Defendants intended to and knowingly caused damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories and stole and misappropriated Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets through cyber theft and then perpetrated a fraud on the USPTO by submitting fraudulent patent applications to the USPTO and receiving fraudulently obtained patents, to wit: US 10,970,113 (Exh. 37); US 11,099,893 (Exh. 39); US 11,310,342 (Exh. 40); US 11,055,428 (Exh. 41); US 11,163,902 (Exh. 42); and US 11,321,064 (Exh. 43) (collectively "Stolen Patents").

433.    As alleged in greater detail in Sections II and V-VIII, above, the Defendants acquired, used, or disclosed Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets knowing that they were stolen and misappropriated, obtained, or converted through Defendants' cyber theft of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets without Sylabs' consent or authorization. Further, the Defendants intentionally engaged in these acts to benefit themselves, with the knowledge and/or intent that these acts would injure Sylabs and cause damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories.

434.    The cyber corruption, cyber destruction, cyber theft and use of Sylabs' Trade Secrets, Corporate Secrets, and/or other privileged and protected information by Defendants was without Sylabs' authorization, and Sylabs did not consent to their cyber corruption, cyber destruction, cyber theft, acquisition, disclosure, or use of Sylabs' Trade Secrets, Corporate Secrets, and other privileged and protected information.

435.    At all times mentioned in this Complaint, the Defendants intended to corrupt and cause damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories and to convert, misappropriate, and steal Sylabs' Trade Secrets,

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

Corporate Assets, and Corporate Secrets to their own use and benefit and for their own enrichment.

436.    As alleged in greater detail in Sections II and V-VIII, above, the Defendants clearly knew and intended that Sylabs, as the owner of the Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets, would be damaged by their actions.

437.    As alleged in greater detail in this Count and in Sections II and V-VIII, above, as a result of the Defendants' cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets, Sylabs has suffered actual damages in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

438.    As alleged in greater detail in this Count and in Sections II and V-VIII, above, as a result of the Defendants' cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets, Defendants have been unjustly enriched.

439.    As alleged in greater detail in this Count and in Sections II and V-VIII, above, as a result of the Defendants' cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets, Sylabs requests that the Court issue an order that all right, title, and interest in and to the Stolen Patents be divested from defendant CIQ and fully vested in Sylabs, and that the currently listed inventors in the Stolen Patents be removed and replaced with the names of Sylabs' relevant employees as the sole inventors.

440.    Sylabs further pleads entitlement to a reasonable royalty from each of the Stolen Patents to compensate Sylabs for Defendants' cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

441.    Sylabs further pleads entitlement to a disgorgement of profits received from each of the Stolen Patents to compensate Sylabs for Defendants' cyber corruption, cyber

destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

442.   Sylabs further pleads entitlement to all funds Defendants have raised due to their cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets in an amount to be proven at trial but in an amount that exceeds $25,000,000.

443.   As alleged in greater detail in this Count and in Sections II and V-VIII, above, the Defendants' cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets was willful and malicious based on the facts alleged herein. Defendants acted with a purpose and willingness to commit the acts alleged, and Defendants' conduct was not reasonable under the circumstances. Sylabs is therefore entitled to exemplary damages and attorney fees and costs. Sylabs further seeks exemplary damages against Defendants in an amount up to two times the amount of Sylabs' actual damages according to proof under 18 U.S.C. § 1836.

444.   As alleged in greater detail in this Count and in Sections II and V-VIII, above, the Defendants' cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets has caused and will continue to cause Sylabs irreparable and substantial injury and therefore cannot be fully redressed through damages alone.

445.   As alleged in greater detail in this Count and in Sections II and V-VIII, above, if Defendants were permitted to continue to use and disseminate Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets, then Sylabs would be irreparably harmed and the economic damages to Sylabs would be difficult to quantify. An injunction prohibiting Defendants from further acquisition, disclosure, use, and possession of Sylabs' Trade Secrets, Corporate Secrets, and other privileged and protected information is necessary to provide Sylabs with complete relief.

446.    Sylabs requests injunctive relief, as Defendants' wrongful conduct alleged herein in greater detail in this Count and in Sections II and V-VIII, above, by their cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets will continue unless enjoined and restrained by this Court  and will cause great and irreparable injury to Sylabs' business, and it could cause Defendants to have improper advantages, positions, and rights in the marketplace to Sylabs' detriment. Absent injunctive relief, Defendants' further disclosure and use of Sylabs' Trade Secrets, Corporate Secrets, and/or other privileged and protected information could irreparably harm Sylabs.

### COUNT II

### VIOLATIONS OF COMPUTER FRAUD AND ABUSE ACT

### (Against All Defendants)

447.    The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

448.    As an initial matter, on page 12 of the MTD Order, this Court determined that under the original complaint (Dkt. 1) Sylabs' "CFAA Claim Fails Because Sylabs Does Not Allege That It Suffered Any **Harm Remediable By The Statute**" (Dkt. 59, p. 12, ll. 1-27; emphasis added).

449.    As cited by this Court, in *Van Buren* and *Andrews*, the Supreme Court and Ninth Circuit provided guidance for determining harm remediable by the CFAA:

> "[T]he CFAA is 'an anti-hacking statute,' not 'an expansive misappropriation statute.' *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1263 (9th Cir. 2019) (citation omitted). It provides a cause of action to '[a]ny person who suffers damage or loss by reason of a violation of ' the statute. 18 U.S.C. § 1030(g). 'The statutory definitions of "damage" and "loss" . . . focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data.' *Van Buren v. United States*, 141 S. Ct. 1648, 1660 (2021)."

*See* MTD Order, p. 12, ll. 2-7.

450.    In its MTD Order, this Court further identified the pleading deficiencies in Sylabs' claim under the CFAA, as it relates to remediable harm:

LEPISCOPO & ASSOCIATES LAW FIRM

"Sylabs does not allege that it experienced any damage to its computers or servers (*e.g.*, **file corruption**)."

*See* MTD Order, p. 12, ll. 11-12 (emphasis added).

451. As alleged in greater detail in Sections II and V-VIII, above, Sylabs' Trade Secrets include scientific, technical, economic, and engineering information as herein alleged.

452. As determined by and set forth in this Court's MTD Order, between 2018 and 2020, Sylabs created five such value-added technologies constituting Sylabs' Trade Secrets: (1) SingularityPRO, (2) Singularity Image Format, SIF technology, (3) Singularity Enterprise, (4) Fuzzball and (5) Armored Containers. *See* MTD Order, Dkt. p. 2, ll. 7-11.

453. In its MTD Order, this Court indicated that: "[T]he definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." In identifying a trade secret at the pleading stage, a plaintiff "need not 'spell out the details of the trade secret,' but must minimally provide 'reasonable notice of the issues which must be at the time of trial and . . . provide reasonable guidance in ascertaining the scope of appropriate discovery.'" *See* MTD Order, Dkt. 59, p. 9, ll. 1-6.

454. Under these elements, this Court made a finding that Sylabs sufficiently described SingularityPRO, Singularity Enterprise, Fuzzball, and Armored Containers as trade secrets for purposes of this Action: "Thus, Sylabs sufficiently describes four of its five purported trade secrets which are not publicly available." *See* MTD Order, Dkt. 59, p. 9, l. 17 through p. 11, l. 14.

455. As to Sylabs' SIF Technology, this Court found that Sylabs did not sufficiently describe it because it failed to distinguish between what was publicly disclosed in its SIF Application (Exh. 54) and that which constitutes its trade secrets:

"While Sylabs may retain trade-secret protection over those aspects of SIF technology not published in its patent application, it fails to 'delineate the boundaries between its trade secrets and its information that has been made public through patents and patent applications. . . ' Rather, **Sylabs must**

**simply allege with particularity those aspects of its SIF technology not discussed in its patent application**, and it does not do so in the Complaint."

*See* MTD Order, Dkt. 59, p. 10, ll. 7-10 (emphasis added).

456.   In order to cure this deficiency, this Court indicated that "Sylabs must simply allege with particularity those aspects of its SIF technology **not** discussed" in Sylabs' SIF Application (Exh. 54). *See* MTD Order, Dkt. 59, p. 10, ll. 14-16 (emphasis added).

457.   As to showing those aspects of its SIF technology **not** discussed in Sylabs' SIF Application, Sylabs has provided sufficient allegations in Section II and Sections V-VIII of this Complaint. *See* ¶¶ 167, 210, and 372, Figure 10).

458.   As to the  SIF Technology, CIQ's Patents Based on Armored Containers Trade Secrets, CIQ's Patent Nos. US 11,055,428 (Exh. 41), US 11,163,902 (Exh. 42), and US 11,321,064 (Exh. 43) are described and based upon Sylabs' Armored Containers technology, which was born out of Sylabs' research and development starting in June of 2019. It is important to note that the Armored Containers technology that serves as the basis of CIQ's patents is **not** based on the technology disclosed in Sylabs' SIF Application for its SIF technology. *See* ¶¶ 207-209; ¶ 372, Figure 10).

459.   Sylabs alleges as follows to cure the aforementioned deficiencies. Specifically, Sylabs alleges that the following SIF technology components were not disclosed in Sylabs' SIF Application (Exh. 54) or Sylabs' SIF Patent (Exh. 55) but were stolen and used by Defendants to procure the Armored Container patents. For example, CIQ patent 11,055,428 (Exh. 41) specifically mentions this type of approach for another format of container images, namely OCI container images. Sylabs has never publicly disclosed the Trade Secrets underlying the specific method of encrypting container images as it pertains to OCI images but has been developing this as part of its secret "Armored Containers" project, well before Defendants left Sylabs. Thus, these are Sylabs' Trade Secrets, which were stolen by Defendants to develop and unlawfully and fraudulently procure their Patent Nos. US 11,055,428 (Exh. 41), US 11,163,902 (Exh. 42), and US 11,321,064 (Exh. 43).

LEPISCOPO & ASSOCIATES LAW FIRM

460.    Sylabs' Trade Secrets constitute information, including systems and methods, code, compilations, programs, devices, methods, techniques, or processes that derive independent economic value from not being generally known to the public or other persons who can obtain significant economic value from the Trade Secrets' disclosure.

461.    Sylabs' Trade Secrets were (and currently are) valuable and were secret and not publicly available but for Defendants' cyber corruption, cyber destruction, and cyber theft. In particular, after stealing, open-sourcing, patenting, employing, and marketing Sylabs' Trade Secrets, Defendants initially raised $26,000,000, currently reaching a total of $33,000,000 raised to date, and according to defendant Greg Kurtzer, CIQ now has an enterprise value of $150,000,000.[30]

462.    As mentioned, the MTD Order indicates that Sylabs needs to identify and allege the specific policies, methods, and procedures utilized by Sylabs to protect its Trade Secrets (*see* Dkt. 59, p. 11, ll. 13-17).

463.    At all times mentioned herein, Sylabs has taken reasonable measures to protect the secrecy of Sylabs' Trade Secrets. In particular, and as set forth in greater detail above in Section II, ¶¶ 59-85, Sylabs has very specific policies, methods, and procedures for protecting the secrecy of Trade Secrets: (a) Sylabs' Trade Secret Protections; (b) Conflict of Interest Policies; (c) Technical Protections; and (d) IP Assignment/NDA Agreements. Sylabs' policies, methods, and procedures are powerful and designed to protect the secrecy of Sylabs' Trade Secrets. *See* Exh. 38: Decl. of Tarbell ¶¶ 4 & 5; Exhs. 47-52.

464.    Generally, Sylabs' Server and Google Workspace provide security for the protection of Sylabs' Trade Secrets. *See* Exh. 38: Decl. of Tarbell ¶¶ 3-5. Of course, this type of security was nullified by Defendants through their unlawful and unauthorized intrusions into Sylabs' Server when they were insider threats and external threats. Specifically, Mr. Tarbell provides numerous factual examples of Defendants' insider

---

[30]    *See*: https://siliconangle.com/2022/05/12/ciq-raises-26m-promote-free-alternative-red-hat-linux/.

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

threats and external cyber intrusions into Sylabs' Server. *See* Exh. 38: Decl. of Tarbell ¶¶ 29-127; Exhs. 2-36, 57, 44, & 45.

465.   Sylabs utilized a protective server environment for its data, files, and directories. Specifically, Sylabs utilized Google Workspace, which is a cloud computing-based service that many companies utilize for employees to collaborate, store, and share files. Workspace has a robust logging feature that allows the auditing of employee activities within this environment. *See* Exh. 38: Decl. of Tarbell ¶ 4.

466.   Sylabs utilized Workspace features such as Google Drive to securely store, edit, and work together on sensitive corporate files. Sylabs employed these Google Workspace tools in part to ensure the security of their company secrets and sensitive data. *See* Exh. 38: Decl. of Tarbell ¶ 5.

467.   In addition to the Trade Secret Protections, Sylabs maintained Conflict of Interest Policies to not only ensure the secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets from being utilized and those having knowledge of those Trade Secrets from utilizing them as a means of **competing against Sylabs**—in the way that CIQ is competing against Sylabs after stealing Sylabs' Trade Secrets. *See* Exh. 47.

468.   In addition to the Trade Secret Protections and Conflict of Interest Policies, Sylabs maintained and utilized the Technical Protections to not only maintain secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets from being utilized and those having knowledge of those Trade Secrets from utilizing them as a means of competing against Sylabs. So, for example, during all times relevant to this Action, Sylabs took steps to ensure that all source code and other materials related to its Fuzzball and Armored Containers Trade Secrets were kept secret, as is the general practice for other closed source Sylabs projects/products such as SingularityPRO and Singularity Enterprise. Thus, source code, technical documentation, and planning material are stored in private server projects, and access to the projects was strictly limited on a need-to-know basis even within Sylabs. As is common practice at technology firms, Sylabs' employees, including  Defendants, execute IP Assignment/NDA Agreements. *See* Exhs. 48-52.

469.   By way of an actual example, during the relevant timeframe of this Action, Sylabs was engaged in pursuing business with the United States Government. So, for example, when Sylabs responded to the U.S. Government's request for proposal, which is titled "Open Call for Innovative Defense-Related Dual-Purpose Technologies/Solutions with a Clear Air Force Stakeholder" ("RFP"), it included in this RFP, as well as other proposals, the following Notice (*see* Exh. 53):

> "This proposal includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed-in whole or in part-for any purpose other than to evaluate this proposal. If, however, a contract is awarded to this offeror as a result of-or in connection with-the submission of this data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. . ."

470.   In addition to the Trade Secret Protections, Conflict of Interest Policies, and Technical Protections, Sylabs also utilized IP Assignment/NDA Agreements to not only maintain secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets from being utilized and those having knowledge of those Trade Secrets from utilizing them as a means of competing against Sylabs. *See* Exhs. 47-52.

471.   On page 12 of the MTD Order, this Court determined that under the original complaint (Dkt. 1) Sylabs' "CFAA Claim Fails Because Sylabs Does Not Allege That It Suffered Any **Harm Remediable By The Statute**" (Dkt. 59, p. 12, ll. 1-27; emphasis added). Mr. Tarbell has provided an analysis and discussion of the evidence to address the insufficiency of the original allegations. *See* Exh. 38: Decl. of Tarbell ¶¶ 3-13.

472.   First, Mr. Tarbell explains the security features of Sylabs' Server and Google Workspace:

> "One part of Google's security features is the audit logs that record users' actions on Sylabs access controlled computer systems. These audit logs provide Sylabs administrators a detailed list of security-relevant actions taken on their sensitive corporate files. These actions include, but are not limited to, trashing files, trashing folders, deleting files, and deleting folders."

*See* Exh. 38: Decl. of Tarbell ¶ 4.

LEPISCOPO & ASSOCIATES LAW FIRM

473.   Mr. Tarbell goes on to explain why Defendants' trashing or deletion of files constitutes the type of damage that is remediable under CFAA. In particular, Mr. Tarbell explains:

> "Google states that a user 'can remove Google Drive files and folders from… (Google Workspace) My Drive and shared drives…(with) trash or delete.' Files and folders in Google Workspace Drive can be **permanently deleted without moving the data to trash**. Any file or folder that is moved into trash is automatically deleted after 30 days. After a file is deleted, any other user that has been shared that file will lose access to the file."

*See* Exh. 38: Decl. of Tarbell ¶ 5 (emphasis added).

474.   Next, Mr. Tarbell connects the preceding explanation with Section 1030(e)(8) of the CFAA: "Damage, as defined in 18 USC § 1030(e)(8), is 'any impairment to the integrity or availability of data, a program, a system, or information.'" *See* Exh. 38: Decl. of Tarbell ¶ 6.

475.   Mr. Tarbell then goes  on explain that Sylabs has suffered cognizable damage that is remediable under CFAA:

> "Deleting and trashing, which are automatically deleted after 30 days, files and folders in Sylabs' Google Workspace is a damage. These files' availability to legitimate Sylabs' Google Workspace users was impaired."

*See* Exh. 38: Decl. of Tarbell ¶ 7.

476.   Further,  Mr. Tarbell explains that under Section 1030(e)(6) of CFAA Defendants' access to Sylabs' Server for the purpose of deleting and trashing Sylabs' data, files, and directories exceeded any authorized access they might have enjoyed. Further, Mr. Tarbell explains that under Section 1030(e)(6) of CFAA, Defendants' access to Sylabs' Server for the purpose of deleting and trashing Sylabs' data, files, and directories **exceeded any authorized access** they might have enjoyed under, for example, the IP Assignment/NDA Agreements (*see* Exhs. 48-52):

> "Exceeds authorized access, as defined in 18 USC § 1030(e)(6), is to access a computer with authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or

Lepiscopo & Associates Law Firm

alter. **<u>Deleting and trashing files, damaging the data, on a Sylabs'</u>** **<u>computer system after resigning from Sylabs is exceeding authorized</u>** **<u>access</u>**."

*See* Exh. 38: Decl. of Tarbell ¶ 13 (emphasis added). Whatever the outside scope may be interpreted to be, the IP Assignment/NDA Agreements do **not** authorize Defendants to engage in the unlawful acts alleged in this Complaint. *See* Sections II and V-VIII; *see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

477.     Finally, Mr. Tarbell provides examples of some of the Defendants' unlawful acts that caused Sylabs damage under Section 1030(e)(8):

"As KURTZER was walking out the door of Sylabs, after tendering his resignation, KURTZER deleted 142 folders (Exhibit 3) and 881 files (Exhibit 4).

Defendant Robert Adolph ("ADOLPH") trashed 24 files from Sylabs' Google Workspace between tendering his resignation and the effective date of his resignation. These trashed files would also be automatically deleted within 30 days.

Defendant Matthew Hayden ("HAYDEN") deleted a file from Sylabs' Google Workspace nine days after his resignation from Sylabs."

*See* Exh. 38: Decl. of Tarbell ¶¶ 8-12; Exhs. 3, 4, 19, 20, 34, 35, 44, and 45.

478.     Furthermore, notwithstanding the Trade Secret Protections, Conflict of Interest Policies, Technical Protections, and IP Assignment/NDA Agreements specifically created and utilized by Sylabs, the evidence proves that Defendants simply ignored and failed to comply with them and affirmatively conspired to circumvent them for purposes of causing cyber corruption, cyber destruction, and cyber theft of Sylabs' Trade Secrets. Consequently, Sylabs alleges that Defendants breached their IP Assignment/NDA Agreements with Sylabs. Further, Sylabs is informed and believes, and based on such information and belief alleges that these Defendants engaged in fraud in the procurement of the IP Assignment/NDA Agreements without having any intention of performing the promises made in their respective agreements. Accordingly, Sylabs has alleged separate

LEPISCOPO & ASSOCIATES LAW FIRM

breach of written contract and intentional misrepresentation counts against defendants Gregory Kurtzer, Matthew Hayden, Erin Fong, Robert Adolph, David Buss, Marlin Prager, and Open Drives, Inc., including requests for  punitive damages. *See* Counts XII-XXI below.

479.    As set forth in greater detail above, Defendants made significant and ongoing unlawful cyber intrusions into Sylabs' Server for the purposes of: (a) corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer files; and (j) cyber intrusion to Sylabs' computer directories. *See* Section II, ¶¶ 27-54 of this Complaint; *see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

480.    Unlawful Conduct Engaged In By Defendants After Mass Resignation From Sylabs. Sylabs is informed and believes, and based upon such information and belief alleges that in furtherance of their conspiracy with their codefendants, defendants Greg Kurtzer, Julia Kurtzer, Adolph, Hayden, Fong, Buss, and Prager, and, through their respective officers, defendants CIQ and Open Drives, agreed to a mass resignation from Sylabs but to continue engaging in unauthorized access even **after** they departed Sylabs on March 31, 2020. For example, between April 2, 2020 and April 15, 2020, defendants Greg Kurtzer, Adolph, Hayden, Julia Kurtzer, and Fong made significant and ongoing unlawful cyber intrusions into Sylabs' Server for the purposes of: (a) corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer files;

and (j) cyber intrusion to Sylabs' computer directories. *See* Section II, ¶¶ 27-54 of this Complaint; *see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

481. As alleged in greater detail this Count and in Sections II and V-VIII, above, the Defendants intended to and knowingly caused damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories, all of which occurred in the Northern District of California.

482. As alleged in greater detail in this Count and in Sections II and V-VIII, above, the Defendants intended to and knowingly caused damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories.

483. As alleged in greater detail in this Count and in Sections II and V-VIII, above, the Defendants clearly knew they would be causing damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories in contravention of CFAA, 18 U.S.C. § 1030.

484. As set forth in this Count, as well as in greater detail in Sections II and V-VIII, above, Sylabs has alleged sufficient facts and provided sufficient evidence to prove Defendants' cyber corruption and cyber destruction of Sylabs' server, data, folders, files, and directories. As a consequence, Sylabs has suffered actual, remediable damages under the CFAA due to Defendants' cyber corruption and cyber destruction in the form of monetary damages in an amount that exceeds $75,000:

(a) costs, wages, and fees incurred to discover Defendants' cyber intrusions to Sylabs' Server;

(b) costs, wages, and fees incurred to discover the harm caused to Sylabs' server, data, folders, files, and directories by Defendants' cyber intrusions, cyber corruption, and cyber destruction;

(c) costs, wages, and fees incurred to find, gather, and organize evidence of Defendants' cyber intrusions to Sylabs' Server;

LEPISCOPO & ASSOCIATES LAW FIRM

(d)  costs, wages, and fees incurred to find, gather, and organize evidence of the harm caused to Sylabs' server, data, folders, files, and directories by Defendants' cyber intrusions, cyber corruption, and cyber destruction;

(e)  costs, wages, and fees incurred to assess the evidence of Defendants' cyber intrusions to Sylabs' Server;

(f)  costs, wages, and fees incurred to assess the evidence of the harm caused to Sylabs' server, data, folders, files, and directories by Defendants' cyber intrusions, cyber corruption, and cyber destruction;

(g)  costs, wages, and fees incurred to conduct forensic analysis of the evidence of Defendants' cyber intrusions to Sylabs' Server;

(h)  costs, wages, and fees incurred to conduct forensic analysis of the evidence of the harm caused to Sylabs' server, data, folders, files, and directories by Defendants' cyber intrusions, cyber corruption, and cyber destruction;

(i)  costs, wages, and fees incurred to prepare forensic reports of the evidence of Defendants' cyber intrusions to Sylabs' Server;

(j)  costs, wages, and fees incurred to prepare forensic reports of the evidence of the harm caused to Sylabs' server, data, folders, files, and directories by Defendants' cyber intrusions, cyber corruption, and cyber destruction;

(k)  costs, wages, and fees incurred to remedy harm caused by Defendants' cyber intrusions to Sylabs' Server;

(l)  costs, wages, and fees incurred to remedy harm caused to Sylabs' server, data, folders, files, and directories by Defendants' cyber intrusions, cyber corruption, and cyber destruction;

(m) all other costs, wages, and fees incurred as a consequence of Defendants' cyber intrusions to Sylabs' Server; and

(n) all other costs, wages, and fees incurred as a consequence of Defendants' cyber corruption and cyber destruction to Sylabs' server, data, folders, files, and directories.

LEPISCOPO & ASSOCIATES LAW FIRM

485.    Sylabs has suffered the foregoing harm that is remediable under the CFAA in an amount that exceeds $75,000.

486.    As a direct consequence of Defendants' cyber corruption and cyber destruction, as alleged in this Count and in Sections II and V-VIII, Sylabs has suffered the requisite remediable harm under the CFAA. *See Van Buren* and *Sirius; see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

## COUNT III

## VIOLATIONS OF CALIFORNIA UNIFORM TRADE SECRETS ACT

## (Against All Defendants)

487.    The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

488.    In its MTD Order, this Court analyzed Sylabs' Defense of Trade Secrets Act ("DTSA") (Count I) and California's Uniform Trade Secrets Act ("CUTSA") (Count III) "claims together because the elements are substantially similar." *See* Dkt. 59, p. 8, ll. 22-24 (citation omitted). Further, the Court expressed concerns that Sylabs did not plead facts with sufficient particularity to establish Sylabs' Trade Secrets under DTSA and CUTSA: (a) Sylabs did not allege facts sufficient to show those aspects of its SIF technology **not** discussed in Sylabs' U.S. Patent Application No. US 2019/0377708 A1 ("Sylabs SIF Application") (*see* Exh. 54); and (b) Sylabs did not allege facts sufficient to show the policies, methods, and procedures it maintained to protect the secrecy of its Trade Secrets from being publicly disclosed (Dkt. 59, p. 8, l. 21 through p. 11, l. 27).

489.    Thus, Sylabs will address the Court's concerns with Sylabs' claims under CUTSA in this Count III in the same manner in which it addressed Sylabs' claims under DTSA in Count I. *See* Dkt. 59, p. 8, ll. 22-24.

490.    As determined by and set forth in this Court's MTD Order, between 2018 and 2020, Sylabs created five such value-added technologies constituting Sylabs' Trade Secrets: (1) SingularityPRO, (2) Singularity Image Format, SIF technology, (3) Singularity Enterprise, (4) Fuzzball and (5) Armored Containers. *See* MTD Order, Dkt. p. 2, ll. 7-11.

LEPISCOPO & ASSOCIATES LAW FIRM

491.   In its MTD Order, this Court indicated that: "[T]he definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." In identifying a trade secret at the pleading stage, a plaintiff "need not 'spell out the details of the trade secret,' but must minimally provide 'reasonable notice of the issues which must be at the time of trial and . . . provide reasonable guidance in ascertaining the scope of appropriate discovery.'" *See* MTD Order, Dkt. 59, p. 9, ll. 1-6.

492.   Under these elements, this Court made a finding that Sylabs sufficiently described SingularityPRO, Singularity Enterprise, Fuzzball, and Armored Containers as trade secrets for purposes of this Action: "Thus, Sylabs sufficiently describes four of its five purported trade secrets which are not publicly available." *See* MTD Order, Dkt. 59, p. 9, l. 17 through p. 11, l. 14.

493.   As to Sylabs' SIF Technology, this Court found that Sylabs did not sufficiently describe it because it failed to distinguish between what was publicly disclosed in its SIF Application (Exh. 54) and that which constitutes its trade secrets:

"While Sylabs may retain trade-secret protection over those aspects of SIF technology not published in its patent application, it fails to 'delineate the boundaries between its trade secrets and its information that has been made public through patents and patent applications. . . ' Rather, **Sylabs must simply allege with particularity those aspects of its SIF technology not discussed in its patent application**, and it does not do so in the Complaint."

*See* MTD Order, Dkt. 59, p. 10, ll. 7-10 (emphasis added).

494.   In order to cure this deficiency, this Court indicated that "Sylabs must simply allege with particularity those aspects of its SIF technology **not** discussed" in Sylabs' SIF Application (Exh. 54). *See* MTD Order, Dkt. 59, p. 10, ll. 14-16 (emphasis added).

495.   As to showing those aspects of its SIF technology **not** discussed in Sylabs' SIF Application, Sylabs has provided sufficient allegations below in Section II and Section VIII of this Complaint. *See* ¶¶ 167, 210, and 372, Figure 10).

496.   As to the  SIF Technology, as set forth below in greater detail in Section VI, ¶ 136, CIQ's Patents Based on Sylabs' Armored Containers Trade Secrets, CIQ's Patent

LEPISCOPO & ASSOCIATES LAW FIRM

Nos. US 11,055,428 (Exh. 41), US 11,163,902 (Exh. 42), and  US 11,321,064 (Exh. 43) are described and based upon the Armored Containers technology, which was born out of Sylabs' research and development starting in June of 2019. It is important to note that the Armored Containers technology that serves as the basis of CIQ's patents is **not** based on the technology disclosed in Sylabs' SIF Application for its SIF technology. *See* ¶ 57; ¶ 369, Figure 10).

497.    Sylabs alleges as follows to cure the aforementioned deficiencies. Specifically, Sylabs alleges that the following SIF technology components were not disclosed in Sylabs' SIF Application (Exh. 54) or Sylabs' SIF Patent (Exh. 55) but were stolen and used by Defendants to procure the Armored Container patents. For example, CIQ patent 11,055,428 (Exh. 41) specifically mentions this type of approach for another format of container images, namely OCI container images. Sylabs has never publicly disclosed the Trade Secrets underlying the specific method of encrypting container images as it pertains to OCI images but has been developing this as part of its secret "Armored Containers" project, well before Defendants left Sylabs. Thus, these are Sylabs' Trade Secrets, which were stolen by Defendants to develop and unlawfully and fraudulently procure their Patent Nos. US 11,055,428 (Exh. 41), US 11,163,902 (Exh. 42), and US 11,321,064 (Exh. 43).

498.    Sylabs' Trade Secrets constitute information, including systems and methods, code, compilations, programs, devices, methods, techniques, or processes that derive independent economic value from not being generally known to the public or other persons who can obtain significant economic value from the Trade Secrets' disclosure.

499.    Sylabs' Trade Secrets were (and currently are) valuable and were secret and not publicly available but for Defendants' cyber corruption, cyber destruction, and cyber theft. In particular, after stealing, open-sourcing, patenting, employing, and marketing Sylabs' Trade Secrets, Defendants initially raised $26,000,000, reaching a total of

LEPISCOPO & ASSOCIATES LAW FIRM

$33,000,000 raised to date, and according to defendant Greg Kurtzer, CIQ now has an enterprise value of $150,000,000.[31]

500.   As mentioned, the MTD Order indicates that Sylabs needs to identify and allege the specific policies, methods, and procedures utilized by Sylabs to protect its Trade Secrets (*see* Dkt. 59, p. 11, ll. 13-17).

501.   At all times mentioned herein, Sylabs has taken more than adequate measures to protect the secrecy of Sylabs' Trade Secrets. In particular, and as set forth in greater detail above in Section II, ¶¶ 58-84, Sylabs has very specific policies, methods, and procedures for protecting the secrecy of Trade Secrets: (a) Sylabs' Trade Secret Protections; (b) Conflict of Interest Policies; (c) Technical Protections; and (d) IP Assignment/NDA Agreements. Sylabs' policies, methods, and procedures are powerful and designed to protect the secrecy of Sylabs' Trade Secrets. *See* Exh. 38: Decl. of Tarbell ¶¶ 4 & 5; Exhs. 47-52.

502.   Generally, Sylabs' Server and Google Workspace provide security for the protection of Sylabs' Trade Secrets. *See* Exh. 38: Decl. of Tarbell ¶¶ 3-5. Of course, this type of security was nullified by Defendants through their unlawful and unauthorized intrusions into Sylabs' Server when they were insider threats and external threats. Specifically, Mr. Tarbell provides numerous factual examples of Defendants' insider threats and external cyber intrusions into Sylabs' Server. *See* Exh. 38: Decl. of Tarbell ¶¶ 29-127; Exhs. 2-36, 57, 44, & 45.

503.   Sylabs utilized a protective server environment for its data, files, and directories. Specifically, Sylabs utilized Google Workspace, which is a cloud computing-based service that many companies utilize for employees to collaborate, store, and share files. Workspace has a robust logging feature that allows the auditing of employee activities within this environment. *See* Exh. 38: Decl. of Tarbell ¶ 4.

---

[31]   *See*: https://siliconangle.com/2022/05/12/ciq-raises-26m-promote-free-alternative-red-hat-linux/.

LEPISCOPO & ASSOCIATES LAW FIRM

504.  Sylabs utilized Workspace features such as Google Drive to securely store, edit, and work together on sensitive corporate files. Sylabs employed these Google Workspace tools in part to ensure the security of their company secrets and sensitive data. *See* Exh. 38: Decl. of Tarbell ¶ 5.

505.  In addition to the Trade Secret Protections, Sylabs maintained Conflict of Interest Policies to not only ensure secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets and those having knowledge of those Trade Secrets from being utilized as a means of **competing against Sylabs**—in the way that CIQ is competing against Sylabs after stealing Sylabs' Trade Secrets. *See* Exh. 47.

506.  In addition to the Trade Secret Protections and Conflict of Interest Policies, Sylabs maintained and utilized the Technical Protections to not only maintain secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets and those having knowledge of those Trade Secrets from being utilized as a means of competing against Sylabs. So, for example, during all times relevant to this Action, Sylabs took steps to ensure that all source code and other materials related to its Fuzzball and Armored Containers Trade Secrets were kept secret, as is the general practice for other closed source Sylabs projects/products such as SingularityPRO and Singularity Enterprise. Thus, source code, technical documentation, and planning material are stored in private server projects, and access to the projects was strictly limited on a need-to-know basis even within Sylabs. As is common practice at technology firms, Sylabs' employees, including Defendants, execute IP Assignment/NDA Agreements. *See* Exhs. 48-52.

507.  By way of an actual example, during the relevant timeframe of this Action, Sylabs was engaged in pursuing business with the United States Government. So, for example, when Sylabs responded to the U.S. Government's request for proposal, which is titled "Open Call for Innovative Defense-Related Dual-Purpose Technologies/Solutions with a Clear Air Force Stakeholder" ("RFP") it included in this RFP, as well as other proposals, the following Notice (*see* Exh. 53):

"This proposal includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed-in whole or in

LEPISCOPO & ASSOCIATES LAW FIRM

part-for any purpose other than to evaluate this proposal. If, however, a contract is awarded to this offeror as a result of-or in connection with-the submission of this data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. . ."

508.    In addition to the Trade Secret Protections, Conflict of Interest Policies, and Technical Protections, Sylabs also utilized IP Assignment/NDA Agreements to not only maintain secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets from being utilized and those having knowledge of those Trade Secrets from utilizing them as a means of competing against Sylabs. *See* Exhs. 47-52.

509.    Notwithstanding the Trade Secret Protections, Conflict of Interest Policies, Technical Protections, and IP Assignment/NDA Agreements specifically created and utilized by Sylabs, Defendants simply ignored and failed to comply with them and affirmatively conspired to circumvent them for purposes of causing cyber corruption, cyber destruction, and cyber theft of Sylabs' Trade Secrets.  Consequently, Sylabs alleges that Defendants breached their IP Assignment/NDA Agreements with Sylabs. Further, Sylabs is informed and believes, and based on such information and belief alleges that these Defendants engaged in fraud in the procurement of the IP Assignment/NDA Agreements without having any intention of performing the promises made in their respective agreements. Accordingly, Sylabs has alleged separate breach of written contract and intentional misrepresentation counts against defendants Gregory Kurtzer, Matthew Hayden, Erin Fong, Robert Adolph, David Buss, Marlin Prager, and Open Drives, Inc., including requests for  punitive damages. *See* Counts XII-XXI, below.

510.    As set forth in greater detail above, Defendants made significant and ongoing unlawful cyber intrusions into Sylabs' Server for the purposes of: (a) corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer

LEPISCOPO & ASSOCIATES LAW FIRM

files; (j) cyber intrusion to Sylabs' computer directories; (k) cyber theft of Sylabs' Trade Secrets; and (l) cyber misappropriation of Sylabs' Trade Secrets. *See* Section II, ¶¶ 27-54 of this Complaint; *see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

511. Unlawful Conduct Engaged In By Defendants After Mass Resignation From Sylabs. Sylabs is informed and believes, and based upon such information and belief alleges that in furtherance of their conspiracy with their codefendants, defendants Greg Kurtzer, Julia Kurtzer, Adolph, Hayden, Fong, Buss, and Prager, and, through their respective officers, defendants CIQ and Open Drives, agreed to a mass resignation from Sylabs but to continue engaging in unauthorized access even **after** they departed Sylabs on March 31, 2020. For example, between April 2, 2020 and April 15, 2020, defendants Greg Kurtzer, Adolph, Hayden, Julia Kurtzer, and Fong made significant and ongoing unlawful cyber intrusions into Sylabs' Server for the purposes of: (a) corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer files; (j) cyber intrusion to Sylabs' computer directories; (k) cyber theft of Sylabs' Trade Secrets; and (l) cyber misappropriation of Sylabs' Trade Secrets. *See* Section II, ¶¶ 27-54 of this Complaint; *see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

512. As alleged in greater detail in this Count and in Sections II and V-VIII, above, Defendants' actions constitute actual, and threatened and ongoing violations under CUTSA, California Civil Code §§ 3426 *et seq.*: (a) cyber corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs'

LEPISCOPO & ASSOCIATES LAW FIRM

computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer files; (j) cyber intrusion to Sylabs' computer directories; (k) cyber theft of Sylabs' Trade Secrets; and (l) cyber misappropriation of Sylabs' Trade Secrets. *See* Section II, ¶¶ 27-54 of this Complaint; *see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

513. At all times relevant to this Complaint, Sylabs owned Sylabs' Trade Secrets as Sylabs is the entity in which rightful legal or equitable title to Sylabs' Trade Secrets is reposed.

514. As alleged in greater detail in this Count and in Sections II and V-VIII, above, Defendants intended to and knowingly caused damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories, and accessed Sylabs' Server without authorization and disclosed, acquired, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Sylabs' Trade Secrets. They performed such acts in furtherance of the conspiracy and to perpetrate the theft and misappropriation of Sylabs' Trade Secrets in the Northern District of California.

515. As alleged in greater detail in this Count and in Sections II and V-VIII, above, the Defendants intended to and knowingly caused damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories and stole and misappropriated Sylabs' Trade Secrets through cyber theft, and then perpetrated a fraud on the USPTO by submitting fraudulent patent applications to the USPTO and receiving fraudulently obtained patents, to wit: US 10,970,113 (Exh. 37); US 11,099,893 (Exh. 39); US 11,310,342 (Exh. 40); US 11,055,428 (Exh. 41); US 11,163,902 (Exh. 42); and US 11,321,064 (Exh. 43) (*i.e.*, the Stolen Patents).

516. As alleged in greater detail in Sections II and V-VIII, above, the Defendants acquired, used, or disclosed Sylabs' Trade Secrets, knowing that they were stolen and misappropriated, obtained, or converted through Defendants' cyber theft of Sylabs' Trade Secrets without Sylabs' consent or authorization. Further, the Defendants intentionally

LEPISCOPO & ASSOCIATES LAW FIRM

engaged in these acts to benefit themselves, with the knowledge and/or intent that these acts would injure Sylabs and cause damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories.

517.   The cyber corruption, cyber destruction, cyber theft and use of Sylabs' Trade Secrets by Defendants was without Sylabs' authorization, and Sylabs did not consent to their cyber corruption, cyber destruction, cyber theft, acquisition, disclosure, or use of Sylabs' Trade Secrets.

518.   At all times mentioned in this Complaint, the Defendants intended to corrupt and cause damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories and to convert, misappropriate, and steal Sylabs' Trade Secrets to and for their own use and benefit and for their own enrichment.

519.   As alleged in greater detail in Sections II and V-VIII, above, the Defendants clearly knew and intended that Sylabs, as the owner of the Sylabs' Trade Secrets would be damaged by their actions.

520.   As alleged in greater detail in this Count and in Sections II and V-VIII, above, as a result of the Defendants' cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets, Sylabs has suffered actual damages in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

521.   As alleged in greater detail in this Count and in Sections II and V-VIII, above, as a result of the Defendants' cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets, Defendants have been unjustly enriched.

522.   As alleged in greater detail in this Count and in Sections II and V-VIII, above, as a result of the Defendants' cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets, Sylabs requests that the Court issue an order that all right, title, and interest in and to the Stolen Patents be divested from defendant CIQ and fully vested in Sylabs, and that the currently listed inventors in the Stolen Patents be removed and replaced with the names of Sylabs' relevant employees as the sole inventors.

LEPISCOPO & ASSOCIATES LAW FIRM

523. Sylabs further pleads entitlement to a reasonable royalty from each of the Stolen Patents to compensate Sylabs for Defendants' cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

524. Sylabs further pleads entitlement to a disgorgement of profits received from each of the Stolen Patents to compensate Sylabs for Defendants' cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

525. Sylabs further pleads entitlement to all funds Defendants have raised due to their cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets in an amount to be proven at trial but in an amount that exceeds $25,000,000.

526. As alleged in greater detail in Sections II and V-VIII, above, the Defendants intended to and knowingly stole through cyber theft from Sylabs' Server and, without authorization, disclosed, acquired, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Sylabs' Trade Secrets. They performed such acts in furtherance of the conspiracy and to perpetrate the theft and misappropriation of Sylabs' Trade Secrets in the Northern District of California.

527. As alleged in greater detail in Sections II and V-VIII, above, the Defendants intended to and knowingly committed cyber corruption, cyber destruction, and stole Sylabs' Trade Secrets through cyber theft and then perpetrated a fraud on the USPTO by submitting fraudulent patent applications to the USPTO and receiving approval and issuance of the Stolen Patents.

528. The use of Sylabs' Trade Secrets by Defendants was without Sylabs' authorization, and Sylabs did not consent to their acquisition, disclosure, or use of Sylabs' Trade Secrets.

529. At all times mentioned in this Complaint, the Defendants intended to convert Sylabs' Trade Secrets to their own use and benefit.

LEPISCOPO & ASSOCIATES LAW FIRM

530.   As alleged in greater detail in Sections II and V-VIII, above, the Defendants clearly knew and intended that Sylabs, as the owner of the Sylabs' Trade Secrets would be injured by their actions.

531.   As alleged in greater detail in Sections II and V-VIII, above, the Defendants clearly knew that obtaining and using Sylabs' Trade Secrets for their own interests and benefit but not for Sylabs' benefit exceeded their authority to use Sylabs' Trade Secrets in contravention of CUTSA, California Civil Code §§ 3426 et seq.

532.   As a result of the Defendants' cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets, Sylabs has suffered actual damages in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

533.   As a result of the Defendants' cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets, Defendants have been unjustly enriched.

534.   As a result of the Defendants' cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets, Sylabs requests that the Court issue an order that all right, title, and interest in and to the Stolen Patents be divested from defendant CIQ and fully vested in Sylabs, and that the currently listed inventors in the Stolen Patents (Exhs. 34 and 39-43) be removed and replaced with the names of Sylabs' relevant employees as the sole inventors.

535.   Pursuant to CUTSA, California Civil Code § 3426.1, Sylabs further pleads entitlement to a reasonable royalty from each of the Stolen Patents (Exhs. 34 and 39-43) to compensate Sylabs for Defendants' cyber theft and misappropriation of Sylabs' Trade Secrets in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

536.   Pursuant to CUTSA, California Civil Code § 3426.1, Sylabs further pleads entitlement to a disgorgement of profits received from each of the Stolen Patents (Exhs. 34 and 39-43) to compensate Sylabs for Defendants' cyber theft and misappropriation of Sylabs' Trade Secrets in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

LEPISCOPO & ASSOCIATES LAW FIRM

537.   Pursuant to CUTSA, California Civil Code § 3426.1, Sylabs further pleads entitlement to all funds Co-Conspirators have raised due to their cyber theft and misappropriation of Sylabs' Trade Secrets in an amount to be proven at trial but in an amount that exceeds $25,000,000.

538.   As alleged in greater detail in Sections II and V-VIII, above, the Co-Conspirators' cyber theft and misappropriation of Sylabs' Trade Secrets has caused and will continue to cause Sylabs irreparable and substantial injury and therefore cannot be fully redressed through damages alone.

539.   As already demonstrated in Sections II and V-VIII, above, if Co-Conspirators were permitted to continue to use and disseminate Sylabs' Trade Secrets, then Sylabs would be irreparably harmed and the economic damages to Sylabs would be difficult to quantify. An injunction prohibiting Co-Conspirators from further acquisition, disclosure, use, and possession of Sylabs' Trade Secrets is necessary to provide Sylabs with complete relief.

540.   Pursuant to CUTSA, California Civil Code § 3426.1, Sylabs requests injunctive relief , as Co-Conspirators' wrongful conduct alleged herein by their cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets will continue unless enjoined and restrained by this Court  and will cause great and irreparable injury to Sylabs' business, and it could cause Co-Conspirators to have improper advantages, positions, and rights in the marketplace to Sylabs' detriment. Absent injunctive relief, Co-Conspirators' further disclosure and use of Sylabs' Trade Secrets could irreparably harm Sylabs.

541.   As alleged in greater detail in Sections II and V-VIII, above, the Co-Conspirators' cyber corruption, cyber destruction, and cyber theft and misappropriation of Sylabs' Trade Secrets was willful and malicious based on the facts alleged herein. Co-Conspirators acted with a purpose and willingness to commit the acts alleged, and Co-Conspirators' conduct was not reasonable under the circumstances. Sylabs is therefore entitled to exemplary damages and attorney fees and costs. Sylabs further seeks exemplary

damages against Defendants in an amount up to two times the amount of Sylabs' actual damages according to proof under CUTSA, California Civil Code § 3426.1.

**COUNT IV**

**VIOLATIONS OF CIVIL RICO, 18 U.S.C. § 1962(c)**

**(Against All Defendants)**

542. The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

543. In its MTD Order, this Court found that Sylabs' Count IV for RICO fails because it relied upon Sylabs' Count I (i.e., violation of the DTSA) as its Predicate Acts to establish RICO, which this Court held Sylabs failed to establish in the original complaint:

> "Sylabs selects Defendants' alleged violations of the DTSA as the necessary predicate acts. *See* Complaint ¶¶ 187-88; *see also* CIQ Opposition at 22-23; IAG Opposition at 22-23; 18 U.S.C. § 1961(1). Its Section 1962(c) claim therefore fails, **because Sylabs does not sufficiently allege any DTSA violations.**"

*See* MTD Order, Dkt. 59, p.13, ll. 6-10 (emphasis added).

544. It follows, therefore, that if Sylabs' cures the deficiencies with violations of DTSA (Count I), then Sylabs' RICO claim in this Count (and Count V as well) is sufficiently pleaded. *Id.*

545. It is also important to note for purposes of alleging the Predicate Acts under the RICO Act claims alleged in Counts IV and V, that the allegations set forth herein constitute not only civil claims but also Defendants' violation of federal **criminal** statutes, including, for example: 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1030(a)(4) (Computer Fraud), 18 U.S.C. § 1030(a)(2) (Theft of Information from a Computer), 18 U.S.C. § 1030(b) (Conspiring to Violate the CFAA), and 18 U.S.C. § 1030(a)(5)(B) (Recklessly Damaging a Computer).

546. As determined by and set forth in this Court's MTD Order, between 2018 and 2020, Sylabs created five value-added technologies constituting Sylabs' Trade Secrets: (1) SingularityPRO, (2) Singularity Image Format, SIF technology, (3) Singularity Enterprise, (4) Fuzzball and (5) Armored Containers. *See* MTD Order, Dkt. p. 2, ll. 7-11.

LEPISCOPO & ASSOCIATES LAW FIRM

547.    In its MTD Order, this Court indicated that: "[T]he definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." In identifying a trade secret at the pleading stage, a plaintiff "need not 'spell out the details of the trade secret,' but must minimally provide 'reasonable notice of the issues which must be at the time of trial and . . . provide reasonable guidance in ascertaining the scope of appropriate discovery.'" *See* MTD Order, Dkt. 59, p. 9, ll. 1-6.

548.    Under these elements, this Court made a finding that Sylabs sufficiently described SingularityPRO, Singularity Enterprise, Fuzzball, and Armored Containers as trade secrets for purposes of this Action: "Thus, Sylabs sufficiently describes four of its five purported trade secrets which are not publicly available." *See* MTD Order, Dkt. 59, p. 9, l. 17 through p. 11, l. 14.

549.    As to Sylabs' SIF Technology, this Court found that Sylabs did **not** sufficiently describe it because it failed to distinguish between what was publicly disclosed in its SIF Application (Exh. 54) and that which constitutes its trade secrets:

"While Sylabs may retain trade-secret protection over those aspects of SIF technology not published in its patent application, it fails to 'delineate the boundaries between its trade secrets and its information that has been made public through patents and patent applications. . . ' Rather, **Sylabs must simply allege with particularity those aspects of its SIF technology not discussed in its patent application**, and it does not do so in the Complaint."

*See* MTD Order, Dkt. 59, p. 10, ll. 7-10 (emphasis added).

550.    In order to cure this deficiency, this Court indicated that "Sylabs must simply allege with particularity those aspects of its SIF technology **not** discussed" in Sylabs' SIF Application (Exh. 54). *See* MTD Order, Dkt. 59, p. 10, ll. 14-16 (emphasis added).

551.    As to showing those aspects of its SIF technology **not** discussed in Sylabs' SIF Application, Sylabs has provided sufficient allegations in Section II and Sections V-VIII of this Complaint. *See* ¶ 58; ¶ 372, Figure 10).

552.    As to the  SIF Technology, as set forth below in greater detail in Section VI, ¶ 136, CIQ's Patents Based on Sylabs' Armored Containers Trade Secrets, CIQ's Patent

Nos. US 11,055,428 (Exh. 41), US 11,163,902 (Exh. 42), and US 11,321,064 (Exh. 43) are described and based upon Sylabs' Armored Containers technology, which was born out of Sylabs' research and development starting in June of 2019. It is important to note that the Armored Containers technology that serves as the basis of CIQ's patents is **not** based on the technology disclosed in Sylabs' SIF Application for its SIF technology. *See* ¶ 58; ¶ 372, Figure 10).

553.    Sylabs alleges as follows to cure the aforementioned deficiencies. Specifically, Sylabs alleges that the following SIF technology components were not disclosed in Sylabs' SIF Application (Exh. 54) or Sylabs' SIF Patent (Exh. 55) but were stolen and used by Defendants to procure the Armored Container patents. For example, CIQ patent 11,055,428 (Exh. 41) specifically mentions this type of approach for another format of container images, namely OCI container images. Sylabs has never publicly disclosed the Trade Secrets underlying the specific method of encrypting container images as it pertains to OCI images but has been developing this as part of its secret "Armored Containers" project, well before Defendants left Sylabs. Thus, these are Sylabs' Trade Secrets, which were stolen by Defendants to develop and unlawfully and fraudulently procure their Patent Nos. US 11,055,428 (Exh. 41), US 11,163,902 (Exh. 42), and US 11,321,064 (Exh. 43).

554.    Sylabs' Trade Secrets constitute information, including systems and methods, code, compilations, programs, devices, methods, techniques, or processes that derive independent economic value from not being generally known to the public or other persons who can obtain significant economic value from the Trade Secrets' disclosure, and all of which is intended to be placed in interstate and foreign commerce.

555.    Sylabs' Trade Secrets were (and currently are) valuable and were secret and not publicly available but for Defendants' cyber corruption, cyber destruction, and cyber theft. In particular, after stealing, open-sourcing, patenting, employing, and marketing Sylabs' Trade Secrets, Defendants initially raised $26,000,000, reaching a total of

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

1   $33,000,000 raised to date, and according to defendant Greg Kurtzer, CIQ now has an
2   enterprise value of $150,000,000.[32]

3   556.   As mentioned, the MTD Order indicates that Sylabs needs to identify and
4   allege the specific policies, methods, and procedures utilized by Sylabs to protect its Trade
5   Secrets (*see* Dkt. 59, p. 11, ll. 13-17).

6   557.   At all times mentioned herein, Sylabs has taken more than adequate measures
    to protect the secrecy of Sylabs' Trade Secrets. In particular, and as set forth in greater
7   detail above in Section II, ¶¶ 59-85, Sylabs has very specific policies, methods, and
8   procedures for protecting the secrecy of its Trade Secrets: (a) Sylabs' Trade Secret
9   Protections; (b) Conflict of Interest Policies; (c) Technical Protections; and (d) IP
10  Assignment/NDA Agreements. Sylabs' policies, methods, and procedures are powerful
11  and designed to protect the secrecy of Sylabs' Trade Secrets. *See* Exh. 38: Decl. of Tarbell
12  ¶¶ 4 & 5; Exhs. 47-52.

13  558.   Generally, Sylabs' Server and Google Workspace provide security for the
14  protection of Sylabs' Trade Secrets. *See* Exh. 38: Decl. of Tarbell ¶¶ 3-5. Of course, this
15  type of security was nullified by Defendants through their unlawful and unauthorized
16  intrusions into Sylabs' Server when they were insider threats and external threats.
17  Specifically, Mr. Tarbell provides numerous factual examples of Defendants' insider
    threats and external cyber intrusions into Sylabs' Server. *See* Exh. 38: Decl. of Tarbell ¶¶
18  29-127; Exhs. 2-36, 57, 44, & 45.

19
20  559.   Sylabs utilized a protective server environment for its data, files, and
    directories. Specifically, Sylabs utilized Google Workspace, which is a cloud computing-
21  based service that many companies utilize for employees to collaborate, store, and share
22  files. Workspace has a robust logging feature that allows the auditing of employee activities
23  within this environment. *See* Exh. 38: Decl. of Tarbell ¶ 4.

24

25

26
    [32]   *See*: https://siliconangle.com/2022/05/12/ciq-raises-26m-promote-free-
27         alternative-red-hat-linux/.

28

560.    Sylabs utilized Workspace features such as Google Drive to securely store, edit, and work together on sensitive corporate files. Sylabs employed these Google Workspace tools in part to ensure the security of their company secrets and sensitive data. *See* Exh. 38: Decl. of Tarbell ¶ 5.

561.    In addition to the Trade Secret Protections, Sylabs maintained Conflict of Interest Policies to not only ensure secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets from being utilized and those having knowledge of those Trade Secrets from utilizing them as a means of **competing against Sylabs**—in the way that CIQ is competing against Sylabs after stealing Sylabs' Trade Secrets. *See* Exh. 47.

562.    In addition to the Trade Secret Protections and Conflict of Interest Policies, Sylabs maintained and utilized the Technical Protections to not only maintain secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets from being utilized and those having knowledge of those Trade Secrets from utilizing them as a means of competing against Sylabs. So, for example, during all times relevant to this Action, Sylabs took steps to ensure that all source code and other materials related to its Fuzzball and Armored Containers Trade Secrets were kept secret, as is the general practice for other closed source Sylabs projects/products such as SingularityPRO and Singularity Enterprise. Thus, source code, technical documentation, and planning material are stored in private server projects, and access to the projects was strictly limited on a need-to-know basis even within Sylabs. As is common practice at technology firms, Sylabs' employees, including Defendants, execute IP Assignment/NDA Agreements. *See* Exhs. 48-52.

563.    By way of an actual example, during the relevant timeframe of this Action, Sylabs was engaged in pursuing business with the United States Government. So, for example, when Sylabs responded to the U.S. Government's request for proposal, which is titled "Open Call for Innovative Defense-Related Dual-Purpose Technologies/Solutions with a Clear Air Force Stakeholder" ("RFP"). Included in this RFP, as well as other proposals, was the following Notice (*see* Exh. 53):

> "This proposal includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed-in whole or in

LEPISCOPO & ASSOCIATES LAW FIRM

part-for any purpose other than to evaluate this proposal. If, however, a contract is awarded to this offeror as a result of-or in connection with-the submission of this data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. . ."

564.    In addition to the Trade Secret Protections, Conflict of Interest Policies, and Technical Protections, Sylabs also utilized IP Assignment/NDA Agreements to not only maintain secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets from being utilized and those having knowledge of those Trade Secrets from utilizing them as a means of competing against Sylabs. *See* Exhs. 47-52.

565.    Notwithstanding the Trade Secret Protections, Conflict of Interest Policies, Technical Protections, and IP Assignment/NDA Agreements specifically created and utilized by Sylabs, Defendants simply ignored and failed to comply with them and affirmatively conspired to circumvent them for purposes of causing cyber corruption, cyber destruction, and cyber theft of Sylabs' Trade Secrets.  Consequently, Sylabs alleges that Defendants breached their IP Assignment/NDA Agreements with Sylabs. Further, Sylabs is informed and believes, and based on such information and belief alleges that these Defendants engaged in fraud in the procurement of the IP Assignment/NDA Agreements without having any intention of performing the promises made in their respective agreements. Accordingly, Sylabs has alleged separate breach of written contract and intentional misrepresentation counts against defendants Gregory Kurtzer, Matthew Hayden, Erin Fong, Robert Adolph, David Buss, Marlin Prager, and Open Drives, Inc., including requests for  punitive damages. *See* Counts XII-XXI below.

566.    As set forth in greater detail above, Defendants made significant and ongoing unlawful cyber intrusions into Sylabs' Server for the purposes of: (a) corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer

LEPISCOPO & ASSOCIATES LAW FIRM

files; (j) cyber intrusion to Sylabs' computer directories; (k) cyber theft of Sylabs' Trade Secrets; (l) cyber misappropriation of Sylabs' Trade Secrets; (m) cyber theft of Sylabs' Corporate Assets; (n) cyber misappropriation of Sylabs' Corporate Assets; (o) cyber theft of Sylabs' Corporate Secrets; and (p) cyber misappropriation of Sylabs' Corporate Secrets. *See* Section II, ¶¶ 27-54 of this Complaint; *see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

567.    Unlawful Conduct Engaged In By Defendants After Mass Resignation From Sylabs. Sylabs is informed and believes, and based upon such information and belief alleges that in furtherance of their conspiracy with their codefendants, defendants Greg Kurtzer, Julia Kurtzer, Adolph, Hayden, Fong, Buss, and Prager, and, through their respective officers, defendants CIQ and Open Drives, agreed to a mass resignation from Sylabs but to continue engaging in unauthorized access even **after** they departed Sylabs on March 31, 2020. For example, between April 2, 2020 and April 15, 2020, defendants Greg Kurtzer, Adolph, Hayden, Julia Kurtzer, and Fong made significant and ongoing unlawful cyber intrusions into Sylabs' Server for the purposes of: (a) corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer files; (j) cyber intrusion to Sylabs' computer directories; (k) cyber theft of Sylabs' Trade Secrets; (l) cyber misappropriation of Sylabs' Trade Secrets; (m) cyber theft of Sylabs' Corporate Assets; (n) cyber misappropriation of Sylabs' Corporate Assets; (o) cyber theft of Sylabs' Corporate Secrets; and (p) cyber misappropriation of Sylabs' Corporate Secrets. *See* Section II, ¶¶ 27-54 of this Complaint; *see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

568.    As alleged in greater detail in this Count and in Sections II and V-VIII, above, Defendants' actions constitute actual, and threatened and ongoing violations of under

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

CUTSA, California Civil Code §§ 3426 *et seq*.: (a) cyber corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer files; (j) cyber intrusion to Sylabs' computer directories; (k) cyber theft of Sylabs' Trade Secrets; (l) cyber misappropriation of Sylabs' Trade Secrets; (m) cyber theft of Sylabs' Corporate Assets; (n) cyber misappropriation of Sylabs' Corporate Assets; (o) cyber theft of Sylabs' Corporate Secrets; and (p) cyber misappropriation of Sylabs' Corporate Secrets.  *See* Section II, ¶¶ 27-54 of this Complaint; *see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

569.    As alleged in greater detail in this Count and in Sections II and V-VIII, above, Defendants intended to and knowingly caused damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories, and  accessed Sylabs' Server without authorization and disclosed, acquired, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets. They performed such acts in furtherance of the conspiracy and to perpetrate the theft and misappropriation of Sylabs' Trade Secrets, Corporate Assets, and/or Corporate Secrets in the Northern District of California.

570.    As alleged in greater detail in this Count and in Sections II and V-VIII, above, the Defendants intended to and knowingly caused damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories and stole and misappropriated Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets through cyber theft and then perpetrated a fraud on the USPTO by submitting fraudulent patent applications to the USPTO and receiving fraudulently obtained patents, to wit: US 10,970,113 (Exh. 37); US 11,099,893 (Exh. 39); US 11,310,342 (Exh. 40); US 11,055,428 (Exh. 41); US 11,163,902 (Exh. 42); and US 11,321,064 (Exh. 43) (*i.e.*, the Stolen Patents).

571.    As alleged in greater detail in Sections II and V-VIII, above, the Defendants acquired, used, or disclosed Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets knowing that they were stolen and misappropriated, obtained, or converted through Defendants' cyber theft of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets without Sylabs' consent or authorization. Further, the Defendants intentionally engaged in these acts to benefit themselves, with the knowledge and/or intent that these acts would injure Sylabs and cause damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories.

572.    The cyber corruption, cyber destruction, cyber theft and use of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets was without Sylabs' authorization, and Sylabs did not consent to their cyber corruption, cyber destruction, cyber theft, acquisition, disclosure, or use of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets.

573.    At all times mentioned in this Complaint, the Defendants intended to corrupt and cause damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories and to convert, misappropriate, and steal Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets to their own use and benefit and for their own enrichment.

574.    As alleged in greater detail in Sections II and V-VIII and pursuant to 18 U.S.C § 1961(4), the Defendants formed an association-in-fact enterprise (the "Enterprise") to engage in activities to affect interstate and foreign commerce by conspiring and collaborating to plan and effectuate the interstate cyber corruption, cyber destruction of Sylabs' Server, data, folders, files, and directories, and theft and sale of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets. The Enterprise operated in and through the instrumentalities of interstate and foreign commerce and within in this District.

575.    As alleged in greater detail in Sections II and V-VIII and pursuant to 18 U.S.C § 1961(1), the Enterprise's interstate cyber corruption, cyber destruction of Sylabs' Server, data, folders, files, and directories, and theft and sale of Sylabs' Trade Secrets,

LEPISCOPO & ASSOCIATES LAW FIRM

Corporate Assets, and Corporate Secrets constitutes racketeering activity under RICO, all of which was operated in and through the instrumentalities of interstate and foreign commerce and within this District.

576.    As alleged in greater detail in Sections II and V-VIII and pursuant to 18 U.S.C § 1961(5), the Enterprise's interstate cyber corruption, cyber destruction of Sylabs' Server, data, folders, files, and directories, and theft and sale of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets constitutes a pattern of racketeering activity under RICO, all of which was operated in and through the instrumentalities of interstate and foreign commerce and within in this District.

577.    As alleged in greater detail in Sections II and V-VIII, as a direct and proximate result of racketeering activities and violations of 18 U.S.C. § 1962(c) by the Enterprise, which operated in and through the instrumentalities of interstate and foreign commerce and within this District, Sylabs has suffered economic damages both domestically and abroad, including, but not limited to, injuries in the Northern District of California, in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

578.    As alleged in greater detail in Sections II and V-VIII, the aforementioned acts of the Enterprise, which operated in and through the instrumentalities of interstate and foreign commerce and within this District, were done willfully, with malice toward Sylabs, entitling Sylabs to treble damages, attorneys' fees, and costs.

579.    As alleged in greater detail in Sections II and V-VIII, the Enterprise's racketeering activities and violations of 18 U.S.C. § 1962(c), which operated in and through the instrumentalities of interstate and foreign commerce and within this District, has caused and will continue to cause Sylabs irreparable and substantial injury and therefore cannot be fully redressed through damages alone. An injunction prohibiting the Enterprise from further acquisition, disclosure, use, and possession of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets is necessary to provide Sylabs with complete relief.

580.    If the Enterprise is permitted to continue to engage in their racketeering activities and violations of 18 U.S.C. § 1962(c), which operates in and through the

LEPISCOPO & ASSOCIATES LAW FIRM

instrumentalities of interstate and foreign commerce, Sylabs would be irreparably harmed and the economic damages to Sylabs will be difficult to quantify.

**COUNT V**

**VIOLATIONS OF CIVIL RICO, 18 U.S.C. § 1962(d)**

**(Against All Defendants)**

581.   The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

582.   In its MTD Order, this Court found that Sylabs' Count IV for RICO fails because it relied upon Sylabs' Count I (i.e., violation of the DTSA) as its Predicate Acts to establish RICO, which this Court held Sylabs failed to establish in the original complaint:

"Sylabs selects Defendants' alleged violations of the DTSA as the necessary predicate acts. *See* Complaint ¶¶ 187-88; *see also* CIQ Opposition at 22-23; IAG Opposition at 22-23; 18 U.S.C. § 1961(1). Its Section 1962(c) claim therefore fails, **because Sylabs does not sufficiently allege any DTSA violations**."

*See* MTD Order, Dkt. 59, p.13, ll. 6-10 (emphasis added).

583.   It follows, therefore, that if Sylabs cures the deficiencies with violations of DTSA (Count I), then Sylabs' RICO claim in this Count (and Count V as well) is sufficiently pleaded. *Id.*

584.   It is also important to note for purposes of alleging the Predicate Acts under the RICO Act claims alleged in Counts IV and V, that the allegations set forth herein constitute not only civil claims but also Defendants' violation of federal **criminal** statutes, including, for example: 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1030(a)(4) (Computer Fraud), 18 U.S.C. § 1030(a)(2) (Theft of Information from a Computer), 18 U.S.C. § 1030(b) (Conspiring to Violate the CFAA), and 18 U.S.C. § 1030(a)(5)(B) (Recklessly Damaging a Computer).

585.   As determined by and set forth in this Court's MTD Order, between 2018 and 2020, Sylabs created five value-added technologies constituting Sylabs' Trade Secrets: (1) SingularityPRO, (2) Singularity Image Format, SIF technology, (3) Singularity Enterprise, (4) Fuzzball and (5) Armored Containers. *See* MTD Order, Dkt. p. 2, ll. 7-11.

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

586.   In its MTD Order, this Court indicated that: "[T]he definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." In identifying a trade secret at the pleading stage, a plaintiff "need not 'spell out the details of the trade secret,' but must minimally provide 'reasonable notice of the issues which must be at the time of trial and . . . provide reasonable guidance in ascertaining the scope of appropriate discovery.'" *See* MTD Order, Dkt. 59, p. 9, ll. 1-6.

587.   Under these elements, this Court made a finding that Sylabs sufficiently described SingularityPRO, Singularity Enterprise, Fuzzball, and Armored Containers as trade secrets for purposes of this Action: "Thus, Sylabs sufficiently describes four of its five purported trade secrets which are not publicly available." *See* MTD Order, Dkt. 59, p. 9, l. 17 through p. 11, l. 14.

588.   As to Sylabs' SIF Technology, this Court found that Sylabs did **not** sufficiently describe it because it failed to distinguish between what was publicly disclosed in its SIF Application (Exh. 54) and that which constitutes its trade secrets:

> "While Sylabs may retain trade-secret protection over those aspects of SIF technology not published in its patent application, it fails to 'delineate the boundaries between its trade secrets and its information that has been made public through patents and patent applications. . . ' Rather, **Sylabs must simply allege with particularity those aspects of its SIF technology not discussed in its patent application**, and it does not do so in the Complaint."

*See* MTD Order, Dkt. 59, p. 10, ll. 7-10 (emphasis added).

589.   In order to cure this deficiency, this Court indicated that "Sylabs must simply allege with particularity those aspects of its SIF technology **not** discussed" in Sylabs' SIF Application (Exh. 54). *See* MTD Order, Dkt. 59, p. 10, ll. 14-16 (emphasis added).

590.   As to showing those aspects of its SIF technology **not** discussed in Sylabs' SIF Application, Sylabs has provided sufficient allegations in Section II and Sections V-VIII of this Complaint. *See* ¶ 57; ¶ 369, Figure 10).

591.   As to the SIF Technology, as set forth below in greater detail in Section VI, ¶ 136, CIQ's Patents based on Sylabs' Armored Containers Trade Secrets, CIQ's Patent

LEPISCOPO & ASSOCIATES LAW FIRM

Nos. US 11,055,428 (Exh. 41), US 11,163,902 (Exh. 42), and  US 11,321,064 (Exh. 43) are described and based upon the armored container technology, which was born out of Sylabs' research and development starting in June of 2019. It is important to note that the Armored Containers technology that serves as the basis of CIQ's patents is **not** based on the technology disclosed in Sylabs' SIF Application for its SIF technology. *See* ¶ 58; ¶ 372, Figure 10).

592.    Sylabs alleges as follows to cure the aforementioned deficiencies. Specifically, Sylabs alleges that the following SIF technology components were not disclosed in Sylabs' SIF Application (Exh. 54) or Sylabs' SIF Patent (Exh. 55) but were stolen and used by Defendants to procure the Armored Containers patents. For example, CIQ patent 11,055,428 (Exh. 41) specifically mentions this type of approach for another format of container images, namely OCI container images. Sylabs has never publicly disclosed the Trade Secrets underlying the specific method of encrypting container images as it pertains to OCI images but has been developing this as part of its secret "Armored Containers" project, well before Defendants left Sylabs. Thus, these are Sylabs' Trade Secrets, which were stolen by Defendants to develop and unlawfully and fraudulently procure their Patent Nos. US 11,055,428 (Exh. 41), US 11,163,902 (Exh. 42), and US 11,321,064 (Exh. 43).

593.    Sylabs' Trade Secrets were (and currently are) valuable and were secret and not publicly available but for Defendants' cyber corruption, cyber destruction, and cyber theft. In particular, after stealing, open-sourcing, patenting, employing, and marketing Sylabs' Trade Secrets, Defendants initially raised $26,000,000, reaching a total of $33,000,000 raised to date, and according to defendant Greg Kurtzer, CIQ now has an enterprise value of $150,000,000.[33]

---

[33]    *See*: https://siliconangle.com/2022/05/12/ciq-raises-26m-promote-free-alternative-red-hat-linux/.

LEPISCOPO & ASSOCIATES LAW FIRM

594.   As mentioned, the MTD Order indicates that Sylabs needs to identify and allege the specific policies, methods, and procedures utilized by Sylabs to protect its Trade Secrets (*see* Dkt. 59, p. 11, ll. 13-17).

595.   At all times mentioned herein, Sylabs has taken more than adequate measures to protect the secrecy of Sylabs' Trade Secrets. In particular, and as set forth in greater detail above in Section II, ¶¶ 59-85, Sylabs has very specific policies, methods, and procedures for protecting the secrecy of its Trade Secrets: (a) Sylabs' Trade Secret Protections; (b) Conflict of Interest Policies; (c) Technical Protections; and (d) IP Assignment/NDA Agreements. Sylabs' policies, methods, and procedures are powerful and designed to protect the secrecy of Sylabs' Trade Secrets. *See* Exh. 38: Decl. of Tarbell ¶¶ 4 & 5; Exhs. 47-52.

596.   Generally, Sylabs' Server and Google Workspace provide security for the protection of Sylabs' Trade Secrets. *See* Exh. 38: Decl. of Tarbell ¶¶ 3-5. Of course, this type of security was nullified by Defendants through their unlawful and unauthorized intrusions into Sylabs' Server when they were insider threats and external threats. Specifically, Mr. Tarbell provides numerous factual examples of Defendants' insider threats and external cyber intrusions into Sylabs' Server. *See* Exh. 38: Decl. of Tarbell ¶¶ 29-127; Exhs. 2-36, 57, 44, & 45.

597.   Sylabs utilized a protective server environment for its data, files, and directories. Specifically, Sylabs utilized Google Workspace, which is a cloud computing-based service that many companies utilize for employees to collaborate, store, and share files. Workspace has a robust logging feature that allows the auditing of employee activities within this environment. *See* Exh. 38: Decl. of Tarbell ¶ 4.

598.   Sylabs utilized Workspace features such as Google Drive to securely store, edit, and work together on sensitive corporate files. Sylabs employed these Google Workspace tools in part to ensure the security of their company secrets and sensitive data. *See* Exh. 38: Decl. of Tarbell ¶ 5.

599. In addition to the Trade Secret Protections, Sylabs maintained Conflict of Interest Policies to not only ensure secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets from being utilized and those having knowledge of those Trade Secrets from utilizing them as a means of **competing against Sylabs**—in the way that CIQ is competing against Sylabs after stealing Sylabs' Trade Secrets. *See* Exh. 47.

600. In addition to the Trade Secret Protections and Conflict of Interest Policies, Sylabs maintained and utilized the Technical Protections to not only maintain the secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets from being utilized and those having knowledge of those Trade Secrets from utilizing them as a means of competing against Sylabs. So, for example, during all times relevant to this Action, Sylabs took steps to ensure that all source code and other materials related to its Fuzzball and Armored Containers Trade Secrets were kept secret, as is the general practice for other closed source Sylabs projects/products such as SingularityPRO and Singularity Enterprise. Thus, source code, technical documentation, and planning material are stored in private server projects, and access to the projects was strictly limited on a need-to-know basis even within Sylabs. As is common practice at technology firms, Sylabs' employees, including Defendants, execute IP Assignment/NDA Agreements. *See* Exhs. 48-52.

601. By way of an actual example, during the relevant timeframe of this Action, Sylabs was engaged in pursuing business with the United States Government. So, for example, when Sylabs responded to the U.S. Government's request for proposal, which is titled "Open Call for Innovative Defense-Related Dual-Purpose Technologies/Solutions with a Clear Air Force Stakeholder" ("RFP"), it included in this RFP, as well as other proposals, the following Notice (*see* Exh. 53):

> "This proposal includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed-in whole or in part-for any purpose other than to evaluate this proposal. If, however, a contract is awarded to this offeror as a result of-or in connection with-the submission of this data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. . ."

LEPISCOPO & ASSOCIATES LAW FIRM

602. In addition to the Trade Secret Protections, Conflict of Interest Policies, and Technical Protections, Sylabs also utilized IP Assignment/NDA Agreements to not only maintain the secrecy of Sylabs' Trade Secrets but also prevent those Trade Secrets from being utilized and those having knowledge of those Trade Secrets from utilizing them as a means of competing against Sylabs. *See* Exhs. 47-52.

603. Notwithstanding the Trade Secret Protections, Conflict of Interest Policies, Technical Protections, and IP Assignment/NDA Agreements specifically created and utilized by Sylabs, Defendants simply ignored and failed to comply with them and affirmatively conspired to circumvent them for purposes of causing cyber corruption, cyber destruction, and cyber theft of Sylabs' Trade Secrets.  Consequently, Sylabs alleges that Defendants breached their IP Assignment/NDA Agreements with Sylabs. Further, Sylabs is informed and believes, and based on such information and belief alleges that these Defendants engaged in fraud in the procurement of the IP Assignment/NDA Agreements without having any intention of performing the promises made in their respective agreements. Accordingly, Sylabs has alleged separate breach of written contract and intentional misrepresentation counts against defendants Gregory Kurtzer, Matthew Hayden, Erin Fong, Robert Adolph, David Buss, Marlin Prager, and Open Drives, Inc., including requests for  punitive damages. *See* Counts XII-XXI, below.

604. As set forth in greater detail above, Defendants made significant and ongoing unlawful cyber intrusions into Sylabs' Server for the purposes of: (a) corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer files; (j) cyber intrusion to Sylabs' computer directories; (k) cyber theft of Sylabs' Trade Secrets; (l) cyber misappropriation of Sylabs' Trade Secrets; (m) cyber theft of Sylabs' Corporate Assets; (n) cyber misappropriation of Sylabs' Corporate Assets; (o) cyber theft

LEPISCOPO & ASSOCIATES LAW FIRM

of Sylabs' Corporate Secrets; and (p) cyber misappropriation of Sylabs' Corporate Secrets. *See* Section II, ¶¶ 27-54 of this Complaint; *see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

605.    <u>Unlawful Conduct Engaged In By Defendants After Mass Resignation From Sylabs</u>. Sylabs is informed and believes, and based upon such information and belief alleges that in furtherance of their conspiracy with their codefendants, defendants Greg Kurtzer, Julia Kurtzer, Adolph, Hayden, Fong, Buss, and Prager, and, through their respective officers, defendants CIQ and Open Drives, agreed to a mass resignation from Sylabs but to continue engaging in unauthorized access even **after** they departed Sylabs on March 31, 2020. For example, between April 2, 2020 and April 15, 2020, defendants Greg Kurtzer, Adolph, Hayden, Julia Kurtzer, and Fong made significant and ongoing unlawful cyber intrusions into Sylabs' Server for the purposes of: (a) corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files; (e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer files; (j) cyber intrusion to Sylabs' computer directories; (k) cyber theft of Sylabs' Trade Secrets; (l) cyber misappropriation of Sylabs' Trade Secrets; (m) cyber theft of Sylabs' Corporate Assets; (n) cyber misappropriation of Sylabs' Corporate Assets; (o) cyber theft of Sylabs' Corporate Secrets; and (p) cyber misappropriation of Sylabs' Corporate Secrets. *See* Section II, ¶¶ 27-54 of this Complaint; *see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

606.    As alleged in greater detail in this Count and in Sections II and V-VIII, above, Defendants' actions constitute actual, and threatened and ongoing violations of under CUTSA, California Civil Code §§ 3426 *et seq*.: (a) cyber corruption and damage to Sylabs' computer server; (b) corruption and damage to Sylabs' computer data; (c) corruption and damage to Sylabs' computer folders; (d) corruption and damage to Sylabs' computer files;

(e) corruption and damage to Sylabs' computer directories; (f) cyber intrusion to Sylabs' computer server; (g) cyber intrusion to Sylabs' computer files; (h) cyber intrusion to Sylabs' computer folders; (i) cyber intrusion to Sylabs' computer files; (j) cyber intrusion to Sylabs' computer directories; (k) cyber theft of Sylabs' Trade Secrets; (l) cyber misappropriation of Sylabs' Trade Secrets; (m) cyber theft of Sylabs' Corporate Assets; (n) cyber misappropriation of Sylabs' Corporate Assets; (o) cyber theft of Sylabs' Corporate Secrets; and (p) cyber misappropriation of Sylabs' Corporate Secrets. *See* Section II, ¶¶ 27-54 of this Complaint; *see also* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

607.   As alleged in greater detail in this Count and in Sections II and V-VIII, above, Defendants intended to and knowingly caused damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories, and accessed Sylabs' Server without authorization and disclosed, acquired, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets. They performed such acts in furtherance of the conspiracy and to perpetrate the theft and misappropriation of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets in the Northern District of California.

608.   As alleged in greater detail in this Count and in Sections II and V-VIII, above, the Defendants intended to and knowingly caused damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories and stole and misappropriated Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets through cyber theft and then perpetrated a fraud on the USPTO by submitting fraudulent patent applications to the USPTO and receiving fraudulently obtained patents, to wit: US 10,970,113 (Exh. 37); US 11,099,893 (Exh. 39); US 11,310,342 (Exh. 40); US 11,055,428 (Exh. 41); US 11,163,902 (Exh. 42); and US 11,321,064 (Exh. 43) (*i.e.*, the Stolen Patents).

609.   As alleged in greater detail in Sections II and V-VIII, above, the Defendants acquired, used, or disclosed Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets knowing that they were stolen and misappropriated, obtained, or converted through

LEPISCOPO & ASSOCIATES LAW FIRM

Defendants' cyber theft of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets without Sylabs' consent or authorization. Further, the Defendants intentionally engaged in these acts to benefit themselves, with the knowledge and/or intent that these acts would injure Sylabs and cause damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories.

610.    The cyber corruption, cyber destruction, cyber theft and use of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets by Defendants was without Sylabs' authorization, and Sylabs did not consent to their cyber corruption, cyber destruction, cyber theft, acquisition, disclosure, or use of Sylabs' Trade Secrets, Corporate Assets, and Corporate Assets, and Corporate Secrets.

611.    At all times mentioned in this Complaint, the Defendants intended to corrupt and cause damage to Sylabs (CIQ's competitor) and Sylabs' computer server, data, folders, files, and directories and to convert, misappropriate, and steal Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets to their own use and benefit and for their own enrichment.

612.    As alleged in greater detail in Sections II and V-VIII and pursuant to 18 U.S.C § 1961(4), the Defendants formed an association-in-fact enterprise (the "Enterprise") to engage in activities to affect interstate and foreign commerce by conspiring and collaborating to plan and effectuate the interstate cyber corruption, cyber destruction of Sylabs' Server, data, folders, files, and directories, and theft and sale of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets. The Enterprise operated in and through the instrumentalities of interstate and foreign commerce and within in this District.

613.    As alleged in greater detail in Sections II and V-VIII and pursuant to 18 U.S.C § 1961(1), the Enterprise's interstate cyber corruption, cyber destruction of Sylabs' Server, data, folders, files, and directories, and theft and sale of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets constitutes racketeering activity under RICO, all

LEPISCOPO & ASSOCIATES LAW FIRM

of which was operated in and through the instrumentalities of interstate and foreign commerce and within this District.

614.    As alleged in greater detail in Sections II and V-VIII and pursuant to 18 U.S.C § 1961(5), the Enterprise's interstate cyber corruption, cyber destruction of Sylabs' Server, data, folders, files, and directories, and theft and sale of Sylabs' Trade Secrets, Corporate Assets, and Corporate Secrets constitutes a pattern of racketeering activity under RICO, all of which was operated in and through the instrumentalities of interstate and foreign commerce and within in this District.

615.    As alleged in greater detail in Sections II and V-VIII and as alleged in greater detail in Counts I and IV of this Complaint, the Co-Conspirators have intentionally conspired and agreed to directly, and indirectly participate in the affairs of the Enterprise through a pattern of racketeering activities in violation of 18 U.S.C § 1832, which operated in and through the instrumentalities of interstate and foreign commerce and within this District.

616.    As alleged in greater detail in Sections II and V-VIII and as alleged in greater detail in Counts I and IV of this Complaint, the Co-Conspirators knew that their actions constituted a pattern of racketeering activities and agreed to those actions in furtherance of, and for the benefit of the Enterprise, which operated in and through the instrumentalities of interstate and foreign commerce and within this District.

617.    As alleged in greater detail in Sections II and V-VIII and as alleged in greater detail in Counts I and IV of this Complaint, the actions of the Co-Conspirators constitute a conspiracy to violate 18 U.S.C § 1962(c), in violation of 18 U.S.C § 1962(d).

618.    As alleged in greater detail in Sections II and V-VIII and as alleged in greater detail in Counts I and IV of this Complaint, as a direct and proximate result of racketeering activities and violations of 18 U.S.C. § 1962(d) by the Enterprise, which operated in and through the instrumentalities of interstate and foreign commerce and within this District, Sylabs has suffered economic damages both domestically and abroad, including, but not

limited to, injuries in the Northern District of California, in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

619.    As alleged in greater detail in Sections II and V-VIII and as alleged in greater detail in Counts I and IV of this Complaint, the aforementioned acts of the Co-Conspirators were done willfully, with malice toward Sylabs, entitling Sylabs to treble damages, attorneys' fees, and costs.

620.

**PRELIMINARY STATEMENT TO COUNTS ALLEGED UNDER CALIFORNIA LAW: CUTSA DOES NOT PREEMPT SYLABS' REMAINING STATE LAW CLAIMS BECAUSE THEY ARE NOT BASED ON MISAPPROPRIATION OF TRADE SECRETS**

621.    In its MTD Order, this Court found that Sylabs' state law claims alleged below, Counts VI through XXI are not actionable because they are preempted by CUTSA:

"The CUTSA Preempts Sylabs' Other State-Law Claims. Sylabs asserts six state-law claims in addition to its CUTSA claim, all of which it bases on the same conduct underlying its CUTSA claim, namely, Defendants' alleged **misappropriation of Sylabs' purported trade secrets**. But '[u]nder California law, CUTSA provides the exclusive civil remedy for conduct falling within its terms and supersedes other civil remedies based upon **misappropriation of a trade secret**.'"

*See* MTD Order, Dkt. 59, p.13, ll. 20-25 (emphasis added).

622.    In response to the foregoing, Sylabs has updated the allegations comprising its state law claims below with facts that support claims separate and independent from CUTSA. This is because there are assets and property the Defendants stole and misappropriated from Sylabs that are **not** Trade Secrets, and, therefore, **not** actionable under CUTSA.

623.    The following summary of Sylabs' assets and property stolen and misappropriated by Defendants are **not** defined as, nor are they a part of its Trade Secrets (hereinafter referred to collectively as "Sylabs' Corporate Assets"):

(a)  corporate documents and minutes of shareholder and board of directors' meetings ("Sylabs' Corporate Records");

LEPISCOPO & ASSOCIATES LAW FIRM

(b)  financial records ("Sylabs' Financial Records");

(c)  partner and joint venture records ("Sylabs' Collaboration Records");

(d)  existing and prospective customer list ("Sylabs' Customer List");

(e)  sales and potential sales lists ("Sylabs' Sales Lists");

(f)  statements of work ("Sylabs' SOWs");

(g)  purchase orders ("Sylabs' POs");

(h)  invoices ("Sylabs' Invoices");

(i)  marketing strategies, plans, and pricing ("Sylabs' Marketing");

(j)  prospective investors list ("Sylabs' Investors");

(k)  human resources ("HR") records ("Sylabs' HR Records");

(l)  employees' files, including information relating to Sylabs employees' salary and benefits packages, payroll information, addresses, dates of birth, driver's licenses, tax identification numbers, etc. (collectively "Sylabs Employees' Files");

(m) offers of employment, executive employment agreements, employment agreements, independent contract agreements, consultant agreements, technical advisor agreements, and reseller agreements  (collectively "Sylabs' Staff Agreements");'

(n)  attorney-client communications, attorney work-product documents, accountant-client communications, settlement negotiations and agreements, nondisclosure agreements, and tax returns (collectively "Sylabs' Privileged Docs"); and

(o)  emails and correspondence from the Sylabs' Server, including but not limited to ones relating to sensitive corporate secrets and affairs, and ones discussing attorney-client communications, attorney work-product documents, accountant-client communications, settlement negotiations and agreements, nondisclosure agreements, and tax returns information (collectively "Sylabs' Sensitive Correspondence").

624.   As alleged in greater detail below and in Sections II and V-VIII, above, Defendants stole and misappropriated Sylabs' Corporate Assets. *See* Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs.

LEPISCOPO & ASSOCIATES LAW FIRM

625. Keep in mind, Defendants stole and misappropriated Sylabs' Trade Secrets, which is actionable under the CUTSA; and Defendants also stole and misappropriated Sylabs' Corporate Assets, which is **not** actionable under the CUTSA and for which the CUTSA provides **no remedy**.

626. Furthermore, in Count III under the CUTSA, Sylabs neither alleges nor requests any remedies regarding Defendants' theft and misappropriation of Sylabs' Corporate Assets.

627. As a consequence of the foregoing, Sylabs alleges the following counts under California law for which there is no remedy under CUTSA, and, which, therefore, are not preempted by CUTSA. Accordingly, Counts VI through XXI are actionable under California law and the remedies provided for thereunder are separate and distinct from those remediable under CUTSA. *See* MTD Order, Dkt. 59, p.13, ll. 20-25 (emphasis added).

## COUNT VI
## CIVIL CONSPIRACY
### (Against All Defendants)

628. The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

629. As alleged in greater detail in Sections II and V-VIII, above, Defendants entered into an agreement to commit cyber theft and misappropriation of Sylabs' Corporate Assets.

630. As alleged in greater detail in Sections II and V-VIII, above, Defendants carried out their agreement and performed such acts in furtherance of the conspiracy to perpetrate the theft and misappropriation of Sylabs' Corporate Assets in the Northern District of California.

631. As alleged in greater detail in Sections II and V-VIII, above, Defendants' agreement and conspiracy are ongoing and in furtherance of their conspiracy.

632. As alleged in greater detail in Sections II and V-VIII, above, through their agreement and conspiracy, Defendants have caused and will continue to cause Sylabs

irreparable and substantial injury and therefore cannot be fully redressed through damages alone. An injunction prohibiting Defendants from further acquisition, disclosure, use, and possession of Sylabs' Corporate Assets is necessary to provide Sylabs with complete relief.

633.    As alleged in greater detail in Sections II and V-VIII, above, as a result of Defendants' agreement and conspiracy to commit cyber theft and misappropriation of Sylabs' Corporate Assets, Sylabs has suffered actual damages in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

634.    As alleged in greater detail in II and V-VIII, above, as a result of Defendants' agreement and conspiracy to commit cyber theft and misappropriation of Sylabs' Corporate Assets, Defendants have been unjustly enriched.

635.    Pursuant to California Civil Code Section 3294, Sylabs requests  an award of exemplary damages against Defendants, jointly and severally, according to proof at trial.

### COUNT VII

### VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW ("UCL"), CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, *et seq.*

### (Against All Defendants)

636.    The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

637.    The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

638.    The UCL imposes strict liability. Sylabs need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred. However, as alleged in greater detail in Sections II and V-VIII, above, Defendants engaged in knowing and intentional conduct that constitutes unfair, fraudulent, and unlawful business practices.

### "*Unfair*" Prong

639.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or

LEPISCOPO & ASSOCIATES LAW FIRM

substantially injurious to individuals, entities, and/or consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

640.    As alleged in greater detail in Sections II and V-VIII, above, the harm to Sylabs, as well as the public, outweighs the utility of Defendants' practices. There were reasonably available alternatives to further Defendants' legitimate business interests other than the unlawful, fraudulent, misleading, and deceptive conduct alleged herein; for example, Defendants could have developed CIQ's business through lawful means. Instead, Defendants chose to commit interstate cyber theft and misappropriation of Sylabs' Corporate Assets. So, for example, as a consequence of Defendants' theft and misappropriation of Sylabs' Corporate Assets, defendant CIQ would have an unfair competitive advantage and a turn-key business without having to spend the capital or time to develop a new, start-up business like everyone else in Silicon Valley.

**"*Fraudulent*" Prong**

641.    A business act or practice is "fraudulent" under the UCL if it is likely to be deceptive and injurious to individuals, entities, the public, or public policy.

642.    As alleged in greater detail in Sections II and V-VIII, above, Defendants' conduct was clearly fraudulent and designed to commit cyber theft and misappropriation of Sylabs' Corporate Assets.

643.    As alleged in greater detail in Sections II and V-VIII, above,  Defendants' actions were in clear contravention of the established public policy aims of California, as expressed in the UCL and in the crimes against property provisions of the California Penal Code, Title 13, Chapters 1-15.

**"*Unlawful*" Prong**

644.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

645.    As alleged in greater detail in Sections II and V-VIII, above, Defendants' acts and practices alleged above constitute unlawful business acts or practices as they have

LEPISCOPO & ASSOCIATES LAW FIRM

violated state and federal law in connection with their cyber theft and misappropriation of Sylabs' Corporate Assets.

646. The violation of any law constitutes an "unlawful" business practice under the UCL.

647. As alleged in greater detail in Sections II and V-VIII, above, Defendants' conspiracy and their acts and practices engaged in furtherance of their conspiracy were intended to and did result in violations of the Crimes Against Property provisions of the California Penal Code, Title 13, Chapters 1-15, including, for example, Penal Code Section 487, Grand Theft.

648. As alleged in greater detail in Sections II and V-VIII, above, Defendants' conspiracy and their conduct have defrauded and misled Sylabs and the public, including the investors who invested between $25,000,000 and $33,000,000 in defendant CIQ, in the past and will continue to mislead in the future; for example, they are not the owners Sylabs' Corporate Assets but have raised over $25,000,000 based on that fraud, their cyber theft, and their unlawful competition practices. Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

649. As alleged in greater detail in Sections II and V-VIII, above, Defendants' violation of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat to Sylabs and the public, including the current and prospective investors in defendant CIQ.

650. As alleged in greater detail in Sections II and V-VIII, above, pursuant to the UCL, Sylabs is entitled to preliminary and permanent injunctive relief and order Defendants to cease their fraudulent and unfair competition, as well as disgorgement of and restitution to Sylabs of all Defendants' revenues and capital investments (between $25,000,000 and $33,000,000) associated with their unfair competition, or such portion of those revenues and/or capital investments as the Court may find equitable.

/////

/////

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

## COUNT VIII

### BREACH OF FIDUCIARY DUTY—CYBER THEFT & FRAUD BY OFFICER & DIRECTOR

### (Against Defendant Greg Kurtzer and DOES 1 through 10)

651.    The allegations in Paragraphs 1 to 404 are incorporated here by reference.

652.    As alleged in greater detail in Sections II and V-VIII, above, defendant Greg Kurtzer was an officer and director of Sylabs and breached his fiduciary duties to Sylabs.

653.    As alleged in greater detail in Sections II and V-VIII, above, defendant Greg Kurtzer has willfully and intentionally breached the fiduciary duties he owed to Sylabs as an officer and director of Sylabs by willfully and intentionally violating his IP Assignment/Nondisclosure Agreement (Exh. 48) and by assisting, conspiring, and committing cyber theft and misappropriation of Sylabs' Corporate Assets.

654.    As alleged in greater detail in Sections II and V-VIII, above, defendant Greg Kurtzer has failed to act with the utmost care, loyalty, and good faith in the best interests of Sylabs and failed to honor and satisfy his duties of undivided loyalty to the corporation and confidentiality as an ordinary and prudent officer or director of a corporation would under similar circumstances.

655.    As alleged in greater detail in Sections II and V-VIII, above, as a result of defendant Greg Kurtzer's breach of the fiduciary duties he owed to Sylabs by participating in the conspiracy to commit cyber theft and misappropriation of Sylabs' Corporate Assets, Sylabs has suffered actual damages in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

656.    As alleged in greater detail in Sections II and V-VIII, above, defendant Greg Kurtzer breached his fiduciary duties to Sylabs by committing cyber theft and misappropriation of Sylabs' Corporate Assets, which was willful and malicious based on the facts alleged herein. Further, defendant Greg Kurtzer acted with a purpose and willingness to commit the acts alleged, and his conduct was not reasonable under the circumstances. Sylabs is therefore entitled to exemplary damages in an amount to be proven at time of trial.

657.    Sylabs is also entitled to its attorneys' fees and costs.

**COUNT IX**

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY—CYBER THEFT & FRAUD BY OFFICER & DIRECTOR**

**(Against Defendants Julia Kurtzer, Robert Adolph, Matthew Hayden, Erin Fong, CIQ, Open Drives, Inc., David Buss, Marlin Prager, Joel  Whitley, IAG Capital Partners, and DOES 20 through 50)**

658.    The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

659.    As alleged in greater detail in Sections II and V-VIII, above, and as alleged in greater detail in Count VIII, above, defendant Greg Kurtzer was an officer and director of Sylabs and breached his fiduciary duties to Sylabs.

660.    As alleged in greater detail in Sections II and V-VIII, above, defendants Julia Kurtzer, Robert Adolph, Matthew Hayden, Erin Fong, CIQ, Open Drives, Inc., David Buss, Marlin Prager, Joel  Whitley, IAG, and Does 20 through 50 have willfully and intentionally conspired and agreed to directly and indirectly aid and abet and in fact aided and abetted defendant Greg Kurtzer's breach of the fiduciary duties he owed to Sylabs as an officer and director of Sylabs.

661.    As alleged in greater detail in Sections II and V-VIII, above, defendants Julia Kurtzer, Robert Adolph, Matthew Hayden, Erin Fong, CIQ, Open Drives, Inc., David Buss, Marlin Prager, Joel  Whitley, IAG, and Does 20 through 50 aided and abetted defendant Greg Kurtzer to breach his fiduciary duties to Sylabs by participating in the conspiracy to commit cyber theft and misappropriation of Sylabs' Corporate Assets.

662.    As alleged in greater detail in Sections II and V-VIII, above, as a result of Julia Kurtzer, Robert Adolph, Matthew Hayden, Erin Fong, CIQ, Open Drives, Inc., David Buss, Marlin Prager, Joel  Whitley, IAG, and Does 20 through 50's aiding and abetting defendant Greg Kurtzer to breach his fiduciary duties to Sylabs by participating in the conspiracy to commit cyber theft and misappropriation of Sylabs' Corporate Assets, Sylabs

LEPISCOPO & ASSOCIATES LAW FIRM

has suffered actual damages in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

663.    As alleged in greater detail in Sections II and V-VIII, above, Julia Kurtzer, Robert Adolph, Matthew Hayden, Erin Fong, CIQ, Open Drives, Inc., David Buss, Marlin Prager, Joel Whitley, IAG Capital Partners, and Does 20 through 50's aiding and abetting defendant Greg Kurtzer to breach his fiduciary duties to Sylabs by participating in the conspiracy to commit cyber theft and misappropriation of Sylabs' Corporate Assets was willful and malicious based on the facts alleged herein. Said defendants acted with a purpose and willingness to commit the acts alleged, and their conduct was not reasonable under the circumstances. Sylabs is therefore entitled to exemplary damages in an amount to be proven at time of trial.

664.    Sylabs is also entitled to its attorneys' fees and costs.

## COUNT X

### UNJUST ENRICHMENT

### (Against All Defendants)

665.    The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

666.    As alleged in greater detail in Sections II and V-VIII, above, and in paragraph 621 of the section title, the Preliminary Statement To Counts Alleged Under California Law, above,  Sylabs' Corporate Assets include: Sylabs' Corporate Records; Sylabs' Financial Records; Sylabs' Collaboration Records; Sylabs' Customer List; Sylabs' Sales Lists; Sylabs' SOWs; Sylabs' POs; Sylabs' Invoices; Sylabs' Marketing  Plans; Sylabs' Investors; Sylabs' HR Records; Sylabs Employees' Files; Sylabs' Staff Agreements; Sylabs' Privileged Docs; and Sylabs' Sensitive Correspondence.

667.    As alleged in greater detail in Sections II and V-VIII, above, Sylabs' Corporate Assets derive independent economic value from not being generally known to Sylabs' competitors such as defendant CIQ, or the public or other persons who can obtain significant economic value from the Sylabs' Corporate Assets' disclosure.

668.    As alleged in greater detail in Sections II and V-VIII, above, Sylabs has taken reasonable measures to protect the secrecy of Sylabs' Corporate Assets. However, Defendants' actions constitute actual and threatened theft and misappropriation of Sylabs' Corporate Assets by Defendants.

669.    As alleged in greater detail in Sections II and V-VIII, above, Defendants intended to and knowingly stole Sylabs' Corporate Assets through cyber theft from Sylabs' Server and, without authorization, disclosed, acquired, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Sylabs' Corporate Assets. They performed such acts in furtherance of the conspiracy and to perpetrate the theft and misappropriation of Sylabs' Corporate Assets in the Northern District of California.

670.    As alleged in greater detail in Sections II and V-VIII, above, the use of Sylabs' Corporate Assets by Defendants was without Sylabs' authorization, and Sylabs did not consent to their acquisition, disclosure, or use of Sylabs' Corporate Assets.

671.    As alleged in greater detail in Sections II and V-VIII, above, Defendants intended to convert Sylabs' Corporate Assets to their own use and benefit.

672.    As alleged in greater detail in Sections II and V-VIII, above, Defendants clearly knew and intended that Sylabs, as the owner of Sylabs' Corporate Assets, would be injured by their actions.

673.    As alleged in greater detail in Sections II and V-VIII, above, Defendants clearly knew that stealing and using Sylabs' Corporate Assets for their own interests and benefit but not for Sylabs' benefit exceeded their authority to use   thereby constituting conversion.

674.    As alleged in greater detail in Sections II and V-VIII, above, Defendants' conversion through cyber theft and misappropriation of Sylabs' Corporate Assets, Defendants have been unjustly enriched.

675.    As a result of the Defendants' cyber theft and misappropriation of Sylabs' Corporate Assets, Sylabs requests that the Court issue an order that all right, title, and

LEPISCOPO & ASSOCIATES LAW FIRM

interest in and to Sylabs' Corporate Assets be divested from defendant CIQ and fully vested in Sylabs.

676.    Sylabs further pleads entitlement to a disgorgement of profits to compensate Sylabs for Defendants' cyber theft and misappropriation of Sylabs' Corporate Assets in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

677.    Sylabs further pleads entitlement to all funds Defendants have raised due to their cyber theft and misappropriation of Sylabs' Corporate Assets in an amount to be proven at trial but in an amount that exceeds $25,000,000.

/////

**COUNT XI**

**CONVERSION**

**(Against All Defendants)**

678.    The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

679.    As alleged in greater detail in Sections II and V-VIII, above, and in paragraph 621 of the section title, the Preliminary Statement To Counts Alleged Under California Law, above,  Sylabs' Corporate Assets include: Sylabs' Corporate Records; Sylabs' Financial Records; Sylabs' Collaboration Records; Sylabs' Customer List; Sylabs' Sales Lists; Sylabs' SOWs; Sylabs' POs; Sylabs' Invoices; Sylabs' Marketing  Plans; Sylabs' Investors; Sylabs' HR Records; Sylabs Employees' Files; Sylabs' Staff Agreements; Sylabs' Privileged Docs; and Sylabs' Sensitive Correspondence.

680.    As alleged in greater detail in Sections II and V-VIII, above, Sylabs' Corporate Assets derive independent economic value from not being generally known to Sylabs' competitors such as defendant CIQ, or the public or other persons who can obtain significant economic value from the Sylabs' Corporate Assets' disclosure.

681.    As alleged in greater detail in Sections II and V-VIII, above, Sylabs has taken reasonable measures to protect the secrecy of Sylabs' Corporate Assets. However, Defendants' actions constitute actual and threatened theft and misappropriation of Sylabs' Corporate Assets by Defendants.

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

682.   As alleged in greater detail in Sections II and V-VIII, above, Defendants intended to and knowingly stole Sylabs' Corporate Assets through cyber theft from Sylabs' Server and, without authorization, disclosed, acquired, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Sylabs' Corporate Assets. They performed such acts in furtherance of the conspiracy and to perpetrate the theft and misappropriation of Sylabs' Corporate Assets in the Northern District of California.

683.   As alleged in greater detail in Sections II and V-VIII, above, the use of Sylabs' Corporate Assets by Defendants was without Sylabs' authorization, and Sylabs did not consent to their acquisition, disclosure, or use of Sylabs' Corporate Assets.

684.   As alleged in greater detail in Sections II and V-VIII, above, Defendants intended to convert Sylabs' Corporate Assets to their own use and benefit.

685.   As alleged in greater detail in Sections II and V-VIII, above, the use of Sylabs' Corporate Assets by Defendants was without Sylabs' authorization, and Sylabs did not consent to their conversion, acquisition, disclosure, or use of Sylabs' Corporate Assets.

686.   As alleged in greater detail in Sections II and V-VIII, above, Defendants intended to convert and steal Sylabs' Corporate Assets to their own use and benefit.

687.   As alleged in greater detail in Sections II and V-VIII, above, Defendants clearly knew and intended that Sylabs, as the owner of the Sylabs' Corporate Assets, would be injured by their actions.

688.   As alleged in greater detail in Sections II and V-VIII, above, Defendants clearly knew that stealing, converting, and using Sylabs' Corporate Assets for their own interests and benefit but not for Sylabs' benefit exceeded their authority to use Sylabs' Corporate Assets thereby constituting conversion.

689.   As alleged in greater detail in Sections II and V-VIII, above, as a result of the Defendants' conversion through cyber theft and misappropriation of Sylabs' Corporate Assets, Defendants have been unjustly enriched.

LEPISCOPO & ASSOCIATES LAW FIRM

690.    As alleged in greater detail in Sections II and V-VIII, above, as a result of the Defendants' cyber theft and misappropriation of Sylabs' Corporate Assets, Sylabs requests that the Court issue an order that all right, title, and interest in and to Sylabs' Corporate Assets be divested from defendant CIQ and fully vested in Sylabs.

691.    As alleged in greater detail in Sections II and V-VIII, above, Sylabs further pleads entitlement to a disgorgement of profits to compensate Sylabs for Defendants' cyber theft and misappropriation of Sylabs' Corporate Assets in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

692.    As alleged in greater detail in Sections II and V-VIII, above, Sylabs further pleads entitlement to all funds Defendants have raised due to their conversion through cyber theft and misappropriation of Sylabs' Corporate Assets in an amount to be proven at trial but in an amount that exceeds $25,000,000.

693.    Pursuant to California Civil Code Section 3294, Sylabs requests  an award of exemplary damages against Defendants, jointly and severally, according to proof at trial.

### COUNT XII

### BREACH OF WRITTEN CONTRACT

### (Against Defendant Greg Kurtzer)

694.    The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

695.    On or about November 10, 2017, Sylabs and Defendant Gregory Kurtzer entered into an IP Assignment/NDA Agreement ("Kurtzer Agreement"). *See* Exh. 48 hereto.

696.    As alleged in greater detail in Sections II and V-VIII, above, Sylabs performed all, or substantially all, of the significant and material things that it was required to perform under the terms and conditions of the Kurtzer Agreement.

697.    As alleged in greater detail in Sections II and V-VIII, above, in or about the timeframe March through June of 2020, Defendant Kurtzer failed to perform the significant and material terms and conditions of the Kurtzer Agreement, and, in fact, willfully and

LEPISCOPO & ASSOCIATES LAW FIRM

intentionally breached the terms of said agreement by intentionally committing cyber theft and misappropriation of Sylabs' Corporate Assets.

698.   In particular, and as alleged in greater detail in Sections II and V-VIII, Defendant Kurtzer breached the following provisions of the Kurtzer Agreement by the theft and misappropriation of Sylabs' Corporate Assets:

(a)   Section 1(e)—regarding Business Assets, which are Sylabs' Corporate Assets and were assigned to Sylabs (*see* Exh. 48, p. 3, Section 1(e)):

"Business Assets" means all business and marketing plans, worldwide marketing rights, software, customer and supplier lists, price lists, mailing lists, customer and supplier records and other confidential or proprietary information relating to the Technology, as well as all computers, office equipment and other tangible personal property owned (i.e., not leased) by Assignor immediately prior to the execution and delivery of this Agreement and used in or related to the Business."

(b)   Section 2(a)—which is an assignment of all then existing and **future** Business Assets to Sylabs, which necessarily includes Defendant Kurtzer's right, title, and interest in all future business assets such as Sylabs' Corporate Assets (*see* Exh. 48, p. 3, Sections 1(f) & 2(a)):

"The Assignor hereby sells, transfers, assigns and conveys, to the Company, and its successors and assigns, the Assignor's entire right, title and interest in and to the Assigned Assets and all rights of action, power and benefit belonging to or accruing from the Assigned Assets including the right to undertake proceedings to recover past and future damages and claim all other relief in respect of any acts of infringement thereof whether such acts shall have been committed before or after the date of this assignment, the same to be held and enjoyed by said Company, for its own use and benefit and the use and benefit of its successors, legal representatives and assigns, as fully and entirely as the same would have been held and enjoyed by the Assignor, had this assignment not been made."

(c)   examples of evidence of violations of Sections 1(e) and 2(a) in order to finalize the theft and misappropriation of Sylabs' Corporate Assets: Exh. 38, Decl. of Tarbell, Exhs. 3-4 (deleting and trashing Assigned Assets); Exh. 38, Decl. of Tarbell, ¶¶

LEPISCOPO & ASSOCIATES LAW FIRM

104-106, 107-109, 110-121, Exhs. 44, 45 (download and transferred Assigned Assets, deleted Assigned Assets); Exh. 38, Decl. of Tarbell, ¶¶ 119-120, Exhs. 44-45 (receiving Assigned Assets, unauthorized access to Sylabs' Server); Exh. 38, Decl. of Tarbell, ¶¶ 32, 50-54, Exhs. 2, 25, 28, 29, 44, and 45 (granting and permitting access of Assigned Assets to unauthorized users); Exh. 38, Decl. of Tarbell, ¶ 50, Exhs. 36, 44, 45 (granting and permitting access of Assigned Assets to unauthorized users); Exh. 38, Decl. of Tarbell, ¶ 50, Exhs. 26, 44, 45 (granting and permitting access of Assigned Assets to unauthorized users); Exh. 38, Decl. of Tarbell, ¶ 51.a-t, Exhs. 3-5, 44-45 (deleting and releasing Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 52.a-k, Exhs. 15-23, 44-45 (releasing, removing, and deleting Assigned Assets, and unlawfully changing sharing permissions to permit unauthorized users to access Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 54, Exhs. 24, 44-45 (downloading, transferring, and releasing, Assigned Assets to unauthorized users); Exh. 38, Decl. of Tarbell, ¶ 89, Exhs. 36, 44-45 (releasing, changing permissions to allow unauthorized users access to Assigned Assets); Exh. 38: Decl. of Tarbell, ¶ 30, Exhs. 2-25, 28-29, 44-45 (deleting, transferring, releasing, and sharing Assigned Assets with unauthorized users); Exh. 38, Decl. of Tarbell, ¶ 32, Exhs. 2-25, 28-29, 44-45 (deleting Assigned Assets, transferring, and downloading Assigned Assets, and changing permissions to allow unauthorized users to access Assigned Assets); Exh. 38, Decl. of Tarbell, ¶¶ 8-9, 22, 50-54, 56, 77, 87, Exhs. 2-36, 57, 68-73, 44 (downloading and releasing Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 131, Exhs. 44-45 (releasing Assigned Assets, changing permissions to allow unauthorized users to access, view, download, and use Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 8-9, 22, 50-54, 77, 87, Exhs. 2-36, 57, 68-73, Exhs. 44-45 (releasing, downloading, and editing Assigned Assets, and changing permissions to allow unauthorized users to access, view, and download Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 50, Exhs. 44-45 (releasing, downloading, editing, and renaming Assigned Assets, deleting Assigned Assets, and changing permissions to allow unauthorized users to access Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 51.a-t, Exhs. 3-5, 44-45 (deleting and releasing Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 52.a-k, Exhs.

15-23, 44-45 (releasing, removing, and deleting Assigned Assets, and unlawfully changing sharing permissions to permit unauthorized users to access Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 53, Exhs. 44-45, 69 (releasing, removing, and deleting Assigned Assets, and unlawfully changing sharing permissions to permit unauthorized users to access Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 32, Exhs. 2-25, 28-29, 44-45 (deleting Assigned Assets, transferring, and downloading Assigned Assets, and changing permissions to allow unauthorized users to access Assigned Assets).

699. As alleged in greater detail in Sections II and V-VIII, above, Defendant Kurtzer's breach of the Kurtzer Agreement, as herein alleged, was the substantial factor and the direct and proximate cause of the harm and damage sustained by Sylabs in an amount to be proven at trial that greatly exceeds $75,000.

## COUNT XIII

## INTENTIONAL MISREPRESENTATION —PROMISE WITHOUT INTENTION TO PERFORM (Against Defendant Greg Kurtzer)

700. The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

701. On or about November 10, 2017, Sylabs and Defendant Gregory Kurtzer entered into an IP Assignment/NDA Agreement ("Kurtzer Agreement"). *See* Exh. 48 hereto.

702. As alleged in greater detail in Sections II and V-VIII, above, Sylabs performed all, or substantially all, of the significant and material things that it was required to perform under the terms and conditions of the Kurtzer Agreement.

703. Defendant Kurtzer made the promises set forth in the Kurtzer Agreement without any intention of performing said promises.

704. Defendant Kurtzer intended that Sylabs rely on the promises made in the Kurtzer Agreement for the express purpose of having Sylabs' provide him with access to Sylabs' Corporate Assets.

LEPISCOPO & ASSOCIATES LAW FIRM

705. Sylabs reasonably and detrimentally relied on Defendant Kurtzer's promises made in the in the Kurtzer Agreement, and based upon that reliance, provided Defendant Kurtzer with access to Sylabs' Corporate Assets.

706. As alleged in greater detail in Sections II and V-VIII, above, in or about the timeframe March through June of 2020, Defendant Kurtzer failed to perform the significant and material terms and conditions of the Kurtzer Agreement, and, in fact, willfully and intentionally breached the terms of said agreement by intentionally committing cyber theft and misappropriation of Sylabs' Corporate Assets.

707. In particular, and as alleged in greater detail in Sections II and V-VIII, Defendant Kurtzer breached the following provisions of the Kurtzer Agreement:

(a) Section 1(e)—regarding Business Assets, which are Sylabs' Corporate Assets and were assigned to Sylabs (*see* Exh. 48, p. 3, Section 1(e)):

> "Business Assets" means all business and marketing plans, worldwide marketing rights, software, customer and supplier lists, price lists, mailing lists, customer and supplier records and other confidential or proprietary information relating to the Technology, as well as all computers, office equipment and other tangible personal property owned (i.e., not leased) by Assignor immediately prior to the execution and delivery of this Agreement and used in or related to the Business."

(b) Section 2(a)—which is an assignment of all then existing and **future** Business Assets to Sylabs, which necessarily includes Defendant Kurtzer's right, title, and interest in all future business assets such as Sylabs' Corporate Assets (*see* Exh. 48, p. 3, Sections 1(f) & 2(a)):

> "The Assignor hereby sells, transfers, assigns and conveys, to the Company, and its successors and assigns, the Assignor's entire right, title and interest in and to the Assigned Assets and all rights of action, power and benefit belonging to or accruing from the Assigned Assets including the right to undertake proceedings to recover past and future damages and claim all other relief in respect of any acts of infringement thereof whether such acts shall have been committed before or after the date of this assignment, the same to be held and enjoyed by said Company, for its own use and benefit and the use and

benefit of its successors, legal representatives and assigns, as fully and entirely as the same would have been held and enjoyed by the Assignor, had this assignment not been made."

(c) examples of evidence of violations of Sections 1(e) and 2(a) in order to finalize the theft and misappropriation of Sylabs' Corporate Assets are: Exh. 38, Decl. of Tarbell, Exhs. 3-4 (deleting and trashing Assigned Assets); Exh. 38, Decl. of Tarbell, ¶¶ 104-106, 107-109, 110-121, Exhs. 44, 45 (downloading and transferring Assigned Assets, deleting Assigned Assets); Exh. 38, Decl. of Tarbell, ¶¶ 119-120, Exhs. 44-45 (receiving Assigned Assets, unauthorized access to Sylabs' Server); Exh. 38, Decl. of Tarbell, ¶¶ 32, 50-54, Exhs. 2, 25, 28, 29, 44, and 45 (granting and permitting access of Assigned Assets to unauthorized users); Exh. 38, Decl. of Tarbell, ¶ 50, Exhs. 36, 44, 45 (granting and permitting access of Assigned Assets to unauthorized users); Exh. 38, Decl. of Tarbell, ¶ 50, Exhs. 26, 44, 45 (granting and permitting access of Assigned Assets to unauthorized users); Exh. 38, Decl. of Tarbell, ¶ 51.a-t, Exhs. 3-5, 44-45 (deleting and releasing Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 52.a-k, Exhs. 15-23, 44-45 (releasing, removing, and deleting Assigned Assets, and unlawfully changing sharing permissions to permit unauthorized users to access Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 54, Exhs. 24, 44-45 (downloading, transferring, and releasing, Assigned Assets to unauthorized users); Exh. 38, Decl. of Tarbell, ¶ 89, Exhs. 36, 44-45 (releasing, changing permissions to allow unauthorized users access to Assigned Assets); Exh. 38: Decl. of Tarbell, ¶ 30, Exhs. 2-25, 28-29, 44-45 (deleting, transferring, releasing, and sharing Assigned Assets with unauthorized users); Exh. 38, Decl. of Tarbell, ¶ 32, Exhs. 2-25, 28-29, 44-45 (deleting Assigned Assets, transferring, and downloading Assigned Assets, and changing permissions to allow unauthorized users to access Assigned Assets); Exh. 38, Decl. of Tarbell, ¶¶ 8-9, 22, 50-54, 56, 77, 87, Exhs. 2-36, 57, 68-73, 44 (downloading and releasing Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 131, Exhs. 44-45 (releasing Assigned Assets, changing permissions to allow unauthorized users to access, view, download, and use Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 8-9, 22, 50-54, 77, 87, Exhs. 2-36, 57, 68-73, Exhs. 44-45 (releasing, downloading, and editing Assigned Assets, and changing

LEPISCOPO & ASSOCIATES LAW FIRM

permissions to allow unauthorized users to access, view, and download Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 50, Exhs. 44-45 (releasing, downloading, editing, and renaming Assigned Assets, deleting Assigned Assets, and changing permissions to allow unauthorized users to access Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 51.a-t, Exhs. 3-5, 44-45 (deleting and releasing Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 52.a-k, Exhs. 15-23, 44-45 (releasing, removing, and deleting Assigned Assets, and unlawfully changing sharing permissions to permit unauthorized users to access Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 53, Exhs. 44-45, 69 (releasing, removing, and deleting Assigned Assets, and unlawfully changing sharing permissions to permit unauthorized users to access Assigned Assets); Exh. 38, Decl. of Tarbell, ¶ 32, Exhs. 2-25, 28-29, 44-45 (deleting Assigned Assets, transferring, and downloading Assigned Assets, and changing permissions to allow unauthorized users to access Assigned Assets).

708.   As alleged in greater detail in Sections II and V-VIII, above, Defendant Kurtzer's breach of the Kurtzer Agreement, as herein alleged, were the substantial factor and the direct and proximate cause of the harm and damage sustained by Sylabs in an amount to be proven at trial that greatly exceeds $75,000.

709.   Pursuant to California Civil Code Section 3294, Sylabs requests  an award of exemplary damages against defendants Kurtzer according to proof at trial.

**COUNT XIV**

**BREACH OF WRITTEN CONTRACT**

**(Against Defendant Matthew Hayden)**

710.   The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

711.   On or about August 8, 2018, Sylabs and Defendant Matthew Hayden entered into an IP Assignment/NDA Agreement ("Hayden Agreement"). *See* Exh. 49 hereto.

712.   As alleged in greater detail in Sections II and V-VIII, above, Sylabs performed all, or substantially all, of the significant and material things that it was required to perform under the terms and conditions of the Hayden Agreement.

LEPISCOPO & ASSOCIATES LAW FIRM

713.   As alleged in greater detail in Sections II and V-VIII, above, in or about the timeframe March through June of 2020, Defendant Hayden failed to perform the significant and material terms and conditions of the Hayden Agreement, and, in fact, willfully and intentionally breached the terms of said agreement by intentionally committing cyber theft and misappropriation of Sylabs' Corporate Assets.

714.   In particular, and as alleged in greater detail in Sections II and V-VIII, Defendant Hayden breached the following provisions of the Hayden Agreement:

(a)   Section 1—Definition of Confidential Information that includes Sylabs' Corporate Assets (*see* Exh. 49, p. 1, Section 1):

"Confidential Information. 'Confidential Information' describes any non-public information that relates to the **actual or anticipated business, research or business development planning or activities of Company** and any proprietary information, technical data, formulae, trade secrets, and know-how of Company, whether disclosed directly or indirectly, in writing, orally, or by inspection or observation. "Confidential Information" includes, but is not be limited to technical information, **budgets, notebooks, client and customer lists, contact lists, business plans, pricing, inventory lists, lists of suppliers**, design and manufacturing techniques, business data, computer programs, the buying habits, practices, customs or traditions of any customers, **marketing methods and related data**, credit information, costs of materials and the prices for selling products and services, and **all other information of a technical or commercial nature relating to the business and affairs of Company** that has not been made available to the general public."

(b)   Sections 2.a & 2.b—regarding disclosure of Sylabs' Corporate Assets and asserting that Sylabs' Corporate Assets are the property of Sylabs (*see* Exh. 49, p. 2, Sections 2.a & 2.b):

"a. Disclosure. Employee agrees at all times during the period of employment, and at all times thereafter, to hold Confidential Information in strictest confidence and not use it for any purpose except for the benefit of Company to fulfill Employee's employment obligations. Employee will not disclose Confidential Information to any third party without written authorization of an officer of Company.

LEPISCOPO & ASSOCIATES LAW FIRM

b. <u>Confidential Information Is Property of Company</u>. Employee acknowledges that all Confidential Information is and shall remain Company's sole property. Employee will take all reasonable precautions to prevent any unauthorized disclosure of Confidential Information. In the event of termination of employment with Company, Employee shall promptly deliver all Confidential Information in Employee's possession or control to Company and shall retain no archival copies."

(c) Sections 4.a & 4.b—regarding prohibition on using Sylabs' Corporate Assets to compete against Sylabs or soliciting Sylabs' customers (*see* Exh. 49, p. 3, Sections 4.a & 4.b):

"a. <u>Non-Competition</u>. Employee shall not during Employee's employment directly or indirectly render any services of a business, commercial or professional nature to any other person or organization, whether for compensation or otherwise, which person or organization competes with Company, or which would prevent Employee from rendering the agreed services to Company to the fullest extent possible during Employee's employment.

b. <u>Non-Solicitation of Customers</u>. Employee agrees that Employee shall not directly or indirectly solicit any customers of Company at any time after termination of Employee's employment with Company using Confidential Information. This requirement shall be enforceable as long as permitted by law."

(d) examples of evidence of violations of Sections 1, 2.a, 2.b, 4.a, and 4.b in order to finalize the theft and misappropriation of Sylabs' Corporate Assets: Exh. 38: Decl. of Tarbell ¶ 30 (Hayden was insider threat);Exh. 56 (preparing customer and/or client lists for disclosure to unauthorized persons not for Sylabs' benefit); Exh. 38, Decl. of Tarbell, ¶ 58-60, Exhs. 44-45, 68 (accessing, editing, and deleting Confidential Information not for Sylabs' benefit); Exh. 38, Decl. of Tarbell, ¶ 61-65, Exhs. 44-45, 68-69 (accessing, viewing, downloading, and editing Confidential Information **post**-termination not for Sylabs' benefit); Exh. 38, Decl. of Tarbell, ¶ 66-67, Exhs. 44-45, 68 (accessing Sylabs' Server post-termination and deleting Confidential Information not for Sylabs' benefit); Exh. 38, Decl.

of Tarbell, ¶ 8-9, 22, 50-54, 56, 77, 87, Exhs. 2-36, 57, 68-73, 44-45 (accessing Sylabs' Server post-termination and accessing, viewing, and deleting Confidential Information not for Sylabs' benefit); Exh. 38, Decl. of Tarbell, ¶ 60, Exhs. 44-45 (accessing, viewing, editing, and downloading Confidential Information, and changing permissions for access not for Sylabs' benefit); Exh. 38, Decl. of Tarbell, ¶ 60, Exhs. 44-45 (accessing, viewing, and downloading Confidential Information not for Sylabs' benefit); Exh. 38, Decl. of Tarbell, ¶ 31-127, Exhs. 2-36, 44-45, 57 (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information and compete against Sylabs]; Exh. 56 (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information and create CIQ to compete with Sylabs); Exh. 38, Decl. of Tarbell, ¶ 52, Exhs. 16-23, 44-45 (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information and compete against Sylabs); Exh. 38, Decl. of Tarbell, ¶ 58-60, Exhs. 44-45, 68 (accessing, editing, and deleting Confidential Information in further of conspiracy to compete against Sylabs); and Exh. 38, Decl. of Tarbell, ¶ 29-30, 34, Exhs. 44-45 (tendering resignation simultaneously with other employees and Co-Defendants to work for competing company, CIQ).

715.    As alleged in greater detail in Sections II and V-VIII, above, Defendant Hayden's breach of the Hayden Agreement, as herein alleged, was the substantial factor and the direct and proximate cause of the harm and damage sustained by Sylabs in an amount to be proven at trial that greatly exceeds $75,000.

## COUNT XV

### INTENTIONAL MISREPRESENTATION —PROMISE WITHOUT INTENTION TO PERFORM
### (Against Defendant Matthew Hayden)

716.    The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

717.    On or about August 8, 2018, Sylabs and Defendant Matthew Hayden entered into an IP Assignment/NDA Agreement ("Hayden Agreement"). *See* Exh. 49 hereto.

LEPISCOPO & ASSOCIATES LAW FIRM

718.   As alleged in greater detail in Sections II and V-VIII, above, Sylabs performed all, or substantially all, of the significant and material things that it was required to perform under the terms and conditions of the Hayden Agreement.

719.   Defendant Hayden made the promises set forth in the Hayden Agreement without any intention of performing said promises.

720.   Defendant Hayden intended that Sylabs rely on the promises made in the Hayden Agreement for the express purpose of having Sylabs' provide him with access to Sylabs' Corporate Assets.

721.   Sylabs reasonably and detrimentally relied on Defendant Hayden's promises made in the in the Hayden Agreement, and based upon that reliance, provided Defendant Hayden with access to Sylabs' Corporate Assets.

722.   As alleged in greater detail in Sections II and V-VIII, above, in or about the timeframe March through June of 2020, Defendant Hayden failed to perform the significant and material terms and conditions of the Hayden Agreement, and, in fact, willfully and intentionally breached the terms of said agreement by intentionally committing cyber theft and misappropriation of Sylabs' Corporate Assets.

723.   In particular, and as alleged in greater detail in Sections II and V-VIII, Defendant Hayden breached the following provisions of the Hayden Agreement:

(a)   Section 1—Definition of Confidential Information that includes Sylabs' Corporate Assets (*see* Exh. 49, p. 1, Section 1):

"Confidential Information. 'Confidential Information' describes any non-public information that relates to the **actual or anticipated business, research or business development planning or activities of Company** and any proprietary information, technical data, formulae, trade secrets, and know-how of Company, whether disclosed directly or indirectly, in writing, orally, or by inspection or observation. "Confidential Information" includes, but is not be limited to technical information, **budgets, notebooks, client and customer lists, contact lists, business plans, pricing, inventory lists, lists of suppliers**, design and manufacturing techniques, business data, computer programs, the buying habits, practices, customs or traditions of any customers, **marketing methods and related data**, credit

LEPISCOPO & ASSOCIATES LAW FIRM

information, costs of materials and the prices for selling products and services, and **all other information of a technical or commercial nature relating to the business and affairs of Company** that has not been made available to the general public."

(b) Sections 2.a & 2.b—regarding disclosure of Sylabs' Corporate Assets and asserting that Sylabs' Corporate Assets are the property of Sylabs (*see* Exh. 49, p. 2, Sections 2.a & 2.b):

"a. Disclosure. Employee agrees at all times during the period of employment, and at all times thereafter, to hold Confidential Information in strictest confidence and not use it for any purpose except for the benefit of Company to fulfill Employee's employment obligations. Employee will not disclose Confidential Information to any third party without written authorization of an officer of Company.

b. Confidential Information Is Property of Company. Employee acknowledges that all Confidential Information is and shall remain Company's sole property. Employee will take all reasonable precautions to prevent any unauthorized disclosure of Confidential Information. In the event of termination of employment with Company, Employee shall promptly deliver all Confidential Information in Employee's possession or control to Company and shall retain no archival copies."

(c) Sections 4.a & 4.b—regarding prohibition on using Sylabs' Corporate Assets to compete against Sylabs or soliciting Sylabs' customers (*see* Exh. 49, p. 3, Sections 4.a & 4.b):

"a. Non-Competition. Employee shall not during Employee's employment directly or indirectly render any services of a business, commercial or professional nature to any other person or organization, whether for compensation or otherwise, which person or organization competes with Company, or which would prevent Employee from rendering the agreed services to Company to the fullest extent possible during Employee's employment.

b. Non-Solicitation of Customers. Employee agrees that Employee shall not directly or indirectly solicit any customers of Company at any time after termination of Employee's employment with Company

LEPISCOPO & ASSOCIATES LAW FIRM

using Confidential Information. This requirement shall be enforceable as long as permitted by law."

(d)   examples of evidence of violations of Sections 1, 2.a, 2.b, 4.a, and 4.b in order to finalize the theft and misappropriation of Sylabs' Corporate Assets: Exh. 38: Decl. of Tarbell ¶ 30 (Hayden was insider threat);Exh. 56 (preparing customer and/or client lists for disclosure to unauthorized persons not for Sylabs' benefit); Exh. 38, Decl. of Tarbell, ¶ 58-60, Exhs. 44-45, 68 (accessing, editing, and deleting Confidential Information not for Sylabs' benefit); Exh. 38, Decl. of Tarbell, ¶ 61-65, Exhs. 44-45, 68-69 (accessing, viewing, downloading, and editing Confidential Information **post**-termination not for Sylabs' benefit); Exh. 38, Decl. of Tarbell, ¶ 66-67, Exhs. 44-45, 68 (accessing Sylabs' Server post-termination and deleting Confidential Information not for Sylabs' benefit); Exh. 38, Decl. of Tarbell, ¶ 8-9, 22, 50-54, 56, 77, 87, Exhs. 2-36, 57, 68-73, 44-45 (accessing Sylabs' Server post-termination and accessing, viewing, and deleting Confidential Information not for Sylabs' benefit); Exh. 38, Decl. of Tarbell, ¶ 60, Exhs. 44-45 (accessing, viewing, editing, and downloading Confidential Information, and changing permissions for access not for Sylabs' benefit); Exh. 38, Decl. of Tarbell, ¶ 60, Exhs. 44-45 (accessing, viewing, and downloading Confidential Information not for Sylabs' benefit); Exh. 38, Decl. of Tarbell, ¶ 31-127, Exhs. 2-36, 44-45, 57 [conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information and compete against Sylabs]; Exh. 56 (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information and create CIQ to compete with Sylabs); Exh. 38, Decl. of Tarbell, ¶ 52, Exhs. 16-23, 44-45 (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information and compete against Sylabs); Exh. 38, Decl. of Tarbell, ¶ 58-60, Exhs. 44-45, 68 (accessing, editing, and deleting Confidential Information in further of conspiracy to compete against Sylabs); and Exh. 38, Decl. of Tarbell, ¶ 29-30, 34, Exhs. 44-45 (tendering resignation simultaneously with other employees and Co-Defendants to work for competing company, CIQ).

LEPISCOPO & ASSOCIATES LAW FIRM

724. As alleged in greater detail in Sections II and V-VIII, above, Defendant Hayden's breach of the Hayden Agreement, as herein alleged, was the substantial factor and the direct and proximate cause of the harm and damage sustained by Sylabs in an amount to be proven at trial that greatly exceeds $75,000.

725. Pursuant to California Civil Code Section 3294, Sylabs requests  an award of exemplary damages against defendant Hayden according to proof at trial.

**COUNT XVI**

**BREACH OF WRITTEN CONTRACT**

**(Against Defendant Erin Fong)**

726. The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

727. On or about August 6, 2018, Sylabs and Defendant Erin Fong entered into an IP Assignment/NDA Agreement ("Fong Agreement"). *See* Exh. 50 hereto.

728. As alleged in greater detail in Sections II and V-VIII, above, Sylabs performed all, or substantially all, of the significant and material things that it was required to perform under the terms and conditions of the Fong Agreement.

729. As alleged in greater detail in Sections II and V-VIII, above, in or about the timeframe March through June of 2020, Defendant Fong failed to perform the significant and material terms and conditions of the Fong Agreement, and, in fact, willfully and intentionally breached the terms of said agreement by intentionally committing cyber theft and misappropriation of Sylabs' Corporate Assets.

730. In particular, and as alleged in greater detail in Sections II and V-VIII, Defendant Fong breached the following provisions of the Fong Agreement:

(a) Section 1—Definition of Confidential Information that includes Sylabs' Corporate Assets (*see* Exh. 50, p. 1, Section 1):

"Confidential Information. 'Confidential Information' describes any non-public information that relates to the **actual or anticipated business, research or business development planning or activities of Company** and any proprietary information, technical data, formulae, trade secrets, and know-how of Company, whether disclosed directly or indirectly, in writing, orally, or by inspection or

observation. "Confidential Information" includes, but is not be limited to technical information, **budgets, notebooks, client and customer lists, contact lists, business plans, pricing, inventory lists, lists of suppliers**, design and manufacturing techniques, business data, computer programs, the buying habits, practices, customs or traditions of any customers, **marketing methods and related data**, credit information, costs of materials and the prices for selling products and services, and **all other information of a technical or commercial nature relating to the business and affairs of Company** that has not been made available to the general public."

(b)   Sections 2.a & 2.b—regarding non-disclosure of Sylabs' Corporate Assets and asserting that Sylabs' Corporate Assets are the property of Sylabs (*see* Exh. 50, p. 2, Sections 2.a & 2.b):

"a. <u>Disclosure</u>. Employee agrees at all times during the period of employment, and at all times thereafter, to hold Confidential Information in strictest confidence and not use it for any purpose except for the benefit of Company to fulfill Employee's employment obligations. Employee will not disclose Confidential Information to any third party without written authorization of an officer of Company.

b. <u>Confidential Information Is Property of Company</u>. Employee acknowledges that all Confidential Information is and shall remain Company's sole property. Employee will take all reasonable precautions to prevent any unauthorized disclosure of Confidential Information. In the event of termination of employment with Company, Employee shall promptly deliver all Confidential Information in Employee's possession or control to Company and shall retain no archival copies."

(c)   Sections 4.a & 4.b—regarding prohibition on using Sylabs' Corporate Assets to compete against Sylabs or soliciting Sylabs' customers (*see* Exh. 50, p. 3, Sections 4.a & 4.b):

"a. <u>Non-Competition</u>. Employee shall not during Employee's employment directly or indirectly render any services of a business, commercial or professional nature to any other person or organization, whether for compensation or otherwise, which person or organization competes with Company, or which would prevent Employee from

rendering the agreed services to Company to the fullest extent possible during Employee's employment.

b. <u>Non-Solicitation of Customers</u>. Employee agrees that Employee shall not directly or indirectly solicit any customers of Company at any time after termination of Employee's employment with Company using Confidential Information. This requirement shall be enforceable as long as permitted by law."

(d)   examples of evidence of violations of Sections 1, 2.a, 2.b, 4.a, and 4.b in order to finalize the theft and misappropriation of Sylabs' Corporate Assets: Exh. 38: Decl. of Tarbell ¶ 30 (Erin Fong was insider threat); Exh. 56, p. 1 (preparing customer and/or client lists for disclosure to unauthorized persons not for Sylabs' benefit); Exh. 38, Decl. of Tarbell, ¶ 51.h, Exh. 9 p. 1-2, Exhs. 44-45 (conspiring with Co-Defendants and unauthorized persons during his employment to pilfer Sylabs' Confidential Information, including Sylabs' customers and prospective customers, and create CIQ to compete with Sylabs); Exh 38: Decl. of Tarbell ¶¶ 71-73; Exhs. 44, 45, and 70 (changing password permissions to permit Co-Defendants and other unauthorized users to access or use Confidential Information not for the benefit of Sylabs); Exh 38: Decl. of Tarbell ¶ 74; Exhs. 44, 45, and 70 (unlawfully accessing Sylabs' Server post-resignation and creating folder and documents); Exh. 38: Decl. of Tarbell ¶¶ 8, 9, 22, 50-54, 56, 77, and 87; Exhs. 2-36, 57, 68-73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing Sylabs' Server without authorization post-resignation and viewing, deleting, and downloading Sylabs' Confidential Information); Exh. 38: Decl. of Tarbell ¶ 72; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing, viewing, downloading, editing, changing file permissions not for benefit of Sylabs in furtherance of conspiracy to pilfer Sylabs' Confidential Information); Decl. of Tarbell ¶ 73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing, viewing, downloading, and editing Confidential Information not for benefit of Sylabs in furtherance of conspiracy to pilfer Sylabs' Confidential Information); Exh. 38: Decl. of Tarbell ¶ 74; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing Sylabs' Server post-resignation and without authorization not for the benefit of Sylabs).

LEPISCOPO & ASSOCIATES LAW FIRM

731.   As alleged in greater detail in Sections II and V-VIII, above, Defendant Fong's breach of the Fong Agreement, as herein alleged, was the substantial factor and the direct and proximate cause of the harm and damage sustained by Sylabs in an amount to be proven at trial that greatly exceeds $75,000.

**COUNT XVII**

**INTENTIONAL MISREPRESENTATION —PROMISE WITHOUT INTENTION TO PERFORM**

**(Against Defendant Erin Fong)**

732.   The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

733.   On or about August 6, 2018, Sylabs and Defendant Erin Fong entered into an IP Assignment/NDA Agreement ("Fong Agreement"). *See* Exh. 50 hereto.

734.   As alleged in greater detail in Sections II and V-VIII, above, Sylabs performed all, or substantially all, of the significant and material things that it was required to perform under the terms and conditions of the Fong Agreement.

735.   Defendant Fong made the promises set forth in the Fong Agreement without any intention of performing said promises.

736.   Defendant Fong intended that Sylabs rely on the promises made in the Fong Agreement for the express purpose of having Sylabs' provide her with access to Sylabs' Corporate Assets.

737.   Sylabs reasonably and detrimentally relied on Defendant Fong's promises made in the in the Fong Agreement, and based upon that reliance, provided Defendant Fong with access to Sylabs' Corporate Assets.

738.   As alleged in greater detail in Sections II and V-VIII, above, in or about the timeframe March through June of 2020, Defendant Fong failed to perform the significant and material terms and conditions of the Fong Agreement, and, in fact, willfully and intentionally breached the terms of said agreement by intentionally committing cyber theft and misappropriation of Sylabs' Corporate Assets.

739.   In particular, and as alleged in greater detail in Sections II and V-VIII, Defendant Fong breached the following provisions of the Fong Agreement:

(a) Section 1—Definition of Confidential Information that includes Sylabs' Corporate Assets (*see* Exh. 50, p. 1, Section 1):

"Confidential Information. 'Confidential Information' describes any non-public information that relates to the **actual or anticipated business, research or business development planning or activities of Company** and any proprietary information, technical data, formulae, trade secrets, and know-how of Company, whether disclosed directly or indirectly, in writing, orally, or by inspection or observation. "Confidential Information" includes, but is not be limited to technical information, **budgets, notebooks, client and customer lists, contact lists, business plans, pricing, inventory lists, lists of suppliers**, design and manufacturing techniques, business data, computer programs, the buying habits, practices, customs or traditions of any customers, **marketing methods and related data**, credit information, costs of materials and the prices for selling products and services, and **all other information of a technical or commercial nature relating to the business and affairs of Company** that has not been made available to the general public."

(b) Sections 2.a & 2.b—regarding non-disclosure of Sylabs' Corporate Assets and asserted that Sylabs' Corporate Assets are the property of Sylabs (*see* Exh. 50, p. 2, Sections 2.a & 2.b):

"a. Disclosure. Employee agrees at all times during the period of employment, and at all times thereafter, to hold Confidential Information in strictest confidence and not use it for any purpose except for the benefit of Company to fulfill Employee's employment obligations. Employee will not disclose Confidential Information to any third party without written authorization of an officer of Company.

b. Confidential Information Is Property of Company. Employee acknowledges that all Confidential Information is and shall remain Company's sole property. Employee will take all reasonable precautions to prevent any unauthorized disclosure of Confidential Information. In the event of termination of employment with Company, Employee shall promptly deliver all Confidential Information in Employee's possession or control to Company and shall retain no archival copies."

---

LEPISCOPO & ASSOCIATES LAW FIRM

(c)  Sections 4.a & 4.b—regarding prohibition on using Sylabs' Corporate Assets to compete against Sylabs or soliciting Sylabs' customers (*see* Exh. 50, p. 3, Sections 4.a & 4.b):

"a.  <u>Non-Competition</u>.  Employee shall not during Employee's employment directly or indirectly render any services of a business, commercial or professional nature to any other person or organization, whether for compensation or otherwise, which person or organization competes with Company, or which would prevent Employee from rendering the agreed services to Company to the fullest extent possible during Employee's employment.

b.  <u>Non-Solicitation of Customers</u>.  Employee agrees that Employee shall not directly or indirectly solicit any customers of Company at any time after termination of Employee's employment with Company using Confidential Information. This requirement shall be enforceable as long as permitted by law."

(d)  examples of evidence of violations of Sections 1, 2.a, 2.b, 4.a, and 4.b in order to finalize the theft and misappropriation of Sylabs' Corporate Assets: Exh. 38: Decl. of Tarbell ¶ 30 (Erin Fong was insider threat); Exh. 56, p. 1 (preparing customer and/or client lists for disclosure to unauthorized persons not for Sylabs' benefit); Exh. 38, Decl. of Tarbell, ¶ 51.h, Exh. 9 p. 1-2, Exhs. 44-45 (conspiring with Co-Defendants and unauthorized persons during his employment to pilfer Sylabs' Confidential Information, including Sylabs' customers and prospective customers, and create CIQ to compete with Sylabs); Exh 38: Decl. of Tarbell ¶¶ 71-73; Exhs. 44, 45, and 70 (changing password permissions to permit Co-Defendants and other unauthorized users to access or use Confidential Information not for the benefit of Sylabs); Exh 38: Decl. of Tarbell ¶ 74; Exhs. 44, 45, and 70 (unlawfully accessing Sylabs' Server post-resignation and creating folder and documents); Exh. 38: Decl. of Tarbell ¶¶ 8, 9, 22, 50-54, 56, 77, and 87; Exhs. 2-36, 57, 68-73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing Sylabs' Server without authorization post-resignation and viewing, deleting, and downloading Sylabs' Confidential Information); Exh. 38: Decl. of Tarbell ¶ 72; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing, viewing, downloading, editing, changing file permissions

LEPISCOPO & ASSOCIATES LAW FIRM

not for benefit of Sylabs in furtherance of conspiracy to pilfer Sylabs' Confidential Information); Decl. of Tarbell ¶ 73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing, viewing, downloading, and editing Confidential Information not for benefit of Sylabs in furtherance of conspiracy to pilfer Sylabs' Confidential Information); Exh. 38: Decl. of Tarbell ¶ 74; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing Sylabs' Server post-resignation and without authorization not for the benefit of Sylabs).

740.    As alleged in greater detail in Sections II and V-VIII, above, Defendant Fong's breach of the Fong Agreement, as herein alleged, was the substantial factor and the direct and proximate cause of the harm and damage sustained by Sylabs in an amount to be proven at trial that greatly exceeds $75,000.

741.    Pursuant to California Civil Code Section 3294, Sylabs requests  an award of exemplary damages against defendant Fong according to proof at trial.

**COUNT XVIII**

**BREACH OF WRITTEN CONTRACT**

**(Against Defendant Robert Adolph)**

742.    The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

743.    On or about September 23, 2019, Sylabs and Defendant Robert Adolph entered into an IP Assignment/NDA Agreement ("Adolph Agreement"). *See* Exh. 51 hereto.

744.    As alleged in greater detail in Sections II and V-VIII, above, Sylabs performed all, or substantially all, of the significant and material things that it was required to perform under the terms and conditions of the Adolph Agreement.

745.    As alleged in greater detail in Sections II and V-VIII, above, in or about the timeframe March through June of 2020, Defendant Adolph failed to perform the significant and material terms and conditions of the Adolph Agreement, and, in fact, willfully and intentionally breached the terms of said agreement by intentionally committing cyber theft and misappropriation of Sylabs' Corporate Assets.

LEPISCOPO & ASSOCIATES LAW FIRM

746. In particular, and as alleged in greater detail in Sections II and V-VIII, Defendant Adolph breached the following provisions of the Adolph Agreement:

(a) Section 1—Definition of Confidential Information that includes Sylabs' Corporate Assets (*see* Exh. 51, p. 1, Section 1):

"Confidential Information" means information and physical material not generally known or available outside Discloser and information and physical material entrusted to Discloser in confidence by third parties. Confidential Information includes, without limitation: technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Discloser (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers, price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed by Discloser (whether by oral, written, graphic or machine-readable format), which Confidential Information is designated in writing to be confidential or proprietary, or if given orally, is confirmed in writing as having been disclosed as confidential or proprietary within a reasonable time (not to exceed thirty (30) days) after the oral disclosure, or which information would, under the circumstances, appear to a reasonable person to be confidential or proprietary."

(b) Section 2—regarding disclosure of Sylabs' Corporate Assets and asserting that Sylabs' Corporate Assets are the property of Sylabs (*see* Exh. 51, p. 2, Section 2):

"Nondisclosure of Confidential Information. Recipient shall not use any Confidential Information disclosed to it by Discloser for any purpose other than to carry out discussions concerning, and the undertaking of, the Relationship. Recipient shall not disclose or permit disclosure of any Confidential Information of Discloser to third parties or to employees of Recipient, other than directors, officers, employees, consultants and agents of Recipient who are required to have the information in order to carry out the discussions regarding

the Relationship. Recipient shall take reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of Discloser in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized under this Agreement to have any such information. Such measures shall include the degree of care that Recipient utilizes to protect its own Confidential Information of a similar nature. Recipient shall notify Discloser of any misuse, misappropriation or unauthorized disclosure of Confidential Information of Discloser which may come to Recipient's attention."

(c)   examples of evidence of violations of Sections 1 and 2 in order to finalize the theft and misappropriation of Sylabs' Corporate Assets: Exh. 38: Decl. of Tarbell ¶ 30 (Robert Adolph was insider threat); Exh. 65 (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information and compete against Sylabs with CIQ, and promote CIQ); , Exh. 38, Decl. of Tarbell ¶ 41; Exhs. 44, 45, and 57 (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information, including ongoing projects, and compete against Sylabs with CIQ, and promote CIQ); Exh. 38, Decl. of Tarbell ¶ 41; Exh. 59 (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information, including ongoing projects and prospective business, and compete against Sylabs with CIQ, and promote CIQ); Exh. 38, Decl. of Tarbell ¶ 31-127; Exh. 2-36, 57, 44-45 (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information and compete against Sylabs with CIQ and promote CIQ); Exh. 38, Decl. of Tarbell ¶ 32, 50-54; Exh. 2, p. 1, Exhs. 25, 28, and 29; Exhs. 44 and 45: Drive and Mail Audit Logs (using Sylabs' Confidential Information to prepare competitor CIQ budget not for benefit of Sylabs); Decl. of Tarbell ¶ 51.h; Exh. 7, pp. 1-2; Exhs. 44 and 45: Drive and Mail Audit Logs (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information, including Sylabs' customer and prospective customers, and compete against Sylabs with CIQ, and promote CIQ); Decl. of Tarbell ¶ 52; Exhs. 16 through 23; Exhs. 44 and 45: Drive and Mail Audit Logs (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information after resignation and compete against Sylabs with CIQ and

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

promote CIQ); Exh. 38: Decl. of Tarbell ¶ 56; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (downloading, editing, deleting, and changing sharing permissions regarding Confidential Information in furtherance of conspiracy to pilfer Sylabs' Confidential Information and compete against Sylabs with CIQ); Exh. 38, Decl. of Tarbell, ¶ 8-9, 22, 50-54, 56, 77, 87, Exhs. 2-36, 57, 68-73, 44-45 (tendering resignation simultaneously with other employees and Co-Defendants to work for competing company, CIQ).

747.    As alleged in greater detail in Sections II and V-VIII, above, Defendant Adolph's breach of the Adolph Agreement, as herein alleged, was the substantial factor and the direct and proximate cause of the harm and damage sustained by Sylabs in an amount to be proven at trial that greatly exceeds $75,000.

## COUNT XIX

### INTENTIONAL MISREPRESENTATION —PROMISE WITHOUT INTENTION TO PERFORM (Against Defendant Robert Adolph)

748.    The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

749.    On or about September 23, 2019, Sylabs and Defendant Robert Adolph entered into an IP Assignment/NDA Agreement ("Adolph Agreement"). *See* Exh. 51 hereto.

750.    As alleged in greater detail in Sections II and V-VIII, above, Sylabs performed all, or substantially all, of the significant and material things that it was required to perform under the terms and conditions of the Adolph Agreement.

751.    Defendant Adolph made the promises set forth in the Adolph Agreement without any intention of performing said promises.

752.    Defendant Adolph  intended that Sylabs rely on the promises made in the Adolph Agreement for the express purpose of having Sylabs' provide him with access to Sylabs' Corporate Assets.

753.    As alleged in greater detail in Sections II and V-VIII, above, in or about the timeframe March through June of 2020, Defendant Adolph failed to perform the significant and material terms and conditions of the Adolph Agreement, and, in fact, willfully and

intentionally breached the terms of said agreement by intentionally committing cyber theft and misappropriation of Sylabs' Corporate Assets.

754. In particular, and as alleged in greater detail in Sections II and V-VIII, Defendant Adolph breached the following provisions of the Adolph Agreement:

(a) Section 1—Definition of Confidential Information that includes Sylabs' Corporate Assets (*see* Exh. 51, p. 1, Section 1):

> "Confidential Information" means information and physical material not generally known or available outside Discloser and information and physical material entrusted to Discloser in confidence by third parties. Confidential Information includes, without limitation: technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Discloser (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers, price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed by Discloser (whether by oral, written, graphic or machine-readable format), which Confidential Information is designated in writing to be confidential or proprietary, or if given orally, is confirmed in writing as having been disclosed as confidential or proprietary within a reasonable time (not to exceed thirty (30) days) after the oral disclosure, or which information would, under the circumstances, appear to a reasonable person to be confidential or proprietary."

(b) Section 2—regarding disclosure of Sylabs' Corporate Assets and asserting that Sylabs' Corporate Assets are the property of Sylabs (*see* Exh. 51, p. 2, Section 2):

> "Nondisclosure of Confidential Information. Recipient shall not use any Confidential Information disclosed to it by Discloser for any purpose other than to carry out discussions concerning, and the undertaking of, the Relationship. Recipient shall not disclose or permit disclosure of any Confidential Information of Discloser to third

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

parties or to employees of Recipient, other than directors, officers, employees, consultants and agents of Recipient who are required to have the information in order to carry out the discussions regarding the Relationship. Recipient shall take reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of Discloser in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized under this Agreement to have any such information. Such measures shall include the degree of care that Recipient utilizes to protect its own Confidential Information of a similar nature. Recipient shall notify Discloser of any misuse, misappropriation or unauthorized disclosure of Confidential Information of Discloser which may come to Recipient's attention."

(c)   examples of evidence of violations of Sections 1 and 2 in order to finalize the theft and misappropriation of Sylabs' Corporate Assets:  Exh. 38: Decl. of Tarbell ¶ 30 (Robert Adolph was insider threat); Exh. 65 (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information and compete against Sylabs with CIQ, and promote CIQ); , Exh. 38, Decl. of Tarbell ¶ 41; Exhs. 44, 45, and 57 (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information, including ongoing projects, and compete against Sylabs with CIQ, and promote CIQ); Exh. 38, Decl. of Tarbell ¶ 41; Exh. 59 (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information, including ongoing projects and prospective business, and compete against Sylabs with CIQ, and promote CIQ); Exh. 38, Decl. of Tarbell ¶ 31-127; Exh. 2-36, 57, 44-45 (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information and compete against Sylabs with CIQ and promote CIQ); Exh. 38, Decl. of Tarbell ¶ 32, 50-54; Exh. 2, p. 1, Exhs. 25, 28, and 29; Exhs. 44 and 45: Drive and Mail Audit Logs (using Sylabs' Confidential Information to prepare competitor CIQ budget not for benefit of Sylabs); Decl. of Tarbell ¶ 51.h; Exh. 7, pp. 1-2; Exhs. 44 and 45: Drive and Mail Audit Logs (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information, including Sylabs' customer and prospective customers, and compete against Sylabs with CIQ, and promote CIQ); Decl. of Tarbell ¶ 52; Exhs. 16 through 23; Exhs. 44 and 45: Drive and Mail

LEPISCOPO & ASSOCIATES LAW FIRM

Audit Logs (conspiring with Co-Defendants during his employment to pilfer Sylabs' Confidential Information after resignation and compete against Sylabs with CIQ and promote CIQ); Exh. 38: Decl. of Tarbell ¶ 56; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (downloading, editing, deleting, and changing sharing permissions regarding Confidential Information in furtherance of conspiracy to pilfer Sylabs' Confidential Information and compete against Sylabs with CIQ); Exh. 38, Decl. of Tarbell, ¶ 8-9, 22, 50-54, 56, 77, 87, Exhs. 2-36, 57, 68-73, 44-45 (tendering resignation simultaneously with other employees and Co-Defendants to work for competing company, CIQ).

755.    As alleged in greater detail in Sections II and V-VIII, above, Defendant Adolph's breach of the Adolph Agreement, as herein alleged, was the substantial factor and the direct and proximate cause of the harm and damage sustained by Sylabs in an amount to be proven at trial that greatly exceeds $75,000.

756.    Pursuant to California Civil Code Section 3294, Sylabs requests  an award of exemplary damages against Defendant Adolph according to proof at trial.

**COUNT XX**

**BREACH OF WRITTEN CONTRACT**

**(Against Defendants David Buss, Marlin Prager, and Open Drives, Inc.)**

757.    The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

758.    On or about November 1, 2019, Sylabs and Defendants David Buss, Marlin Prager, and Open Drives, Inc. (collectively "Open Drive Defendants") entered into an IP Assignment/NDA Agreement ("Open Drive Defendants Agreement"). *See* Exh. 52 hereto.

759.    As alleged in greater detail in Sections II and V-VIII, above, Sylabs performed all, or substantially all, of the significant and material things that it was required to perform under the terms and conditions of the Open Drive Defendants Agreement.

760.    As alleged in greater detail in Sections II and V-VIII, above, in or about the timeframe March through June of 2020, Open Drive Defendants failed to perform the significant and material terms and conditions of the Open Drive Defendants Agreement,

and, in fact, willfully and intentionally breached the terms of said agreement by intentionally committing cyber theft and misappropriation of Sylabs' Corporate Assets.

761.   In particular, and as alleged in greater detail in Sections II and V-VIII, Open Drive Defendants breached the following provisions of the Open Drive Defendants Agreement:

(a)   Section 1—Definition of Confidential Information that includes Sylabs' Corporate Assets (*see* Exh. 52, p. 1, Section 1):

"Confidential Information shall include, without limitation, any of Disclosers nonpublic information disclosed either directly or indirectly, in writing, electronically, orally, or by inspection of tangible objects, proprietary or confidential information of third parties, documents, data, prototypes, ideas, inventions, processes, know-how, plans, schematics, all other Discloser technical information, and financial information."

(b)   Section 3—regarding disclosure of Sylabs' Corporate Assets (*see* Exh. 52, p. 1, Section 3):

"Permission; Obligations. Recipient and any of its Affiliates shall: . . .(b) not disclose any Confidential Information to any third party, without Discloser's prior written consent; (c) use Confidential Information only for the Purpose; (d) not reproduce Confidential Information in any form except for the Purpose; . . . (f) not use the Confidential Information to make, have made or sell any products or services that compete with any of Discloser's products or services; . . ."

(c)   examples of evidence of violations of Sections 1 and 3 in order to finalize the theft and misappropriation of Sylabs' Corporate Assets: Exh. 38: Decl. of Tarbell ¶ 30 (David Buss and Marlin Prager were insider and external threats); Exh. 56 (preparation of CIQ's budget from Sylabs' planning and financial information); CIQ's budget (Exh. 58) and Decl. of Tarbell ¶ 41; Exhs. 44, 45, and 57 (additional CIQ budget preparation from Sylabs' customer and financial information); Decl. of Tarbell ¶ 41; Exh. 58 (issues relating to theft of Sylabs' SBIR projects); CIQ's budget (Exh. 58) and Decl. of Tarbell ¶ 41; Exhs. 44, 45, and 57 (further conspiring regarding transferring Sylabs' SBIR award and future

LEPISCOPO & ASSOCIATES LAW FIRM

LEPISCOPO & ASSOCIATES LAW FIRM

SBIR projects, Phases 1-3 to defendant CIQ); Decl. of Tarbell ¶ 41; Exh. 59 (additional conspiring regarding Sylabs' SBIR projects); Exh. 56, p. 1; Exh. 38: Decl. of Tarbell ¶ 41; Exhs. 44 and 45: Drive and Mail Audit Logs (more steps in furtherance of conspiracy to steal Sylabs' SBIR projects); Exh. 62 (acts in furtherance of conspiracy were ongoing from March 8, 2020, through March 30, 2020, regarding Sylabs' SBIR and other issues relating to Sylabs' ongoing business and defendant CIQ's pre-start up business); Exh. 38: Decl. of Tarbell ¶¶ 31-127; Exhs. 2-36 and 57; Exhs. 44 and 45: Drive and Mail Audit Logs (more activities to damage Sylabs); Exh 38: Decl. of Tarbell ¶¶ 98-99; Exhs. 57, 62, 44, and 45 (March 19, 2020, activity regarding conspiracy to damage Sylabs); Exh 38: Decl. of Tarbell ¶¶ 100-101; Exhs. 57-59, 62, 44, and 45 (between March 27, 2020, and March 30, 2020, planning and conspiring regarding damage to Sylabs); Exh 38: Decl. of Tarbell ¶ 31; *see also* Exhs. 36, 57, 44, and 45 (40 protected documents shared and reviewed in furtherance of the conspiracy); Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs (post departure, between April 2, 2020, and April 15, 2020, additional unlawful actions to damage Sylabs); Decl. of Tarbell ¶¶ 8, 9, 22, 50-54, 56, 77, and 87; Exhs. 2-36, 57, 68-73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing and viewing Sylabs' Confidential Information in furtherance of conspiracy to pilfer Sylabs' Confidential Information and create new competing entity, Defendant CIQ); Exh. 38, Decl. of Tarbell ¶ 93; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log accessing and viewing Sylabs' Confidential Information, including product information, in furtherance of conspiracy to pilfer Sylabs' Confidential Information and create new competing entity, Defendant CIQ; Exh. 38, Decl. of Tarbell ¶ 93; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing and viewing Sylabs' Confidential Information, including product information, in furtherance of conspiracy to pilfer Sylabs' Confidential Information and create new competing entity, Defendant CIQ); (t) FAC, ¶ 324, Exh. 38, Decl. of Tarbell ¶ 95; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing and viewing Sylabs' Confidential Information in furtherance of conspiracy to pilfer Sylabs' Confidential Information and create new competing entity, Defendant CIQ); (u) FAC, ¶

325, Exh. 38, Decl. of Tarbell ¶ 96; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing and viewing Sylabs' Confidential Information, including product information, in furtherance of conspiracy to pilfer Sylabs' Confidential Information and create new competing entity, Defendant CIQ); Exh. 63 (participated in 12/19/19 planning meeting and other meetings).

762.     As alleged in greater detail in Sections II and V-VIII, above, Open Drive Defendants' breach of the Open Drive Defendants Agreement, as herein alleged, was the substantial factor and the direct and proximate cause of the harm and damage sustained by Sylabs in an amount to be proven at trial that greatly exceeds $75,000.

**COUNT XXI**

**INTENTIONAL MISREPRESENTATION —PROMISE WITHOUT INTENTION TO PERFORM**

**(Against Defendant David Buss, Marlin Prager, and Open Drives, Inc.)**

763.     The allegations in Paragraphs 1 to 404 are incorporated herein by reference.

764.     On or about November 1, 2019, Sylabs and Defendants David Buss, Marlin Prager, and Open Drives, Inc. (collectively "Open Drive Defendants") entered into an IP Assignment/NDA Agreement ("Open Drive Defendants Agreement"). *See* Exh. 52 hereto.

765.     As alleged in greater detail in Sections II and V-VIII, above, Sylabs performed all, or substantially all, of the significant and material things that it was required to perform under the terms and conditions of the Open Drive Defendants Agreement.

766.     Open Drive Defendants made the promises set forth in the Open Drive Defendants Agreement without any intention of performing said promises.

767.     Open Drive Defendants  intended that Sylabs rely on the promises made in the Open Drive Defendants Agreement for the express purpose of having Sylabs' provide them with access to Sylabs' Corporate Assets.

768.     Sylabs reasonably and detrimentally relied on Open Drive Defendants' promises made in the in the Open Drive Defendants Agreement, and based upon that reliance, provided Open Drive Defendants with access to Sylabs' Corporate Assets.

LEPISCOPO & ASSOCIATES LAW FIRM

769.   As alleged in greater detail in Sections II and V-VIII, above, in or about the timeframe March through June of 2020, Open Drive Defendants failed to perform the significant and material terms and conditions of the Open Drive Defendants Agreement, and, in fact, willfully and intentionally breached the terms of said agreement by intentionally committing cyber theft and misappropriation of Sylabs' Corporate Assets.

770.   In particular, and as alleged in greater detail in Sections II and V-VIII, Open Drive Defendants breached the following provisions of the Open Drive Defendants Agreement:

(a)   Section 1—Definition of Confidential Information that includes Sylabs' Corporate Assets (*see* Exh. 52, p. 1, Section 1):

"Confidential Information shall include, without limitation, any of Disclosers nonpublic information disclosed either directly or indirectly, in writing, electronically, orally, or by inspection of tangible objects, proprietary or confidential information of third parties, documents, data, prototypes, ideas, inventions, processes, know-how, plans, schematics, all other Discloser technical information, and financial information."

(b)   Section 3—regarding disclosure of Sylabs' Corporate Assets (*see* Exh. 52, p. 1, Section 3):

"Permission; Obligations. Recipient and any of its Affiliates shall: . . .(b) not disclose any Confidential Information to any third party, without Discloser's prior written consent; (c) use Confidential Information only for the Purpose; (d) not reproduce Confidential Information in any form except for the Purpose; . . . (f) not use the Confidential Information to make, have made or sell any products or services that compete with any of Discloser's products or services; . . ."

(c)   examples of evidence of violations of Sections 1 and 3 in order to finalize the theft and misappropriation of Sylabs' Corporate Assets: Exh. 38: Decl. of Tarbell ¶ 30 (David Buss and Marlin Prager were insider and external threats); Exh. 56 (preparation of CIQ's budget from Sylabs' planning and financial information); CIQ's budget (Exh. 58) and Decl. of Tarbell ¶ 41; Exhs. 44, 45, and 57 (additional CIQ budget preparation from

LEPISCOPO & ASSOCIATES LAW FIRM

Sylabs' customer and financial information); Decl. of Tarbell ¶ 41; Exh. 58 (issues relating to theft of Sylabs' SBIR projects); CIQ's budget (Exh. 58) and Decl. of Tarbell ¶ 41; Exhs. 44, 45, and 57 (further conspiring regarding transferring Sylabs' SBIR award and future SBIR projects, Phases 1-3 to defendant CIQ); Decl. of Tarbell ¶ 41; Exh. 59 (additional conspiring regarding Sylabs' SBIR projects); Exh. 56, p. 1; Exh. 38: Decl. of Tarbell ¶ 41; Exhs. 44 and 45: Drive and Mail Audit Logs (more steps in furtherance of conspiracy to steal Sylabs' SBIR projects); Exh. 62 (acts in furtherance of conspiracy were ongoing from March 8, 2020, through March 30, 2020, regarding Sylabs' SBIR and other issues relating to Sylabs' ongoing business and defendant CIQ's pre-start up business); Exh. 38: Decl. of Tarbell ¶¶ 31-127; Exhs. 2-36 and 57; Exhs. 44 and 45: Drive and Mail Audit Logs (more activities to damage Sylabs); Exh 38: Decl. of Tarbell ¶¶ 98-99; Exhs. 57, 62, 44, and 45 (March 19, 2020, activity regarding conspiracy to damage Sylabs); Exh 38: Decl. of Tarbell ¶¶ 100-101; Exhs. 57-59, 62, 44, and 45 (between March 27, 2020, and March 30, 2020, planning and conspiring regarding damage to Sylabs); Exh 38: Decl. of Tarbell ¶ 31; *see also* Exhs. 36, 57, 44, and 45 (40 protected documents shared and reviewed in furtherance of the conspiracy); Exh. 38: Decl. of Tarbell ¶¶ 1-127; Exhs. 1-43; 46-73; Exhs. 44 and 45: Drive and Mail Audit Logs (post departure, between April 2, 2020, and April 15, 2020, additional unlawful actions to damage Sylabs); Decl. of Tarbell ¶¶ 8, 9, 22, 50-54, 56, 77, and 87; Exhs. 2-36, 57, 68-73; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing and viewing Sylabs' Confidential Information in furtherance of conspiracy to pilfer Sylabs' Confidential Information and create new competing entity, Defendant CIQ); Exh. 38, Decl. of Tarbell ¶ 93; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log accessing and viewing Sylabs' Confidential Information, including product information, in furtherance of conspiracy to pilfer Sylabs' Confidential Information and create new competing entity, Defendant CIQ; Exh. 38, Decl. of Tarbell ¶ 93; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing and viewing Sylabs' Confidential Information, including product information, in furtherance of conspiracy to pilfer Sylabs' Confidential Information and create new competing entity, Defendant CIQ); (t) FAC, ¶ 324, Exh. 38,

LEPISCOPO & ASSOCIATES LAW FIRM

Decl. of Tarbell ¶ 95; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing and viewing Sylabs' Confidential Information in furtherance of conspiracy to pilfer Sylabs' Confidential Information and create new competing entity, Defendant CIQ); (u) FAC, ¶ 325, Exh. 38, Decl. of Tarbell ¶ 96; Exh. 44: Drive Audit Log; Exh. 45: Email Audit Log (accessing and viewing Sylabs' Confidential Information, including product information, in furtherance of conspiracy to pilfer Sylabs' Confidential Information and create new competing entity, Defendant CIQ); Exh. 63 (participated in 12/19/19 planning meeting and other meetings);

771.   As alleged in greater detail in Sections II and V-VIII, above, Open Drive Defendants' breach of the Open Drive Defendants Agreement, as herein alleged, were the substantial factor and the direct and proximate cause of the harm and damage sustained by Sylabs in an amount to be proven at trial that greatly exceeds $75,000.

772.   Pursuant to California Civil Code Section 3294, Sylabs requests an award of exemplary damages against defendants David Buss, Marlin Prager, and Open Drives, Inc., jointly and severally, according to proof at trial.

## XI.
## NOTICE OF REQUEST FOR PUNITIVE DAMAGES

773.   Pursuant to California Civil Code Section 3294, Sylabs hereby provides notice that it intends to seek exemplary damages against defendants Greg Kurtzer, Matthew Hayden, Erin Fong, Robert Adolph, David Buss, Marlin Prager, and Open Drives, according to proof at trial.

## XII.
## DEMAND FOR TRIAL BY JURY

774.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Sylabs hereby respectfully demands a jury trial on all issues triable by jury.

## XIII.
## DEMAND FOR RELIEF

Sylabs requests the following relief:

1.    Pursuant to the confidentiality and seizure provisions of DTSA, 18 U.S.C. §§ 1835 and 1836, an order appointing a special master ("Special Master") to receive and review the documents in Defendants' possession due to their cyber theft of Sylabs' Server, Trade Secrets, Corporate Secrets, Privileged Documents, and/or other privileged or Sensitive Documents.

2.    Pursuant to the confidentiality and seizure provisions of DTSA, 18 U.S.C. §§ 1835 and 1836, an order seizing and directing Defendants, and each of them, to forthwith deliver all servers, laptops, smartphones, tablets, and all other electronic devices to the Special Master.

3.    As a result of the Defendants' cyber theft and misappropriation of Sylabs' Trade Secrets, Corporate Secrets, and/or other privileged and protected information, Sylabs requests that the Court issue an order that all right, title, and interest in and to the Stolen Patents be divested from defendant CIQ and fully vested in Sylabs, and that the currently listed inventors in the Stolen Patents be removed and replaced with the names of Sylabs' relevant employees as the sole inventors.

4.    As a result of Defendants' cyber theft and misappropriation of Sylabs' Trade Secrets, Corporate Secrets, and/or other privileged and protected information, Sylabs requests damages against Defendants, jointly and severally, in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

5.    Sylabs further requests an award against the Defendants, jointly and severally, of the reasonable royalty from each of the Stolen Patents to compensate Sylabs for Defendants' cyber theft and misappropriation of Sylabs' Trade Secrets, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

6.    Sylabs further requests disgorgement of profits received by Defendants, jointly and severally, from each of the Stolen Patents to compensate Sylabs for Defendants' cyber theft and misappropriation of Sylabs' Trade Secrets, Corporate Secrets, and/or other

LEPISCOPO & ASSOCIATES LAW FIRM

privileged and protected information in an amount to be proven at trial but in an amount that greatly exceeds $75,000.

7.      Sylabs further requests an award against Defendants, jointly and severally, for disgorgement and receipt of all funds and capital Defendants have raised due to their cyber theft and misappropriation of Sylabs' Trade Secrets, Corporate Secrets, and/or other privileged and protected information in an amount to be proven at trial but in an amount that exceeds $25,000,000.

8.      Sylabs further seeks exemplary damages against Defendants, jointly and severally, in an amount according to proof.

9.      Sylabs further seeks exemplary damages against Defendants, jointly and severally, in an amount up to two times the amount of Sylabs' actual damages according to proof.

10.     Sylabs further requests entry of an injunction prohibiting Defendants, and each of them, from further acquisition, disclosure, use, and possession of the Sylabs' Trade Secrets, Corporate Secrets, and/or other privileged and protected information, which is necessary to provide Sylabs with complete relief.

11.     Sylabs requests the Court to award it damages against defendant Gregory Kurtzer for said defendant's breach of written contract, in an amount to be proven at trial that exceeds $75,000.

12.     Sylabs requests the Court to award it damages against defendant Matthew Hayden for said defendant's breach of written contract, in an amount to be proven at trial that exceeds $75,000.

13.     Sylabs requests the Court to award it damages against defendant Erin Fong for said defendant's breach of written contract, in an amount to be proven at trial that exceeds $75,000.

14.     Sylabs requests the Court to award it damages against defendant Robert Adolph for said defendant's breach of written contract, in an amount to be proven at trial that exceeds $75,000.

15. Sylabs requests the Court to award it damages against defendant David Buss for said defendant's breach of written contract, in an amount to be proven at trial that exceeds $75,000.

16. Sylabs requests the Court to award it damages against defendant Marlin Prager for said defendant's breach of written contract, in an amount to be proven at trial that exceeds $75,000.

17. Sylabs requests the Court to award it damages against defendant Open Drives, Inc. for said defendant's breach of written contract, in an amount to be proven at trial that exceeds $75,000.

18. Pursuant to California Civil Code Section 3294, Sylabs requests the Court to award it damages against defendant Gregory Kurtzer for said defendant's intentional misrepresentation (promise without intention to perform) and impose exemplary damages, all in an amount to be proven at trial that exceeds $75,000.

19. Pursuant to California Civil Code Section 3294, Sylabs requests the Court to award it damages against defendant Matthew Hayden for said defendant's intentional misrepresentation (promise without intention to perform), in an amount to be proven at trial that exceeds $75,000.

20. Pursuant to California Civil Code Section 3294, Sylabs requests the Court to award it damages against defendant Erin Fong for said defendant's intentional misrepresentation (promise without intention to perform), in an amount to be proven at trial that exceeds $75,000.

21. Pursuant to California Civil Code Section 3294, Sylabs requests the Court to award it damages against defendant Robert Adolph for said defendant's intentional misrepresentation (promise without intention to perform), in an amount to be proven at trial that exceeds $75,000.

22. Pursuant to California Civil Code Section 3294, Sylabs requests the Court to award it damages against defendant David Buss for said defendant's intentional

misrepresentation (promise without intention to perform), in an amount to be proven at trial that exceeds $75,000.

23.   Pursuant to California Civil Code Section 3294, Sylabs requests the Court to award it damages against defendant Marlin Prager for said defendant's intentional misrepresentation (promise without intention to perform), in an amount to be proven at trial that exceeds $75,000.

24.   Pursuant to California Civil Code Section 3294, Sylabs requests the Court to award it damages against defendant Open Drives, Inc. for said defendant's intentional misrepresentation (promise without intention to perform), in an amount to be proven at trial that exceeds $75,000.

25.   Pursuant to California Civil Code Section 3294, Sylabs requests  an award of exemplary damages against defendants Gregory Kurtzer, Matthew Hayden, Erin Fong, Robert Adolph, David Buss, Marlin Prager, and/or Open Drives, Inc., according to proof at trial.

26.   Attorneys' fees and costs.

27.   Pre-judgment and/or post-judgment interest on all damages awarded.

28.   Such other and further relief as the Court deems just and proper.

Dated:  January 22, 2024.          **LEPISCOPO & ASSOCIATES LAW FIRM**

By:  /s/ Peter D. Lepiscopo          
        **PETER D. LEPISCOPO**
        *Counsel of Record*
        Attorneys for Plaintiff, **SYLABS, INC.**

LEPISCOPO & ASSOCIATES LAW FIRM

Lepiscopo & Associates Law Firm

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing **First Amended Complaint and Exhibits 1 through 74 attached thereto** with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on January 22, 2024. I further certify that all participants in the case are registered CM/ECF users and that service of the **First Amended Complaint and Exhibits 1 through 74 attached thereto** will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on January 22, 2024, at Newport Beach, California.

LEPISCOPO & ASSOCIATES LAW FIRM

By: /s/ Peter D. Lepiscopo
      **PETER D. LEPISCOPO**
      *Counsel of Record*
      Attorneys for Plaintiff, **SYLABS, INC.**